JUDGE KAPLAN

08 CV 10637

Floyd Abrams
S. Penny Windle
Tammy L. Roy
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
Telephone: 212-701-3000



RECEIVED
DEC 0 8 2008
U.S.D.C. S.D.N.Y.
CASHIERS

*Attorneys for Defendant The McGraw-Hill Companies, Inc.*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
Vasili Tsereteli, individually and on behalf of all
others similarly situated,

Plaintiff,

-against-

Residential Asset Securitization Trust 2006-A8,
Credit Suisse Securities (USA) LLC, Moody's
Investors Service, Inc., and The McGraw-Hill
Companies, Inc.,

Defendants.
-------------------------------------------------------------X

Civil Action No. _____ ___ ___

**<u>NOTICE OF REMOVAL</u>**

Defendant The McGraw-Hill Companies, Inc. ("McGraw-Hill"), by its undersigned attorneys, hereby remove the above-captioned case pending in the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005 ("CAFA"), and the claims may be removed to this Court under 28 U.S.C. § 1453. Alternatively, this Court has jurisdiction pursuant to 28 U.S.C. §§ 157(a), 1334(b) and 1452(a) (bankruptcy removal).

As grounds for removal, McGraw-Hill states as follows:

1.      On November 19, 2008, plaintiff Vasili Tsereteli ("Plaintiff") filed this putative state court class action (the "State Court Action") by filing a complaint entitled *Tsereteli v.*

*Residential Asset Securitization Trust 2006-A8, et al.* (the "Class Action Complaint") in the Supreme Court of the State of New York, County of New York on behalf of purchasers of Senior Mortgage Pass Through Certificates, Series 2006-H issued on or about June 28, 2006 by the Residential Asset Securitization Trust 2006-A8 (the "Senior Certificates"). This case was assigned an index number of 08603380/08.

2.     The Class Action Complaint alleges, among other things, that certain registration statements and prospectuses filed in connection with the Senior Certificates contained misstatements and omissions in violation of Sections 11 and 12 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l.

3.     Pursuant to 28 U.S.C. § 1446(a) and (b), this Notice of Removal is being filed in the United States District Court for the Southern District of New York within thirty days after November 19, 2008, *i.e.,* the date that McGraw-Hill received, through service or otherwise, a copy of the Summons and Complaint.

Class Action Fairness Act of 2005 ("CAFA")

4.     Pursuant to 28 U.S.C. §§ 1332(d)(2) and 1453, a putative "class action" commenced after February 18, 2005 may be removed by any defendant to the appropriate United States District Court if: (a) the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and (b) any member of the putative class is a citizen of a state different from any defendant. 28 U.S.C. § 1332(d)(2)(A).

5.     CAFA is applicable to the State Court Action because the Action was commenced on or about November 19, 2008, *i.e.,* after the effective date of CAFA. 28 U.S.C. §§ 1332, 1453.

6.     The State Court Action is a "class action" within the meaning of CAFA because Plaintiff seeks to represent a class of persons in a "civil action filed under" Article 9 of the New York Civil Practice Law and Rules, *i.e.,* a "State statute or rule of judicial procedure authorizing

an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. §§ 1332(d)(1)(B), 1453(a).

7.      The State Court Action satisfies CAFA's amount in controversy requirement. Under 28 U.S.C. § 1332(d)(6), the amount in controversy in a putative class action is determined by aggregating the amount at issue in the claims of all members of the putative class. Here, the Class Action Complaint alleges that the defendants made false and misleading statements in connection with the issuance of approximately $603,163,942 in mortgage pass-through certificates, and that the value of these certificates has declined substantially due to the defendants' alleged violations. *See* Class Action Complaint ¶¶ 1, 10. While McGraw-Hill denies that Plaintiff or any putative class member is entitled to recover any amount or the other relief sought, these allegations plainly make the aggregate amount in controversy in this State Court Action more than $5,000,000, exclusive of interest and costs. 28 U.S.C. § 1332(d)(2).

8.      The State Court Action satisfies CAFA's diversity of citizenship requirement. To establish diversity jurisdiction under CAFA, it is sufficient that any one member of the putative class is a citizen of a state different from any one defendant. 28 U.S.C. § 1332(d)(2)(A). Plaintiff asserts in the Summons that his principal residence is located in the State of New York. *See* Summons. Defendant Moody's Investors Service, Inc. is a citizen of, *inter alia*, Delaware, and other defendants, on information and belief, are also citizens of, *inter alia*, Delaware.

9.      No exceptions to CAFA's applicability apply in this case.

Alternative Ground for Removal

10.     Alternatively, removal is proper under 28 U.S.C. §§ 157(a), 1334(b), 1452(a) and Bankruptcy Rule 9027. Plaintiff alleges in the Class Action Complaint that non-party IndyMac Bank, F.S.B. underwrote the home mortgage loans underlying the Senior Certificates. Class Action Complaint ¶ 3. Plaintiff alleges that IndyMac Bank F.S.B., which is "the majority owned

subsidiary and principal asset of IndyMac Bancorp, Inc., was seized and closed by the OTS on July 11, 2008." *Id.* ¶ 17. According to the Class Action Complaint, "[t]hat same day, the OTS chartered a new institution, 'IndyMac Federal Bank,' and transferred to it substantially all the assets and certain liabilities of IndyMac Bank and IndyMac Bancorp, Inc." *Id.* According to the Class Action Complaint, "[t]he FDIC was appointed as conservator of the new institution," and "IndyMac Bancorp, Inc. and IndyMac Bank filed for Chapter 7 bankruptcy protection." *Id.* A review of public filings indicates that, on July 31, 2008, IndyMac Bancorp, Inc. filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Bankruptcy Code (Case No. 08-21752) in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Action").

11.     One or more of the defendants may have indemnity, contribution and other claims against IndyMac Bancorp, Inc. and/or IndyMac Bank, F.S.B. Such claims may have a conceivable effect on the bankruptcy estate and, therefore, the State Court Action is "related to" the Bankruptcy Action and removal is proper.

Other Procedural Requirements

12.     In accordance with 28 U.S.C. § 1446(a), attached hereto as Exhibit A are file-stamped copies of all process, pleadings and orders served upon McGraw-Hill in the State Court Action, namely the Summons and Complaint.

13.     McGraw-Hill will promptly serve a copy of the Notice of Removal on Plaintiff's counsel and file with the Clerk of the Supreme Court of the State of New York, County of New York, a Notice of Filing of Notice of Removal pursuant to 28 U.S.C. § 1446(d).

14.     This Notice of Removal is signed pursuant to Fed. R. Civ. P. 11. *See* 28 U.S.C. § 1446(a).

WHEREFORE, this action should proceed in the United States District Court for the Southern District of New York as an action properly removed thereto.

Dated:   December 8, 2008                              Respectfully submitted,

                                        Floyd Abrams
                                        S. Penny Windle
                                        Tammy L. Roy
                                        CAHILL GORDON & REINDEL LLP
                                        80 Pine Street
                                        New York, New York 10005
                                        Telephone:  212-701-3000
                                        Facsimile:  212-269-5420

                                        *Attorneys for Defendant The McGraw-Hill Companies, Inc.*

# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

VASILI TSERETELI, individually and on behalf of
all others similarly situated,                        :
                                                      :                    08603380
                            Plaintiff,                :
                                                      :   Index No.:_____
            v.                                        :
                                                      :   IAS Part
Residential Asset Securitization Trust 2006-A8;       :
Credit Suisse Securities (USA) LLC; Moody's Investors :   **SUMMONS**
Service, Inc.; and The McGraw-Hill Companies, Inc.,   :
                                                      :
                            Defendants.               :
                                                      :

TO THE ABOVE NAMED DEFENDANTS:

        **YOU ARE HEREBY SUMMONED** and required to serve upon plaintiffs' attorneys,
whose address is:

        WOLF POPPER LLP
        845 Third Avenue, 12th Floor
        New York, New York 10022

an answer to the complaint in this action within 20 days after the service of this summons,
exclusive of the day of service, or within 30 days after the service is complete if this summons is
not personally delivered to you within the State of New York. In case of your failure to answer,
judgment will be taken against you by default for the relief demanded in the complaint.

        New York County is designated as the place of trial in that plaintiffs' principal residence
is in New York County and Defendants' principal place of business is within the County of New
York.

FILED

NOV 19 2008

NEW YORK
COUNTY CLERK'S OFFICE

Dated: November 19, 2008
       New York, New York

                               Respectfully submitted,

                               By: _____
                               Marian P. Rosner
                               James A. Harrod
                               Robert S. Plosky
                               **WOLF POPPER LLP**
                               845 Third Avenue
                               New York, New York 10022
                               Telephone: (212) 759-4600
                               Facsimile: (212) 486-2093

                               Counsel for Plaintiff and the Proposed Class

Doc. 162092

**Defendant's List**

Residential Asset Securitization Trust 2006-08
c/o Deutsche Bank AG (Trustee)
60 Wall Street
New York, New York 10005


Credit Suisse Securities (USA) LLS
c/o Corporation Service Company
80 State Street
Albany, New York 12207-2543

Moody's Investors Service, Inc.
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

The McGraw-Hill Companies, Inc.
1221 Avenue of the Americas
New York, New York, 10020

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

08603380

| | |
|---|---|
| VASILI TSERETELI, individually and on behalf of all others similarly situated, | : |
| Plaintiff, | :   **CLASS ACTION** |
| v. | :   **COMPLAINT FOR** |
| Residential Asset Securitization Trust 2006-A8; Credit Suisse Securities (USA) LLC; Moody's Investors Service, Inc.; and The McGraw-Hill Companies, Inc., | :   **VIOLATION OF SECTIONS 11 AND 12 OF THE SECURITIES ACT OF 1933** |
| Defendants. | :   **JURY TRIAL DEMANDED** |

Plaintiff alleges the following based upon the investigation of counsel, Wolf Popper LLP, which included a review of United States Securities and Exchange Commission ("SEC") filings, press releases, news stories, research reports, credit rating materials and legal filings concerning the above-named defendants and other related entities described herein, as well as their own internal investigation. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. The claims asserted herein do not sound in or arise from allegations of fraud.



FILED
NOV 19 2008
NEW YORK
COUNTY CLERK'S OFFICE

## NATURE OF THE ACTION

1.     This is a class action brought by Vasili Tsereteli alleging violations of Sections 11 and 12 of the Securities Act of 1933, 15 U.S.C. § 77a et seq. ("Securities Act"), on behalf of purchasers of $603,163,942 of Senior Mortgage Pass-Through Certificates, Series 2006-H (the "Senior Certificates") issued on or about June 28, 2006 by the Residential Asset Securitization Trust 2006-A8 ("RAST" or the "Trust" or the "Issuing Entity") (the issuance of the Certificates by RAST shall sometimes be referred to as the "Offering").

2.     The Senior Certificates were issued and sold pursuant to a Registration Statement filed with the SEC in a Form S-3 (File No. 333-132042) on February 24, 2006 (amended March 29 and April 13, 2006), and a Prospectus Supplement dated June 28, 2006, which supplemented a Base Prospectus dated June 14, 2006 (the Registration Statement, Base Prospectus and Prospectus Supplement are, unless otherwise indicated, collectively referred to as the "Prospectus," with all citations to the Prospectus Supplement).

3.     The Senior Certificates would receive payments based on payments of interest and principal made by the borrowers of underlying home mortgage loans (the "Mortgage Loans") that were underwritten by IndyMac Bank, F.S.B. ("IndyMac Bank"), a subsidiary of IndyMac Bancorp, Inc. (IndyMac Bancorp, Inc. and IndyMac Bank, F.S.B. shall sometimes be referred to collectively as "IndyMac"). Prior to its collapse and seizure by the Office of Thrift Supervision ("OTS") in July 2008, IndyMac was one of the ten largest mortgage loan underwriters and servicers in the United States.

4.     Prior to the Offering, IndyMac underwrote the Mortgage Loans according to its stated

underwriting guidelines. Then IndyMac "work[ed] with [the] underwriters and [the] rating agencies" in structuring the securitization of the Mortgage Loans, which included selecting the individual Mortgage Loans that would be used as collateral for the Senior Certificates. Prospectus at S-68. Between 2002 and 2005, the approximate annual volume of mortgage loan securitizations sponsored by IndyMac increased roughly 400%, from $6.25 billion to $31.37 billion. *Id.* IndyMac, through a subsidiary, created RAST and the Senior Certificates were underwritten by defendant Credit Suisse Securities (USA) LLC ("Credit Suisse"), who sold them to investors.

5.      Based on the representations in the Prospectus relating to the underwriting of the Mortgage Loans, the rating agencies Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's ("S&P") (collectively, the "Rating Agencies") assigned the Senior Certificates among the highest ratings applicable to such debt issues. It was a condition precedent to the sale of the Senior Certificates that they received the ratings identified in the Prospectus. Nearly all of the Senior Certificates received "triple A" credit ratings from the Rating Agencies.

6.      The Rating Agencies were also active participants in the structuring of the Offering, which, as further described below, was a "collaborative process" that involved "extended consultations" between the Rating Agencies and the Issuing Entity. *See* The New York Times, *"Triple-A Failure,"* April 27, 2008 (the "Times Article").

7.      Following the issuance of the Senior Certificates, disclosures began to emerge revealing that during the time period in which the Mortgage Loans were originated, IndyMac routinely disregarded its underwriting guidelines in an effort to boost its loan production. These disclosures were confirmed by substantially higher rates of delinquencies and foreclosures on

mortgage loans underwritten by IndyMac, including the Mortgage Loans securitized in the Offering. As of October 27, 2008, the Mortgage Loans had a 19.4% rate of delinquency, default or foreclosure.

8.     These disclosures, and the poor performance of the Mortgage Loans, caused the Rating Agencies to recognize that they had not rated the Senior Certificates consistent with the true risks of these instruments at the time of the Offering.  Therefore, the Rating Agencies re-evaluated the Senior Certificates applying "new" and "updated" "methodologies" that properly accounted for IndyMac's actual lax underwriting.  As a result, both Moody's and S&P downgraded the Senior Certificates.

9.     During sworn Congressional testimony provided on October 23, 2008, Sean Egan, the Managing Director of Egan-Jones Ratings, stated that losses on investments such as the Senior Certificates were the product of a securitization process in which "everybody involved . . . had an incentive for . . . letting things go by [and ignoring risks] . . . – from the mortgage broker, the mortgage banker, the investment bank, the issuer or the paid rating firm," because "[t]hey all g[o]t paid if the [securitization] deal[s] happen[ed], and they d[id]n't get paid if the [securitization] deal[s] d[id]n't happen."  Congressional Hearing Unofficial Transcript (LEXIS, printed as of October 23, 2008) ("Hrg. Tr.") at 13.

10.     The above revelations shed light on the true quality and risk of the Mortgage Loans and caused the value of the Senior Certificates to substantially collapse.  Plaintiff purchased his Senior Certificates at par for $1,000 per Certificate at the time of the Offering, but now, at the commencement of the action herein, they are valued at $60.84 per $100 of par value - a 39% decline in value on a once "triple-A" rated bond.

11.     Defendants are liable in connection with the Offering and the issuance of the Prospectus, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 11 and 12(a)(2) of the Securities Act, 15 U.S.C. §§ 77k and 77l(a)(2).

13.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

14.     Venue is proper in this County pursuant to Section 22 of the Securities Act. Many of the acts and transactions alleged herein, including the preparation and dissemination of many of the material misstatements and omissions contained in the Prospectus filed in connection with the Offering, occurred in substantial part in this County. Additionally, the Senior Certificates were actively marketed and sold in this County. In addition, Defendants Credit Suisse and the Rating Agencies maintain offices in this County and all Defendants regularly conduct business in this County.

## PARTIES

15.     Plaintiff, Vasili Tsereteli, purchased $200,000 face value Class 1-A-1 Senior Mortgage Pass-Through Certificates pursuant to the Prospectus; that transaction settled upon the consummation of the Offering on or about June 28, 2006. Plaintiff purchased pursuant to the Prospectus that contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. Plaintiff has suffered damages pursuant to Sections 11 and 12

of the Securities Act.

16.    Defendant Residential Asset Securitization Trust 2006-A8 was the Issuing Entity for the Offering. Per its filings with the SEC, RAST is a common law trust created under the laws of the State of New York. RAST was created by IndyMac MBS, Inc. and issued the Senior Certificates in connection with the Offering. IndyMac MBS, Inc. was a subsidiary of IndyMac Bank, F.S.B.

17.    Non-party IndyMac Bank, F.S.B., the majority owned subsidiary and principal asset of IndyMac Bancorp, Inc., was seized and closed by the OTS on July 11, 2008. The Federal Deposit Insurance Corporation ("FDIC") was appointed receiver of IndyMac Bank. That same day, the OTS chartered a new institution, "IndyMac Federal Bank," and transferred to it substantially all the assets and certain liabilities of IndyMac Bank and IndyMac Bancorp, Inc. The FDIC was appointed as conservator of the new institution. IndyMac Bancorp, Inc. and IndyMac Bank filed for Chapter 7 bankruptcy protection and are now in conservatorship. They are not named as defendants in this Action.

18.    Defendant Credit Suisse Securities (USA) LLC is an investment banking firm principally located at Eleven Madison Avenue, New York, New York 10010. Credit Suisse is one of the leading underwriters of mortgage and asset-backed securities in the United States. Credit Suisse served as the underwriter for the Senior Certificates issued through the Offering and was intimately involved in the Offering. As underwriter, Credit Suisse was responsible for the truth, accuracy and completeness of the Prospectus. The Prospectus disseminated in connection with the Offering contained material misstatements and omissions of material fact relating to the underwriting practices and origination of the underlying Mortgage Loans.

19.    Defendant Moody's Investor Service is a credit rating agency with its principal offices located at 7 World Trade Center at 250 Greenwich Street, New York, New York 10007.  Moody's performs financial research and analysis for commercial and government entities and holds a 40 percent share of the world's credit ratings market.  As a condition to the issuance of the Senior Certificates, Moody's purportedly analyzed the Offering to address the likelihood of the receipt of all distributions (principal and interest) on the Senior Certificates and assigned credit ratings for each tranche of the Offering, which was integral in establishing pricing, interest rates and a market for the Senior Certificates.

20.    Defendant The McGraw-Hill Companies, Inc. maintains a business division doing business as "Standard & Poors' Ratings Services" ("S&P" shall refer to The McGraw-Hill Companies and its business division Standard & Poors' Ratings Services).  Defendant S&P is a credit rating agency with its headquarters located at 55 Water Street, New York, New York 10041.  S&P performs financial research and analysis for commercial and governmental entities and also holds a 40 percent share of the world's credit ratings market.  As a condition to the issuance of the Senior Certificates, S&P purportedly analyzed the Offering to address the likelihood of the receipt of all distributions (principal and interest) on the Senior Certificates and assigned credit ratings for each tranche of the Offering, which was integral in establishing pricing, interest rates and a market for the Senior Certificates.

## CLASS ACTION ALLEGATIONS

21.    Plaintiff brings this action as a class action pursuant to Article 9 of the New York Civil Practice Law and Rules ("CPLR") on behalf of a class consisting of all persons who purchased

or acquired the Senior Certificates (the "Class") pursuant and/or traceable to the Prospectus issued in connection with the Offering. Excluded from the Class are Defendants, their respective officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

22.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is presently unknown to Plaintiff and can only be ascertained through appropriate discovery, Plaintiff reasonably believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Defendants and/or the Trustee (defined below) for the Issuing Entity and may be notified of the pendency of this action by mail, the Internet or publication using the form of notice similar to that customarily used in securities class actions.

23.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of statutory law complained of herein.

24.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained Wolf Popper LLP, counsel competent and experienced in class and securities litigation.

25.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether the provisions of the Securities Act of 1933 were violated by the Defendants as alleged herein;

b.     whether the Prospectus contained materially untrue statements or omitted statements of material fact; and

c.     to what extent the members of the Class have sustained damages pursuant to the statutory measure of damages.

26.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

27.     Currently, the United States is ensnared in a financial crisis arising, in material part, from the greed that drove financial firms to issue billions of dollars of debt securities "collateralized" by mortgages that were recklessly underwritten and originated. The Plaintiff and Class members have been the victims of just such practices, having purchased the Senior Certificates pursuant to a Prospectus that contained material misstatements and omissions.

### The Mortgage Pool

28.     The Prospectus generally described the pool of Alt-A Mortgage Loans collateralizing the Senior Certificates as follows: "The certificates represent interests in a pool consisting of three loan groups of primarily 30-year conventional, fixed rate loans secured by first liens on one- to four-

family residential properties." *See* Prospectus at S-1, S-5.  In addition, the Prospectus stated that the

mortgage rate of each of the mortgage loans "will be fixed for the life of the Mortgage Loan." *Id.*

at S-33.

29.    The Prospectus also provided aggregate statistical information about the three loan

groups comprising the mortgage pool, including the following:

"[T]he weighted average Mortgage Rate of the Mortgage Loans was approximately
6.735% per annum."

"[T]he average principal balance of the Mortgage Loans was approximately
$375,683."

"[T]he weighted average loan age of the Mortgage Loans was approximately 2
months."

"[T]he weighted average remaining term to stated maturity of the Mortgage Loans
was approximately 357 months."

"[T]he weighted average original Loan-to-Value Ratio of the Mortgage Loans was
approximately 72.22%."

"[T]he weighted average FICO Credit Score of the Mortgage Loans was
approximately 711."

*Id.* at S-53-59.

## Background of the Offering

30.    Prior to the Offering, IndyMac underwrote the Mortgage Loans according to its stated

underwriting guidelines.   Then IndyMac "work[ed] with underwriters and rating agencies" in

initiating and structuring the securitization of the Mortgage Loans, which included selecting the

individual mortgages that would constitute the securitized "pool" of mortgages.  Prospectus at S-68.

Between 2002 and 2005, the approximate annual volume of mortgage loan securitizations sponsored

by IndyMac increased roughly 400%, from $6.25 billion to $31.37 billion. *Id.*

31.     Next, IndyMac "sold" the Mortgage Loans to its subsidiary, IndyMac MBS, Inc. (the "Depositor"), which in turn transferred the Mortgage Loans to the Trust by way of its Trustee, Deutsche Bank National Trust Company ("Deutsche Bank" or the "Trustee").

32.     The Trust issued the Certificates in multiple tranches, or classes; with each class representing a different portion of the aggregate Certificates' balance, and with each class carrying its own pass-through interest rate. The classes were grouped into categories, designated as "Senior Certificates" or "Subordinated Certificates," as follows:

| DESIGNATION | CLASSES OF CERTIFICATES |
|---|---|
| Senior Certificates | Class 1-A-1, Class 1-A-2, Class 1-A-3, Class 1-A-4, Class 1-A-5, Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4, Class 2-A-5, Class 2-A-6, Class 2-A-7, Class 2-A-8, Class 3-A-1, Class 3-A-2, Class 3-A-3, Class 3-A-4, Class 3-A-5, Class 3-A-6, Class 3-A-7, Class 3-A-8, Class 3-A-9, Class 3-A-10, Class 3-A-11, Class PO, Class A-X and Class A-R Certificates |
| Subordinated Certificates | Class B-1, Class B-2, Class B-3, Class B-4, Class B-5, Class B-6, Class B-7, Class B-8, Class B-9 and Class B-10 Certificates |

Prospectus at S-71-72.

33.     The Senior Certificates had an initial aggregate balance of approximately $603,163,942 out of the total $632,676,943 in the Trust, and represented an initial beneficial ownership interest in the Trust of approximately 94.00%. *Id.* at S-74. In general, the Senior Certificate holders were to receive distributions (payments of interest and, if available, principal) on the distribution dates ahead of the Subordinated Certificate holders. *Id.* at S-16-18.

34.     The Trust sold the Senior Certificates to Credit Suisse. The Subordinated Certificates were sold to and underwritten by Lehman Brothers Inc. ("Lehman"). Credit Suisse and Lehman, as

underwriters, were obligated to ensure that the Prospectus issued with the Certificates did not contain any material misstatements or omissions, including as related to the stated manner in which the Mortgage Loans had been originated or underwritten.

35.     Once the Senior Certificates were rated by the Rating Agencies, Credit Suisse offered the Senior Certificates to investors, such as Plaintiff and other Class members.

36.     As set forth in the Prospectus, the Mortgage Loans were the principal source by which Senior Certificate purchasers were to obtain repayment of their investment plus interest.  On the stated distribution/payment date, the Senior Certificate holders received payments from the Trustee based on the particular tranche of the Mortgage Loan pool they held.  These payments included interest, and in certain cases, principal, paid by the Trust.  Thus the disclosures in the Prospectus, concerning the Mortgage Loans, underwriting process and other data reflecting their credit risk, were critical to investors.

37.     The investors paid approximately $603,163,942 for their Senior Certificates, which monies were used to pay IndyMac for the "sale" and assignment of the Mortgage Loans to the Trust. Credit Suisse received a portion of this sum (Credit Suisse and Lehman split a 0.7% fee of the total $632,676,943 issuance), amounting to a massive fee for its work in connection with the Offering.

**Background of the Alt-A Mortgage Market**

38.     IndyMac, as a leading underwriter of home mortgage loans, has recently become the subject of numerous government and civil investigations and lawsuits, accusing the company of not following prudent or proper underwriting procedures and, therefore, causing improper, fraudulent and below-standard mortgage loans to be securitized and sold to investors.  These improper

underwriting practices violated IndyMac's own underwriting guidelines as described in the Prospectus and as discussed further below.

39.     During the recent housing boom, IndyMac specialized in a category of mortgage loans known as "Alt-A" loans. Historically, Alt-A loans were offered as an alternative to prime mortgages for self-employed borrowers that could not provide documentation, such as W-2 Forms, to verify their income or assets on loan applications. *See* Zelman Credit Suisse Analyst Report, *"Mortgage Liquidity du Jour: Underestimated No More,"* March 12, 2007 (the "2007 Credit Suisse Report").

40.     Because Alt-A loan borrowers were not required to verify their incomes or assets through documentation, Alt-A loans were particularly susceptible to impaired underwriting practices. Thus, underwriters like IndyMac used Alt-A loans when they could not or did not want to accurately assess whether borrowers applying for these "alternative documentation" loans were financially able to timely repay the loans.

41.     Between 2002 and 2006, the Alt-A mortgage market grew from 5% of total originations to approximately 20%. *Id.* During this time, Alt-A issuers loosened their underwriting standards, permitting riskier borrowers -- in terms of credit quality, income and assets -- to qualify for Alt-A loans. This accounted for the dramatic increase in the volume of Alt-A loans that were issued, securitized and sold to investors; as well as the equally dramatic increase in profits for Alt-A issuers.

42.     IndyMac's reported profits tripled during this time, and IndyMac was the top Alt-A lender in the nation, producing $70 billion in volume, or 17.5%, of the Alt-A market. *See* Inside Mortgage Finance, *"2007 Mortgage Market Statistical Annual - Volume 1."* During the second

quarter of 2006, IndyMac sold 97% of the mortgage loans it produced through securitizations, accounting for a nearly 50% jump in the common stock price for IndyMac, which reached a record high in April 2006.

43.   In order to maximize profits by selling more loans, IndyMac disregarded its underwriting standards and approved loans to unqualified borrowers. IndyMac was not concerned with the poor quality of the loans it approved because, as long as the secondary market for securitized mortgage products remained hot, IndyMac could immediately package the risky loans into pools and sell them to investors; therefore removing the risk of default from its books. As Paul Miller Jr., an analyst at Friedman, Billings, Ramsey, reflected: "The sales culture took over, and the sales division really drove the company." *See* The New York Times, *"Lax Lending Standards Led to IndyMac's Downfall,"* July 29, 2008.

44.   Ultimately, underwriting deficiencies came to light. An increasing number of unqualified borrowers, who were not able to make their mortgage payments, began defaulting on their loan obligations.   The demand for mortgage-backed securities soon plunged, as these investments were seen as extremely risky. IndyMac was unable to sell its highly risky loans, which led to massive earnings losses and a falling share price.

45.   On June 30, 2008, the Center for Responsible Lending ("CRL"), a national nonprofit, nonpartisan research and policy organization "dedicated to protecting home ownership and family wealth by working to eliminate abusive financial practices," exposed IndyMac's lending and underwriting abuses in a report entitled, *"IndyMac: What Went Wrong?* – How an 'Alt-A' Leader Fueled its Growth with Unsound and Abusive Mortgage Lending" (the "CRL Report"). According

to the CRL Report:

> IndyMac's lending volume and profits soared during the mortgage boom.  Loan volume tripled in three years [between 2003 and 2006], approaching $90 billion in 2006 [from $29 billion in 2003]. It grew far faster than most of its competitors; its share of the national mortgage market increased from 0.77% to 3.30% over that span. Profits more than doubled over those three years, hitting $343 million in 2006.

> In 2007 and 2008, however, it suffered a dramatic reversal of fortune.  IndyMac's "non-performing assets" - bankspeak for loans that have gone bad - have been growing at a steep rate. The firm's dollar volume of non-performing assets exploded 11-fold in 15 months - going from $184 million (0.63% of assets) at the close of 2006 to $2.1 billion (6.51% of assets) at the end of the first quarter of 2008. IndyMac generally defines "non-performing assets" as loans that are at least 90 days overdue or in foreclosure.

> As a result of the growing number of bad loans and a drop in mortgage originations, IndyMac posted a $615 million loss in 2007, and a $184 million loss in the first three months of 2008.  That combined loss of nearly $800 million over 15 months means that it has more than given back all of the $636 million in profits it posted in 2005-2006, at the height of the mortgage boom.

> Meanwhile, IndyMac's stock price, which hit its highest level ever at the end of 2006, topping $45, has plummeted, falling below one dollar as of June 26, 2008. Long-time shareholders have lost some 95% of their value in just over two years.

> The company has eliminated riskier products such as low documentation Alt-A loans and "piggy back" loans, and [Chief Executive Officer] Michael Perry continues to express optimism that the company will turn things around once the housing market improves.

CRL Report at 5-6.

46.     Unfortunately for IndyMac's numerous employees and shareholders, things did not turn around, and on July 11, 2008 IndyMac was seized by the OTS and later filed for Chapter 7 bankruptcy protection.   The Federal Bureau of Investigation ("FBI") also commenced an investigation against the company on July 16, 2008, in connection with its home loan program.

## Disclosures in the Prospectus

47.   The Prospectus described the specific attributes of the Mortgage Loans, as well as the

procedures by which IndyMac acquired and underwrote the Mortgage Loans.  These descriptions

contained material misstatements and omissions of fact.

### Disclosures Concerning The Origination Process

48.   The Prospectus described the origination process by which IndyMac acquired the

Mortgage Loans it underwrote from various sellers, as follows:

> IndyMac Bank acquires mortgage loans principally through four channels: mortgage
> professionals, consumer direct, correspondent and conduit. IndyMac Bank also
> acquires a relatively small number of mortgage loans through other channels.
>
> *Mortgage professionals*: Mortgage brokers, mortgage bankers, financial institutions
> and homebuilders who have taken applications from prospective borrowers and
> submitted those applications to IndyMac Bank.
>
> *Consumer direct*: Mortgage loans initiated through direct contact with the borrower.
> This contact may arise from internet advertising and IndyMac Bank website traffic,
> affinity relationships, company referral programs, realtors and through its Southern
> California retail banking branches.
>
> *Correspondent*: Mortgage brokers, mortgage bankers, financial institutions and
> homebuilders who sell previously funded mortgage loans to IndyMac Bank.
>
> *Conduit*: IndyMac Bank acquires pools of mortgage loans in negotiated transactions
> either with the original mortgagee or an intermediate owner of the mortgage loans.

Prospectus at S-61 (emphasis in original).

49.   With respect to each seller, the Prospectus stated that:

> IndyMac Bank approves each mortgage loan seller prior to the initial transaction on
> the basis of the seller's financial and management strength, reputation and prior
> experience. Sellers are periodically reviewed and if their performance, as measured
> by compliance with the applicable loan sale agreement, is unsatisfactory, IndyMac
> Bank will *cease doing business with them.*

*Id.* (emphasis added).

    50.    The Prospectus also described the various documentation programs for the loans

IndyMac acquired, as follows:

> IndyMac Bank purchases loans that have been originated under one of seven documentation programs: Full/Alternate, FastForward, Limited, Stated Income, No Ratio, No Income/No Asset and No Doc. In general, documentation types that provide for less than full documentation of employment, income and liquid assets require higher credit quality and have lower loan-to-value ratios and loan amount limits.

> Under the Full/Alternate Documentation Program, the prospective borrower's employment, *income and assets are verified through written documentation such as tax returns, pay stubs or W-2 forms.* Generally, a two-year history of employment or continuous source of income is required to demonstrate adequacy and continuance of income. Borrowers applying under the Full/Alternate Documentation Program may, based on certain loan characteristics and higher credit quality, qualify for IndyMac Bank's FastForward program and be entitled to income and asset documentation relief. Borrowers who qualify for FastForward must state their income, provide a signed Internal Revenue Service Form 4506 (authorizing IndyMac Bank to obtain copies of their tax returns), and state their assets; *IndyMac Bank does not require any verification of income or assets under this program.*

> The Limited Documentation Program is similar to the Full/Alternate Documentation Program except that borrowers generally must document income and employment for one year (rather than two, as required by the Full/Alternate Documentation Program). Borrowers under the Limited Documentation Program may use bank statements to verify their income and employment. If applicable, written verification of a borrower's assets is required under this program.

> The Stated Income Documentation Program requires prospective borrowers to provide information regarding their assets and income. Information regarding a borrower's assets, if applicable, is verified through written communications. *Information regarding income is not verified and employment verification may not be written.*

> The No Ratio Program requires prospective borrowers to provide information regarding their assets, which is then verified through written communications. *The No Ratio Program does not require prospective borrowers to provide information*

*regarding their income*, but employment may not be written.

Under the No Income/No Asset Documentation Program and the No Doc Documentation Program, emphasis is placed on the credit score of the prospective borrower and on the value and adequacy of the mortgaged property as collateral, rather than on the income and the assets of the prospective borrower. ***Prospective borrowers are not required to provide information regarding their assets or income under either program***, although under the No Income/No Asset Documentation Program, employment is orally verified.

*Id.* at S-62-63 (emphasis added).

51.     The statements about IndyMac's dealings with loan sellers were materially misleading because, as described below in paragraphs 64-68, IndyMac did not screen its sellers to ensure that they were providing only high quality loans meeting IndyMac's purported standards. Instead, many of the sellers provided poor quality loans that quickly went delinquent. Rather than ceasing to do business with these sellers, IndyMac ignored the problem and continued to purchase risky loans from the same sellers.

52.     The statements about IndyMac's documentation programs omitted to disclose that borrowers' credit information was submitted in violation of these policies as described below in paragraphs 69-76.

*Disclosures Concerning The Underwriting Process*

53.     The Prospectus described the underwriting guidelines and procedures that IndyMac purportedly followed:

Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to IndyMac Bank's underwriting guidelines . . . .

         ***

IndyMac Bank has two principal underwriting methods designed to be responsive to the needs of its mortgage loan customers: traditional underwriting and e-MITS (Electronic Mortgage Information and Transaction System) underwriting. E-MITS is an automated, internet-based underwriting and risk-based pricing system.

> *IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral.* Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac Bank's guidelines.

*See* Prospectus at S-61-64 (describing the underwriting guidelines in depth) (emphasis added).

54.     These statements were materially misleading or omitted facts necessary to make them not misleading because, as described below in paragraphs 69-80, IndyMac failed to follow its established underwriting guidelines and instead systematically issued loans to unqualified borrowers who failed to meet the criteria and minimum requirements for approval, as evidenced by, among other things, higher than anticipated rates of delinquencies and foreclosures.

**Disclosures Concerning The Mortgage Loans**

55.     As discussed above, the Prospectus provided statistical information about the Mortgage Loans, including their Loan-to-Value ("LTV") Ratios. As the Prospectus explained:

> The *"Loan-to-Value Ratio"* of a Mortgage Loan at any given time is a fraction, expressed as a percentage, the numerator of which is the principal balance of that Mortgage Loan at the date of determination and the denominator of which is
>
> o   in the case of a purchase, the lesser of the selling price of the mortgaged property or its appraised value at the time of sale, or
>
> o   in the case of a refinance, the appraised value of the mortgaged property at the time of the refinance.
>
> ***
>
> To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property *in accordance with the Uniform Standards of Profession Appraisal Practice*. The appraiser generally inspects the property, analyzes data including the sales prices of comparable properties and issues an opinion of value using a Fannie Mae/Freddie Mac appraisal report form, or other acceptable form. In some cases, an automated valuation model (AVM) may be used in lieu of an appraisal. AVMs are computer programs that use real estate information,

> such as demographics, property characteristics, sales prices, and price trends to calculate a value for the specific property. The value of the property, as indicated by the appraisal or AVM, must support the loan amount.

*Id.* at S-34, 63 (emphasis added).

56.    LTV Ratios, like borrowers' FICO scores, are important statistical tools for assessing the credit quality of securities derived from mortgage loans. LTV Ratios measure the amount of equity a homeowner has and are predictive of both the credit quality of the loan and the homeowner's incentive to avoid delinquency, default and foreclosure. According to Meredith Whitney, currently the managing director of Oppenheimer & Co., "LTV [Ratio] analysis will prove far more predictive of not just [the] loss frequency, but more importantly of [the] loss severity [of mortgage-backed securities]," than FICO scores. *See* MarketWatch, *"Forget FICO, analyst says,"* December 5, 2007.

57.    Any individual loan's LTV Ratio is predicated on the appraised value of the home; thus an inflated appraisal will lower the LTV Ratio. When the LTV Ratio of a group of home loans rises, the credit quality of securities derived from those loans falls; the securities are riskier. An LTV Ratio of over 100% is an indication that the equity in the home is lower than the total amount owed by the homeowner on the loan. This situation often leads to default by the homeowner and significant losses for investors/holders of securities derived from the loan.

58.    In addition to listing the LTV Ratios for each group of Mortgage Loans as well as for the aggregate pool, the Prospectus warranted that, "[a]t origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or less," and that the weighted LTV Ratio for the aggregate pool of Mortgage Loans was "approximately 72.22%." Prospectus at S-36, 41, 47, 54.

59.    The LTV Ratio statistics contained in the Prospectus were materially misleading

because, as described below in paragraphs 81-86, IndyMac routinely utilized overstated appraisal values in its underwriting process in violation of the Uniform Standards of Profession Appraisal Practice ("USPAP"), which increased the average LTV Ratios of the Mortgage Loans above the percentages stated in the Prospectus. This understated the riskiness of the Senior Certificates.

### Disclosures Concerning The Credit Ratings

60.     According to the Prospectus, as condition precedent to the issuance of the Senior Certificates, the Rating Agencies were required to rate them and assign them "triple-A" ratings. In assigning these ratings, the Rating Agencies were to take into account factors similar to those purportedly assessed by IndyMac underwriters, such as the credit quality of the Mortgage Loans, in order to determine the likelihood that Senior Certificate holders would receive all distributions on the Mortgage Loans. The Prospectus stated as follows:

> *It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("S&P") and that, except with respect to the Class 2-A-8 and Class A-R Certificates, they be rated Aaa by Moody's Investors Service, Inc. ("MOODY'S").* It is a condition to the issuance of the Class 2-A-8 Certificates that they be rated Aa1 by Moody's. It is a condition to the issuance of the Class B-1, Class B-2, Class B-3, Class B-4, Class B-5 and Class B-6 Certificates that they be rated at least AA, AA-, A+, A-, BBB and BBB-, respectively, by S&P, and Aa2, Aa3, A2, A3, Baa2 and Baa3 by Moody's, respectively.

> The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the certificateholders under the agreements pursuant to which the certificates are issued. *S&P's ratings take into consideration the credit quality of the mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates.* The rating assigned by S&P to the Notional Amount Certificates do not address whether investors will recoup their initial investments.

> The ratings assigned by Moody's to mortgage pass-through certificates address the

likelihood of the receipt of all distributions on the Mortgage Loans by the certificateholders under the agreements pursuant to which the certificates are issued. *Moody's ratings take into consideration the credit quality of the mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates.* The rating assigned by Moody's to the Notional Amount Certificates do not address whether investors will recoup their initial investments.

The ratings of the rating agencies do not address the possibility that, as a result of principal prepayments, certificateholders may receive a lower than anticipated yield.

The ratings assigned to the offered certificates should be evaluated independently from similar ratings on other types of securities. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the rating agencies.

Prospectus at S-133 (emphasis added).

61.    Accordingly, prior to the issuance of the Senior Certificates, the Rating Agencies rated all Senior Certificates in accordance with the requirements outlined in the Prospectus; assigning them "triple-A" ratings. *Id.* at S-7-8. The Rating Agencies' ratings, as set forth in the Prospectus, were a material term of the Offering. Because the ratings were a condition precedent to the Offering, the Senior Certificates would not have been sold to investors but for the ratings provided by Moody's and S&P. Furthermore, as discussed below, the Rating Agencies worked in conjunction with the Issuing Entity to structure the Offering. As such, the Rating Agencies substantially participated in the sale of securities to the Class of investors.

62.    The statements in the Prospectus about the factors considered by the Rating Agencies in assigning initial ratings to the Senior Certificates, and the initial ratings themselves, contained material misstatements or omissions because, as described below in paragraphs 87-122, the Rating Agencies issued the ratings based on an outdated credit rating methodology designed in or about

2002, and were subject to conflicts of interest that influenced the accuracy of their ratings.

**The Prospectus Contained Material Misstatements And Omissions**

63.    Since the Offering, IndyMac's actual business practices have come to light, causing the company to be seized by the OTS and to be investigated by the FBI (among others) in relation to its loan practices. These undisclosed and misrepresented problems resulted in a serious decline in the performance of the Mortgage Loans, as is demonstrated by the chart below. The chart displays the percentage of "defaulting" Mortgage Loans out of the aggregate loan pool at each distribution date since the Offering, as reported. The percentages come from Delinquency Reports generated on each distribution date. The term "defaulting" includes delinquent (for one or more payments) Mortgage Loans, as well as Mortgage Loan properties in foreclosure, in bankruptcy or real estate owned ("REO").



DEFAULTING MORTGAGE LOANS

*The Prospectus Contained Material Misstatements Concerning IndyMac's Origination Practices And Omitted To Disclose Material Facts*

64.     According to the Prospectus, IndyMac acquired newly originated mortgage loans from various sales channels, including mortgage brokerages.  Prior to purchasing the loans, IndyMac was supposed to examine each seller "on the basis of the seller's financial and management strength, reputation and prior experience." Prospectus at S-61, quoted above in paragraph 49 (describing the loan origination process).   In addition, the Prospectus stated that IndyMac was supposed to "periodically review" the quality of the loans being provided to determine whether they satisfied the loan sale agreements executed with each seller.  *Id.*  Upon information and belief, these loan sale agreements generally warranted that the loans being provided met IndyMac's origination quality standards and were not in or about to default; otherwise the seller was required to honor any timely repurchase requests for defaulting loans.  Finally, the Prospectus made clear that if any seller provided "unsatisfactory" and defaulting loans to IndyMac, IndyMac would "cease doing business" with that seller.  *Id.*

65.     During the housing boom, IndyMac sought to increase the quantity of loans it could acquire, securitize and sell, so the company began purchasing low-quality loans from non-reputable sellers. *See Tripp et al. v. IndyMac Bancorp, Inc. et al.*, No. 07-cv-1635-GW(VBK) (C.D. Cal. filed Mar. 12, 2007), at ¶¶ 73-92 (all references to *Tripp v. IndyMac Bancorp* ("*Tripp*") contained in this Complaint refer to the "Third Amended Class Action Complaint" filed with the court on June 6, 2008).

66.     According to *Tripp*, between 2005 and 2006, IndyMac acquired pools of recently originated mortgages from various sellers that IndyMac had not properly vetted. *Id.* at ¶¶ 74, 85, 91.

The sellers signed loan sale agreements requiring them to repurchase any "early defaulting loans" - loans where borrowers either failed to make their first payment or failed to make a timely payment within the first three months after IndyMac's acquisition - within thirty days of receiving IndyMac's repurchase request. *Id.* at ¶¶ 74-75, 82, 85, 88, 91.

67.    Almost immediately after IndyMac acquired the loans, nearly all of them became distressed or defaulted. *Id.* at ¶¶ 75, 82, 88 (the percentage of defaulting loans in the pools ranged from 89%-97% for the cases explicitly discussed in *Tripp*). However, instead of making immediate repurchase requests and terminating its business relationship with the sellers, IndyMac continued to purchase defaulting loans from the sellers. *Id.* at ¶¶ 77, 80-81, 85, 87, 91.

68.    IndyMac's lengthy delay in pursuing its repurchase rights against the sellers with respect to these numerous distressed or defaulted loans was not disclosed in the Prospectus. Also not disclosed, was the fact that IndyMac departed from its policy outlined in the Prospectus, of carefully approving and monitoring the sellers and ceasing to do business with those that sold IndyMac loans that became distressed or defaulted.

### The Prospectus Contained Material Misstatements Concerning IndyMac's Underwriting Practices And Omitted To Disclose Material Facts

69.    According to the Prospectus, IndyMac underwrote loans according to the stated underwriting guidelines disclosed therein. However, from 2003 forward IndyMac ignored those guidelines when underwriting loans, causing the quality of its underwritten loans to decline significantly. During this time, the robust market for home loans perpetuated IndyMac's insatiable hunger for mortgages and a complacency about the risks they posed.

70.    At the start of the housing boom, IndyMac adopted increasingly lax underwriting

standards, resulting in higher loan volume and greater profits.  For example, many of the loans IndyMac acquired during this time were originated under programs that did not require borrowers to submit documentary support for the financial information contained in their loan applications. More than 70% of the Mortgage Loans were originated under documentation programs that either did not require underwriters to verify borrowers' reported incomes and/or assets, or did not require borrowers to report their incomes and/or assets on their loan applications in the first place.  *See* Prospectus at S-58.  As a result, loan underwriters had no way to verify borrowers' financial information in order to accurately assess their "ability to repay" the loans, as was required by IndyMac's underwriting guidelines.  *See Id.* at S-62 ("IndyMac's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's . . . ability to repay the mortgage loan").

71.     As stated in paragraph 50, *supra*, the Prospectus described the various loan documentation programs used by IndyMac, including "Stated Income."  According to former IndyMac underwriters interviewed by the Center for Responsible Lending, loan documentation programs, such as "Stated Income" loans, that required no documentation of a borrower's income, were "[a] big problem" because they "allowed outside mortgage brokers and in-house sales staffers to inflate applicants' incomes and make them look like better credit risks." CRL Report at 8.[1]  More than 43% of the Mortgage Loans were originated under the "Stated Income" documentation program.

---

[1] Information contained in the CRL Report was derived from interviews of former IndyMac employees either conducted by CRL or by counsel in numerous lawsuits filed against IndyMac, which CRL reviewed.  *See* CRL Report at 2-3 ("Most of these ex-employees were mortgage underwriters who were responsible for reviewing loan applications to make sure information was accurate and that borrowers could afford the deals").  Unless otherwise provided, internal citations contained in the CRL Report are omitted herein.

Prospectus at S-58.

72.    As the housing boom continued, IndyMac increased its loan production by instructing

its underwriters to "disregard company [underwriting] policies" and "push through" every loan

application, even where the applications contained "fudged or falsified information." CRL Report

at 2-3.    Underwriting became a "procedural annoyance that was tolerated [only] because loans

needed an underwriter's stamp of approval if they were going to be sold to investors." *Id.* at 8.

73.    According to one former IndyMac employee, even where IndyMac built a

computerized system called "e-MITS" into the underwriting process as a way to supposedly check

underwriters' work, e-MITS did not prevent the underwriters from approving loan applications

containing false information. *Tripp* at ¶ 36. As described in the Prospectus:

> IndyMac Bank has two principal underwriting methods designed to be responsive to
> the needs of its mortgage loan customers: traditional underwriting and e-MITS
> (Electronic Mortgage Information and Transaction System) underwriting. E-MITS
> is an automated, internet-based underwriting and risk-based pricing system.

Prospectus at S-62.

74.    Although the Prospectus stated that e-MITS "enable[d] [IndyMac] to estimate

expected credit loss, interest rate risk and prepayment risk *more objectively* than traditional

underwriting and also provide[d] consistent underwriting decisions," *id.*, e-MITS was only as

objective as the underwriters themselves. IndyMac's "much vaunted e-MITS system . . ., which was

supposed to prevent gaming of the Company's underwriting guidelines," was ineffective. *Tripp* at

¶ 36. The "problem" with e-MITS was that it was a "'junk-in, junk-out' system that was only as

good as the information it was provided." *Id.* Therefore, "if underwriters wanted approval for a loan

that did not satisfy the Company's underwriting guidelines, they would simply need to input

information that was not reflective of the borrower's true characteristics and e-MITS would provide approval based on the false information entered by the underwriter." *Id.*

75.     The CRL Report detailed numerous occasions where either underwriters or mortgage brokers inflated borrowers' incomes in order to approve them for loans they were unable to afford. In one case, a retiree who was approved for a loan claimed that he was never asked to state his income on his loan application. CRL Report at 14. Nevertheless, when he obtained a copy of the approved loan application, the retiree's "income" was provided, but the amount listed exceeded his actual income. *Id.* According to the retiree's attorney, it did not matter whether his client's income had been inflated before or after the loan application was received by IndyMac's underwriters because: "Any prudent underwriter should have questioned the income considering the amount/source and required proof. It can only be surmised that [the falsified amount stated on the approved application] . . . was the income needed to qualify for the loan." *Id.*

76.     In another case, IndyMac "specifically instructed the [borrower's mortgage] broker to send copies of [the borrower's] Social Security award letters with *the dollar amounts blacked out.* In other words, the lender wanted proof that [the borrower] was receiving Social Security but didn't want to know how much." *Id.* at 15 (emphasis added). This purposeful ignorance of a borrower's financial status clearly violated the underwriting guidelines described in the Prospectus, which required IndyMac's underwriters to "analy[ze] . . . the borrower's credit history . . . [and] ability to repay the mortgage loan" before granting approval. Prospectus at S-62. Without knowing such information as a borrower's income, there would be no way to perform such an analysis.

77.     Credit Suisse's own Equity Research Department, led by Senior Research Analyst

Ivy L. Zelman, released several negative reports about the housing market and about the riskiness

of securities derived from home mortgage loans.  According to the 2007 Credit Suisse Report:

> [Credit Suisse analysts] initially highlighted the proliferation of these mortgage products and easing lending standards *nearly four years ago* in our report titled *"Mortgage Liquidity: Don't Underestimate the Underwriting."*  Since our initial discussion on the topic, the evolution of the mortgage market has only accelerated further in the form of sustained easing of lending standards and the more innovation of exotic mortgage products.

2007 Credit Suisse Report at 3 (emphasis added).  In addition, a few months after Credit Suisse

underwrote the Senior Certificates, its Equity Research Department released a report predicting the

end of the housing boom and decreased home values in the coming year.  Zelman et. al., *"Data

Masks Grim Reality,"* September 6, 2006 ("Many [home] owners will simply decide to hand over

their keys to the banks as appraisal values will most likely be lower than market value").

78.     The 2007 Credit Suisse Report emphasized that due to loose underwriting standards

and the increased use of exotic mortgage products, the Alt-A segment of the mortgage market was

susceptible to the same type of widespread deterioration already occurring in the subprime segment.

This was partially due to the fact that "Alt-A" loans, which came to be known as "liar loans" due to

the propensity for borrowers to exaggerate their income on loan applications, made up a significant

portion of the Mortgage Loans. *2007 Credit Suisse Report at 38.* "While many believe that buyers

choose to provide limited or no documentation [with their loan applications] for convenience rather

than necessity, a study by the Mortgage Asset Research Institute sampling 100 stated income (low/no

documentation) loans found that 60% of borrowers had 'exaggerated' their income by more than

50%." *Id.* at 5.

79.     The 2007 Credit Suisse Report concluded:

> While the rapid expansion of the subprime market has been highly publicized and scrutinized of late, the Alt-A market has expanded [just as significantly] . . . . Although the credit profile of Alt-A borrowers is stronger than that of the subprime market . . ., *we believe that there is considerable risk associated with the lax underwriting standards and exotic mortgage products utilized in this segment of the market in recent years*, both in the form of continued credit deterioration and reduced incremental demand resulting from tightening lending standards.
>
> * * *
>
> [W]e estimate that 25% of Alt-A . . . loans would not be approved under tighter [lending] restrictions.

*Id.* at 4, 9 (emphasis added).

80.     Because IndyMac's actual underwriting practices were not disclosed in the Prospectus, the Prospectus materially misrepresented the underwriting process. Senior Certificate holders were damaged by the increased loan delinquencies that were the direct result of IndyMac's undisclosed practices.

**The Prospectus Contained Material Misstatements Concerning IndyMac's Appraisal Practices And Omitted To Disclose Material Facts**

81.     Aside from inflating borrowers' incomes and assets to "push through" loans for approval, IndyMac also "improperly selected appraisers . . . who performed faulty and defective [appraisals] . . . which inflated the value of residential properties." *See Cedeno v. IndyMac Bancorp, Inc et al.*, No. 06-cv-6438(JGK) (S.D.N.Y. initiated August 25, 2006) (all references to *Cedeno v. IndyMac Bancorp,* refer to the "Amended Class Action Complaint" filed with the court on July 20, 2007), at ¶ 2.[2] Specifically, "IndyMac told outside appraisers the 'target value' that they needed to

---

[2] The *Cedeno* court granted IndyMac's (through FDIC) motion to dismiss on August 25, 2008, for failure to state a legal claim upon which relief could be granted. The court's opinion did not address the veracity of the underlying allegations, and possibly indicated that they were credible. *See Cedeno v. IndyMac Bancorp, Inc.*, 2008 U.S. Dist. LEXIS 65337, *10 n.6 (S.D.N.Y. Aug. 26, 2008) ("The defendant argues that the suggestion that inflated appraisals benefit IndyMac is contrary to common sense, because inflated appraisals result in under-secured

hit to make a loan go through. The company rewarded appraisers who played ball and hit the values with more assignments, but punished those who didn't by cutting their assignments . . . ." CRL Report at 13.

82.     IndyMac's policy of using inflated appraisal values to approve mortgages violated the underwriting guidelines outlined in the Prospectus. While the Prospectus required "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans [to] include[] an analysis of . . . the adequacy of the mortgaged property as collateral," such analysis was to be made "in accordance with the Uniform Standards of Profession Appraisal Practice ["USPAP"]." Prospectus at S-62-63. Moreover, the Prospectus required that "[t]he value of the property, as indicated by the appraisal . . . must support the loan amount." *Id.*

83.     Using inflated appraisal values violated USPAP and ensured that the value of the property as indicated by the appraisal would support the loan amount. According to "USPAP Q&A," a publication of the Appraisal Standards Board that "develops, interprets, and amends the [USPAP] on behalf of appraisers and users of appraisal services," the <u>Conduct</u> section of the USPAP ETHICS RULE "requires an appraiser to be independent, impartial, and objective, and to perform assignments without bias. An appraiser who intentionally '*inflates*' or 'deflates' an opinion of value would be in violation of the <u>Conduct</u> section of the Rule." USPAP Q&A Vol. 9, No. 11, November 2007 (emphasis added).

_____

loans, and under-secured loans lead to losses if the borrower defaults. However, this argument does not negate the plausibility of plaintiff's claim. The plaintiff asserts that the higher appraisals allowed the defendants to increase the money they would acquire as a result of the mortgage loans"). Following the court's order, the parties stipulated to a voluntarily dismissal on October 27, 2008.

84.     In addition, the inflated appraisals caused the LTV Ratios of the Mortgage Loans, as disclosed in the Prospectus, to be materially understated.  As explained in the Prospectus, LTV Ratios were calculated using appraisal values (in the denominator).  Prospectus at S-34.  Inflating appraisal values reduced the LTV Ratios such that the true riskiness of the loans were significantly understated and not realized by investors in securities derived from those loans.

85.     Thus, the LTV Ratios provided in the Prospectus, as well as the guarantee that no LTV Ratio exceeded the benchmark 100% ratio - above which borrowers owed more on their loans than the equity in their properties and had little incentive to continue timely making their mortgage payments - were inaccurate and misleading.  This misstated the risk of the Senior Certificates issued in the Offering.

86.     Upon information and belief, the same improper origination, underwriting and appraisal procedures described above were used by IndyMac to approve many of the delinquent and defaulted Mortgage Loans sold in the Offering and caused such delinquencies and defaults.  This was in violation of the stated underwriting procedures outlined in the Prospectus.

**The Prospectus Contained Material Misstatements Concerning The Rating Agencies' Ratings And Omitted To Disclose Material Facts**

87.     Following the disclosures about IndyMac's improper underwriting practices, the Rating Agencies, whose rating activities were a prerequisite to the issuance of the Senior Certificates, conceded that the ratings assigned to the Senior Certificates and as listed in the Prospectus were inflated; and the "methodology" used to evaluate the underlying mortgages, as described in the Prospectus, was outdated and not properly followed.  Moreover, the Prospectus failed to disclose the inherent conflicts in the Rating Agencies' participation in the Offering.

88.     In April 2007, Moody's announced that the methodology that had been deployed first in 2002 and that continued to be used through early 2007, to value the subprime and Alt-A mortgages that served as collateral for mortgage-backed securities, was outdated and would be revised.  Moody's cited the "considerable evolution of the mortgage market since 2002" as the reasoning behind the need to revise its rating methods.  As one member of the press noted, this was a "stunning admission; [Moody's] model had been based on a world that no longer existed."  Times Article (defined above at paragraph 6).

89.     Following Moody's announcement, other rating agencies followed suit with their own reviews and amendments to the methodologies used to rate subprime and Alt-A securities.  In a July 10, 2007 press release, S&P announced that it was going to change the methodology that it had been using to rate such securities.  S&P stated that the standard variables - i.e., FICO credit scores, LTV Ratios and ownership status - used to evaluate a borrower's risk for default "are proving less predictive" than in the past.

90.     The Ratings Agencies continued to revise their methodologies and ratings throughout late 2007 and 2008.  Moody's disclosed that the ratings assigned to mortgage-backed securities collateralized with IndyMac loans were inflated and did not reflect the securities' true values.

91.     Despite generalized revisions to the rating methodologies, Moody's did not take any action specific to any RAST Certificates until November 27, 2007, when it announced that it had taken "negative rating actions on certain Alt-A deals issued by [RAST] in 2006 and late 2005," including most classes of RAST's 2006-A8 Subordinated Certificates.  As Moody's explained, "[t]he ratings were downgraded and placed under review for downgrade based on higher than anticipated

rates of delinquency, foreclosure, and REO ["Real Estate Owned"] in the underlying collateral relative to credit enhancement levels." Notably, Moody's revealed that the current negative ratings action and downgrades were determined after analysis of RAST's bonds using Moody's "update[d]" rating methodology. There were no changes to the ratings of the Senior Certificates.

92.   On May 9, 2008, Moody's placed nearly all classes of RAST's 2006-A8 Senior Certificates "on Review for Possible Downgrade," and further downgraded nearly all Subordinated Certificates.

93.   On August 14, 2008, applying its updated rating methodology, Moody's downgraded nearly all classes of RAST's 2006-A8 Senior Certificates from Aaa to Baa1 (7 notches), and further downgraded nearly all of the Subordinated Certificates.

94.   Following Moody's downgrade of the Senior Certificates, Plaintiff's account statement for the month-ended August 31, 2008, reflected a precipitous decline in the market value of the Senior Certificates - from approximately $83.37 per $100 of par value as of July 31, 2008 (pre-ratings downgrade) to $54.12 per $100 of par value as of August 31, 2008 (following the ratings downgrade), a 35% decline.

95.   On October 15, 2008, S&P placed nearly all classes of RAST's 2006-A8 Senior Certificates on "AAA*-" "negative credit watch" for possible downgrades. On November 5, 2008, S&P downgraded nearly all classes of RAST's 2006-A8 Senior Certificates from AAA to B.

96.   The downgrades to the Senior Certificates were as follows:

| CLASS | Moody's Ratings Changes | | S&P's Ratings Changes | |
|---|---|---|---|---|
| | Initial Rating | 8-14-08 | Initial Rating | 11-05-08 |
| Class 1-A-1 | Aaa | Baa1 | AAA | B |
| Class 1-A-2 | Aaa | Baa1 | AAA | B |
| Class 1-A-3 | Aaa | Baa1 | AAA | B |
| Class 1-A-4 | Aaa | Baa1 | AAA | B |
| Class 1-A-5 | Aaa | Baa1 | AAA | B |
| Class 2-A-1 | Aaa | Baa1 | AAA | B |
| Class 2-A-2 | Aaa | Baa1 | AAA | B |
| Class 2-A-3 | Aaa | Baa1 | AAA | B |
| Class 2-A-4 | Aaa | Baa1 | AAA | B |
| Class 2-A-5 | Aaa | None | AAA | None |
| Class 2-A-6 | Aaa | None | AAA | None |
| Class 2-A-7 | Aaa | Baa1 | AAA | B |
| Class 2-A-8 | Aa1 | Baa2 | AAA | B |
| Class 3-A-1 | Aaa | Baa1 | AAA | B |
| Class 3-A-2 | Aaa | Baa1 | AAA | B |
| Class 3-A-3 | Aaa | Baa1 | AAA | B |
| Class 3-A-4 | Aaa | Baa1 | AAA | B |
| Class 3-A-5 | Aaa | Baa1 | AAA | B |
| Class 3-A-6 | Aaa | None | AAA | None |
| Class 3-A-7 | Aaa | Baa1 | AAA | B |
| Class 3-A-8 | Aaa | Baa1 | AAA | B |
| Class 3-A-9 | Aaa | Baa1 | AAA | B |

| Class 3-A-10 | Aaa | Baa1 | AAA | B |
|---|---|---|---|---|
| Class 3-A-11 | Aaa | Baa1 | AAA | B |
| Class PO | Aaa | Baa1 | AAA | B |
| Class A-X | Aaa | Confirmed | AAA | None |
| Class A-R | N/R | None | AAA | None |

97.     The Times Article was largely critical of the Rating Agencies', and in particular

Moody's, role in the collapse of the mortgage-backed securities market.  The article referred to the

Rating Agencies' work as "magic," which transformed "risky mortgages into investments that would

be suitable for investors who would know nothing about the underlying loans" and would be "just

as safe, in theory, as other triple-A securities."  The article reported:

> Over the last decade, Moody's and its two principal competitors, Standard & Poor's
> and Fitch, played this game to perfection -- *putting what amounted to gold seals on
> mortgage securities that investors swept up with increasing elan. For the rating
> agencies, this business was extremely lucrative. Their profits surged*, Moody's in
> particular: it went public, saw its stock increase sixfold and its earnings grow by 900
> percent.
>
> ***
>
> *Mortgage volume surged; in 2006, it topped $2.5 trillion.* Also, many more
> mortgages were issued to risky subprime borrowers. Almost all of those subprime
> loans ended up in securitized pools; indeed, *the reason banks were willing to issue
> so many risky loans is that they could fob them off on Wall Street.*
>
> But who was evaluating these securities? Who was passing judgment on the quality
> of the mortgages, on the equity behind them and on myriad other investment
> considerations? *Certainly not the investors. They relied on a credit rating.*
>
> *Thus the agencies became the de facto watchdog over the mortgage industry.* In a
> practical sense, it was Moody's and Standard & Poor's that set the credit standards
> that determined which loans Wall Street could repackage and, ultimately, which
> borrowers would qualify. Effectively, they did the job that was expected of banks and
> government regulators. *And today, they are a central culprit in the mortgage bust,*
> in which the total loss has been projected at $250 billion and possibly much more.

Times Article (emphasis added).

98.     The Times Article also reported on the credit rating process employed by Moody's,

and cited an example of a pool of 2,393 mortgage loans issued in early spring 2006 with a total face

value of $430 million.  Moody's had analyzed the credit data and rated the pool, called "Subprime

XYZ" for anonymity purposes, in a frenzied and haphazard manner that was characteristic of most

ratings during the housing boom:

> *Subprime XYZ typified the exuberance of the age.* All the mortgages in the pool
> were subprime – that is, they had been extended to borrowers with checkered credit
> histories. In an earlier era, such people would have been restricted from borrowing
> more than 75 percent or so of the value of their homes, but during the great bubble,
> no such limits applied.
>
> *Moody's did not have access to the individual loan files, much less did it
> communicate with the borrowers or try to verify the information they provided in
> their loan applications.* "We aren't loan officers," Claire Robinson, a 20-year veteran
> who is in charge of asset-backed finance for Moody's, told me. "Our expertise is as
> statisticians on an aggregate basis. We want to know, of 1,000 individuals, based on
> historical performance, what percent will pay their loans?"
>
> *The loans in Subprime XYZ were issued in early spring 2006 — what would turn
> out to be the peak of the boom.* They were originated by a West Coast company that
> Moody's identified as a "nonbank lender."
>                                       ***
> Moody's assigned an analyst to evaluate the package, subject to review by a
> committee. *The investment bank provided an enormous spreadsheet chock with
> data on the borrowers' credit histories and much else that might, at very least, have
> given Moody's pause.* Three-quarters of the borrowers had adjustable-rate mortgages,
> or ARMs – "teaser" loans on which the interest rate could be raised in short order.
> Since subprime borrowers cannot afford higher rates, they would need to refinance
> soon. *This is a classic sign of a bubble – lending on the belief, or the hope, that
> new money will bail out the old.*
>
> *Moody's learned that almost half of these borrowers — 43 percent — did not
> provide written verification of their incomes.* The data also showed that 12 percent
> of the mortgages were for properties in Southern California, including a half-percent
> in a single ZIP code, in Riverside. That suggested a risky degree of concentration.

On the plus side, Moody's noted, 94 percent of those borrowers with adjustable-rate loans said their mortgages were for primary residences. "That was a comfort feeling," Robinson said. Historically, people have been slow to abandon their primary homes. When you get into a crunch, she added, "You'll give up your ski chalet first."

Another factor giving Moody's comfort was that all of the ARM loans in the pool were first mortgages (as distinct from, say, home-equity loans). Nearly half of the borrowers, however, took out a simultaneous second loan. *Most often, their two loans added up to all of their property's presumed resale value, which meant the borrowers had not a cent of equity.*

*In the frenetic, deal-happy climate of 2006, the Moody's analyst had only a single day to process the credit data from the bank.* The analyst wasn't evaluating the mortgages but, rather, the bonds issued by the investment vehicle created to house them. A so-called special-purpose vehicle -- a ghost corporation with no people or furniture and no assets either until the deal was struck -- would purchase the mortgages. Thereafter, monthly payments from the homeowners would go to the S.P.V. The S.P.V. would finance itself by selling bonds. The question for Moody's was whether the inflow of mortgage checks would cover the outgoing payments to bondholders. *From the investment bank's point of view, the key to the deal was obtaining a triple-A rating — without which the deal wouldn't be profitable.*

*Id.* (emphasis added).

99.     To rate complex securities, such as mortgage-backed securities like Subprime XYZ, and even more complex C.D.O.'s (pools of mortgage-backed securities), Moody's and other Rating Agencies used statistical models based on historical default patterns and past data that were no longer relevant in the current environment. By way of example, the Times Article took a closer look at a $750 million mortgaged-backed securitization that Moody's rated in late 2006 using its outdated model:

Moody's used statistical models to assess C.D.O.'s; it relied on historical patterns of default. *This assumed that the past would remain relevant in an era in which the mortgage industry was morphing into a wildly speculative business.*
                                                        ***
*Moody's rated three-quarters of this C.D.O.'s bonds triple-A.* The ratings were derived using a mathematical construct known as a Monte Carlo simulation -- as if

each of the underlying bonds would perform like cards drawn at random from a deck of mortgage bonds in the past. *There were two problems with this approach. First, the bonds weren't like those in the past; the mortgage market had changed.* As Mark Adelson, a former managing director in Moody's structured-finance division, remarks, it was "like observing 100 years of weather in Antarctica to forecast the weather in Hawaii." *And second, the bonds weren't random. Moody's had underestimated the extent to which underwriting standards had weakened everywhere. When one mortgage bond failed, the odds were that others would, too.*

*Moody's estimated that this C.D.O. could potentially incur losses of 2 percent. It has since revised its estimate to 27 percent. The bonds it rated have been decimated, their market value having plunged by half or more.* A triple-A layer of bonds has been downgraded 16 notches, all the way to B. Hundreds of C.D.O.'s have suffered similar fates (most of Wall Street's losses have been on C.D.O.'s). *For Moody's and the other rating agencies, it has been an extraordinary rout.*

*Id.* (emphasis added).

100.     Nevertheless, the accuracy of the ratings was not of paramount concern to the investment banks and issuers who paid the Rating Agencies to rate their products; it was far more important to get the Rating Agencies' stamp of approval than it was to get an accurate assessment of their products.  This led to an inherent conflict of interest between the Rating Agencies and their clients: either give the rating that the investment bank or issuer needs to sell the securities, or risk losing repeat business to your competitors:

Arthur Levitt, the former chairman of the Securities and Exchange Commission, charges that *"the credit-rating agencies suffer from a conflict of interest -- perceived and apparent -- that may have distorted their judgment, especially when it came to complex structured financial products."* Frank Partnoy, a professor at the University of San Diego School of Law who has written extensively about the credit-rating industry, says that *the conflict is a serious problem. Thanks to the industry's close relationship with the banks whose securities it rates, Partnoy says, the agencies have behaved less like gatekeepers than gate openers.* . . . .

\*\*\*

*Issuers thus were forced to seek credit ratings (or else their bonds would not be marketable).* The agencies -- realizing they had a hot product and, what's more, a captive market -- started charging the very organizations whose bonds they were rating. This was an efficient way to do business, but *it put the agencies in a*

*conflicted position*. As Partnoy says, rather than selling opinions to investors, the rating agencies were now selling "licenses" to borrowers. Indeed, *whether their opinions were accurate no longer mattered so much*. Just as a police officer stopping a motorist will want to see his license but not inquire how well he did on his road test, *it was the rating – not its accuracy – that mattered to Wall Street.*

\*\*\*

*The challenge to investment banks is to design securities that just meet the rating agencies' tests*. Risky mortgages serve their purpose; since the interest rate on them is higher, more money comes into the pool and is available for paying bond interest. But if the mortgages are too risky, Moody's will object. *Banks are adroit at working the system, and pools like Subprime XYZ are intentionally designed to include a layer of Baa bonds, or those just over the border*. "Every agency has a model available to bankers that allows them to run the numbers until they get something they like and send it in for a rating," a former Moody's expert in securitization says. In other words, *banks were gaming the system*; according to Chris Flanagan, the subprime analyst at JPMorgan, "Gaming is the whole thing."

When a bank proposes a rating structure on a pool of debt, the rating agency will insist on a cushion of extra capital, known as an "enhancement." The bank inevitably lobbies for a thin cushion (the thinner the capitalization, the fatter the bank's profits). It's up to the agency to make sure that the cushion is big enough to safeguard the bonds. *The process involves extended consultations between the agency and its client. In short, obtaining a rating is a collaborative process.*

*The evidence on whether rating agencies bend to the bankers' will is mixed. The agencies do not deny that a conflict exists*, but they assert that they are keen to the dangers and minimize them. . . . . But in structured finance, a handful of banks return again and again, paying much bigger fees. A deal the size of [Subprime] XYZ can bring Moody's $200,000 and more for complicated deals. *And the banks [and issuers] pay only if Moody's delivers the desired rating. Tom McGuire, the Jesuit theologian who ran Moody's through the mid-'90s, says this arrangement is unhealthy.* If Moody's and a client bank don't see eye to eye, the bank can either tweak the numbers or try its luck with a competitor like S.&P., a process known as *"ratings shopping."*

*And it seems to have helped the banks [and issuers] get better ratings*. Mason, of Drexel University, compared default rates for corporate bonds rated Baa with those of similarly rated collateralized debt obligations until 2005 (before the bubble burst). Mason found that the C.D.O.'s defaulted eight times as often. One interpretation of the data is that *Moody's was far less discerning when the client was a Wall Street securitizer.*

*Id*. (emphasis added).

101.    As a result of all of these problems with the ratings – the frenzied nature of the ratings process; the Rating Agencies' use of outdated methodology built upon inaccurate assumptions; and the inherent conflict of interest between the Rating Agencies and their clients – the ratings were rendered meaningless as highly rated securitizations were written down and investors lost confidence in the Rating Agencies' assessments:

> Last year, Moody's had to downgrade more than 5,000 mortgage securities – *a tacit acknowledgment that the mortgage bubble was abetted by its overly generous ratings*. Mortgage securities rated by Standard & Poor's and Fitch have suffered a similar wave of downgrades.
>
> ***
>
> Even Mark Zandi, the very visible economist at Moody's forecasting division (which is separate from the ratings side), was worried about the chilling crosswinds blowing in credit markets. In a report published in May 2006, he noted that consumer borrowing had soared, household debt was at a record and a fifth of such debt was classified as subprime. At the same time, loan officers were loosening underwriting standards and easing rates to offer still more loans. *Zandi fretted about the "razor-thin" level of homeowners' equity, the avalanche of teaser mortgages and the $750 billion of mortgages he judged to be at risk. Zandi concluded, "The environment feels increasingly ripe for some type of financial event."*
>
> *A month after Zandi's report, Moody's rated Subprime XYZ. The analyst on the deal also had concerns.* Moody's was aware that mortgage standards had been deteriorating, and it had been demanding more of a cushion in such pools. *Nonetheless, its credit-rating model continued to envision rising home values.* Largely for that reason, the analyst forecast losses for XYZ at only 4.9 percent of the underlying mortgage pool. Since even the lowest-rated bonds in XYZ would be covered up to a loss level of 7.25 percent, the bonds seemed safe.
>
> XYZ now became the responsibility of a Moody's team that monitors securities and changes the ratings if need be (the analyst moved on to rate a new deal). Almost immediately, the team noticed a problem. Usually, people who finance a home stay current on their payments for at least a while. But a sliver of folks in XYZ fell behind within 90 days of signing their papers. After six months, an alarming 6 percent of the mortgages were seriously delinquent. (Historically, it is rare for more than 1 percent of mortgages at that stage to be delinquent.)
>
> Moody's monitors began to make inquiries with the lender and were shocked by what they heard. Some properties lacked sod or landscaping, and keys remained in the

mailbox; the buyers had never moved in. The implication was that people had bought homes on spec: as the housing market turned, the buyers walked.

By the spring of 2007, 13 percent of Subprime XYZ was delinquent -- and it was worsening by the month. *XYZ was hardly atypical; the entire class of 2006 was performing terribly. (The class of 2007 would turn out to be even worse.)*

In April 2007, Moody's announced it was revising the model it used to evaluate subprime mortgages. It noted that the model "was first introduced in 2002. Since then, the mortgage market has evolved considerably." *This was a rather stunning admission; its model had been based on a world that no longer existed.*

*** 

*Over the summer and fall of 2007, Moody's and the other agencies repeatedly tightened their methodology for rating mortgage securities, but it was too late. They had to downgrade tens of billions of dollars of securities.* By early this year, when I met with Moody's, an astonishing 27 percent of the mortgage holders in Subprime XYZ were delinquent. Losses on the pool were now estimated at 14 percent to 16 percent -- three times the original estimate. Seemingly high-quality bonds rated A3 by Moody's had been downgraded five notches to Ba2, as had the other bonds in the pool aside from its triple-A's.

*Id.* (emphasis added).

102.    On October 22, 2008, the United States House of Representatives Committee on Oversight and Government Reform held a hearing titled, "Credit Rating Agencies and the Financial Crisis." The hearing examined the actions of the three largest credit rating agencies, S&P, Moody's, and Fitch Ratings, leading up to the current financial crisis.

103.    Among those individuals making statements at the hearing were: Raymond McDaniel ("McDaniel"), Chairman and CEO of Moody's; Deven Sharma ("Sharma"), President of S&P; Jerome Fons ("Fons"), a former managing director of credit policy at Moody's; and Frank Raiter ("Raiter"), a former managing director and head of the residential mortgage-backed securities ratings group at S&P. Employees of Fitch Ratings and Egan-Jones Ratings also testified at the hearing.

104.    The hearing confirmed most of the information from the Times Article about the

problems with the Rating Agencies, such as their outdated rating methodologies and conflicts of interest.

105.    For example, when asked why the Rating Agencies failed to properly anticipate the impact of falling housing prices and declining underwriting standards on mortgage-backed securities, Fons testified that:

> [A] large part of the blame can be placed on the *inherent conflicts of interest* found in the issuer pays business model [where issuers, rather than investors, pay the Rating Agencies to rate their securities] and on *ratings shopping* by issuers of structured securities. *A drive to maintain or expand market share made the rating agencies willing participants in the shopping spree.*

Hrg. Tr. at 6 (emphasis added).

106.    Raiter added that although S&P developed updated versions of its model for determining the loss expected on a given bond, "those versions of the model were never released," and S&P continued to use outdated models during the housing boom, which could not predict the falling housing prices and the ensuing housing bust. *Id.* at 9. Raiter explained:

> While we had enjoyed substantial management support up to this time, by 2001 the stress for profits and the desire to keep expenses low prevented us from, in fact developing and implementing the appropriate [ratings] methodology to keep track of the new products.
>
> As a result, we didn't have the data going forward in 2004 and '05 to really track what was happening with the subprime products and some of the new alternative payment type products, and *we did not, therefore, have the ability to forecast when they started to go awry.*

*Id.* (emphasis added).

107.    Fons commented further about the conflict between the Rating Agencies and the issuers who paid them for their ratings, on the one hand, and investors who relied on the ratings to purchase the issuers' securities, on the other:

> [W]e definitely knew that . . . investors were conflicted in what they wanted in terms of having stable ratings on bonds once they held them, that issuers were conflicted in that they wanted high ratings on their securities *whether or not they deserved them*, and that the *bankers were taking advantage of the competition in the rating industry to game the system*.
>
> ***
>
> It was clear . . . [by the end of the housing boom] that . . . faulty ratings had already permeated the entire financial system, and many of these other institutions were unwitting victims, including the monoline insurers, including the banks, including insurance companies and others.  So I think . . . [McDaniel's statement, that "[u]nchecked competition" among the Rating Agencies "can place the entire financial system at risk,"] was prescient.

*Id.* at 15 (emphasis added).

108.   Much of the most damning information against the Rating Agencies came from several of their own internal documents that were presented as hearing exhibits.  One document was the transcript from Moody's September 10, 2007 Managing Director's Town Hall Meeting ("Town Hall").  At the meeting, McDaniel stated:

> The purpose of this town hall . . . [is] so that we can speak as candidly as possible about what's going on in the subprime market . . . .
>
> ***
>
> [W]hat was happening was, it was a slippery slope. . . . .  What happened in '04 and '05 with respect to subordinated tranches is that *our competition, Fitch and S&P, went nuts.  Everything was investment grade.  It didn't really matter.* . . . .
>
> ***
>
> We tried to alert the market.  *We said we're not rating it.  This stuff isn't investment grade.  No one cared because the machine just kept going.*

Town Hall at 1, 63 (emphasis added).

109.   The following day, at a Moody's Town Hall Feedback session, a member of Moody's management team commented:

> We heard 2 answers yesterday: 1. people lied, and 2. there was an unprecedented sequence of events in the mortgage markets.  As for #1, it seems to me that *we had blinders on and never questioned the information we were given*.  Specifically, why would a rational borrower with full information sign up for a floating rate loan that

they couldn't possibly repay, and why would an ethical and responsible lender offer such a loan? As for #2, *it is our job to think of the worst case scenarios and model them; why didn't we envision that credit would tighten after being loose, and housing prices would fall after rising*, after all[,] most economic events are cyclical and bubbles inevitably burst. Combined, these errors make us look either *incompetent at credit analysis, or like we sold our soul to the devil for revenue, or a little of both.* Moody's franchise value is based on staying AHEAD OF THE PACK on credit analysis and instead we are in the middle of the pack. *I would like more candor from senior management about our errors* and how we will address them in the future.

*Id.* at 80 (emphasis added).

110.    Similar sentiments to those of McDaniel – regarding the Rating Agencies' initial reluctance to rate non-investment grade securities, followed by general acquiescence to do so – were echoed by two S&P structured finance employees during an online "instant message" conversation in April 2007:

> Employee 1: "that deal is ridiculous"
>
> Employee 2: "I *(sic)* know right . . . model def[initely] does not capture half of the . . . risk"
>
> Employee 1: "we should not be rating it"
>
> Employee 2: "*we rate every deal . . . it could be structured by cows and we would rate it*"
>
> Employee 1: "but there's a lot of risk associated with it - I personally don't feel comfy signing off as a committee member."

(Emphasis added).

111.    In a confidential presentation McDaniel made to the Moody's board of directors in October 2007, titled "Credit Policy issues at Moody's suggested by the subprime/liquidity crisis," McDaniel addressed a topic he called "Rating Erosion by Persuasion," and described how the persuasive influence the bankers, issuers, and investors had on the Rating Agencies (the conflict of

interest), as well as the Rating Agencies' own drive for profits, contributed to put ratings quality at

"risk":

> Analysts and MDs [Managing Directors] are continually "pitched" by bankers,
> issuers, investors – all with reasonable arguments – whose views can color credit
> judgment, sometimes improving it, other times degrading it (*we "drink the kool-
> aid"*). Coupled with *strong internal emphasis on market share & (sic) margin
> focus, this does constitute a "risk" to ratings quality.*

(Emphasis added).

112.    Many investors were stunned and irate after finding out that hundreds of mortgage-

backed securities, initially rated "triple-A" by the Rating Agencies, were suddenly being downgraded

in 2007 and 2008.  Documents showed how some of these investors voiced their concerns about the

lax practices at the Rating Agencies, but they were largely ignored.  For example, in an internal e-

mail, a Moody's official recapped a "tough" conversation she had with the Chief Investment Officer

of Global CDOs at Fortis Investments the day after Moody's and S&P announced that they were

downgrading over 450 mortgage-backed securities and threatened to downgrade over 200 others (on

July 10, 2007):

> I just got off a tough call with Maryam Muessel from Fortis Investments. She's the
> Chief Investment Officer of Global CDOs.  She requested to speak with someone
> very senior, very quickly.  She and other investors (blackrock *(sic)* is one of the
> names she mentioned) have formed a steering group to try to get the rating agencies
> to listen to the needs of investors.  She is extremely frustrated.  Had a few choice
> words for me, here's a recap:
> *"if you can't figure out the loss ahead of the fact, what's the use of using your
> ratings?"*
> "you have legitimized these things" referring to subprime & abs [asset-backed
> securities] cdos *(sic)* and *"leading people into dangerous risk."*
> *"if the ratings are b.s., the only use in ratings is comparing b.s. relative to more
> b.s."*
> "luckily I avoided Moody's ratings. didn't buy into your ratings, but 91 sucker
> managers did and were punished yesterday [when Moody's announced the ratings
> downgrades]."

(Emphasis added).

113.   In another internal e-mail, another Moody's official described a "direct and candid" conversation she had with a PIMCO employee the day after the Moody's and S&P downgrades were announced:

> I had a very direct and candid discussion with Josh Anderson [at PIMCO]. He started the discussion by saying that Moody's has "a lot more to do" with respect to ratings adjustments and that the recent downgrades "don't help."
> ***
> Josh's main point is that PIMCO and others (he mentioned Blackrock and WAMCO) have previously been very vocal about their disagreements over Moody's ratings methodology. He cited several meetings they have had with Pramila Gupta [a Moody's analyst] *questioning Moody's rating methodologies and assumptions*. He found *the Moody's analyst to be arrogant* and gave the indication that "We're smarter than you." *Despite wanting to work with Moody's as a "good ally with good discussions," eventually they "gave up."*
>
> Josh then became very passionate in the call - almost emotional. He complimented Moody's for doing "a great job, moving the capital markets forward." He said that PIMCO would "go to bat" for Moody's. He feels that Moody's has *a powerful control over Wall Street*" but is *"frustrated that Moody's doesn't stand up to Wall Street.*" They are disappointed that in this case *Moody's has "toed the line."* "Someone up there *just wasn't on top of it,*" he said. He complimented Moody's work in CDO's and CLO's but, *in the case of RMBS [Residential Mortgage-Backed Securities], its mistakes were "so obvious - you have to step back."* . . . .
>
> Our discussion concluded with PIMCO's belief that *Moody's methodology was "still flawed - and we'll tell you why."* . . . .

(Emphasis added).

114.   That same e-mail (as the one involving the PIMCO employee) also described a "very open and direct" conversation the same Moody's official had with a Vanguard employee the day after the Moody's and S&P downgrades were announced:

> Mabel Yu [at Vanguard] was very open and direct in her communications about Moody's and its rating process. . . . . Yu later commented that she believed S&P's actions came about 1$^{1/2}$ years too late; she felt the rating criteria should have been

adjusted earlier. Yu expressed *"frustration" with the rating agencies' willingness to "allow issuers to get away with murder."* She is finding the phenomenon particular to RMBS and CMBS ["Commercial Mortgage-Backed Securities"]. . . . . Vanguard has witnessed the deals "getting worse and worse" and Yu reported that the market has been screaming for a while, "look at sub-prime!"

Over the recent months, Yu reports that Vanguard has become less and less comfortable with rating labels. *"It feels like[] there's a big party out there. The [rating] agencies are giving issuers every benefit of the doubt."* She feels that there's also too much competition between the rating agencies. *"I feel that if Moody's doesn't give the rating, the issuer can simply [go] elsewhere and get it somewhere else,"* she said. . . . .

(Emphasis added).

115.   In a final recapped discussion, the same Moody's official quoted a frustrated

Blackrock employee:

"The rating agency process is run to be efficient rather than to 'have a good sense of the pieces'" he commented . . . . He said that in RMBS, analysts 'relied too much on manufactured data that is weak." He emphasized that *there's "too much reliance on data not fully verified." He questioned any analyst's ability to adequately analyze data without a long track record of performance.* He asked, "How do you establish quality on low doc loans? How do you rate that? It's not just LTV [Ratios]. There's been a lack of pro-active questioning."

(Emphasis added).

116.   In response to these comments, Fons was asked during the hearing whether the

investors had "a point?" He replied:

Absolutely. . . . *[T]he deterioration in standards was palpable* – as I said, evidence – first arose at least in 2006 as things were slipping, and the analysts or the managers for whatever reason *turned a blind eye to this, did not update their models or their thinking, and . . . allowed this to go [on].*

And . . . [what] these investors are most upset about clearly is the fact that a AAA was downgraded. AAAs had historically been very stable ratings through time. And so *there was . . . an implicit compact, if you will, that the AAA rating was to be something that was to last for at least . . . several years without . . . losing that rating.*

And when you see something go from AAA to a low rating in such a short period of time, clearly that . . . [is] *evidence of – of a massive mistake somewhere* . . . .

Hrg. Tr. at 31 (emphasis added).

117.   The exchange about this topic concluded as follows:

Rep. Betty McCollum: "So the *AAA is like the gold standard*."

Fons: "*It is, yes*. It's . . . the brand. That's what the Moody's is . . . selling."

*Id.* (emphasis added).

118.   The Congressional testimony also revealed the extent to which the Rating Agencies' motivation for rating the Senior Certificates was profit-driven, to the exclusion of any desire on the part of the Rating Agencies to ensure the accuracy of their methodologies or ratings:

Rep. Betty McCollum: "According to the [Fortis] e-mail, the Fortis investment manager had come to Moody's the year before to discuss her concerns about the company's methodology. So she's been concerned before. In fact, she told Moody's, quote, "that she and other investors had formed a steering group to try to get the rating agency to listen to the need of the investors."

"So, Mr. Egan [from Egan-Jones Ratings] or Mr. Raiter, what does it say about a system when the investors, the people these ratings are supposed to be serving, their customer – their customer has to form a steering group just so the credit agencies won't ignore them. What does this say about the credit agencies?"

Raiter: *"Well, I just think it's a further indictment that there was a breakdown between the people that were trying to maximize profits and the people that were trying to maximize the credit ratings methodology and activities, and that the people with the . . . profit motive won."*

*Id.* (emphasis added).

119.   Raiter's conclusion that "profit motive won" over ratings accuracy, was further borne out later in the hearing by Representative Jackie Speier, who stated:

I'd like to move to the motivation for much of what you've told us today, which

appears to be money. I want to show you how the revenues for these – rating residential mortgage-backed securities and CDOs became a significant part of these rating agencies' bottom lines.

Let's start with S&P. As you can see from this chart [included as an exhibit to the hearing], S&P increased its share of revenue for rating mortgage-backed securities from 24 percent of U.S. rating revenue in 2002 to as much as 37 percent in 2006.

Let's now show you Fitch. As you can see from this chart [included as an exhibit to the hearing], Fitch's revenues for rating these bonds increased steadily, accounting for 35 percent of its U.S. rating revenue in 2004 and '05 before dropping slightly in 2006.

Now we have a slightly different chart [included as an exhibit to the hearing] with . . . Moody's, but it shows the same trend. By 2006, Moody's' structural finance division, which rates mortgage-backed securities and CDOs, accounted for more than half of the company's total rating revenue.

So profits have played a huge role in the rating of these exotic instruments, is that not the case? And if you could just each indicated that.

***

Raiter: "*Profits were running the show. I mean, in a nutshell, that was the simple answer. And the business managers that were in charge were – just wanted to get as much of the revenue as they saw in the charts like this growing out in the street into their coffers.*"

*Id.* at 34-35 (emphasis added).

120.    With profits "running the show," it is particularly egregious that the Prospectus failed to disclose any information about the fees the Rating Agencies earned for rating the Senior Certificates, the negotiation process that established such fees or the terms of the ratings agreements between the Issuing Entity and the Rating Agencies.

121.    Finally, the Congressional Hearing testimony revealed that although the Rating Agencies knew that issuers falsified data about borrowers' assets and creditworthiness in order to approve home loans, the Rating Agencies did not account for the diminished quality of such borrower data when rating the mortgage-backed securities upon which the home loans served as

collateral.  In fact, the Rating Agencies did not even look at the tapes containing the borrower data

for the underlying loans before they fed that data into their models and warranted the accuracy of the

resulting ratings:

> Rep. Thomas M. Davis III: "Now, the rating can only be as good, then, as the data that's put into the models."

> Raiter: "Correct."

> Rep. T. Davis: "But there's no independent verification that the data is accurate."

> Raiter: "No independent verification of the [underlying mortgage tapes by the Rating Agencies], that's correct."

> \*\*\*

> "From the loan originators and the borrowers who might have fudged home buyers' creditworthiness, employment history, to the issuers who packaged these mortgages and wanted to get the highest possible rating – it looks to me like there were a lot of places along the line where the data that ultimately makes it to the rating agencies could be made unreliable."

> \*\*\*

> Rep. T. Davis: "OK.  Now, *if it's not the rating agencies' job to ensure the accuracy of the data it's using to rate these securities, whose job is it?*"

> Raiter: "That's correct.  *We determined that it was better to put the onus on the issuer.*"

*Id.* at 39-40 (emphasis added).  Under these circumstances, there is no way that the Rating Agencies

could have "take[n] into consideration the credit quality of the mortgage pool" when rating the

Senior Certificates, as the Prospectus states.

122.    Plaintiff and Class members, who purchased the Senior Certificates because they were

rated "triple-A" in the Prospectus, were denied crucial information - omitted from the Prospectus -

detailing how the ratings were based on outdated methodologies and influenced by conflicts of

interest, which combined to erode the ratings' predictive value about the riskiness of the securities

to which they were assigned. The "triple-A" "stamp-of-approval" proved meaningless, as "triple-A"

securities performed on par with "B-rated" and even "C-rated" securities.

## COUNT I
### Violation of Section 11 of The Securities Act
### (Against All Defendants)

123.    Plaintiff repeats and realleges each and every allegation contained above.

124.    This Count is brought pursuant to Section 11 of the Securities Act on behalf of the Class, against all Defendants, and is not based on allegations of fraud.

125.    Plaintiff and all other members of the Class purchased the Senior Certificates, which were registered with the SEC in a Form S-3 dated February 24, 2006 (and amended March 29 and April 13, 2006), pursuant to the Registration Statement.

126.    Defendant RAST is the registrant for the Offerings and filed the Prospectus as the issuer of the Senior Certificates, as defined in Section 11(a)(1) of the Securities Act.

127.    Defendant Credit Suisse served as the "underwriter" for the Senior Certificates and qualifies as such according to the definition in Section 2(a)(11) of the Securities Act, 15 U.S.C, § 77b(a)(11). As such, Credit Suisse participated in the solicitation, offering, and sale of the Senior Certificates to the investing public pursuant to the Prospectus, and is liable under Section 11(a)(5) of the Securities Act.

128.    The Rating Agency Defendants served as appraisers as defined in Section 11(a)(4) of the Securities Act. The Rating Agencies purportedly reviewed and analyzed the Senior Certificates and provided the credit rating for each tranche of Senior Certificates. The Rating Agencies' service of providing the credit rating for the Senior Certificates was essential to pricing and marketing the Senior Certificates. The Rating Agencies' ratings were contained within the Prospectus and were a condition precedent to the sale of the Senior Certificates.

129.    The Prospectus, at the time it became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above. The facts misstated and omitted would have been material to a reasonable person reviewing the Prospectus.

130.    The Defendants did not make a reasonable investigation and perform due diligence and did not possess reasonable grounds for believing that the statements contained in the Prospectus were true, did not omit any material fact, and were not materially misleading.

131.    Plaintiff and the other Class members did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions contained in the Prospectus.

132.    Plaintiff and other Class members sustained damages as a result of misstatements and omissions in the Prospectus, for which they are entitled to compensation.

133.    Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offering, pursuant to Section 13 of the Securities Act.

## COUNT II
### Violation of Section 12(a)(2) of the Securities Act
### (Against All Defendants)

134.    Plaintiff repeats and realleges each and every allegation contained above.

135.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all Defendants, and is not based on allegations of fraud.

136.    By means of the Prospectus, and by using means and instruments of transportation and communication in interstate commerce and of the mails, the Defendants through the Offering sold the Senior Certificates to Plaintiff and other members of the Class.

137. Defendants RAST and Credit Suisse each successfully solicited these purchases, motivated at least in part by their own financial interest. Defendants RAST and Credit Suisse each reviewed and participated in drafting the Prospectus. Credit Suisse, as sole underwriter of the Senior Certificates, sold the Senior Certificates to the Class. Through ensuring the successful completion of the Offering, Credit Suisse obtained substantial underwriting fees.

138. The Rating Agency Defendants were "substantial participants" in the Offering of the Senior Certificates, and are therefore liable as "sellers" under Section 12(a)(2) of the Securities Act.

139. The Prospectus, at the time it became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above. The facts misstated and omitted would have been material to a reasonable person reviewing the Prospectus.

140. Defendants, as "sellers," owed to the purchasers of the Senior Certificates, including Plaintiff and other Class members, the duty to perform due diligence and make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Prospectus.

141. Plaintiff and other members of the Class purchased or otherwise acquired the Senior Certificates pursuant to the defective Prospectus. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

142. Plaintiff, individually and representatively, hereby offers to tender to Defendants

those Senior Certificates which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such Senior Certificates, in return for the consideration paid for those Senior Certificates together with interest thereon.  Class members who have sold their Senior Certificates are entitled to rescissionary damages.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

    a.    Determining that this action is a proper class action under CPLR Article 9;

    b.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    c.    Awarding recission or a rescissory measure of damages;

    d.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    e.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 19, 2008
New York, New York

Respectfully submitted,

By: _____

Marian P. Rosner
James A. Harrod
Robert S. Plosky
**WOLF POPPER LLP**
845 Third Avenue
New York, New York 10022
Telephone: (212) 759-4600
Facsimile: (212) 486-2093

Counsel for Plaintiff and the Proposed Class