# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VASILI TSERETELI and VASZURELE LTD., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A8, CREDIT SUISSE SECURITIES (USA) LLC, MOODY'S INVESTORS SERVICE, INC., and THE McGRAW-HILL COMPANIES, INC.,<br><br>Defendants. | No. 08-CV-10637 (LAK)<br><br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933<br><br><br>JURY TRIAL DEMANDED |

Doc. 163291

# **TABLE OF CONTENTS**

I.  NATURE OF THE ACTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  JURISDICTION AND VENUE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.  BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.  Securitization Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.  Securitization Method . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        i.  The Certificates' Creation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        ii.  The Credit Rating Agencies' Role As Underwriters . . . . . . . . . . . . . . . . 11

        iii.  The Certificates' Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

V.  DISCLOSURES IN THE OFFERING DOCUMENTS  . . . . . . . . . . . . . . . . . . . . . . . . 18

    A.  Loan Underwriting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    B.  Loan Statistical Information  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    C.  Ratings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VI.  MATERIALLY UNTRUE STATEMENTS AND OMISSIONS . . . . . . . . . . . . . . . . . . 21

    A.  Loan Underwriting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        i.  Loan Underwriting - General Abandonment of Standards  . . . . . . . . . . 22

        ii.  Loan Underwriting - Undisclosed Impact of "Low-Doc" Underwriting . 23

        iii.  Loan Underwriting - Undisclosed Problems With Appraisals  . . . . . . . . 26

        iv.  Loan Underwriting - Undisclosed Lack of Underwriting Quality . . . . . . 27

    B.  Loan Statistical Information  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    C.  Ratings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

VII.     CERTIFICATES' PERFORMANCE AND DAMAGES TO THE CLASS . . . . . . . . . . 39

VIII.    CLASS ACTION ALLEGATIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

IX.      COUNTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Plaintiffs, Vaszurele Ltd. ("Vaszurele") and Vasili Tsereteli ("Tsereteli"), allege the following based upon an investigation of their counsel, which included, among other things, a review of documents publicly filed with the U.S. Securities and Exchange Commission ("SEC"); Congressional testimony and exhibits; numerous news articles and press releases; research reports; and other publicly available information, except as to allegations specifically pertaining to Plaintiffs and their counsel, which are based on personal knowledge.

## I.     NATURE OF THE ACTION

1.     This is a class action brought by Vaszurele and Tsereteli alleging violations of Sections 11 and 12 of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq*. ("Securities Act"), on behalf of all persons who purchased the Senior Mortgage Pass-Through Certificates, Series 2006-H ("Senior Certificates") issued on June 28, 2006 (the "Offering") by the Residential Asset Securitization Trust 2006-A8 ("RAST" or the "Trust" or the "Issuing Entity" or the "Issuer") pursuant and/or traceable to the Offering Documents (defined below).

2.     The Senior Certificate holders receive periodic "pass-through" distributions of principal and interest made by borrowers of underlying home mortgage loans (the "Mortgage Loans").  The Mortgage Loans were originated and/or underwritten by IndyMac Bank, F.S.B. ("IndyMac Bank"), a subsidiary of IndyMac Bancorp, Inc. (sometimes collectively referred to herein as, "IndyMac").  Prior to its collapse and seizure by the Office of Thrift Supervision ("OTS") in July 2008, IndyMac was one of the ten largest mortgage loan underwriters in the United States.  Between 2002 and 2005, the approximate annual volume of mortgage loan securitizations sponsored by IndyMac increased roughly 400%, from $6.25 billion to $31.37 billion.

3.     The Certificates were issued and sold pursuant to a registration statement filed with

the SEC on Form S-3 (File No. 333-132042) on February 24, 2006 (amended March 29 and April 13, 2006) (the "Registration Statement"), a base prospectus dated June 14, 2006 (the "Prospectus") and a prospectus supplement dated June 28, 2006 (the "Prospectus Supplement") (the Registration Statement, Base Prospectus and Prospectus Supplement are, unless otherwise indicated, collectively referred to as the "Offering Documents").[1]

4.     RAST "work[ed] with underwriters and rating agencies in structuring [the Mortgage Loans'] securitization." S-68. Defendant Credit Suisse underwrote the Senior Certificates and sold them to investors. Defendants Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's ("S&P") (collectively, the "Rating Agencies") helped structure the Senior Certificates and assigned them the "triple-A" credit ratings that were a condition precedent to their sale.

5.     Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and did not omit material facts. However, due to Defendants' negligence, this did not occur. As a result, Plaintiffs and other investors suffered damages.

## II.    JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to Sections 11 and 12(a)(2) of the Securities Act (15 U.S.C. §§ 77k and 77l(a)(2)).

7.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)) and 28 U.S.C. § 1331.

8.     Venue is proper in this Judicial District pursuant to Section 22(a) of the Securities

---

[1] Page citations to the Offering Documents will be preceded with an "R" for "Registration Statement," a "P" for "Prospectus" or an "S" for "Prospectus Supplement."

Act, 15 U.S.C. § 77v(a) and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of the Offering Documents used to effectuate the Offering and the issuance of the Certificates, occurred in substantial part in this District. Additionally, the Senior Certificates were actively marketed and sold in this District, and all of the Defendants are located and/or regularly conduct business in this District.

9.      In connection with the acts, conduct and other wrongs alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce.

## III.   <u>PARTIES</u>

10.     Vaszurele is a personal holding company and a controlled foreign corporation that was established by Tsereteli for his own benefit and incorporated in the British Virgin Islands on July 21, 2005.  As reflected in the Certification of Vaszurele attached hereto, Vaszurele purchased on behalf of Tsereteli $200,000 face value Class 1-A-1 Senior Mortgage Pass-Through Certificates pursuant to the Offering Documents.  That transaction settled upon the consummation of the Offering on or about June 28, 2006.  The purchase was made pursuant to the Offering Documents that contained untrue statements of material fact and omitted facts necessary to make the statements therein true.  Vaszurele Ltd. has suffered damages pursuant to Sections 11 and 12 of the Securities Act.

11.     Tsereteli is the sole Director, President, Treasurer, shareholder and owner of Vaszurele.  Tsereteli controls and directs all of the operations of Vaszurele.  As the purchase of the RAST Certificates was made on Tsereteli's behalf, Tsereteli has suffered damages pursuant to Sections 11 and 12 of the Securities Act.

12.     Defendant Residential Asset Securitization Trust 2006-A8 was the Issuing Entity for the Offering.  RAST was created by IndyMac MBS, Inc. and issued the Senior Certificates in connection with the Offering.  IndyMac MBS, Inc. was a subsidiary of IndyMac Bank, F.S.B.

13.     Defendant Credit Suisse Securities (USA) LLC is an investment banking firm principally located at Eleven Madison Avenue, New York, New York 10010.  Credit Suisse is one of the leading underwriters of mortgage and asset-backed securities in the United States.  Credit Suisse served as the underwriter for the Senior Certificates issued through the Offering and was intimately involved in the Offering.

14.     Defendant Moody's Investor Service, a division of Moody's Corp., is a credit rating agency with its principal offices located at 7 World Trade Center at 250 Greenwich Street, New York, New York 10007.  Moody's performs financial research and analysis for commercial and government entities and holds a 40 percent share of the world's credit ratings market.  Moody's worked with RAST in structuring the securitization transactions that created the Senior Certificates, evaluated the quality of the Senior Certificates and assigned the credit ratings that were a condition precedent to the Senior Certificates' sale.

15.     Defendant The McGraw-Hill Companies, Inc. maintains a business division doing business as "Standard & Poor's Rating Services" ("S&P" shall refer to McGraw-Hill and its business division Standard & Poor's Ratings Services).  Defendant S&P is a credit rating agency with its headquarters located at 55 Water Street, New York, New York 10041.  S&P performs financial research and analysis for commercial and governmental entities and also holds a 40 percent share of the world's credit ratings market.  S&P worked with RAST in structuring the securitization transactions that created the Senior Certificates, evaluated the quality of the Senior Certificates and

assigned the credit ratings that were a condition precedent to the Senior Certificates' sale.

16.    Defendants Moody's and S&P are collectively referred to herein as the "Rating Agencies" or the "Rating Agency Defendants."

## IV.    **BACKGROUND**

### A.    **Securitization Participants**

17.    "Securitization" is the process by which assets are pooled, and debt obligations representing claims on the cash flow distributions (e.g., principal and interest payments) from the pools are issued.  When the assets in the pools are mortgage loans, the debt obligations issued are commonly known as "mortgage-backed securities" ("MBS").  The mortgage loans are said to serve as collateral for, or "back," the MBS.

18.    The general mechanics of mortgage-backed securitization are similar regardless of the exact type of mortgages involved (e.g., residential vs. commercial mortgage loans).  The participants in the process, and the method of securitization that created the Certificates from a pool of residential Mortgage Loans (the "Pool"), are each explained below.

19.    The chart below depicts the participants in the securitization process and provides an overview of the securitization transactions:



Diagram based on "Summary of Transaction Parties" chart at S-21.

20.     First, IndyMac Bank (the "Sponsor" or "Seller" or  "Servicer") originated and acquired (from other originators) the Pool, which consisted of 1,708 Mortgage Loans with an aggregate principal balance outstanding of $641,665,755.31.  S-53.  IndyMac Bank (purportedly) underwrote the Mortgage Loans according to its stated underwriting guidelines.  The Mortgage Loans were "primarily 30-year conventional, fixed rate loans secured by first liens on one- to four-family residential properties."  S-1.

21.     Next, the Sponsor sold the Pool to its subsidiary, IndyMac MBS, Inc. (the "Depositor").  As owner of the Pool, the Depositor was entitled to receive the cash flow distributions made by the borrower of the underlying Mortgage Loans.  The Depositor created a Special Purpose Vehicle ("SPV"), the Trust, and transferred (or deposited) the Pool into the Trust.  The Trust issued

the Mortgage-Pass Through Certificates as a means of selling the Depositor's right to receive the Pool's cash flow distributions to investors. Mortgage pass-through certificates are the most basic form of MBS and entitle holders to a proportion of all cash flow distributions made by borrowers of the pool's underlying assets. When borrowers made principal and interest payments on the Mortgage Loans these payments "passed through" the Trust to the Certificate holders. However, before the Certificates were issued, they were first created through the securitization process (explained below).

22.     After the Mortgage Loans were securitized, the Trust passed the Certificates back to the Depositor. The Depositor filed the Offering Documents, which explained the material terms of the Offering, with the SEC. The Depositor then sold the Certificates to Credit Suisse and Lehman Brothers Inc. ("Lehman Brothers") (collectively, the "Underwriters"). The Underwriters inspected the Offering Documents to ensure their accuracy and sold the Certificates to investors (along with copies of the Offering Documents). This is known as a firm-commitment underwriting.

23.     The Certificates were sold in the following classes:

| DESIGNATION | CLASSES OF CERTIFICATES |
|---|---|
| Senior Certificates | Class 1-A-1, Class 1-A-2, Class 1-A-3, Class 1-A-4, Class 1-A-5, Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4, Class 2-A-5, Class 2-A-6, Class 2-A-7, Class 2-A-8, Class 3-A-1, Class 3-A-2, Class 3-A-3, Class 3-A-4, Class 3-A-5, Class 3-A-6, Class 3-A-7, Class 3-A-8, Class 3-A-9, Class 3-A-10, Class 3-A-11 and Class PO Certificates |
| Subordinated Certificates | Class B-1, Class B-2, Class B-3, Class B-4, Class B-5, Class B-6, Class B-7, Class B-8, Class B-9 and Class B-10 Certificates |

24.     Investors paid approximately $603,163,942 to purchase the Senior Certificates (out of $632,676,943 for all Certificates). The Underwriters then paid these proceeds back to the

Depositor, minus a fee for their work in connection with the Offering.  Once the Certificates were sold, the Servicer collected the payments and distributed them through the Trust (functioning as a conduit for the cash flows) to investors, according to the distribution schedule set forth in the Offering Documents.

### B.    Securitization Method

25.    The "essence of structured finance is that it takes pools of undifferentiated risks – such as those contained in a portfolio of residential mortgages or credit card debts – and parcels them out into debt instruments with different risk profiles.  The efficiency in this process is that it allows different investors with different risk appetites to purchase exactly the risks they want." Standard & Poor's, *Structured Finance Commentary: The Fundamentals of Structured Finance Ratings*, August 23, 2007 ("Ratings Fundamentals") at 2.  The alternative – selling the original pool of undifferentiated assets to a single buyer or to multiple buyers who all seek the exact level of risk that the pool currently exhibits (the pool's average risk profile) – "may be difficult in some markets where there are no buyers for such risk."  *Id*. at 3.

26.    Here, the Rating Agencies performed "[a] key step in the process of creating and ultimately selling" the "parcels" that the Pool was divided into.  *See Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies*, July 2008 (hereinafter, "SEC Summary Report") at 7 (emphasis added).  As is described below, the Rating Agencies "substantially participated" in the Certificates' Offering and were "underwriters," as that term is defined in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11).

### i.    The Certificates' Creation

27.    The "parcels" of differing risk profiles that the Pool was divided into are commonly known as classes or "tranches" (French for "slices").  Before delving into their creation, it is useful to explain their general characteristics.

28.    Each tranche assembled from a pool of mortgage loans contains the same undifferentiated grouping of underlying mortgages (the same average risk profile).  To stratify the risk of loss due to nonpayment of cash flow distributions from the underlying mortgage loans – thereby creating debt instruments (i.e., bonds) with distinct risk profiles (i.e., levels of risk and return) that can be sold separately to investors – the bonds are tiered (or "subordinated") in a structure known as a "waterfall."

29.    Within the waterfall structure, the subordinated bonds no longer share losses equally (i.e., carry the same risk profile).  Instead, losses are generally borne by bonds sequentially in reverse order of their proximity to the top of the waterfall (known as "seniority"), such that losses are not allocated to a given tranche until the balances of all tranches with a lower seniority (known as "junior" or "subordinated") have been reduced to zero.  In this way, the subordinated tranches serve as loss protection, or "credit protection," for the senior tranches by standing first in line to absorb losses.[2]  Due to their higher risk of loss and lower payment priority, subordinated bonds pay the highest yield.

30.    Through the "magic" of subordination (and other forms of loss protection), a pool

---

[2] Other forms of loss protection include "over-collateralization," which is the amount that the principal balance of the mortgage pool exceeds the principal balance of the tranche securities issued by trust," and "excess spread," which is the "amount that the trust's monthly [expected] interest income exceeds its monthly liabilities."  *SEC Summary Report* at 6.

of risky assets can be structured so that it produces a senior tranche with enough loss protection (in the form of subordinated tranches) to be deemed relatively risk-free and of high credit quality by credit rating agencies; good enough to be rated "triple-A."

> [T]he likelihood that an investor in a particular tranche will receive both the principal and interest due on the bond depends not only on the quality of the loans in the securitiz[ed] pool, but also on the amount of loss protection provided. Because losses on subprime loans are generally expected to be much higher than losses on "prime" loans, a greater amount of loss protection is needed in a subprime securitization for the senior tranche to receive the same rating as the senior tranche of a prime securitization. The higher the seniority of a bond issued in a securitization, the more likely it will be repaid in full – meaning it is "less risky." Conversely, the lower the seniority of a bond, the less protection it will have against losses, making it less likely to be repaid in full. As a result, the tranches of a . . . securitization generally receive progressively lower ratings as the seniority of the tranches gets lower. Each progressively more subordinate bond has less loss protection because each has fewer bonds that can provide a cushion to absorb losses in case of defaults on some of the loans in the pool.

Congressional Testimony, April 17, 2007 – Warren Kornfeld (Managing Director, Moody's).

31.     The diagram on the next page illustrates the basic structure of subordinated tranches and the attributes of loss protection:



From John D. Martin, *A Primer on the Role of Securitization in the Credit Market Crisis of 2007*, at 6, Figure 3 (Baylor University, January 7, 2009) (diagram is edited).

### ii.     The Credit Rating Agencies' Role As Underwriters

32.     The rating a particular tranche receives is based upon the rating agency's evaluation of two key factors.  One is the cumulative "expected loss" of the entire loan pool, which is based upon an assessment of the attributes and "credit quality" of the loan pool (this factor affects all tranches in a given pool equally).  The other is the amount of loss protection (or seniority) of the tranche (this factor is distinct for each tranche in a given pool).

33.     According to Warren Kornfeld (of Moody's):

*In rating a . . . [MBS], Moody's first estimates the amount of cumulative losses that the underlying pool of subprime mortgage loans are expected to suffer over the lifetime of the loans (that is, until all the loans in the pool are either paid off or*

default).  . . . .

In arriving at the cumulative loss estimate, Moody's considers both quantitative and qualitative factors.  We analyze over 50 specific factors about the loans in a pool which helps us project the future performance of the loans under a large number of different projected future economic scenarios.  The data we analyze include: . . . credit bureau scores, . . . the amount of equity borrowers have in their homes, how fully the borrowers documented their income and assets, whether the borrower intends to occupy or rent the property, and whether the loan is for purchase or refinance.  Next, we consider the more qualitative factors of the asset pool such as the lending criteria . . . and underwriting standards and past performance of similar loans . . . .

We then analyze the structure of the transaction and the level of loss protection allocated to each tranche of bonds.  Finally, based on all of this information, a Moody's rating committee determines the rating of each tranche.

Congressional Testimony, April 17, 2007 – Warren Kornfeld (emphasis added).

34.    S&P analyzes similar factors and employs the same general ratings process:

S&P evaluates the overall creditworthiness of a pool of mortgage loans by conducting loan level analysis – each mortgage loan is analyzed individually.  This analysis is performed using our LEVELS ["Loan Evaluation and Estimate of Loss System"] model.  Our criteria do not dictate the terms of the mortgage loans; rather the originator in the underwriting process determines these terms.  S&P will evaluate the loan characteristics which include, but are not limited to: the amount of equity a borrower has in the home; the loan type; the amount of income verification; whether the borrower occupies the home; and the purpose of the loan.  This analysis allows us to quantify multiple risk factors, or the layered risk, and allows for an assessment of the increased default probability that is associated with each factor.  Based on the individual loan characteristics, the LEVELS model calculates probabilities of default and loss realized upon default, *and on a pool basis, helps us determine how much credit enhancement is needed to support the rated bonds*.

Congressional Testimony, April 17, 2007 – Susan Barnes (Managing Director, S&P) (emphasis added).

35.    The "purpose of the [rating agencies'] [expected] loss analysis is to determine how much credit enhancement a given tranche security would need for a particular category of credit

rating." *SEC Report* at 8.  The particular category of credit rating investors generally desire the most is the "triple-A" category.  Due to this high demand, "triple-A" rated bonds are the most lucrative tranches an issuer can offer.  In addition, "the senior tranche -- as the highest rated tranche -- pays the lowest coupon rate of the RMBS' tranches and, therefore, costs the arranger the least to fund." *See Summary Report* at 8 (emphasis added).  The Offering Documents even conditioned the sale of the Senior Certificates on their receipt of "triple-A" ratings.  S-133.

36.     However, issuers cannot simply issue an unlimited number of lucrative "triple-A" rated senior tranches.  Each senior tranche must be supported by enough subordinated tranches to absorb all expected losses from the loan pool.  Necessarily, the greater the expected loss of the pool, the more subordinated tranches (and other forms of loss protection) that must be issued, and the less of the pool's aggregate balance that can be devoted to the senior tranches.  "Generally, arrangers aim for the largest possible senior tranche, i.e., to provide the least amount of credit enhancement possible." *SEC Report* at 8.

37.     Thus, the "expected loss" of the loan pool dictates the limits of the MBS structure that issuers can create.  Since rating agencies derive this critical calculation, they (and not the issuers) hold the key to creating saleable MBS (i.e., "triple-A" rated bonds that investors desire).  For example, a rating agency might evaluate a $600 million pool of Alt-A mortgage loans and calculate its expected loss at $150 million dollars (or 25% of the total).  In order to create a group of "triple-A" rated tranches from that pool, the pool must be structured with enough subordinated tranches to absorb all of the expected losses before they get to the "triple-A" tranches ($150 million).  Thus, the maximum value of the senior tranche(s) that can be issued based on this expected loss is $450 million ($600 million - $150 million).  However, if the expected loss is

increased to 50%, then the issuer can no longer issue such a large senior tranche, since there isn't enough credit protection to sustain it (50% of $600 million = $300 million for credit support, leaving only $300 million for "triple-A" senior tranches).

38.     Rating agencies actively *tell* issuers how to structure tranches to receive particular ratings.  As one news article accounted:

> Late last year, officials from Moody's Investors Service gave a PowerPoint presentation to a group of mortgage lenders in Moscow.  . . . .
>
> But midway through the presentation, Moody's revealed a significant, and ultimately more dangerous, role that the agencies play in financial markets.  *The slides detailed an "iterative process, giving feedback" to underwriters before bonds are even issued.  They laid out how Moody's and its peers help their clients put together complicated mortgage securities before they receive an official ratings stamp.* ....
>
> . . . *It's becoming clear that the rating agencies were far from passive raters, particularly when it came to housing bonds.  With these, the agencies were integral to the process.*  . . . .
>
> ***
>
> *Ratings-agency officials concede that they work with Wall Street banks, even if they don't exactly shout it from the rooftops.  "You start with a rating and build a deal around a rating," explains Brian Clarkson, Moody's co-COO.  But the agencies reject the accusation that they take an active role in structuring the deal.*

Portfolio, *Overrated*, September 2007 ("Overrated") (emphasis added).

39.     The rating agencies describe this as "collaboration" or being involved in an "iterative process" with issuers.  According to S&P:

> Since the arrangers are selling to investors in each tranche a specific type of risk and since investors compare these tranches using the universal scoring system of the rating agency, *it follows that arrangers will seek to tailor their structure to generate the rating for each tranche that matches what the buyers are seeking* [i.e., "triple-A" ratings].  Not doing so could result in no buyers being found for the tranches that don't meet investor appetite.  If the structure as it is first presented to the rating agency doesn't satisfy the investor, then it is rational for the arranger to make changes that will meet the buyer's need.

To do that, they must have a dialogue with the agencies. This dialogue will inevitably take *as many iterations as are necessary for the structure to provide what investors are seeking* or for the arranger to conclude that no viable structure can be created, at which point the transactions are usually abandoned.

*Ratings Fundamentals* at 3 (emphasis added).

40.     Moreover, rating agencies freely disseminate their ratings models to issuers so that issuers can pre-structure their MBS with a focus on obtaining desired ratings: "As part of our commitment to transparency, S&P makes its LEVELS model available to investors who wish to license it. *The vast majority of those involved in issuing RMBS have access to LEVELS* and *use it regularly*." Congressional Testimony, September 26, 2007 – Vickie A. Tillman (Executive Vice President of S&P) (emphasis added).

41.     According to the Bank for International Settlements:

What distinguishes the rating of structured finance transactions from the rating of traditional instruments is that the former requires the rating agencies to be involved in the deal's structuring process. . . . . *Deal origination thus involves obtaining implicit structuring advice by the rating agencies, at least to the extent that arrangers use rating agency models to pre-structure deals and subsequently engage in an iterative dialogue with the agencies in order to finalize these structures*. As a result, ratings of structured finance instruments have a decidedly *ex ante* character.

Joseph R. Mason and Joshua Rosner, *Where Did the Risk Go? How Misapplied Bond Ratings Cause Mortgage Backed Securities and Collateralized Debt Obligation Market Disruptions*, May 14, 2007 at 13 n. 30 (quoting Bank for International Settlements, Committee on the Global Financial System, *The Role of Ratings in Structured Finance: Issues and Implications* 2 (Jan. 2005)) (emphasis added).

42.     On June 16, 2008, the SEC issued proposed rule amendments to "impose additional requirements" on the rating agencies "in order to address concerns about the integrity of their credit rating procedures and methodologies in the light of the role they played in determining credit ratings

for securities collateralized by or linked to subprime residential mortgages." SEC, *Proposed Rules for Nationally Recognized Rating Organizations*, June 16, 2008. One of the proposed rules was aimed at prohibiting rating agencies from rating the products they structured: "[T]he interaction between the NRSRO [i.e., rating agency] and the arranger during the RMBS and CDO rating process has raised concerns that the NRSROs are *rating products they designed (i.e., evaluating their own work)*." *Id*. at 26 (italicized emphasis added).

43.     According to former SEC Chairman Christopher Cox:

> The credit rating agencies, which until late September 2007 were not regulated by statute, notoriously gave AAA ratings to these structured mortgage-backed securities. *But that was not all: the ratings agencies sometimes helped to design these securities so they could qualify for higher ratings. These ratings . . . also skewed the computer risk models and regulatory capital computations.* Both the risk models used by financial institutions and the capital standards used by banking and securities regulators had the credit ratings hard-wired into them.

Congressional Testimony, October 22, 2008 - Christopher Cox (emphasis added).

44.     In addition to all of the commentary and admissions that they share their models with issuers and give them feedback on their pre-rated MBS structures, the Rating Agencies also admit that they play a role in helping issuers structure MBS; which makes the Rating Agencies "underwriters" and "substantial participants" in their offering and sale.

> [T]he ratings process is not and should not be a guessing game. *Without informed discussion, issuers would be proposing structure upon structure until they stumbled upon the structure that best matches with their goals.* That certainly would not make the markets more transparent and efficient.

Congressional Testimony, September 26, 2007 – Vickie A. Tillman (S&P Executive Vice President) (emphasis added).

### iii.    The Certificates' Sale

45.    According to the Offering Documents, it was a condition precedent to the issuance of the Senior Certificates that they be rated "triple-A" by the Rating Agencies.  S-133.  Without obtaining these ratings, the Senior Certificates could not have been issued.  Thus, in a very literal sense, the Senior Certificates' sale was dependent upon the Rating Agencies' participation in the Offering.

46.    In addition, the Rating Agencies also played a more practical but just as necessary role in the Senior Certificates' sale and distribution.  The Rating Agencies helped "translate" the differentiated risk each tranche held into a meaningful "language" (i.e., the ratings) that investors could readily understand and rely upon.  Without such ratings, the Senior Certificates could not have been sold.  According to S&P:

> For a securitization market to develop, investors must be able to compare the risks of various tranches being offered in the market.  . . . .  But how can they know [whether any particular] . . . complex structured finance tranche carries a level of credit risk with which they are comfortable?
>
> By providing an objective and independent assessment and a universal scoring system that allows like for like comparisons of credit risk, rating agencies assist in this process.

*Ratings Fundamentals* at 3.

47.    Thus, the Rating Agencies' ratings "ma[d]e a market" for the Senior Certificates' sale just like the other Underwriters.  *See* S-133.  According to Ohio attorney general Marc Dann: "[The credit-rating agencies] made the market.  Nobody would have been able to sell these bonds without the ratings."  *Overrated*.

## V.     DISCLOSURES IN THE OFFERING DOCUMENTS

48.     The Offering Documents provided pertinent information about the Mortgage Loans backing the Certificates – including statistical information and the practices used to underwrite the Mortgage Loans – as well as critical information about the credit ratings assigned to the Certificates. Investors were instructed to "read [this information] carefully . . . before making any investment decisions."   S-5.   However, as described in detail below, this information contained untrue statements of material fact and omitted to state material facts about the Certificates and the underlying Mortgage Loans that were necessary to make the statements therein true.

### A.     Loan Underwriting

49.     The Offering Documents stated that IndyMac underwrote the Mortgage Loans "according to . . . [its] underwriting guidelines" that were described in the Offering Documents. *See* S-62.   These underwriting guidelines required loan underwriters to conduct "an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral," prior to approving the loan.   S-62.

50.     With regard to analyzing borrowers' ability to repay the Mortgage Loans, the Offering Documents stated that loan underwriters evaluated information about borrowers' income, assets and employment (i.e., "financial data") included in loan applications.   *See* S-62-63 (discussing Indymac's seven loan documentation programs).

51.     With regard to analyzing the adequacy of the mortgaged property as collateral, the Offering Documents stated that loan underwriters evaluated information about the appraised value of the mortgaged properties:

> To determine the adequacy of the property to be used as collateral, *an appraisal is generally made of the subject property in accordance with the Uniform Standards*

*of Professional Appraisal Practice*. The appraiser generally inspects the property, analyzes data including the sales prices of comparable properties and issues an opinion of value using a Fannie Mae/Freddie Mac appraisal report form, or other acceptable form. In some cases, an automated valuation model (AVM) may be used in lieu of an appraisal. AVMs are computer programs that use real estate information, such as demographics, property characteristics, sales prices, and price trends to calculate a value for the specific property. *The value of the property, as indicated by the appraisal or AVM, must support the loan amount.*

S-63 (emphasis added).

52.     These statements were untrue because, as further described in paragraphs 58-77 below, they failed to disclose the fact that IndyMac's loan underwriters did not underwrite the Mortgage Loans according to IndyMac's stated underwriting guidelines.  Specifically, the Mortgage Loan underwriters (i) relied on inaccurate borrower financial information that did not reflect the true ability of borrowers to repay their loans, and (ii) relied on inaccurate appraisal data that did not reflect the true value and adequacy of the mortgaged properties serving as loan collateral.  In so doing, the underwriters were unable to accurately (i) assess borrowers' ability to repay the Mortgage Loans, or (ii) the adequacy of the mortgaged properties as collateral, prior to approving loans.

**B.**     **Loan Statistical Information**

53.     The Offering Documents provided aggregate statistical information about the Mortgage Loans in the loan Pool, which included the following aggregate data:

"[T]he weighted average Mortgage Rate of the Mortgage Loans was approximately 6.735% per annum."

"[T]he average principal balance of the Mortgage Loans was approximately $375,683."

"[T]he weighted average loan age of the Mortgage Loans was approximately 2 months."

"[T]he weighted average remaining term to stated maturity of the Mortgage Loans was approximately 357 months."

> "[T]he weighted average FICO Credit Score of the Mortgage Loans was approximately 711."

> "*[T]he weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 72.22%.*"

S-53-59 (emphasis added).

54.     The statements reflecting the LTV ratios provided in the Offering Documents were untrue because, as further described in paragraphs 78-87 below, they materially overstated borrowers' equity in their homes and failed to disclose that the mortgaged properties (acting as loan collateral) would be inadequate to cover the full loan balance in the event of foreclosure.

### C.     Ratings

55.     The Offering Documents stated that, as condition precedent to the issuance of the Senior Certificates, the Rating Agencies were required to rate them and assign them "triple-A" ratings.

> *It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's,* a division of The McGraw-Hill Companies, Inc. ("S&P") and that, except with respect to the Class 2-A-8 and Class A-R Certificates, *they be rated Aaa by Moody's* Investors Service, Inc. ("MOODY'S"). It is a condition to the issuance of the Class 2-A-8 Certificates that they be rated Aa1 by Moody's.

S-133 (emphasis added).

56.     In assigning these ratings, the Rating Agencies were to take into account factors similar to those purportedly assessed by IndyMac loan underwriters, such as the overall credit quality of the Mortgage Loans, in order to determine the likelihood that Senior Certificate holders would receive all distributions on the Mortgage Loans.  The Offering Documents stated as follows:

> The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the certificateholders under the agreements pursuant to which the certificates are issued.

*S&P's ratings take into consideration the credit quality of the mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates.* The rating assigned by S&P to the Notional Amount Certificates do not address whether investors will recoup their initial investments.

The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the certificateholders under the agreements pursuant to which the certificates are issued. *Moody's ratings take into consideration the credit quality of the mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates.* The rating assigned by Moody's to the Notional Amount Certificates do not address whether investors will recoup their initial investments.

S-133 (emphasis added).

57.     These statements were untrue because, as further described in paragraphs 88-103 below, the Rating Agencies did not accurately determine the likelihood that Senior Certificate holders would receive all distributions on the Mortgage Loans.  Specifically, when assigning the Senior Certificates "triple-A" ratings, the Rating Agencies relied upon rating methodologies that were outdated and inaccurately calculated the credit quality and expected loss (from default) of the Mortgage Loans.

## VI.     MATERIALLY UNTRUE STATEMENTS AND OMISSIONS

### A.     Loan Underwriting

58.     According to the Offering Documents, IndyMac underwrote the Mortgage Loans according to its stated underwriting guidelines that required its underwriters to analyze borrowers' credit history, ability to repay their loans and the adequacy of the mortgaged property as collateral (in the form of appraisals) before approving loan applications.  However, this was not the case.

i. **Loan Underwriting - General Abandonment of Standards**

59.     Instead, the Offering Documents did not disclose that, during the time period when the Mortgage Loans were underwritten, IndyMac abandoned its stated underwriting guidelines and "embarked on a path of aggressive growth" that was supported by its "high risk business strategy" of "originating . . . Alt-A loans on a large scale" and then "packag[ing] them together in securities" and "[selling] them on the secondary market" to investors.  U.S. Department of the Treasury, Office of Inspector General ("OIG") Audit Report (OIG-09-032), *Safety and Soundness: Material Loss Review of IndyMac Bank, FSB*, February 26, 2009 (the "OIG Report") at 2, 7.  This strategy, which allowed IndyMac to grow rapidly – increasing its total assets sixfold (from nearly $5 billion to over $30 billion) and making it the seventh largest savings and loan and ninth largest mortgage loan originator in the U.S. – was also the "primary cause[] of IndyMac's failure."  *Id*. at 2.

60.     In its effort to "produce as many loans as possible and sell them in the secondary market," *id*. at 21, IndyMac "relaxed" and ultimately abandoned its underwriting standards to permit riskier borrowers to qualify for Alt-A loans; sacrificing loan quality for loan quantity.  "IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories.  Appraisals obtained by IndyMac on underlying collateral were often questionable as well."  *Id*. at 2.  Ultimately, IndyMac was making loans to borrowers who "simply could not afford to make their payments," *id*., and "the quality of [IndyMac's] loans became a running joke among its employees . . . ."  *CRL Report* at 3.  "These practices left many [borrowers] deep in debt and struggling to avoid foreclosure."  *Id*. at 2.

61.     During this time, IndyMac was entirely focused on loan production and was oblivious to the fact that if housing values fell and borrowers could no longer afford to make their loan

payments, the loans it was originating would default:

> Executives at IndyMac, like many people on both Wall Street and Main Street, apparently never dreamed that home prices might fall.  To the contrary, IndyMac made many loans on terms that implicitly assumed prices would keep rising.
>
> Since 2000, IndyMac collected deposits from customers and used the money to make lucrative - and, it turns out, perilous - [Alt-A] mortgages a rung above subprime.  The bank also let people borrow money without providing documentation to verify their income and assets.
>
> As long as home prices continued to go up, the company's strategy was very lucrative for executives, employees and shareholders.
>
> *Analysts say the boom perpetuated an insatiable hunger for mortgages and a complacency about the risks they posed.*
>
> "*The sales culture took over, and the sales division really drove the company*," said Paul Miller Jr., an analyst at Friedman, Billings, Ramsey.

International Herald Tribune, *Chronology of a U.S. bank failure*, July 29, 2008 (emphasis added).

62.     The abandonment of IndyMac's loan underwriting procedures and guidelines, described above in paragraphs 59-61, was not disclosed in the Offering Documents.  Failure to disclose this information, which was negligent, constitutes a material omission and rendered the disclosures in the Offering Documents concerning those loan underwriting procedures and guidelines, quoted above in paragraphs 49-51, untrue.

### ii.     Loan Underwriting - Undisclosed Impact of "Low-Doc" Underwriting

63.     With regard to the "financial data" that IndyMac's underwriters purportedly used to evaluate the borrowers' ability to repay the Mortgage Loans, the *CRL Report* and *OIG Report* stated that: IndyMac's underwriters "routinely . . . [approved] loans without regard to borrowers' ability to repay" and with "little, if any, review of borrower qualifications, including income, assets, and employment."  *CRL Report* at 2, 9; *OIG Report* at 11.

64.     According to the Offering Documents, the majority of the Mortgage Loans were originated under "low-documentation" programs that did not require borrowers to submit their full financial information on loan applications.  *See* S-58, S-62-63.  According to CRL:

> [D]uring the housing and mortgage boom of 2003-2006, IndyMac moved away from documenting borrowers' income and assets – *basic information that's crucial to determining whether consumers can afford a loan*.
>
> Take, for example, a $354 million pool of mortgages that IndyMac packaged into a mortgage-backed securities deal in June 2006.  Less than 10% of the dollar volume involved "full-documentation" loans.  The rest involved low or no-documentation loans -- mostly "stated income" loans in which borrowers' income was simply affirmed without supporting evidence such as tax documents or pay stubs.
>
> As recently as the first quarter of 2007, just 21% of IndyMac total loan production involved "full-doc" mortgages. [From Footnote to last sentence:] IndyMac has now moved decidedly back in the direction of fully documenting borrowers income and other particulars, with 69% of its loan volume in March 2008 involving "full-doc" mortgages.

*CRL Report* at 3, 3 n. 6 (emphasis added).

65.     These "low-doc" Alt-A loans came to be known as "liar loans," due to the propensity for borrowers and mortgage brokers to lie about or exaggerate borrowers' financial information on loan applications.  *See* Zelman Credit Suisse Analyst Report, *"Mortgage Liquidity du Jour: Underestimated No More*," March 12, 2007 at 38.  "[A] study by the Mortgage Asset Research Institute sampling 100 stated income (low . . . documentation) loans found that 60% of borrowers had 'exaggerated' their income by more than 50%."  *Id*. at 5.

66.     More than 70% of the Mortgage Loans (as a percentage of aggregate principal balance outstanding) were originated under low-documentation programs that either did not require underwriters to verify borrowers' reported incomes and/or assets, or did not require borrowers to report their incomes and/or assets on their loan applications in the first place.  *See* S-58.  As a result,

loan underwriters had no way to verify borrowers' financial information in order to accurately assess

their "ability to repay" the loans, as was required by IndyMac's underwriting guidelines.  *See* S-62

("IndyMac's underwriting criteria for traditionally underwritten mortgage loans includes an analysis

of the borrower's . . . ability to repay the mortgage loan").

67.    Former IndyMac underwriters explained that low-doc loans were "[a] big problem"

because "these loans allowed outside mortgage brokers and in-house sales staffers to inflate

applicants' [financial information] . . . and make them look like better credit risks."  *CRL Report* at

8.  These "[s]hoddily documented loans were known inside the company as 'Disneyland loans' –

in honor of a mortgage issued to a Disneyland cashier whose loan application claimed an income

of $90,000 a year."  *Id*. at 3.

68.    With respect to the approximately 18% of Mortgage Loans originated under the "no-

doc" program, the Offering Documents stated that mortgage underwriters should evaluate the loans

based on "the credit score of the prospective borrower and on the value and adequacy of the

mortgaged property as collateral, rather than on the . . . [financial information] of the prospective

borrower."  *See* S-58, S-63.  This assumed that, even without access to borrowers' financial data,

underwriters could effectively monitor the quality and risk of the loans.  However, as OTS found

during its 2008 internal failed bank review of IndyMac, the "risk from its loan products . . . was not

sufficiently offset by other underwriting parameters, primarily higher FICO scores and lower LTV

ratios."  *OIG Report* at 31.

69.    As described above in paragraphs 63-68, it was not disclosed in the Offering

Documents that the risk of default or non-payment of Mortgage Loans underwritten through

low-documentation, or no-documentation, programs could not be accurately assessed and was likely

understated. Failure to disclose this information, which was negligent, constitutes a material omission and rendered the disclosures in the Offering Documents concerning those loan underwriting procedures and guidelines, quoted above in paragraphs 49-51, untrue.

### iii. Loan Underwriting - Undisclosed Problems With Appraisals

70.     With regard to the quality of the appraisals that IndyMac's underwriters purportedly used to evaluate the adequacy of the mortgaged properties as collateral for loans, the OIG Report stated that: "property appraisals obtained to support the collateral on loans" contained "weaknesses," were "often questionable" and were "not in compliance with the Uniform Standard of Professional Appraisal Practice (USPAP)."   *OIG Report* at 12.  This was in direct contrast to the statements in the Offering Documents stating that appraisals were conducted "in accordance with the Uniform Standards of Profession Appraisal Practice."  S-62.

71.     One reason why the appraisals were not in compliance with USPAP was because IndyMac used inflated appraisals to support higher loan amounts and allow more borrowers to qualify for loans.  According to the Appraisal Standards Board, the Conduct section of the USPAP ETHICS RULE "requires an appraiser to be independent, impartial, and objective, and to perform assignments without bias.  An appraiser who intentionally '*inflates*' or 'deflates' an opinion of value would be in violation of the Conduct section of the Rule."  USPAP Q&A Vol. 9, No. 11, November 2007 (emphasis added).

72.     OIG found instances where "IndyMac obtained multiple appraisals on property that had vastly different values" with "no evidence to support, or explain why different values were determined." *OIG Report* at 12.  For example, "the file for one 80/20, $1.5 million loan [OIG] reviewed contained several appraisals with values ranging between $639,000 and $1.5 million.

There was no support to show why *the higher appraisal was the appropriate one to use for approving the loan.*"  *Id.* at 12 (emphasis added).  However, according to Marla Freedman, the assistant inspector general for audit at OIG, IndyMac "always went with the high appraisal because their goal was to get these loans done and make a profit."  Los Angeles Times, *Federal regulators ignored problems at IndyMac, report finds*, February 26, 2009.

73.     Without adequate appraisals, it was impossible for underwriters to ensure that "the value of the property, as indicated by the appraisal . . . support[ed] the loan amount."  S-62.

74.     The non-compliance with the USPAP standards in connection with the underwriting of the Mortgage Loans, described above in paragraphs 70-73, was not disclosed in the Offering Documents.  Failure to disclose this information, which was negligent, constitutes a material omission and rendered the disclosures in the Offering Documents concerning compliance with USPAP standards, quoted above in paragraphs 49-51, untrue.

### iv.     Loan Underwriting - Undisclosed Lack of Underwriting Quality

75.     IndyMac was not concerned by the poor quality of the loans it produced and the increased risk of borrower default because, "as long as it was able to sell those [risky] loans in the secondary mortgage market," IndyMac could remove the risk of default from its own books and "remain profitable."  *OIG Report* at 3, 7-8.  As long as the secondary market remained hot and housing values continued to rise, IndyMac continued to make a profit.  Between 2000 and 2006, IndyMac's total loan production increased ninefold (from $10 billion to $90 billion) and its profits tripled:

> While home prices climbed, Alt-A loans posed few problems for IndyMac.  If a buyer wasn't able to afford his payments, the bank got title to a home worth more than the amount owed.  The bank was also able to find investors eager to buy pools

of those mortgages that had been pulled together into securities backed by the future payments

CNNMoney.com, *The fall of IndyMac*, July 13, 2008.

76.     Eventually, an increasing number of unqualified borrowers were unable to make their mortgage payments and began defaulting on their loan obligations.  When housing prices suddenly began to deteriorate, the defaults skyrocketed and "investors ran away from the mortgage-backed securities."  *Id.*  "[T]he secondary market for loans collapsed in late 2007 . . . [and] IndyMac could no longer sell its . . . [risky Alt-A] mortgage loans" to investors.  *OIG Report* at 9.  IndyMac was left holding a "high concentration of risky assets" on its own books and ultimately failed.  *Id.* at 2.

77.     Investors who had purchased securities backed by these risky loans (prior to the secondary market's collapse), such as the Senior Certificate holders, were in a similar, lamentable position as IndyMac.  As the borrowers of the underlying loans began to default, the value of the securities held by these investors (*e.g.*, the Senior Certificates) plummeted.  Senior Certificate holders were damaged by the increased loan delinquencies that were the direct result of IndyMac's undisclosed underwriting practices.

**B.     Loan Statistical Information**

78.     As explained above in paragraphs 70-74, the appraisals of Mortgage Loan borrowers' mortgaged properties were inflated.  This caused the Mortgage Loans' LTV ratios contained in the Offering Documents, which were based on those inflated appraisals, to be untrue and to materially overstate borrowers' equity in their homes.

79.     The LTV ratio of a loan is "the ratio of the principal balance of the loan relative to the value of the . . . [mortgaged property]."  Frank J. Fabozzi, Henry A. Davis, Moorad Choudhry,

*Introduction to Structured Finance* (John Wiley and Sons, 2006) ("Structured Finance") at 83.  LTV ratio is a "commonly computed ratio for securitized products backed by residential and commercial mortgage loans" that measures the amount of equity a homeowner has in the mortgaged property and is "one of the most important variables in predicting the default of the borrower."  *Id*. at 84.

80.     According to the Offering Documents:

The **"*Loan-to-Value Ratio*"** of a Mortgage Loan at any given time is a fraction, expressed as a percentage, the numerator of which is the principal balance of that Mortgage Loan at the date of determination and the denominator of which is

o   in the case of a purchase, the lesser of the selling price of the mortgaged property or its appraised value at the time of sale, or

o   in the case of a refinance, the appraised value of the mortgaged property at the time of the refinance.

S-34 (emphasis in original).

81.     For example, if a borrower obtains an $80,000 loan that is secured by a mortgaged property with an appraisal value of $100,000, then the loan's LTV ratio is ($80,000/$100,000) = 0.8 or 80%.  The "ratio of 0.8 . . . means that the principal balance of the loan obtained to purchase the . . . [mortgaged property] is 80% of the [mortgaged property's] market value."  *Structured Finance* at 84.  The remaining 20% (or $20,000) of the mortgaged property's market value represents the equity interest that the borrower has in the property:

The difference between the value of an asset and the principal balance of the loan is called the *borrower's equity*. When the LTV is less than 1 [i.e., the value of the mortgaged property exceeds the amount borrowed], the borrower has positive equity in the asset and there is an incentive for the borrower not to default.  Instead of defaulting, it would be an economic advantage for the borrower [or, in the case of foreclosure, the bank] to sell the asset and pay off the loan, pocketing the residual proceeds. A ratio greater than 1 means that the amount borrowed exceeds the value of the asset and there is an incentive for the borrower to default.

*Id*. at 84 (bold emphasis added).

82.     In general, as a loan's LTV ratio increases the borrower's likelihood of default also increases.  "Mortgage loans with higher loan-to-value ratios may present a greater risk of default and, in the case of defaults, an increase in the severity of losses on the related mortgage loans."  S-29.

83.     Due to the increased risk of default for loans with high LTV ratios, lenders often set maximum LTV ratios and maximum loan amounts on loans.  For example, IndyMac placed certain restrictions on loans with LTV ratios greater than 80%:

> *For each mortgage loan with a Loan-to-Value Ratio at origination exceeding 80%, IndyMac Bank will usually require a primary mortgage guarantee insurance policy that conforms to the guidelines of Fannie Mae and Freddie Mac*. After the date on which the Loan-to-Value Ratio of a mortgage loan is 80% or less, either because of principal payments on the mortgage loan or because of a new appraisal of the mortgaged property, no primary mortgage guaranty insurance policy will be required on that mortgage loan.
>
> All of the insurers that have issued primary mortgage guaranty insurance policies with respect to the mortgage loans meet Fannie Mae's or Freddie Mac's standards or are acceptable to the Rating Agencies. In some circumstances, however, IndyMac Bank does not require primary mortgage guaranty insurance on mortgage loans with Loan-to-Value Ratios greater than 80%.

S-62 (emphasis added).

84.     According to the Offering Documents, "the weighted average Loan-to-Value Ratio of the Mortgage Loans was approximately 72.22%."  S-54.  In addition, the Offering Documents warranted that, "[a]t origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or less."  S-34.  These statements were untrue in light of the fact that the LTV ratios were based on inflated appraisal data.

85.     As the following example demonstrates, the inflated appraisals caused the LTV ratios

of the Mortgage Loans to be materially understated in the Offering Documents.  The LTV ratio of a $100,000 loan that is secured by a mortgaged property with an "actual" (or accurately appraised) value of $95,000 is ($100,000/$95,000) = 1.05 or 105%.  However, the LTV ratio of a $100,000 loan that is secured by a mortgaged property with an inflated appraisal value of $125,000 is ($100,000/$125,000) = 0.8 or 80%.

86.     The "actual" LTV ratio greater than 100% means that the borrower has no equity in the mortgaged property and is a default risk; securities derived from this loan are considered risky.  The "inflated" LTV ratio less than 100% means that the borrower has equity in the mortgaged property and is less likely to default; securities derived from this loan are considered less risky.

87.     Thus, where the Offering Documents stated that the average LTV ratio of the Mortgage Loans was 72% and that no Mortgage Loan (at origination) had an LTV ratio greater than 100%, these statistics were untrue in that they (i) overstated borrowers' equity, (ii) understated the default probabilities of the Mortgage Loans and (iii) understated the riskiness of the Certificates derived therefrom.  S-34, S-54.  Also, the disclosures concerning purported restrictions IndyMac placed on loans with LTV ratios exceeding 80% omitted that those restrictions would be ineffective in protecting investors from risk of default because the Mortgage Loans' LTV ratios were materially understated as a result of an undisclosed, faulty appraisal process.  *See* S-62.

### C.     <u>Ratings</u>

88.     According to the Offering Documents, the Rating Agencies assigned the Senior Certificates' "triple-A" ratings by "tak[ing] into consideration the credit quality of the mortgage pool, including . . . [the] structural . . . aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the

certificates." S-133.

89.     The Offering Documents did not disclose that the Rating Agencies negligently evaluated and assigned ratings to the Senior Certificates pursuant to a defective ratings process that involved reliance upon inadequate and antiquated ratings models that considered historical data that was outdated and loan statistical information that failed to account for the true risk of the securities – *even while newer and better models had been developed* – and suspect mortgage loan data provided by issuers that was not independently evaluated or verified.

90.     As a result of the undisclosed problems with the Rating Agencies' ratings process, the Rating Agencies have downgraded the Senior Certificates several times, from the "triple-A" ratings that were a condition precedent to their issuance, to their current "junk" status.  The chart below lists each Senior Certificate class and its ratings downgrades.  (The initial ratings provided can be found in the Offering Documents at S-7-8):

| Moody's Ratings Downgrades | | | | S&P's Ratings Downgrades | | | |
|---|---|---|---|---|---|---|---|
| **Class** | **Initial Rating** | **8-14-08** | **1-29-09** | **Class** | **Initial Rating** | **11-5-08** | **3-30-09** |
| 1-A-1 | Aaa | Baa1 | Caa2 | 1-A-1 | AAA | B | CCC |
| 1-A-2 | Aaa | Baa1 | Caa2 | 1-A-2 | AAA | B | CCC |
| 1-A-3 | Aaa | Baa1 | Caa2 | 1-A-3 | AAA | B | CCC |
| 1-A-4 | Aaa | Baa1 | Caa2 | 1-A-4 | AAA | B | CCC |
| 1-A-5 | Aaa | Baa1 | Caa2 | 1-A-5 | AAA | B | CCC |
| 2-A-1 | Aaa | Baa1 | Caa3 | 2-A-1 | AAA | B | CCC |
| 2-A-2 | Aaa | Baa1 | Ca | 2-A-2 | AAA | B | CCC |
| 2-A-3 | Aaa | Baa1 | Ca | 2-A-3 | AAA | B | CCC |
| 2-A-4 | Aaa | Baa1 | Ca | 2-A-4 | AAA | B | CCC |

| 2-A-5 | Aaa | Aaa | Caa3 | 2-A-5 | AAA | AAA | B |
| 2-A-6 | Aaa | Aaa | Caa3 | 2-A-6 | AAA | AAA | B |
| 2-A-7 | Aaa | Baa1 | Ca | 2-A-7 | AAA | B | CCC |
| 2-A-8 | Aa1 | Baa2 | C | 2-A-8 | AAA | B | CCC |
| 3-A-1 | Aaa | Baa1 | Caa2 | 3-A-1 | AAA | B | CCC |
| 3-A-2 | Aaa | Baa1 | Caa2 | 3-A-2 | AAA | B | CCC |
| 3-A-3 | Aaa | Baa1 | Caa2 | 3-A-3 | AAA | B | CCC |
| 3-A-4 | Aaa | Baa1 | Caa2 | 3-A-4 | AAA | B | CCC |
| 3-A-5 | Aaa | Baa1 | Caa2 | 3-A-5 | AAA | B | CCC |
| 3-A-6 | Aaa | Aaa | Caa2 | 3-A-6 | AAA | BB | CCC |
| 3-A-7 | Aaa | Baa1 | Caa2 | 3-A-7 | AAA | B | CCC |
| 3-A-8 | Aaa | Baa1 | Caa2 | 3-A-8 | AAA | B | CCC |
| 3-A-9 | Aaa | Baa1 | Caa2 | 3-A-9 | AAA | B | CCC |
| 3-A-10 | Aaa | Baa1 | Caa2 | 3-A-10 | AAA | B | CCC |
| 3-A-11 | Aaa | Baa1 | Caa2 | 3-A-11 | AAA | B | CCC |
| PO | Aaa | Baa1 | Caa2 | PO | AAA | B | CCC |

91.    It was not until these rating downgrades occurred on the Senior Certificates that the Rating Agencies conceded that their prior ratings had been untrue.

92.    Since 2006, the Rating Agencies have downgraded hundreds of tranches of MBS certificates that were initially rated "triple-A."  The Rating Agencies have now admitted that the models they used to evaluate underlying mortgage loans and assigning MBS ratings were inadequate, outdated and needed to be revised.

93.    According to The New York Times, in rating complex securities such as MBS and CDOs (derived from MBS), the Rating Agencies used statistical models based on historical default

patterns and past data that were no longer relevant in the current environment.  By way of example,

The New York Times took a closer look at a $750 million mortgaged-backed securitization that

Moody's rated in late 2006 using its outdated model:

> Moody's used statistical models to assess C.D.O.'s; it relied on historical patterns of default. *This assumed that the past would remain relevant in an era in which the mortgage industry was morphing into a wildly speculative business.*
>
> ***
>
> *Moody's rated three-quarters of this C.D.O.'s bonds triple-A*. The ratings were derived using a mathematical construct known as a Monte Carlo simulation -- as if each of the underlying bonds would perform like cards drawn at random from a deck of mortgage bonds in the past. *There were two problems with this approach. First, the bonds weren't like those in the past; the mortgage market had changed*. As Mark Adelson, a former managing director in Moody's structured-finance division, remarks, it was "like observing 100 years of weather in Antarctica to forecast the weather in Hawaii." *And second, the bonds weren't random. Moody's had underestimated the extent to which underwriting standards had weakened everywhere. When one mortgage bond failed, the odds were that others would, too*.
>
> Moody's estimated that this C.D.O. could potentially incur losses of 2 percent. It has since revised its estimate to 27 percent. The bonds it rated have been decimated, their market value having plunged by half or more. A triple-A layer of bonds has been downgraded 16 notches, all the way to B. Hundreds of C.D.O.'s have suffered similar fates (most of Wall Street's losses have been on C.D.O.'s). For Moody's and the other rating agencies, it has been an extraordinary rout.

The New York Times, *Triple-A Failure*, April 27, 2008 ("Triple-A Failure") (emphasis added).

94.    In April 2007 and July 10, 2007, Moody's and S&P, respectively announced that

their ratings models, which had been deployed around 2002 and continued to be used through early

2007, needed to be revised.  According to Moody's, the "considerable evolution of the mortgage

market since 2002" was the reasoning behind the need to revise its rating methods.  S&P stated that

the standard variables - *i.e.*, FICO credit scores, LTV Ratios and ownership status - used to evaluate

a borrower's risk for default "[we]re proving less predictive" than in the past.  As one member of

the press noted, these were "stunning admission[s] . . . [that the Rating Agencies']  model[s] had

been based on a world that no longer existed."

95.     Although the Rating Agencies admitted that they used deficient ratings models when evaluating and assigning ratings to MBS issued between 2005 and 2007, they insisted that this was excusable neglect because these problems were caused by the "unanticipated events" occurring during the recent economic crises.  Deven Sharma, the President of S&P, stated in written testimony to Congress in 2008:

> [M]any of the forecasts we used in our ratings analysis of certain structured finance securities have not been borne out.
>
> ***
>
> Most of the ratings that have been the subject of significant attention, including our ratings on securities backed by subprime mortgages, were issued prior to the second half of 2007.
>
> ***
>
> It is by now clear that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work. Those assumptions about the expected performance of assets in a future economic environment were the result of a robust analysis of the transactions themselves, our monitoring of the market, our experience in rating these types of securities, and historical data, including market events going back as far as 75 years to the Great Depression. We used these assumptions to determine, for example, our expectations regarding potential and likely losses arising out of pools of mortgages, which were then incorporated into our ratings. While we endeavored in good faith to assess what we thought would occur in a variety of future economic conditions so that our ratings might withstand the stresses of economic cycles, events have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred. Just as our analysis has always been informed by past experience and our view of likely future developments, we are taking steps to improve our ratings processes and learn from the unanticipated events now occurring in the markets.

Congressional Hearing, October 22, 2008 – Deven Sharma.

96.     According to Jerome Fons, a former Managing Director of Credit Policy at Moody's, the Rating Agencies "did not update their models or their thinking" during the period of deterioration in credit standards.  Congressional Hearing Testimony - October 22, 2008.

97.     Frank Raiter, the former Managing Director and Head of Residential Mortgage Backed Securities Ratings at S&P, was even more adamant that the problems with the ratings models were directly caused by the Rating Agencies' actions (or inactions) in not updating their models on a timely basis, as they had done for years, and were not the result of unanticipated economic conditions.  In fact, by early 2004, S&P had developed a ratings model that considered nearly 10 million loans that "covered the full spectrum of new mortgage products, particularly in the Alt-A and fixed/floating payment type categories."   However, that model was never implemented.   According to Raiter's written testimony to Congress in 2008:

> In 1995 S&P used a rules-based model for determining the loss expected on any given bond. Late that year, the decision was made to develop a more sophisticated statistically - based approach to estimating the default and loss of individual loans and pools. A new model was built based on approximately 500,000 loans with performance data going back 5 or more years. . . . . *Implicit in this promise was S&P's commitment to keep the model current. In fact, the original contract with the model consultant called for annual updates to the model based on growing data bases.* An update was accomplished in late 1998 or early 1999 when the second version of LEVELs was released. This version was built with a data base of approximately 900,000 loans with 6 to 8 years of performance information. *Each version of the model was better than its predecessor in determining default probabilities. Each new version was built with growing data on traditional as well as new mortgage products, particularly the growing subprime market. It was critical to maintain the best models as they were the linchpin of the rating process.* During this time frame, the analytical staff in the RMBS group at Standard and Poor's enjoyed the full support of senior management. That was critical as acquiring data, performing the statistical analysis and utilizing information technology to put the model into the rating process was expensive and required significant staff support.
>
> ***
>
> *The point of this rather long recital is that the analysts at S&P had developed better methods for determining default which did capture some of the variations among products that were to become evident at the advent of the crisis. It is my opinion that had these models been implemented we would have had an earlier warning about the performance of many of the new products that subsequently lead to such substantial losses. That, in turn, should have caused the loss estimates mentioned above to increase and could have thus caused some of these products to be withdrawn from the market as they would have been too expensive to put into bonds.*

*** 

An unfortunate consequence of continuing to use out- dated versions of the rating model was the failure to capture changes in performance of the new non-prime products. As a result, *expected loss estimates no longer provided the equity necessary to support the AAA bonds. This, in turn, generated the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market.*

Congressional Hearing, October 22, 2008 – Frank Raiter (emphasis added).

98.     In addition to admitting that their methodologies were outdated, representatives of Moody's also admitted that they assigned "triple-A" ratings to securities derived from poor quality loans without independently evaluating the borrower and loan data they received from issuers.  As Raiter stated in his written testimony to Congress in 2008:

In addition to problems with maintaining adequate ratings criteria and models, there were other aspects of rating agency procedures that contributed to the current crisis. . . . . [One] area that deserves attention . . . is in the document reviews, the "structure" in structured finance. The foundation of the rating analysis is the data relied on for determining credit enhancement levels. *Rating agencies do not perform "due diligence" on the data . . . .*

Congressional Testimony, October 22, 2008 – Frank Raiter (emphasis added).

99.     Raiter also told Congress that the Rating Agencies did not even look at the tapes containing the borrower data for the underlying loans before they fed that data into their models and warranted the accuracy of the resulting ratings:

Rep. Thomas M. Davis III: "Now, the rating can only be as good, then, as the data that's put into the models."

Raiter: "Correct."

Rep. T. Davis: "But there's no independent verification that the data is accurate."

Raiter: "No independent verification of the [underlying mortgage tapes by the Rating Agencies], that's correct."

*** 

"From the loan originators and the borrowers who might have fudged home buyers' creditworthiness, employment history, to the issuers who packaged these mortgages

and wanted to get the highest possible rating – it looks to me like there were a lot of places along the line where the data that ultimately makes it to the rating agencies could be made unreliable."

***

Rep. T. Davis: "OK.  Now, *if it's not the rating agencies' job to ensure the accuracy of the data it's using to rate these securities, whose job is it?*"

Raiter: "That's correct.  *We determined that it was better to put the onus on the issuer*."

Congressional Hearing, October 22, 2008 – Frank Raiter (emphasis added).

100.     Michael Kanef, the Group Managing Director of Moody's told Congress in September 2007:

[W]e do not conduct any "due diligence" on these loans . . . .

***

[I]t should be noted that the quality of our opinions is directly tied to the quality of the information we receive from the originators and the investment banks. Regardless of the quality of data we assess, if the data we receive is faulty – e.g., as a result of misrepresentations – the quality of our rating opinions will be jeopardized.

Congressional Testimony, September 27, 2007 – Michael Kanef.

101.     According to a Moody's official, a frustrated Blackrock employee stated that:

"The rating agency process is run to be efficient rather than to 'have a good sense of the pieces'" he commented . . . .  He said that in RMBS, analysts "relied too much on manufactured data that is weak."  He emphasized that *there's "too much reliance on data not fully verified."  He questioned any analyst's ability to adequately analyze data without a long track record of performance.*  He asked, "How do you establish quality on low doc loans?  How do you rate that?  It's not just LTV [Ratios].  There's been a lack of pro-active questioning."

102.     Similarly, *Triple-A Failure* reported that when rating MBS:

*Moody's did not have access to the individual loan files, much less did it communicate with the borrowers or try to verify the information they provided in their loan applications*. "We aren't loan officers," Claire Robinson, a 20-year veteran who is in charge of asset-backed finance for Moody's, told me. "Our expertise is as statisticians on an aggregate basis. We want to know, of 1,000 individuals, based on historical performance, what percent will pay their loans?"

*Triple-A Failure* (emphasis added).

103.    Plaintiffs and Class members, who purchased the Senior Certificates were denied crucial information – omitted from the Offering Documents – detailing how the ratings were based on outdated ratings models and non-verified loan data, which combined to erode the ratings' predictive value about the riskiness of the securities to which they were assigned.  The Rating Agencies failed to properly consider the credit quality of the Mortgage Loans and the structure of the Senior Certificates when assigning them "triple-A" ratings.

## VII.    CERTIFICATES' PERFORMANCE AND DAMAGES TO THE CLASS

104.    Since the Offering, the Senior Certificates have experienced a material decline in value, damaging Plaintiffs and the Class.  This decline in value of the Senior Certificates coincides with a serious decline in the performance of the Mortgage Loans, as is demonstrated by the chart on the next page.  The chart displays the percentage of "defaulting" Mortgage Loans out of the aggregate loan pool at each distribution date since the Offering, as reported.  The percentages come from Delinquency Reports generated on each distribution date.  The term "defaulting" includes delinquent (for one or more payments) Mortgage Loans, as well as Mortgage Loan properties in foreclosure, in bankruptcy or real estate owned ("REO").



105. Defendants did not act with reasonable care and/or due diligence and acted in a negligent manner.  As a result, Plaintiffs and the Class were damaged.

## VIII. CLASS ACTION ALLEGATIONS

106. Plaintiffs bring this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons who purchased the Senior Certificates pursuant and/or traceable to the Offering Documents issued in connection with the Offering (the "Class").  Excluded from the Class are Defendants, their respective officers, affiliates and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

107. The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is presently unknown to Plaintiffs and can

only be ascertained through appropriate discovery, Plaintiffs reasonably believe that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Defendants and/or the Trustee (Deutsche Bank National Trust Company) for the Issuing Entity and may be notified of the pendency of this action by mail, the Internet or publication using the form of notice similar to that customarily used in securities class actions.

108.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of statutory law complained of herein.

109.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

110.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      whether the provisions of the Securities Act of 1933 were violated by the Defendants as alleged herein;

b.      whether the Offering Documents contained materially untrue statements or omitted statements of material fact; and

c.      to what extent the members of the Class have sustained damages pursuant to the statutory measure of damages.

111.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.   COUNTS

### COUNT I
### Violation of Section 11(a)(4) of the Securities Act
### (Against the Rating Agency Defendants)

112.    Plaintiffs repeat and reallege each and every allegation above as it is set forth in full herein.

113.    Count I is brought pursuant to Section 11(a)(4) of the Securities Act, on behalf of Plaintiffs and the Class, against the Rating Agency Defendants.

114.    The Offering Documents, at the time they became effective, contained untrue statements of material fact and omitted to state material facts required to be stated therein or that were necessary to make the statements therein true, as set forth above.  The untrue and omitted facts would have been viewed by a reasonably prudent investor as important, and as substantially altering the total mix of information available, when making investment decisions.

115.    The Rating Agency Defendants are jointly and severally liable to Plaintiffs and the Class for such untrue statements and omissions under Section 11(a)(4) of the Securities Act, for having "prepared or certified any report or valuation which is used in connection with the" Offering Documents.  The Rating Agencies purportedly evaluated the credit quality of the underlying Mortgage Loans and certified the Senior Certificates' valuation as the highest grade investment vehicles by providing the "triple-A" ratings that were a condition precedent to the Senior Certificates' issuance. Without the Rating Agencies' "certification" the Senior Certificates could

not have been sold to Plaintiffs and Class members.

116.    The Rating Agency Defendants owed to the Plaintiffs and the Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.

117.    The Rating Agency Defendants did not make a reasonable investigation and perform due diligence and did not possess reasonable grounds for believing that the statements contained in the Offering Documents were true, did not omit any material fact, and were not materially misleading.

118.    Plaintiffs and the Class members did not know, and in the exercise of reasonable diligence, could not have known of the untrue statements and omissions contained in the Offering Documents.

119.    Plaintiffs and the Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Rating Agency Defendants, for which they are entitled to compensation.

120.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Senior Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

## COUNT II
### Violation of Section 11(a)(5) of the Securities Act
### (Against the Rating Agency Defendants)

121.     Plaintiffs repeat and reallege each and every allegation above as it is set forth in full herein.

122.     Count II is brought pursuant to Section 11(a)(5) of the Securities Act, on behalf of Plaintiffs and the Class, against the Rating Agency Defendants.

123.     The Offering Documents, at the time they became effective, contained untrue statements of material fact and omitted to state material facts required to be stated therein or that were necessary to make the statements therein true, as set forth above.  The untrue and omitted facts would have been viewed by a reasonably prudent investor as important, and as substantially altering the total mix of information available, when making investment decisions.

124.     The Rating Agency Defendants are jointly and severally liable to Plaintiffs and the Class for such untrue statements and omissions under Section 11(a)(5) of the Securities Act, for acting as "underwriters," as that term is defined in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11), in the sale of the Senior Certificates.  The Rating Agency Defendants evaluated the expected loss of the Mortgage Loans and structured the Senior Certificates' tranches accordingly.  The Rating Agencies were also required, as a condition precedent to the Offering, to issue the ratings identified in the Offering Documents, which they did.  As such, the Rating Agency Defendants directly and indirectly participated in the distribution of the Senior Certificates pursuant to the Offering Documents.

125.     The Rating Agency Defendants owed to the Plaintiffs and the Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering

44

Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.

126.    The Rating Agency Defendants did not make a reasonable investigation and perform due diligence and did not possess reasonable grounds for believing that the statements contained in the Offering Documents were true, did not omit any material fact, and were not materially misleading.

127.    Plaintiffs and the Class members did not know, and in the exercise of reasonable diligence, could not have known of the untrue statements and omissions contained in the Offering Documents.

128.    Plaintiffs and the Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Rating Agency Defendants, for which they are entitled to compensation.

129.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Senior Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

**COUNT III**
**Violation of Section 11(a)(5) of the Securities Act**
**(Against Defendant Credit Suisse)**

130.    Plaintiffs repeat and reallege each and every allegation above as it is set forth in full herein.

131.    Count III is brought pursuant to Section 11(a)(5) of the Securities Act, on behalf of Plaintiffs and the Class, against Defendant Credit Suisse.

132.    The Offering Documents, at the time they became effective, contained untrue statements of material fact and omitted to state material facts required to be stated therein or that were necessary to make the statements therein true, as set forth above.  The untrue and omitted facts would have been viewed by a reasonably prudent investor as important, and as substantially altering the total mix of information available, when making investment decisions.

133.    Defendant Credit Suisse is liable to Plaintiffs and the Class for such untrue statements and omissions under Section 11(a)(5) of the Securities Act, for acting as "underwriters," as that term is defined in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11), in the sale of the Senior Certificates.  As such, Defendant Credit Suisse purchased the Senior Certificates from RAST and participated in the solicitation, offering and sale of the Senior Certificates to the investing public.

134.    Defendant Credit Suisse owed to the Plaintiffs and the Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.

135.    Defendant Credit Suisse did not make a reasonable investigation and perform due

diligence and did not possess reasonable grounds for believing that the statements contained in the Offering Documents were true, did not omit any material fact, and were not materially misleading.

136.     Plaintiffs and the Class members did not know, and in the exercise of reasonable diligence, could not have known of the untrue statements and omissions contained in the Offering Documents.

137.     Plaintiffs and the Class members have sustained damages as a result of the wrongful conduct alleged and the violations of Defendant Credit Suisse, for which they are entitled to compensation.

138.     This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Senior Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

**COUNT IV**
**Violation of Section 12(a)(2) of the Securities Act**
**(Against Defendant RAST)**

139.     Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

140.     Count IV is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of Plaintiffs and the Class, against Defendant RAST.

141.     Defendant RAST, through the use of the means and instrumentalities of transportation and communication in interstate commerce and of the mails, offered and sold the Senior Certificates pursuant to the defective Offering Documents for its own financial gain.

Doc. 163291                                        47

142.    Defendant RAST was a "substantial participant" in the Offering of the Senior Certificates, and is therefore liable as a "seller" under Section 12(a)(2) of the Securities Act.

143.    The Offering Documents, at the time they became effective, contained untrue statements of material fact and omitted to state material facts required to be stated therein or that were necessary to make the statements therein true, as set forth above.  The untrue and omitted facts would have been viewed by a reasonably prudent investor as important, and as substantially altering the total mix of information available, when making investment decisions.

144.    Defendant RAST, as "offeror" or "seller" of the Senior Certificates, owed to the Plaintiffs and the Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.

145.    Defendant RAST did not make a reasonable investigation and perform due diligence and did not possess reasonable grounds for believing that the statements contained in the Offering Documents were true, did not omit any material fact, and were not materially misleading.

146.    Plaintiffs and the Class members purchased or otherwise acquired the Senior Certificates pursuant to the defective Offering Documents.  Plaintiffs and the Class members did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

147.    Plaintiffs and the Class members were damaged by Defendant RAST's wrongful conduct.  Those Class members who have retained their Senior Certificates have the right to rescind and recover the consideration paid for their Senior Certificates, as set forth in Section 12(a)(2) of

the 1933 Act.  These Plaintiffs and Class members may tender their Senior Certificates, or proceeds

from the sale thereof, to defendants named in this Cause of Action in exchange for the value of the

consideration paid for such Senior Certificates, plus interest.  In the alternative, Plaintiffs and the

Class seek recovery of damages in an amount to be proven at trial.

148.    This action is brought within one year after the discovery of the untrue statements

and omissions contained in the Offering Documents and within three years of when the Senior

Certificates were sold to the public.  Despite the exercise of reasonable diligence, Plaintiffs could

not have reasonably discovered the untrue statements and omissions in the Offering Documents at

an earlier time.

### COUNT V
### Violation of Section 12(a)(2) of the Securities Act
### (Against Defendant Credit Suisse)

149.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full

herein.

150.    Count V is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of

Plaintiffs and the Class, against Defendant Credit Suisse.

151.    Defendant Credit Suisse, through the use of the means and instrumentalities of

transportation and communication in interstate commerce and of the mails, offered and sold the

Senior Certificates pursuant to the defective Offering Documents for its own financial gain.

152.    Defendant Credit Suisse was a "substantial participant" in the Offering of the Senior

Certificates, and is therefore liable as a "seller" under Section 12(a)(2) of the Securities Act.  For

creating a market for the Senior Certificates' sale and for selling the Senior Certificates to investors,

Defendant Credit Suisse obtained substantial fees.

153.    The Offering Documents, at the time they became effective, contained untrue statements of material fact and omitted to state material facts required to be stated therein or that were necessary to make the statements therein true, as set forth above.  The untrue and omitted facts would have been viewed by a reasonably prudent investor as important, and as substantially altering the total mix of information available, when making investment decisions.

154.    Defendant Credit Suisse, as "offeror" or "seller" of the Senior Certificates, owed to the Plaintiffs and the Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.

155.    Defendant Credit Suisse did not make a reasonable investigation and perform due diligence and did not possess reasonable grounds for believing that the statements contained in the Offering Documents were true, did not omit any material fact, and were not materially misleading.

156.    Plaintiffs and the Class members purchased or otherwise acquired the Senior Certificates pursuant to the defective Offering Documents.  Plaintiffs and the Class members did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

157.    Plaintiffs and the Class members were damaged by Defendant Credit Suisse's wrongful conduct.  Those Class members who have retained their Senior Certificates have the right to rescind and recover the consideration paid for their Senior Certificates, as set forth in Section 12(a)(2) of the 1933 Act.  These Plaintiffs and Class members may tender their Senior Certificates, or proceeds from the sale thereof, to defendants named in this Cause of Action in exchange for the

value of the consideration paid for such Senior Certificates, plus interest.  In the alternative, Plaintiffs and the Class seek recovery of damages in an amount to be proven at trial.

158.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of when the Senior Certificates were sold to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

**COUNT VI**
**Violation of Section 12(a)(2) of the Securities Act**
**(Against the Rating Agency Defendants)**

159.    Plaintiffs repeats and realleges each and every allegation above as if set forth in full herein.

160.    Count VI is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of Plaintiffs and the Class, against the Rating Agency Defendants.

161.    The Rating Agency Defendants, through the use of the means and instrumentalities of transportation and communication in interstate commerce and of the mails, offered and sold the Senior Certificates pursuant to the defective Offering Documents for its own financial gain.

162.    The Rating Agency Defendants were "substantial participants" in the Offering of the Senior Certificates, and are therefore liable as "sellers" under Section 12(a)(2) of the Securities Act. For providing ratings for the Senior Certificates that were essential to their creation and sale, the Senior Certificates, the Rating Agency Defendants obtained substantial fees.

163.    The Offering Documents, at the time they became effective, contained untrue statements of material fact and omitted to state material facts required to be stated therein or that

were necessary to make the statements therein true, as set forth above.  The untrue and omitted facts would have been viewed by a reasonably prudent investor as important, and as substantially altering the total mix of information available, when making investment decisions.

164.    The Rating Agency Defendants, as "offerors" or "sellers" of the Senior Certificates, owed to the Plaintiffs and the Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.

165.    The Rating Agency Defendants did not make a reasonable investigation and perform due diligence and did not possess reasonable grounds for believing that the statements contained in the Offering Documents were true, did not omit any material fact, and were not materially misleading.

166.    Plaintiffs and the Class members purchased or otherwise acquired the Senior Certificates pursuant to the defective Offering Documents.  Plaintiffs and the Class members did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

167.    Plaintiffs and the Class members were damaged by the Rating Agency Defendants' wrongful conduct.  Those Class members who have retained their Senior Certificates have the right to rescind and recover the consideration paid for their Senior Certificates, as set forth in Section 12(a)(2) of the 1933 Act.  These Plaintiffs and Class members may tender their Senior Certificates, or proceeds from the sale thereof, to defendants named in this Cause of Action in exchange for the value of the consideration paid for such Senior Certificates, plus interest.  In the alternative,

Doc. 163291

Plaintiffs and the Class seek recovery of damages in an amount to be proven at trial.

168.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of when the Senior Certificates were sold to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a.    Determining that this action is a proper class action under  Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and appointing Plaintiffs as Class Representatives and their Counsel as Class Counsel;

b.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre and post judgment interest thereon;

c.    Awarding recission or a rescissory measure of damages;

d.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

e.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: April 16, 2009
      New York, New York

                        Respectfully submitted,

                        **WOLF POPPER LLP**

By: ⸻ _Lester L. Levy_ ⸻

                        Lester L. Levy (#LL-9956)
                        Michele F. Raphael (#MR-0964)
                        James A. Harrod (#JH-4400)
                        Robert S. Plosky (#RP-7829)
                        845 Third Avenue
                        New York, NY 10022
                        (212) 759-4600

                        *Counsel for Plaintiffs Vaszurele Ltd.*
                        *and Vasili Tsereteli*

## PLAINTIFF CERTIFICATION

I, Vasili Tsereteli, on behalf of Vaszurele Ltd. ("Vaszurele"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.      I am the sole Director, President, Treasurer and sole shareholder of Vaszurele, a British Virgin Islands personal holding company.   I reviewed and authorized the filing of a complaint against Residential Asset Securitization Trust 2006-A8, Credit Suisse Securities (USA) LLC, Moody's Investors Service, Inc., and The McGraw-Hill Companies, Inc., and have authorized the filing of a complaint and/or lead plaintiff motion on Vaszurele's behalf by Wolf Popper LLP.

2.      As reflected on the attached schedule, Vaszurele purchased $200,000 face value Class 1-A-1 Senior Mortgage Pass-Through Certificates issued on or about June 28, 2006 by Residential Asset Securitization Trust 2006-A8.

3.      Vaszurele did not purchase the securities that are the subject of the RAST Complaint at the direction of counsel or in order to participate in this litigation.

4.      Vaszurele is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.      During the three-year period preceding the date of this certification, Vaszurele has not sought to serve, nor has it served, as a lead plaintiff or class representative on behalf of a class in a private action arising under the federal securities laws.

6.      Vaszurele will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any possible recovery, except for an award, as ordered or approved by the Court, for reasonable costs and expenses (including lost wages) directly relating to its representation of the Class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___8th___ day of April, 2009.

_____
VASILI  TSERETELI
President, Vaszurele Ltd.

Schedule of Vaszurele Ltd's Transactions
Residential Asset Securitization Trust
RAST 2006-A8, Class 1-A-1 (CUSIP: 761119AA4) ("Certificates")

| | Purchases | | | Sales | | |
|---|---|---|---|---|---|---|
| Trade Date | Quantity/ Face Value | Price Per Dollar of Face Value | Cost | Quantity/ Face Value (1) | Price Per Dollar of Face Value | Proceeds |
| 5/19/2006 | 200,000 $ | 1.00 | $ 200,000 | | | |
| 11/25/2008 | | | | 148,395 $ | 0.45 | $ 66,824 |

## CERTIFICATE OF SERVICE

I, LESTER L. LEVY, hereby certify that on April 16, 2009, I caused a true and correct copy of the attached document to be served (i) through the Court's ECF system or, (ii) by U.S. Mail, postage prepaid, on counsel of record, identified on the service list below.

_____ s/ Lester L. Levy _____

Robert F. Serio
Aric H. Wu
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Tel: 212-351-3917
Fax: 212-351-5246

*Attorneys for Defendant Credit Suisse
Securities (USA) LLC*


Joshua M. Rubins
James J. Coster
SATTERLEE STEPHENS BURKE &
   BURKE LLP
230 Park Avenue
New York, New York 10169
Tel: 212-818-9200
Fax: 212-818-9606

*Attorneys for Defendant Moody's
Investors Service, Inc.*

Jami Wintz McKeon
Michael S. Kraut
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178
Tel: 212-309-6927
Fax: 212-309-6001

*Attorneys for Defendant Residential Asset
Securitization Trust 2006-A8*


Floyd Abrams
S. Penny Windle
Tammy Lynn Roy
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
Tel: 212-701-3000
Fax: 212-269-5420

*Attorneys for Defendant The McGraw-Hill
Companies, Inc.*