UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
VASILI TSERETELI, et ano.,

                Plaintiffs,

        -against-                              08 Civ. 10637 (LAK)

RESIDENTIAL ASSET SECURITIZATION
TRUST 2006-A8, et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### MEMORANDUM OPINION

Appearances:

                Lester L. Levy
                Michele F. Raphael
                James A. Harrod
                James Kelly-Kowlowitz
                Robert S. Plosky
                WOLF POPPER LLP
                *Attorneys for Plaintiffs Vaszurele Ltd.*
                *and Vasili Tsereteli*

                Robert F. Serio
                Aric H. Wu
                Eric M. Creizman
                GIBSON, DUNN & CRUTCHER LLP
                *Attorneys for Defendant Credit Suisse*
                *Securities (USA) LLC*

LEWIS A. KAPLAN, *District Judge.*

        This putative class action concerns the issuance, distribution, and sale of a type of

mortgage backed security known as the Senior Mortgage Pass-Through Certificates, Series 2006-H

("Certificates") issued on June 28, 2006.  Plaintiffs claim that the Certificates were issued pursuant

2

to materially misleading offering documents in violation of Sections 11(a)(5) and 12(a)(2) of the Securities Act of 1933.[1]  The matter is before the Court on the motion of defendant Credit Suisse Securities (USA) LLC ("Credit Suisse"), the Certificates' underwriter, to dismiss for failure to state a claim upon which relief may be granted.

<em>Facts</em>

*The Parties*

Lead plaintiff Vaszurele Ltd. ("Vaszurele") is a holding company established and controlled by Vasili Tsereteli, who is also a plaintiff here.[2]  Vaszurele purchased $200,000 face value Class 1-A-1 Certificates "pursuant to the Offering Documents" in a transaction that closed on or about June 28, 2006.[3]  There is no allegation that Tsereteli did so.

Credit Suisse is an investment banking firm that was the sole underwriter in the firm commitment underwriting of the Certificates.[4]  In a firm commitment underwriting, all of the Certificates are sold to the underwriters before they are sold to the public.[5]

---

[1]      15 U.S.C. §§ 77k(a)(5), 77*l*(a)(2).

[2]      Am. Cpt. ¶¶ 10-11.

[3]      *Id.*

[4]      *Id.* ¶¶ 13, 22.  Lehman Brothers, Inc., which is not a party to this action, was an underwriter for the Subordinated Mortgage Pass-Through Certificates.  *Id.* ¶ 22.

[5]      *Id.*

*The Certificates*

The Certificates are a form of mortgage backed security that entitle their owners to a portion of the income stream generated by an underlying pool of mortgage loans.  They were issued and sold pursuant to a February 24, 2006 registration statement, which was amended on March 29 and April 13, 2006, a June 14, 2006 base prospectus, and a June 28, 2006 prospectus supplement.[6]  The Certificates were issued by the Residential Asset Securitization Trust 2006-A8 ("RAST").[7]  IndyMac Bank, F.S.B. ("IndyMac Bank"), a subsidiary of IndyMac Bancorp, Inc., originated or underwrote the mortgage loans in underlying pool.[8]  Moody's Investor Service and Standard & Poor's Rating Services (the "Ratings Agencies") provided credit ratings for the Certificates prior to their sale.[9]  The Certificates' ratings have declined substantially since their initial offering, and the percentage of the defaulting loans in the underlying pool had increased to over twenty-five percent in March 2009.[10]

*The Amended Complaint*

The Offering Documents stated that IndyMac Bank originated loans underlying the

---

[6]     These documents will henceforth be referred to as the "Offering Documents."

[7]     Am. Cpt. ¶ 12.

[8]     *Id.* ¶ 2.

[9]     *Id.*  ¶¶ 14-15.

[10]     *Id.*  ¶¶ 90, 104.

4

Certificates in accordance with its underwriting standards[11] and conducted appraisals of collateral property in accordance with the Uniform Standards of Professional Appraisal Practice ("USPAP").[12] They disclosed also data concerning the loan-to-value ratios of the loans in the pool underlying the Certificates and factors the Ratings Agencies considered in issuing their ratings.[13]  Relying heavily on a report by the Treasury Department, Office of Inspector General ("OIG")[14] and another by an entity referred to as "CRL," plaintiffs allege that these statements were false or misleading because IndyMac Bank had abandoned its underwriting standards and had relied on inflated appraisals obtained in violation of USPAP, while the Ratings Agencies inadequately considered the relevant factors in determining their ratings.[15]

Credit Suisse moves to dismiss the amended complaint principally on the ground that plaintiffs have failed to allege actionable misstatements or omissions and moved also to dismiss the Section 12(a)(2) claims for lack of standing.

*Analysis*

A.      *Legal Standard and Applicable Law*

---

[11]

*Id.* ¶ 49; *see also*, *e.g.*, *id.* ¶¶ 50-51.

[12]

*Id.* ¶ 51.

[13]

*Id.* ¶¶ 53, 56.

[14]

OIG, Audit Report (OIG-09-032), *Safety and Soundness: Material Loss Review of IndyMac Bank, FSB*, February 26, 2009, at 2, 7, *available at* http://treasury.gov/inspector-general/audit-reports/2009/oig09032.pdf (the "OIG Report").

[15]

Am. Cpt.  ¶¶ 52, 54, 57.

In deciding a motion to dismiss, a court ordinarily accepts as true all well pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor.[16]  In order to survive such a motion, however, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"[17] Although such motions are addressed to the face of the pleadings, the court may consider also documents attached to or incorporated by reference in the amended complaint as well as legally required public disclosure documents and documents possessed by or known to the plaintiff upon which it relied in bringing the suit.[18]

Sections 11 and 12(a)(2) are "Securities Act siblings with roughly parallel elements" and may impose liability on an underwriter if a relevant communication contains a material misstatement or omission.[19]  Section 11 applies to registration statements while Section 12 applies to prospectuses or oral communications connected with a sale.[20]  An underwriter may be liable if the relevant communication contains (1) a misrepresentation, (2) an omission in breach of an affirmative legal disclosure obligation, or (3) an omission necessary to prevent existing disclosures

---

16

    *See Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

17

    *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (declining to limit *Twombly* to antitrust cases).

18

    *ATSI Commc'ns, Inc.*, 493 F.3d at  98; *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

19

    *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010).

20

    *Id.*

6

from being misleading.[21]

A misrepresentation or omission is actionable only if material.  A statement or omission is material if "taken together and in context, [it] would have misled a reasonable investor."[22]  As materiality is a mixed question of law and fact, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"[23]

B.      *Section 12(a)(2) Standing*

A plaintiff has standing to bring a Section 12 claim only against a "statutory seller" from which it purchased a security.[24]  A "statutory seller" is one who either transferred title to the purchaser or successfully solicited it for financial gain.[25]  Credit Suisse moves to dismiss the Section 12(a)(2) claim against it on the ground that plaintiffs have not alleged that they were solicited by Credit Suisse or purchased from it in the offering.

---

[21]

   *Id.* at 360-61.

[22]

   *Id.* at 360 (quoting *Romach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004)); *see also DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003).

[23]

   *ECA v. JP Morgan Chase*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)).

[24]

   *See Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 344 (2d Cir. 1987) ("Section 12(2) imposes liability on persons who offer or sell securities and only grants standing to 'the person purchasing such security' from them.")

[25]

   *Pinter v. Dahl*, 486 U.S. 622, 642 (1988); *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir. 1988).

Plaintiffs likely would not have standing had they alleged only that they purchased the Certificates "pursuant or traceable to" the Offering Documents as Credit Suisse implies.[26]  The amended complaint, however, alleges that plaintiffs purchased the Certificates "pursuant to the Offering Documents."[27]   Plaintiffs further allege that the Certificates were sold in a firm-commitment underwriting and that Credit Suisse was the sole underwriter and purchased the Certificates from the issuer prior to the public offering.  Vaszurele alleges that it purchased the Certificates prior to the offering date – and thus at a time when Credit Suisse was the only entity that could have sold them – in a sale that settled on that day.[28]  These allegations are sufficient to support a plausible inference that Vaszurele purchased their Certificates from Credit Suisse.  As Tsereteli alleges no purchase at all, his Section 12 claim is insufficient.

C.      *Existence of Actionable Misstatements or Omissions*

Plaintiffs allege that the Offering Documents contained false or misleading statements regarding (1) IndyMac Bank's underwriting guidelines, (2) appraisals of mortgage collateral, (3) loan-to-value ratios, and (4) the Certificates' ratings.

1.      *IndyMac Bank's underwriting guidelines*

---

[26]

See In re Cosi, Inc. Sec. Litig., 379 F. Supp. 2d 580, 588-89 (S.D.N.Y. 2005).

[27]

Am. Cpt. ¶ 10; *see In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 694 (S.D.N.Y. 2000) (finding claim based on purchase made "pursuant to the Offering" could be brought under § 12 while claim based on purchases made "pursuant or traceable to" offering could not be).

[28]

Am. Cpt. ¶¶ 3, 4, 22, 24; *see also* Residential Asset Securitization Trust 2006-A8 Prospectus Supplement (June 14, 2006), at S-1 ("Credit Suisse Securities (USA) LLC will offer the senior certificates listed above.").

The Offering Documents stated that IndyMac Bank underwrote the loans underlying the Certificates "according to . . . [its] underwriting guidelines," which required "an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral."[29]  They disclosed also that the underwriters "evaluated information about borrowers' income, assets and employment."[30]

Plaintiffs claim that these statements were false and misleading because IndyMac Bank abandoned its underwriting standards and ignored the borrowers' ability to repay in order to produce as many loans as possible.  They allege that IndyMac Bank in fact "embarked on a path of aggressive growth," tried to "produce as many loans as possible and sell them in the secondary market," and "made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories."[31]  Delinquency and foreclosure rates for the underlying loans increased dramatically after the Certificates were issued,[32] and the ratings agencies significantly downgraded the Certificates between 2006 and 2009.[33]  Plaintiffs point also to the OIG and CRL reports, along with other publications, which allegedly indicated that IndyMac Bank approved loans "without regard to borrowers' ability to repay."[34]

---

[29]

Am. Cpt. ¶¶ 49; *see also id.* ¶¶ 50-51, 58.

[30]

*Id.* ¶ 50.

[31]

*Id.*  ¶¶ 59-60; *see also id.* ¶¶ 63-64

[32]

*Id.* ¶ 104.

[33]

*Id.*  ¶ 90.

[34]

*Id.* ¶ 63; *see also* ¶¶ 64-65, 67-68.

Defendants make two arguments for dismissal.  First, they argue that the Offering Documents disclosed the greater risk of default and loss attached to certain categories of loans.[35] But plaintiffs have not alleged that the Offering Documents failed to warn investors about the risks of loss associated with these categories of loans.  They have alleged instead that IndyMac Bank failed to disclose that it had abandoned the underwriting standards that it professed to follow and ignored whether borrowers ever would be able to repay their loans.  The warnings Credit Suisse highlights did not disclose these alleged facts.

Second, Credit Suisse argues that the amended complaint fails to allege that any of the loans underlying the Certificates were issued in deviation from IndyMac Bank's underwriting standards and therefore insufficiently alleges materiality.[36]  The amended complaint, however, sufficiently alleges that there was widespread abandonment of underwriting guidelines at IndyMac Bank during the period of time at issue and that the percentage of "defaulting" loans rose dramatically shortly after the Certificates were issued.  These allegations create a sufficient nexus between the alleged underwriting standard abandonment and the loans underlying the Certificates.[37] At this stage, given these allegations, the Court can not conclude that the allegedly misleading statements were immaterial as a matter of law.[38]

---

[35]

CS Br. at 12-14.

[36]

*Id.* at 15.

[37]

*See*, *e.g.*, *In re Lehman Brothers Sec. & ERISA Litig.*, No. 09 MD 2017 (LAK), 2010 WL 545992, at *5 (S.D.N.Y. Feb. 17, 2010).

[38]

*ECA*, 553 F.3d at 197 (statements immaterial only if "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance").

2.    *Appraisal Practices*

The Offering Documents stated that loan underwriters analyzed the adequacy of the

mortgage property as collateral, generally made appraisals of the property for this purpose, and

conducted those appraisals "in accordance with the Uniform Standards of Professional Appraisal

Practice."[39]  Plaintiffs allege that IndyMac Bank's appraisals were not conducted in accordance with

USPAP and were inflated.[40]  They allege also that the OIG Report found that IndyMac Bank's

appraisals "contained weaknesses," "often [were] questionable" and were "not in compliance with

the Uniform Standards of Professional Appraisal Practice."[41]  These allegations are insufficient to

state a claim.

First, neither an appraisal nor a judgment that a property's value supports a particular

loan amount is a statement of fact.  Each is instead a subjective opinion based on the particular

methods and assumptions the appraiser uses.[42]  A subjective opinion is actionable under the

Securities Act only if the amended complaint alleges that the speaker did not truly have the opinion

---

[39]
Am. Cpt. ¶¶ 49, 51.

[40]
*Id.* ¶ 70.

[41]
*Id.*

[42]
*See Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F.Supp.2d 385, 396 (S.D.N.Y. 2005) (noting that "valuation . . . involve[s] the exercise of judgment"); *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005) (Lynch, J.) ("[V]aluation models depend so heavily on the discretionary choices of the modeler . . . that the resulting models and their predictions can only fairly be characterized as subjective opinions.").

at the time it was made public.[43]   The amended complaint is devoid of any such allegation.

Second, the only fact alleged in support of the allegation that the appraisals were not made in accordance with USPAP is that the OIG Report supposedly said that IndyMac Bank's appraisals "were 'not in compliance with the Uniform Standards of Professional Appraisal Practice (USPAP).'"[44] Were this statement made by the plaintiffs themselves in the amended complaint, as opposed to its having been attributed to OIG, it would have been a legal conclusion not entitled to the assumption of truth unless supported by appropriate factual allegations.[45]   That the conclusory assertion comes not from plaintiffs but from the OIG would make it no less conclusory.   But the Court need not rely on this alone.

Plaintiffs' quotation from the OIG Report is exceptionally misleading.[46]   The report discloses that the OIG examined only twenty-two IndyMac Bank loans.[47]   Of these twenty-two, the OIG Report states, the OIG "*noted instances* where IndyMac officials accepted appraisals that were

---

[43]
See Shields v. Citytrust Bancorp., 25 F.3d 1124, 1131 (2d Cir. 1994) ("A statement of reasons, opinion or belief by such a person when recommending a course of action to stockholders can be actionable under the securities laws if the speaker knows the statement to be false.") (citing *Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1094-96); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 210 (S.D.N.Y. 2003).

[44]
Am. Cpt. ¶¶ 70.  Also quoting from the OIG Report, plaintiffs allege that IndyMac Bank's appraisal practices contained "weaknesses" and were "often questionable." *Id.*   These allegations, however, say nothing about whether IndyMac Bank's appraisal practices violated USPAP.  In any event, neither is sufficient for the reasons discussed below.

[45]
See Iqbal, 129 S.Ct. at 1950.

[46]
The Court may consider the contents of the OIG Report because the plaintiffs have relied on it extensively in their amended complaint, thereby incorporating it by reference.  *See ATSI Commc'ns, Inc.*, 493 F.3d at  98; *Rothman*, 220 F.3d at 88.

[47]
OIG Report at 11.

not in compliance with the Uniform Standard of Professional Appraisal Practice (USPAP)."[48]   The OIG Report therefore does not even remotely support the allegation that the loans in the pool underlying the Certificates were made on the basis of appraisals that did not conform to USPAP. It said only that the appraisals supporting some of the twenty-two loans it examined did not do so. Nor does it contain any suggestion that the loans the OIG examined were in the pools underlying the Certificates.   In short, if plaintiffs' allegation were subjected to the standard of full and frank disclosure that they seek to apply to the Offering Documents, it would fail miserably.

### 3.   *Loan-to-value ratios*

The Offering Documents contain statistical information about the loan-to-value ratios of the loans in the pool underlying the Certificates.[49]   Loan-to-value ratios describe the relationship between a loan's principal balance and the collateral property's value.[50]   Plaintiffs allege that the data in the Offering Documents concerning loan-to-value ratios was false and misleading because IndyMac Bank relied on inflated appraisals.   This claim is completely derivative of the improper appraisal practices claim.[51]   As those allegations are insufficient, the allegations concerning the loan-to-value ratios fail as well.

---

[48]   *Id.* at 12 (emphasis added).

[49]   Am. Cpt. ¶¶ 78-87.

[50]   *Id.* ¶ 79.

[51]   Pl. Br. at 13 ("[T]he inflated appraisals caused the LTV Ratios contained in the Offering Documents to be understated.").

4.      *Ratings and rating methodology*

The Ratings Agencies provided ratings for the Certificates which were included in the Offering Documents.  The ratings "address[ed] the likelihood of the receipt of all distributions" by Certificate owners, and "t[ook] into consideration the credit quality of the mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates."[52]  Plaintiffs contend that these statements were misleading because the Ratings Agencies "did not properly consider the credit quality of the [underlying loans] and the structure of the [Certificates] when assigning them 'triple-A' ratings."[53]

Like the appraisals, whether the "credit quality of the mortgage pool" was "properly considered" or "adequate" to support a particular rating was not a matter of objective fact.  It was instead a statement of opinion by each agency that it believed, based on the models it used and the factors it considered, that the credit quality of the mortgage pool underlying each Certificate was sufficient to support the assigned rating.[54]  For the statements to be actionable, therefore, the amended complaint must allege that the ratings agencies did not truly hold those opinions at the time they were made public.  There are no such allegations in the amended complaint.

With respect to the Ratings Agencies, the amended complaint alleges only that they

---

[52]      Am. Cpt. ¶ 56.

[53]      *Id.* ¶ 103; *see also id.* ¶¶ 57, 89, 92-103.

[54]      *See In re Lehman Brothers Sec. & ERISA Litig.*, 2010 WL 545992, at *6.

14

used out-of-date models,[55] did not verify the loan information provided to them,[56] and have since downgraded the Certificates' ratings.[57] These allegations are insufficient to support an inference that the Ratings Agencies did not actually believe that the ratings they had assigned were supported by the factors they said they had considered.   At best, they support an inference that some people believed or now believe that a different set of models, based on a different set of assumptions, might have resulted in a different rating.   Consequently, the claims based on these statements fail.[58]

       Plaintiffs allege also that the Offering Documents omitted to disclose the actual methodologies and models used by the Ratings Agencies.[59]   This argument is without merit. Plaintiffs have not established any affirmative legal obligation that required this disclosure.   They argue only that the alleged omission was necessary because once the Ratings Agencies "spoke of their ratings process, they had a duty not to mislead."[60]

       This case is unlike those plaintiffs cite as the source of this duty to disclose.   In *SEC v. Yuen*,[61] the defendant publicly stated the company's licensing and advertising revenue, which was misleading because it failed to disclose that a "substantial amount" of the revenue had been

---

[55]
    Am. Cpt. ¶¶ 93-97.

[56]
    *Id.* ¶¶ 98-102.

[57]
    *Id.* ¶ 92.

[58]
    *See In re Lehman Brothers Sec. & ERISA Litig.*, 2010 WL 545992, at *6.

[59]
    Am. Cpt. ¶ 103.

[60]
    Pl. Br. at 27.

[61]
    No. 03 Civ. 4376 (MRP), 2006 WL 1390828 (C.D. Cal. Mar. 16, 2006).

recognized under expired or disputed agreements or from non-traditional transactions in which the customers had not ordered any services.[62]   Similarly, in *Lucia v. Prospect St. High Income Portfolio*,[63] defendants used a ten year comparison between junk bonds and Treasury bills that favored the junk bonds, a comparison that was misleading because a comparison based on the most recent six years favored the Treasury bills.[64]

Here, in contrast, the Offering Documents made no mention of Ratings Agencies' processes or models.   They described only the factors that would be considered under whatever internal processes they used.[65]   Plaintiffs' argument that the Offering Documents were required to disclose the particulars about the Ratings Agencies models merely because they disclosed some of the factors that were considered "misconstrues the nature of defendants' disclosure obligations."[66]

The Court has considered Credit Suisse's other arguments and, with one exception,[67]

---

[62]

*Id.* at *36.

[63]

36 F.3d 170 (1st Cir. 1994).

[64]

*Id.* at 175-76.  *See also In re Ambac Fin. Group, Inc. Sec. Litig.*, No. 08 Civ. 411 (NRB), 2010 U.S. Dist. LEXIS 16701, at *93-94 (S.D.N.Y. Feb. 22, 2010) (statements describing Ambac's underwriting standards in positive terms misleading because company omitted that it had lowered its underwriting standards).

[65]

Am. Cpt. ¶ 56 (Ratings Agencies "take into consideration the credit quality of the mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates.")

[66]

*In re Morgan Stanley Info. Fund Litig.*, 592 F.3d at 365.

[67]

Plaintiffs have moved to dismiss for lack of standing the claims of named plaintiffs Vasili Tsereteli.  As there is no allegation that Mr. Tsereteli himself purchased any Certificates, he has no standing.

finds them to be without merit at this stage.

*Conclusion*

For the foregoing reasons, Credit Suisse's motion to dismiss the amended complaint [DI 31] is granted in its entirety except that it is denied with respect to those claims asserted by Vaszurele based on IndyMac Bank's alleged abandonment of its underwriting standards.

SO ORDERED.

Dated:          March 10, 2010

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)