UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                           :

VASILI TSERETELI and VASZURELE LTD., on      :
behalf of themselves and all others similarly situated,   :

                                         :    No. 08-CV-10637 (LAK)

              Plaintiffs,            :

                                         :

        v.                              :

                                         :

RESIDENTIAL ASSET SECURITIZATION       :
TRUST 2006-A8, CREDIT SUISSE SECURITIES   :
(USA) LLC, MOODY'S INVESTORS SERVICE,   :
INC., and THE McGRAW-HILL COMPANIES, INC., :

                                         :

            Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**DEFENDANT CREDIT SUISSE SECURITIES (USA) LLC'S MEMORANDUM OF LAW
IN OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**Contains Confidential Material Subject To Confidentiality Order (Docket No. 74)**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Phone: (212) 351-4000
Fax: (212) 351-4035

Attorneys for the
Remaining Underwriter Defendants

February 28, 2011

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 4

    I.      RAST 2006-A8 CERTIFICATES ........................................................ 4

    II.     THE MARKET FOR THE CERTIFICATES......................................... 5

    III.    PUBLICLY AVAILABLE INFORMATION ON THE
           PERFORMANCE OF THE CERTIFICATES AND
           UNDERLYING MORTGAGE COLLATERAL ................................. 5

    IV.    PUBLICLY AVAILABLE INFORMATION ON
           INDYMAC'S LOAN UNDERWRITING PRACTICES ..................... 5

    V.     THE PROPOSED CLASS REPRESENTATIVE AND THIS MOTION ............ 7

ARGUMENT ..................................................................................................... 9

    I.      PLAINTIFF CANNOT SATISFY THE
           PREDOMINANCE REQUIREMENT OF RULE 23(b)(3) .............................. 10

        A.     Individual Issues Predominate Because Each
               Member Of The Proposed Class Is Uniquely Situated ........................... 10

              1.     Investor Knowledge ...................................................... 10

              2.     Investor Notice ............................................................... 15

               3.     Investor Reliance ........................................................... 16

         B.     Individual Issues Predominate Because Each Certificate Is Distinct
               And Presents Individualized Questions On Liability And Damages....... 17

               1.     Falsity......................................................................... 18

              2.     Materiality.................................................................. 20

              3.     Damages And Causation............................................. 22

    II.     PLAINTIFF CANNOT SATISFY THE
           SUPERIORITY REQUIREMENT OF RULE 23(b)(3) .................................... 25

# TABLE OF CONTENTS
### (Continued)

**Page**

III.   PLAINTIFF CANNOT SATISFY
THE REQUIREMENTS OF RULE 23(a) ......................................................... 27

    A.   There Is No "Typical" Or "Common" Claim Shared By The
Proposed Class, And Plaintiff Is Subject To Unique Defenses .............. 27

    B.   Plaintiff Is An Inadequate Representative
For The Proposed Class ........................................................................ 30

        1.   Plaintiff's Unfamiliarity With, And
Lack Of Control Over, This Case ................................................ 30

        2.   Inherent Conflicts In The Proposed Class ................................... 32

    C.   Plaintiff Has Not Established Numerosity ............................................. 33

CONCLUSION .................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
    2010 WL 2593948 (S.D.N.Y. June 15, 2010) .............................................................4, 24, 35

*Ackerman v. Oryx Commc'ns, Inc.*,
    609 F.Supp. 363 (S.D.N.Y. 1984) ...........................................................................22

*Ansari v. New York Univ.*,
    179 F.R.D. 112 (S.D.N.Y. 1998) ..................................................................10, 25, 27

*Ashe v. Bd. of Elections in the City of New York*,
    124 F.R.D. 45 (E.D.N.Y. 1989) ...............................................................................35

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    222 F.3d 52 (2d Cir. 2000) ....................................................................................27

*Barnes v. The Am. Tobacco Co.*,
    161 F.3d 127 (3d Cir. 1998) ...................................................................................16

*Beck v. Status Game Corp.*,
    1995 WL 422067 (S.D.N.Y. July 14, 1995) ............................................................32

*Berks County Employees' Ret. Fund v. First Am. Corp.*,
    734 F. Supp. 2d 533 (S.D.N.Y.) ...........................................................................9, 10

*Bersch v. Drexel Firestone, Inc.*,
    519 F.2d 974 (2d Cir. 1975) ...................................................................................27

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*,
    113 F. Supp. 2d 345 (E.D.N.Y. 2000) ....................................................................16

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
    155 F.3d 331 (4th Cir. 1998) ..................................................................................15

*City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.*,
    703 F. Supp. 2d 253 (E.D.N.Y. 2010) ....................................................................19

*Darvin v. Int'l Harverster Co.*,
    610 F. Supp. 255 (S.D.N.Y. 1985) .........................................................................32

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir.2003) ....................................................................................10

*Dodds v. Cigna Sec., Inc.*,
    12 F.3d 346 (2d Cir. 1993) .....................................................................................15

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*Dunnigan v. Metro. Life Ins. Co.*,
   214 F.R.D. 125 (S.D.N.Y. 2003) ............................................................15

*Gunnells v. Healthplan Servs., Inc.*,
   348 F.3d 417 (4th Cir. 2003) ...............................................................16

*In re Credit Suisse First Boston Corp. Analyst Sec. Litig.*,
   250 F.R.D. 137 (S.D.N.Y. 2008) ............................................................17

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   245 F.R.D. 147 (S.D.N.Y. 2007) ............................................................18

*In re Fosamax Prod. Liab. Litig.*,
   248 F.R.D. 389 (S.D.N.Y. 2008) ............................................................25

*In re IndyMac Mortgage-Backed Sec. Litig.*,
   718 F. Supp. 2d 495 (S.D.N.Y. 2010) ....................................................34

*In re Initial Pub. Offering Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006) ...................................................9, 11, 17

*In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*,
   1995 WL 234975 (S.D.N.Y. Apr. 21, 1995) ..........................................15

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   289 F. Supp. 2d 429 (S.D.N.Y. 2003) ....................................................22

*In re Morgan Stanley Information Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) .................................................................20

*In re Parmalat Sec. Litig.*,
   2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) ........................................18

*In re Superior Offshore Int'l, Inc. Sec. Litig.*,
   2010 WL 2305742 (S.D. Tex. June 8, 2010) ...................................11, 15

*In re Vivendi Universal, S.A. Sec. Litig.*,
   242 F.R.D. 76 (S.D.N.Y. 2007) ..............................................................34

*In re WorldCom, Inc. Sec. Litig.*,
   218 F.R.D. 267 (S.D.N.Y. 2003) ............................................................18

*Kaczmarek v. IBM Corp.*,
   186 F.R.D. 307 (S.D.N.Y. 1999) ............................................................25

*Kottler v. Deutsche Bank AG*,
   2010 WL 1221809 (S.D.N.Y. Mar. 29, 2010) ..................................10, 25

# TABLE OF AUTHORITIES
## (Continued)

<u>Page(s)</u>

*Kamerman v. Steinberg*,
    113 F.R.D. 511 (S.D.N.Y. 1986) ...........................................................30

*Landry v. Price Waterhouse Chartered Accountants*,
    123 F.R.D. 474 (S.D.N.Y. 1989) ...........................................................30

*Lenz v. Associated Inns & Rests. Co. of Am.*,
    833 F. Supp. 362 (S.D.N.Y. 1993) .........................................................16

*NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*,
    2010 WL 4054149 (S.D.N.Y. Oct. 14, 2010) .................................23, 30

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F. 3d 154 (3d Cir. 2001) ..................................................................24

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
    __ F.R.D. __, 2011 WL 147735 (S.D.N.Y. Jan. 18, 2011).............. *passim*

*N.J. Carpenters Health Fund v. Residential Capital LLC*,
    2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) .........................................2

*N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Group*,
    720 F. Supp. 2d 254 (S.D.N.Y. 2010) ....................................................2

*Primavera Familienstiftung v. Askin*,
    178 F.R.D 405 (S.D.N.Y. 1998) .............................................................33

*Scott v. New York City Dist. Council of Carpenters Pension Plan*,
    224 F.R.D. 353 (S.D.N.Y. 2004) .....................................................30, 32

*Spagnola v. Chubb Corp.*,
    264 F.R.D. 76 (S.D.N.Y. 2010) .......................................................10, 32

*Stoudt v. E.F. Hutton & Co.*,
    121 F.R.D. 36 (S.D.N.Y. 1988) .............................................................26

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006) ...........................................9

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008) ....................................................................9

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
    445 F.3d 311 (4th Cir. 2006) ...........................................................15, 16

*U.S. v. Geraghty*,
    445 U.S. 388 (1980) ...............................................................................25

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*U.S. Fid. & Guar. Co. v. Madison Fin. Corp.*,
   2002 WL 31731020 (S.D.N.Y. Dec. 4, 2002) ........................................................35

*Warren v. Xerox Corp.*,
   2004 WL 1562884 (E.D.N.Y. Jan. 26, 2004) ......................................................35

*Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*,
   162 F.R.D. 471 (E.D. Pa. 1995) ...........................................................................33

*Zimmerman v. Thompson McKinnon Sec., Inc.*,
   1989 WL 122742 (S.D.N.Y. Oct. 11 1989) ........................................................26

**Rules & Statutes**

Fed. R. Civ. P. 23(a) ..................................................................................... *passim*

Fed. R. Civ. P. 23(a)(1) ............................................................................................33

Fed. R. Civ. P. 23(a)(2) ............................................................................................27

Fed. R. Civ. P. 23(a)(3) ............................................................................................27

Fed. R. Civ. P. 23(a)(4) ....................................................................................30, 32

Fed. R. Civ. P. 23(b)(3) ................................................................................. *passim*

Fed. R. Civ. P. 23(c)(4) ............................................................................................25

Fed. R. Civ. P. 23(c)(5) ............................................................................................25

15 U.S.C. § 77k .............................................................................................. *passim*

15 U.S.C. § 77l(a)(2) ...................................................................................... *passim*

17 C.F.R. § 210.5-03 ................................................................................................17

17 C.F.R. § 230.158 ..................................................................................................17

17 C.F.R. § 230.258(a)(2) .........................................................................................17

Defendant Credit Suisse Securities (USA) LLC respectfully submits this memorandum of law in opposition to Lead Plaintiff's Motion for Class Certification (Dkt. 75).

## INTRODUCTION

Plaintiff has alleged misrepresentations concerning the underwriting standards used by IndyMac Bank in originating or acquiring mortgage loans, and seeks certification of a single class encompassing investors in any of 26 different mortgage-backed securities ("MBS"), regardless of their knowledge of the residential loan market, whether they purchased the MBS in the initial offering, or years later in transactions made after the collapse of the residential real estate market. In so doing, Plaintiff acts as though this is a conventional action involving traditional corporate securities traded on a national exchange or in a liquid, transparent market.

The MBS at issue in this case, however, are very different from traditional corporate securities. The distinct characteristics of each of the MBS, the individual negotiations underlying the purchase and sale of each of the MBS, the sophistication of the different investors in different MBS, the different times at which different investors purchased the MBS, the significant public information relevant to the alleged misrepresentations, and the dramatic events that unfolded in the residential real estate market during this time period all make class certification improper here.

Plaintiff fails to account for any of these factors and has not come close to satisfying its burden of proving by a preponderance of the evidence all of the Rule 23 requirements for class certification. Class certification should be denied for multiple independent reasons.

**Predominance:** Individualized inquiries predominate on the critical issue of investor knowledge. A recent ruling in a MBS case from another court in this District is directly on point. In *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, __ F.R.D. __, 2011 WL 147735 (S.D.N.Y. Jan. 18, 2011) ("*RALI/Harborview*"), the *RALI* plaintiffs and *Harborview* plaintiffs alleged that the mortgage originators for the loans underlying the MBS at issue

"systematically disregarded" the underwriting guidelines described in the offering documents for the MBS,[1] and sought class treatment for investors in the MBS. *Id.* at *1. In holding that class treatment was inappropriate because individual questions of investor knowledge predominate, Judge Baer explained that many proposed class members were "sophisticated investors with significant experience in asset-backed securities markets" and which purchased certificates "at different times, and thus had the benefit of different levels of information about the lending practices relevant to investment in mortgage backed securities." *Id.* at *8-10. Because "investors' knowledge levels will vary depending on their level of sophistication and the timing of their purchase" and "[s]uch variance invites unique defenses . . . that require a great deal of individualized evidence," Judge Baer concluded that "individual issues predominate" and denied certification. *Id.* at *6-10.

Individual issues of investor knowledge likewise preclude class certification here. Just like in the *RALI* and *Harborview* cases, the proposed class here includes leading players in the market for structured products that had significant experience in MBS markets and that purchased over a time period where "more and more information became publicly available" that "cast increasing levels of doubt on whether the loans comprising the mortgage backed securities were originated in conformity with appropriate guidelines." *RALI/Harborview*, 2011 WL 147735 at *10.[2] Thus, just like in the *RALI* and *Harborview* cases, individual issues of investor knowledge predominate.

---

[1] *See N.J. Carpenters Health Fund v. Residential Capital LLC*, 2010 WL 1257528, at *5 (S.D.N.Y. Mar. 31, 2010); *N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Group*, 720 F. Supp. 2d 254, 268 (S.D.N.Y. 2010).

[2] *See* Report of Walter N. Torous, Ph.D. ("Torous Rep.") ¶¶ 56-68, 70, Exs. 18-21 (Ex. A); Chart on MBS Expertise (Ex. B); Chronology of Public Reports (Ex. C). All references in the form (Ex. __) shall be to the exhibits of the Declaration of Aric H. Wu, dated February 28, 2011.

Moreover, as explained herein and in the expert report of Walter N. Torous, Ph.D., each of the MBS at issue here is distinct and presents individualized questions with regard to virtually every aspect of the claims and defenses in the action, including falsity, materiality, damages, and causation.  Individual issues thus predominate.

**Superiority:**  In light of all the individualized issues, addressing all of the claims and defenses relating to the 26 different securities would not be manageable.  *See RALI/Harborview*, 2011 WL 147735 at *11 (finding *Harborview* plaintiffs' request for certification of a class covering 39 mortgage pass-through certificates to be unmanageable because "the Court would have to hear significant individualized evidence").  Moreover, the putative class here includes investors that made significant investments (several in the range of $50 million) and thus have the "incentive to pursue their own claims."  *Id*.  Under these circumstances, Plaintiff does not, and cannot, show that a class action is superior.

**Typicality And Commonality:**  Given the multiplicity of individualized inquiries presented, there is no "typical" or "common" claim in Plaintiff's proposed class.  Indeed,

██████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████  Plaintiff itself is subject to unique defenses that threaten to become the focus of litigation.

**Adequacy:**  Plaintiff is also an inadequate class representative because its lacks sufficient knowledge of the case to exercise independent control over the case and because of inherent conflicts between differently situated class members that purchased different securities at different points in time based on different information.

**Numerosity:**  In the initial offering of the MBS, 25 out of 26 certificates were purchased by fewer than 4 potential class members, and 26 out of 26 certificates were purchased by fewer than 17 potential class members.  When aftermarket purchases are included, only 2 of the 26

3

certificates had more than 40 investors.  The other 24 certificates were purchased by fewer than 10 potential class members.  *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 269 F.R.D. 252, 255 (S.D.N.Y. 2010) ("Generally, courts will find that the numerosity requirement . . . has not been satisfied when the class comprises 21 or fewer.") (citation omitted).

Plaintiff cannot satisfy *any* of the four required elements of Rule 23(a) or the two required elements of Rule 23(b)(3), much less *all* of them, as is their burden.  Accordingly, for all the reasons set forth herein, Plaintiff's motion for class certification should be denied.

## FACTUAL BACKGROUND

### I.     RAST 2006-A8 CERTIFICATES

Plaintiff seeks certification of a class encompassing investors in 26 separate classes of mortgage-backed certificates issued by Residential Asset Securitization Trust 2006-A8 ("RAST 2006-A8").  Each class (often referred to as a "tranche") is a separately traded security that has its own unique CUSIP identifier, original principal note balance, interest rate, payment rights, priority for receiving "pass-through" distributions, and credit rating.  *See* RAST 2006-A8 Prospectus Supplement ("Pro Supp.") at S-7 to S-20 (Ex. D); Torous Rep. ¶¶ 6, 27-45 (Ex. A).

IndyMac Bank, F.S.B. originated, or acquired from other loan originators, the mortgage loans underlying the certificates.  *See* Pro Supp. at S-5, S-21, S-61 (Ex. D).  IndyMac MBS, Inc. purchased 1708 mortgage loans from IndyMac Bank, pooled them, and deposited the loan pool into RAST 2006-A8, which issued the certificates.  *Id.* at S-32.  The loan pool was further subdivided into three separate loan groups that backed different tranches of certificates.  *Id.* at S-5.  As borrowers make monthly mortgage payments, RAST 2006-A8 makes "pass through" payments to certificate holders in order of the priority of their tranche.  *Id.* at S-84 to S-94.

RAST 2006-A8 registered the certificates with the SEC under a registration statement dated February 24, 2006, a base prospectus dated June 14, 2006, and a prospectus supplement dated June 28, 2006.  There were 33 certificates registered with the SEC.  *Id.* at S-1. Credit

Suisse was the underwriter for the 27 of the certificates, including the 26 for which Plaintiff

seeks class treatment, and Lehman Brothers Inc. was the underwriter for 6 of the certificates.

## II.     THE MARKET FOR THE CERTIFICATES

In the initial offering, certificates were sold in "negotiated transactions" at "varying

prices to be determined at the time of sale." *See* Pro Supp. at S-132 (Ex. D).  Secondary market

transactions in certificates were similarly individually negotiated transactions between buyers

and sellers.  Torous Rep. ¶ 100.  At no time did the certificates trade on an exchange.  Thus, the

price paid for certificates could have varied from purchaser to purchaser based on factors such as

the identity and nature of the purchaser and seller, the size of the transaction, the nature of the

transaction, and the timing of the transaction.  *Id.* ¶¶ 100-01.

## III.    PUBLICLY AVAILABLE INFORMATION ON THE PERFORMANCE OF
THE CERTIFICATES AND UNDERLYING MORTGAGE COLLATERAL

Within a month of the initial offering, investors and potential investors had access to

detailed monthly financial statements prepared by the trustee for the certificates, Deutsche Bank

National Trust Co. ("DBNTC").  *See* Pro. Supp. at S-69.  The monthly trustee reports were

publicly available on the internet and provided cumulative and monthly information regarding

the performance of the certificates, including a breakdown of the principal and interest payments

to each tranche, the extent to which any losses had occurred, and aggregated and loan-by-loan

reports on delinquencies and foreclosures in the underlying collateral groups.  *See*, *e.g.*, July 25,

2006 Report (Ex. I); December 26, 2006 Report (Ex. J); December 26, 2007 Report (Ex. K).

Thus, regularly updated performance data that superseded the disclosures contained in the

offering documents was available to investors that purchased after the initial offering.

## IV.    PUBLICLY AVAILABLE INFORMATION ON
INDYMAC'S LOAN UNDERWRITING PRACTICES

The certificates were issued at a time during which there was significant press coverage

of developments in the residential real estate market.  *See* Chronology of Public Reports (Ex. C);

Torous Rep. ¶¶ 56-68, Exs. 18-20.  Indeed, even before the certificates were issued, the press had reported "concerns about the [A]lt-A mortgage market: lax underwriting standards, a propensity for borrowers to 'misstate' their incomes, and 'no doc' programs being used to mask qualification issues."  (Ex. C at 1).  IndyMac's loan underwriting practices were specifically covered by the press.  Numerous articles published throughout 2007, for example, raised questions about IndyMac's loan underwriting practices.[3]  Moreover, as alleged in Plaintiff's original complaint, in March 2007, a lawsuit was filed alleging that (i) "between 2005 and 2006, IndyMac acquired pools of recently originated mortgages from various sellers that IndyMac had not properly vetted"; (ii) "[a]lmost immediately after IndyMac acquired the loans, nearly all of them became distressed or defaulted"; and (iii) "instead of making immediate repurchase requests and terminating its business relationship with sellers, IndyMac continued to purchase defaulting loans from the sellers."[4]  In September 2007, the plaintiffs in that lawsuit filed an amended complaint alleging that IndyMac had "greatly loosened its underwriting guidelines to drive [up] volume and bring in more loan sales" and adopted a policy of "'pushing through' unqualified loans."[5]  In November 2007, Moody's downgraded its ratings for five certificates issued by RAST 2006-A8.[6]  In May 2008, Moody's announced that it had placed nearly all the RAST 2006-A8 certificates on review for possible downgrade, including 23 of the certificates at

---

[3]  *See*, *e.g.*, Chris Isidore, *"Liar Loans": Mortgage Woes Beyond Subprime*, CNNMoney.com, Mar. 19, 2007 (Ex. BB); Ben Steverman, *Mortgage Crisis Roughs Up IndyMac; The Mortgage Lender, Which Provides "Alt-A" Loans, Suffers as the Mortgage Crisis Spreads*, BusinessWeek Online, July 19, 2007 (Ex. CC).

[4]  Comp. ¶¶ 65-67 (Dkt. 1, Ex. A).

[5]  *See* Amended Complaint, ¶¶ 39, 55, in *Tripp v. IndyMac Bancorp, Inc.*, No. 07-CV-1635 (C.D. Cal.) (Ex. Q).

[6]  *See* Moody's Investors Service, "Moody's takes negative rating actions on certain Alt-A deals issued by Residential Asset Securitization Trust in 2006 and late 2005," Nov. 27, 2007 (Ex. Z), *available at* http://www.moodys.com/viewresearchdoc.aspx?lang=en&cy=global&docid= PR_145145.

issue on this motion.[7]  On June 30, 2008, the Center for Responsible Lending issued a report (the "CRL Report") that, by Plaintiff's own allegations, found that "IndyMac's underwriters 'routinely . . . [approved] loans without regard to borrowers' ability to repay' and with 'little, if any, review of borrower qualifications, including income, assets, and employment.'"[8]  Thus, different information about the residential mortgage loan market, the certificates, and IndyMac's loan underwriting practices was available depending on the time at which a potential investor considered purchasing certificates.

## V.      THE PROPOSED CLASS REPRESENTATIVE AND THIS MOTION

"Lead Plaintiff Vaszurele Ltd. is a British Virgin Islands personal holding company owned and controlled by a single shareholder, Vasili Tsereteli."  Lead Plaintiff's Memorandum of Law, dated Dec. 10, 2010 ("P's Br."), at 6 (Dkt. 76).  ███████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████████
██████  █████████████████████████████████████  ████████████
████████████████████████████████████████████
██████████████████████████████████  ██

[7]   *See* Moody's Investors Service, "Moody's Downgrades Certain RAST Alt-A deals," May 9, 2008 (Ex. AA), *available at* http://www.moodys.com/viewresearchdoc.aspx?lang=en&cy= global&docid= PR_155000.

[8]   Am. Comp. ¶ 63 (Dkt. 25) (quoting CRL Report at 2).

[9]   Transcript of Deposition of Vasili Tsereteli ("Tsereteli Tr."), as 30(b)(6) designee of Vaszurele, at 17:6-17, 22:14-17; 115:5-10 (Ex. M); Vaszurele Certification, Schedule A (Dkt. 24-2) (Ex. H).

[10]  Tsereteli Tr. at 44:9 – 45:8; 47:7-10; 81:3-21, 114:5-14 (Ex. M).

[11]  Vaszurele Certification, Schedule A (Dkt. 24-2) (Ex. H).

[12]  Tsereteli Tr. at 67:18-24; 84:13 – 85:8 (Ex. M).

On December 10, 2010, Vaszurele moved for class certification.  Vaszurele seeks to certify a class consisting of "all" investors in 26 certificates issued by RAST 2006-A8.  P's Br. at 1 n.1.  There are no temporal restrictions in Vaszurele's definition of the proposed class, and Vaszurele has identified as putative class members investors who purchased *after* the March 2007 allegations that "IndyMac acquired pools of recently originated mortgages from various sellers that IndyMac had not properly vetted," *after* the September 2007 allegations that IndyMac had "greatly loosened its underwriting guidelines" and adopted a policy of "'pushing through' unqualified loans," and *after* the June 2008 CRL Report that allegedly found that IndyMac "routinely" approved loans "without regard to borrowers' ability to repay."

Though Vaszurele seeks to certify a class consisting of investors in 26 separate MBS, Plaintiff has not submitted a report from a MBS expert.  Instead, Plaintiff has proffered a report from Steven P. Feinstein, an Associate Professor of Finance at Babson College who has never published on MBS, never conducted any studies of MBS, and never taught a course dedicated to MBS.[13]  Professor Feinstein does not know what forms of research or analyses investors in MBS undertake and performed no analysis himself of what information beyond the offering documents was available to investors at any point in time, and did not consider whether the information changed after the initial offering of the certificates occurred.[14]  Professor Feinstein assumed, without any investigation, that Plaintiff's allegations were true and considered any decline in the purported "value" of a certificate to be attributable to the alleged misrepresentations concerning IndyMac's underwriting practices.[15]  Professor Feinstein acknowledged that analyzing macroeconomic and other exogenous factors that might have resulted in defaults in the loan

---

[13] *See* Transcript of Deposition of Steven Feinstein, Ph.D. (Jan. 18, 2011) ("Feinstein Tr.") at 33:19 – 36:14 (Ex. N).

[14] *Id*. at 154:1 – 157:15; 160:16 – 161:24.

[15] *Id*. at 20:16 – 21:6; 173:18 – 174:19.

pools "wasn't part of the scope of [his] engagement," and thus could offer no methodology for establishing causation.[16]   Though Professor Feinstein purported to opine on the materiality of the allegedly untrue statements about IndyMac's underwriting process, he conceded he had performed no "empirical test to see if there are significant price reactions when that information becomes known or corrected."[17]

## ARGUMENT

Class certification should be denied because Plaintiff has failed to meet its burden of proving each Rule 23(a) and Rule 23(b)(3) requirement by a "preponderance of the evidence." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).  The Second Circuit has expressly disavowed a "lenient" approach to class certification. *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 36-42 (2d. Cir. 2006) ("*IPO*").  "Before certifying a class, a district court is obliged to conduct a 'rigorous analysis' to determine whether the plaintiff has satisfied all the [Rule 23] requirements."  *Berks County Employees' Ret. Fund v. First Am. Corp.*, 734 F. Supp. 2d 533, 536 (S.D.N.Y.) (Kaplan, J.).

"[C]ourts should not assume that allegations contained in the complaint are true when deciding a motion for class certification."  *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 2006 WL 2161887, at *3 (S.D.N.Y. Aug. 1, 2006).  Instead, a plaintiff must submit "enough evidence, by affidavits, documents, or testimony," to prove by a preponderance of the evidence that it has satisfied all of the Rule 23 requirements.  *IPO*, 471 F.3d at 41.  The district court must consider "all of the relevant evidence admitted at the class certification stage," including "rebuttal" evidence presented by the defendants, and make a "definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues."  *Id.* at 41-42.

---

[16]   *Id.* at 123:11 – 124:25; 168:4 – 169:8.

[17]   *Id.* at 73:3-5.

Rule 23(a) requires proof of four elements, and Rule 23(b)(3) requires proof of two elements. Fed. R. Civ. P. 23(a), 23(b)(3). "[F]ailure to prove any element precludes certification." *Ansari v. New York Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998).

## I.   PLAINTIFF CANNOT SATISFY THE PREDOMINANCE REQUIREMENT OF RULE 23(b)(3)

Plaintiff has failed to satisfy the predominance requirement of Rule 23(b)(3), which requires proof that "law or fact questions common to the class predominate over questions affecting individual members." *Kottler v. Deutsche Bank AG*, 2010 WL 1221809, at *1 (S.D.N.Y. Mar. 29, 2010). The predominance inquiry under Rule 23(b)(3) "is more demanding than the commonality requirement under Rule 23(a)." *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 98 (S.D.N.Y. 2010) (citation omitted). Class certification must be denied where "issues subject to individualized proof would predominate over common issues." *Berks*, 734 F. Supp. 2d at 541.

### A.   Individual Issues Predominate Because Each Member Of The Proposed Class Is Uniquely Situated

Plaintiff seeks to certify an undifferentiated class consisting of investors in 26 different securities, including investors who purchased in secondary market transactions years after the initial offering of the securities. *See* P's Br. at 1; Torous Rep. ¶¶ 27, 113 (Ex. A). The investors in Plaintiff's proposed class, however, are not an undifferentiated mass. Each is uniquely situated based on its sophistication and expertise in MBS markets, its knowledge of and access to the mortgage industry, and the timing of its purchases. Accordingly, individual issues abound. *See RALI/Harborview*, 2011 WL 147735 at *8-11 (denying certification in MBS case for failure to satisfy Rule 23(b)(3) predominance requirement).

#### 1.   Investor Knowledge

Because investors who "knew about the false statement at the time of acquisition" have no claim under the Securities Act (*DeMaria v. Andersen*, 318 F.3d 170, 175 (2d Cir. 2003)), the Second Circuit has expressly recognized that individual questions of investor knowledge can

defeat class certification: "Plaintiffs must show lack of knowledge to recover on their section 11 claims . . . [T]he predominance requirement is defeated because common questions of knowledge do not predominate over individual questions." *IPO*, 471 F.3d at 43.

Plaintiff and its expert are conspicuously silent on the issue of investor knowledge. *See In re Superior Offshore Int'l, Inc. Sec. Litig.*, 2010 WL 2305742, at *5 (S.D. Tex. June 8, 2010) (denying certification because "the knowledge issue . . . must be determined on an individualized basis as to each investor"). Indeed, Professor Feinstein acknowledged that investor sophistication and differences in investor knowledge were not within the scope of his expert report. Feinstein Tr. at 160:16 – 161:7 (Ex. N).

In *RALI/Harborview*, Judge Baer denied class certification because "many putative class members are sophisticated investors with significant experience in asset-backed securities markets" and "had the benefit of different levels of information about the lending practices relevant to investment in mortgage backed securities." 2011 WL 147735 at *9-10. Like the putative class in *RALI/Harborview*, the putative class here includes leading players in the market for structured products that had significant experience in MBS markets. *See* Torous Rep. ¶¶ 69-71, Ex. 21; Wu Decl. Ex. B.

> ***Sophisticated Investment Funds With MBS Expertise.*** In *RALI/Harborview*, the putative classes included sophisticated investors that "tout their expertise in mortgage backed securities." 2011 WL 147735 at *9.





***Sophisticated Investment Advisors With MBS Expertise.*** In *RALI/Harborview*, the putative classes included investors whose accounts were managed by sophisticated investment advisors with significant MBS expertise. 2011 WL 147735 at *9.

***Large Financial Institutions With Significant Investments In MBS.*** In *RALI/Harborview*, the putative classes included investors that "purchased hundreds of millions of dollars of [mortgage pass-through] certificates." *RALI/Harborview*, 2011 WL 147735 at *10.

***Collateralized Debt Obligations.*** A collateralized debt obligation ("CDO") is an asset-backed security whose payments are derived from a portfolio of fixed-income assets, such as MBS.

***Defendants In Other MBS Lawsuits.*** In *RALI/Harborview*, the putative classes included defendants in other lawsuits who are "alleged to have knowledge regarding originators' systematic disregard of underwriting guidelines." 2011 WL 147735 at *9.

---



"Additionally, putative class members have different levels of knowledge because they purchased the [RAST 2006-A8] certificates at different times."  *Id.* at *10.   The RAST 2006-A8 certificates were issued in June 2006, and the putative class members include investors who purchased years later.   During that time, "more and more information became publicly available" that "cast increasing levels of doubt on whether the loans comprising the mortgage backed securities were originated in conformity with appropriate guidelines."  *Id.*   The public information included:

> ***News Articles Reporting Relaxed Underwriting Standards.***  Numerous articles
> from as early as 2004 warned that mortgage originator were "lowering their
> underwriting standards," making loans "regardless of the buyer's income or credit
> history,"[22] and that such loans "may pose a potentially higher risk of default than
> traditional mortgages."[23]

> ***News Articles Questioning IndyMac's Underwriting Practices.***  Numerous
> articles published throughout 2007 raised questions about IndyMac's loan
> underwriting practices.  For example, CNNMoney.com reported statements of
> industry experts describing Alt-A loans as "liar loans" based on "little or no
> verification of income," and identified IndyMac as "the biggest Alt. A lender."[24]
> BusinessWeek reported that "[b]uyers who take out Alt-A loans . . . submit little

---

[20]

[21]

[22]  Jenny Wiggins, *Interest rate rises to hit households' debt loads*, Finance Times, August 8, 2004, at 1, 25 (Ex. DD)

[23]  Luke Mullins, *In Brief:  Bies Warns of Real Estate Lending Risks*, American Banker, Vol. 170 No. 197, October 13, 2005, at 3 (Ex. EE).

[24]  Isidore, *supra* note 4. (Ex. BB).

documentation" and that "IndyMac, as one of the country's biggest Alt-A originators, is vulnerable as the defaults rise among the loans."[25]

***Lawsuit Regarding IndyMac's Loosening Underwriting Practices.***  As alleged in Plaintiff's original Complaint, in March 2007, a lawsuit was filed alleging that (i) "between 2005 and 2006, IndyMac acquired pools of recently originated mortgages from various sellers that IndyMac had not properly vetted"; (ii) "[a]lmost immediately after IndyMac acquired the loans, nearly all of them became distressed or defaulted"; and (iii) "instead of making immediate repurchase requests and terminating its business relationship with sellers, IndyMac continued to purchase defaulting loans from the sellers."[26]  In September 2007, the plaintiffs filed an amended complaint alleging that IndyMac had "greatly loosened its underwriting guidelines to drive up volume and bring in more loan sales" and adopted a policy of "'pushing through' unqualified loans."[27]

***Monthly Trustee Reports.***  DBNTC's trustee reports, which were and remain publicly available, provide monthly updates on the performance of loan collateral. Thus, investors had different information regarding the loans underlying the RAST 2006-A8 offering as well as the performance of the specific certificates in which they were interested depending on when they purchased.  Torous Rep. ¶ 66.

***Rising Delinquency Rates.***  Plaintiff alleges that increased delinquency rates evidenced that the underwriting guidelines were inaccurately described in the offering documents.  (Am. Comp. ¶ 104).  The monthly trustee reports showed increasing delinquency rates for the loans in the underlying mortgage pools throughout 2007.  Indeed, the delinquency rate for the RAST 2006-A8 mortgage pool jumped from 1.70% in July 2006 to 12.12% in December 2007.  (Ex. I at 12; Ex. K at 12).

***Rating Downgrades.***  Plaintiff also alleges that rating downgrades evidenced that the underwriting guidelines were inaccurately described in the offering documents.  (Am. Comp. ¶ 90).  According to Plaintiff's own allegations, however, in April and July 2007, the rating agencies publicly acknowledged that their models for rating residential MBS were deficient, thus alerting investors that whatever prior rating had been given to a MBS was subject to revision.  (*Id.* ¶¶ 94, 98).  In November 2007, Moody's downgraded its ratings for five certificates issued by RAST 2006-A8.[28]

---

[25]  Steverman, *supra* note 4 (Ex. CC).

[26]  Comp. ¶¶ 65-67 (Dkt. 1, Ex. A).

[27]  Amended Complaint, ¶¶ 39, 55, in *Tripp v. IndyMac Bancorp, Inc.*, No. 07-CV-1635 (C.D. Cal.) (Ex. Q).

[28]  *See* Moody's Investors Service, "Moody's takes negative rating actions on certain Alt-A deals issued by Residential Asset Securitization Trust in 2006 and late 2005," Nov. 27, 2007 (Ex. Z).

[Footnote continued on next page]

Just like in *RALI/Harborview*, the putative class members' knowledge levels "will vary depending on their level of sophistication and the timing of their purchase."  2011 WL 147735 at *6.  "Such variance invites unique defenses . . . that require a great deal of individualized evidence."  *Id.* at *6-8.  Accordingly, "individual issues predominate."  *Id.* at *10.  *See also Superior Offshore*, 2010 WL 2305742 at *6 (denying certification because "[e]ach investor's knowledge is an individual issue over which no common issues of law and fact predominate").

## 2.   Investor Notice

"Affirmative defenses should be considered in making class certification decisions." *Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 133-34 (S.D.N.Y. 2003) (citation omitted). "[W]hen the defendant's affirmative defenses (such as . . . the statute of limitations) may depend on facts peculiar to each plaintiff's case, class certification is erroneous."  *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir. 1998) (internal quotations and citation omitted).  Here, individualized issues of investor notice for the affirmative defense that Plaintiff's claims are time-barred also preclude class certification.  *See Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 324 (4th Cir. 2006) (denying certification where plaintiffs "failed to show that the statute of limitations defense can be resolved on a class-wide basis").

The one-year statute of limitations for Securities Act claims commences when a plaintiff has either actual or inquiry notice of an alleged misstatement.  *See Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 349-50 (2d Cir. 1993).  "Implicit in the doctrine of inquiry notice is the notion that there is a certain quantum of facts that comprises a threshold, unique to each individual investor with his or her own circumstances and characteristics, beyond which the investor was under a

---

[Footnote continued from previous page]

In May 2008, Moody's announced that it had placed additional certificates issued by RAST 2006-A8 on negative credit watch.  *See* Moody's Investors Service, "Moody's Downgrades Certain RAST Alt-A deals," May 9, 2008 (Ex. AA).  Moody's subsequently downgraded an additional 23 certificates issued by RAST 2006-A8.  (Am. Comp. ¶ 90).

duty to inquire." *In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*, 1995 WL 234975, at *5 (S.D.N.Y. Apr. 21, 1995). Class treatment is unwarranted when there is no evidence that the proposed class is "so homogeneous" that "media reports and other information" would affect class members in "the same manner." *Thorn*, 445 F.3d at 323.

As already discussed, the putative class is diverse because it encompasses investors over a lengthy time period and more and more information about the underwriting practices of "Alt-A" lenders in general and of IndyMac in particular became available over time. Moreover, the putative class includes many sophisticated investors. Because "the investor's sophistication affects the extent to which a court may properly conclude that a particular event should have influenced the investor to undertake an inquiry," there will necessarily be individualized issues of investor notice. *Lenz v. Associated Inns & Rests. Co. of Am.*, 833 F. Supp. 362, 376 (S.D.N.Y. 1993). *See also Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 113 F. Supp. 2d 345, 382 (E.D.N.Y. 2000) ("A plaintiff's sophistication in the subject areas at issue is relevant in determining whether inquiry notice exists.").

These individualized issues of investor notice preclude class certification. *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 438 (4th Cir. 2003) (denying certification because statute of limitations defense "would require individualized inquiry in at least some cases"); *Barnes v. The Am. Tobacco Co.*, 161 F.3d 127, 149 (3d Cir. 1998) (same).

### 3.  **Investor Reliance**

Individualized issues of investor reliance also preclude class certification. Under Section 11, a plaintiff must prove reliance on offering materials if it "acquired the security after the issuer has made generally available to its security holders an earning statement covering a period

of at least 12 months beginning after the effective date of the registration statement." 15 U.S.C. § 77k(a).  The trustee reports prepared by DBNTC are "earning statements."[29]

Plaintiff's proposed class includes investors who purchased more than a year after the certificates were issued in June 2006.  Proof of reliance by investors who purchased over a year after the initial offerings will be an inherently individualized issue that can only be assessed class member by class member.  Indeed, because there is no evidence that the certificates traded in an efficient market, no presumption of reliance applies.  *See In re Credit Suisse First Boston Corp. Analyst Sec. Litig.*, 250 F.R.D. 137, 142 & n.11 (S.D.N.Y. 2008) (decertifying class where plaintiff failed to show that presumption of reliance should apply).  Accordingly, "individual questions of reliance would predominate over common questions," and class certification should be denied.  *IPO*, 471 F.3d at 43 (denying certification).

### B. Individual Issues Predominate Because Each Certificate Is Distinct And Presents Individualized Questions On Liability And Damages

Individual issues also predominate because each of the 26 certificates in Plaintiff's proposed class is distinct and presents individualized questions on liability and damages.  *See RALI/Harborview*, 2011 WL 147735 at *11 (denying certification in MBS case because "[w]ere

---

[29] Although SEC Rule 158 provides a list of the kinds of financial statements that constitute earning statements, it expressly does not limit that concept to traditional corporate income statements.  17 C.F.R. § 230.258(a)(2).  Rule 158 provides that a document is an earnings statement if it includes the information required for statements of income in Item 8 of Form 10-K (annual report).  17 C.F.R. § 230.158.  Item 8 of Form 10-K requires the disclosure of financial information set forth in Regulation S-X, including statements regarding assets, revenue, losses, and expenses. 17 C.F.R. § 210.5-03.  The trustee reports contain the same, if not more, information on the performance of the certificates and the underlying loan pools than SEC Form 10-D filings do on asset-backed securities.  *Compare* Asset-Backed Distribution Report, dated January 2, 2007 (Ex. L), *with* December 26, 2006 DBNTC distribution report (Ex. J).

I to certify . . . the Court would have to hear significant individualized evidence on, among other things, each purchaser's knowledge and damages").[30]

### 1.   **Falsity**

Plaintiff erroneously asserts that "the proof needed by Lead Plaintiff to prevail on its claim is the same that is needed to prove the claims of the rest of the Class."  P's Br. at 15.  The 1708 mortgage loans in the RAST 2006-A8 loan pool were subdivided into three loan groups, Loan Group 1, Loan Group 2, and Loan Group 3.  *See* Pro Supp. at S-10, S-35 to S-59.  Different certificates are associated with different loan groups.  Thus, the "related loan group" for Group 1 Senior Certificates, including the Class 1-A-1 certificate that Vaszurele purchased, is Loan Group 1.  *Id.* at S-10.  The "related loan group" for Group 2 Senior Certificates is Loan Group 2, and the "related loan group" for Group 3 Senior Certificates is Loan Group 3.  *Id.*

As explained by Professor Torous, the three loan groups are each comprised of separate and distinct loans that have distinct economic characteristics.  *See* Torous Rep. ¶¶ 31-45.  Not surprisingly, therefore, the performance of the loans in the three loan groups has been dissimilar. *Id.* ¶ 65 n.63.  Moreover, each of the loan groups has a different mix of loans originated under different loan documentation programs.  For example, whereas most of the loans in Loan Group 3 were originated under the full/alternate documentation program, most of the loans in Loan Group 2 were originated under the stated income documentation program.  Pro Supp. at S-44, S-51 (Ex. D).

---

[30]   Ignoring the differences between MBS and traditional corporate securities, Plaintiff erroneously relies on cases involving common stock or corporate bonds traded on exchanges or judicially recognized efficient markets.  *See In re Parmalat Sec. Litig.*, 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) (finding market efficiency for Parmalat stock); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147 (S.D.N.Y. 2007) (Flag common stock); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267 (S.D.N.Y. 2003) (WorldCom stock and bonds).  Neither common stock nor corporate debt is at issue in this case, and the distinct characteristics of mortgage pass-through certificates render class treatment inappropriate here.

Because different certificates are associated with different loan groups, the proof needed for one certificate is not "the same that is needed to prove the claims of the rest of the Class." P's Br. at 15. Deviations from underwriting standards may have occurred with respect to loans in some loan groups, but not others. Deviations from underwriting guidelines will need to be separately proved for loans in each of the three loan groups. *Cf. City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.*, 703 F. Supp. 2d 253, 260 (E.D.N.Y. 2010) ("Plaintiffs must be able to prove falsity with respect to statements, or omissions regarding the mortgages in which they purchased interests. Those statements will inevitably require reference to particular pools of mortgages contained in particular securities.").

There will also be separate and individualized proofs required because different underwriting guidelines applied to different loans. The offering documents for the certificates described the underwriting guidelines in general terms. The specific underwriting requirements, however, changed over time. Torous Rep. ¶ 50 (Ex. A). For each loan, there will need to be individualized determinations regarding when the loan was underwritten, what type of loan it was, and what guidelines applied at the time the loan was underwritten. These determinations, once made for a given loan, cannot be carried over to another loan.

Separate and individualized proofs also will be required because of different exceptions to underwriting guidelines. As disclosed in the offering documents, mortgage loans were underwritten "according to IndyMac Bank's underwriting guidelines . . . or pursuant to an exception to those guidelines." Pro Supp. S-61 to S-62 (Ex. D). Once it is determined which guidelines apply to which loans, each of the loans will have to be examined to determine whether it complied with the relevant guidelines. For any loan that does not, on the surface, appear to comply with the relevant guidelines, there will have to be further inquiry to determine whether the loan nevertheless complies based on an applicable exception at the time the loan was

originated.  This determination, once made for a given loan, cannot be carried over to another loan.[31]

Because individualized questions predominate on the issue of falsity, class certification should be denied.

### 2.   Materiality

To prevail on its claim, Plaintiff also must establish that any alleged false statements are material – *i.e.*, "taken together and in context, [they] would have misled a reasonable investor." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (citation omitted). Plaintiff ignores that the putative class consists of investors in 26 different securities, including investors who purchased years after the initial offerings of the securities, when it asserts that the alleged false statements "were material to all Class members."  P's Br. at 12.  There are multiple reasons why individualized proof on the issue of materiality will predominate.

*First*, the "total mix of information" was not static.  As discussed in Section I.A.1. above, more and more information about the underwriting practices of "Alt-A" lenders in general and of IndyMac in particular became available over the period in which the putative class purchased certificates.  In addition, the monthly trustee reports for the certificates provided updated performance data on the underlying mortgage loans that superseded the disclosures contained in the offering documents for the certificates.  The conclusory assertion of Plaintiff's expert that "information about underwriting guidelines is important" (Feinstein Rep. ¶ 60) ignores that the

---

[31]  There also will be different proofs because of variations in the origination channels for the underlying mortgage loans.  There were at least four origination channels (mortgage professionals, consumer direct, correspondent, and conduit), and IndyMac's underwriting procedures "vary by channel of origination."  Pro Supp. at S-61 to S-63 (Ex. D).  The number of loans originated through different channels varied from loan group to loan group.  For example, whereas a portion of the loans in Loan Group 3 were originated under the consumer direct channel, no loans in Loan Group 1 were originated under the consumer direct channel.  *Id.* at S-39.

total mix of information about IndyMac's underwriting practices materially changed over time. *See* Torous Rep. ¶¶ 80-81 (Ex. A).

*Second*, the number of non-complying loans, if any, will vary across loan groups.  There are 3 distinct loans groups with different loans of different aggregate amounts.  The determination of whether the number or aggregate amount of non-complying loans, if any, is material for any given loan group cannot be carried over to another loan group.

*Third*, non-complying loans, if any, must be individually assessed.  If it is determined that a given loan is non-complying, the nature of the non-compliance will have to be individually assessed.  Some types of non-compliance, such as the failure to collect one of many signatures on some form or the failure to collect one of many documents where there is otherwise substantial evidence of income and a high FICO score, cannot realistically create an expectation of losses.  *Id.* ¶ 85.  Each non-complying loan will have to be separately addressed.

*Fourth*, there will be different proofs of materiality because the objective "reasonable investor" is different for different certificates.  Indeed, there are differences in the capital structure, payment prioritization and credit enhancements for each of the 26 certificates.  *Id.* ¶¶ 35, 39, 41, 83.  For example, the Class 2-A-5 certificate is a "super senior" certificate that is protected from losses by the Class 2-A-8 "support class" certificate.  *Id.* ¶ 83; Pro Supp. at S-124 (Ex. D).  Assume that it is determined that 5% of the loans in Loan Group 2 are non-complying. The debate and proof over whether the 5% deviation is material will be different with respect to the investor in the Class 2-A-8 "support class" certificate and the investor in the Class 2-A-5 "super senior" certificate.

Because individualized questions predominate on the issue of materiality, class certification must be denied.

3.      **Damages And Causation**

Individualized issues of damages and causation also preclude class certification.  *See*

*RALI/Harborview*, 2011 WL 147735 at *11 (denying certification in MBS case because there

would be "significant individualized evidence" on "each purchaser's . . . damages").  Plaintiff

seeks unspecified "damages" (Am. Comp. at 53), and the absence of loss causation is an

affirmative defense to their Securities Act claims.  *See* 15 U.S.C. §§ 77k(e), 77l(b); *In re Merrill*

*Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003)

(dismissing Section 12(a)(2) claim because there was no causal link between the alleged

misstatements and plaintiffs' alleged loss); *Ackerman v. Oryx Commc'ns, Inc.*, 609 F. Supp. 363,

368 (S.D.N.Y. 1984) (dismissing Section 11 claim because plaintiffs failed to show that alleged

misstatements "caused whatever losses plaintiffs may have suffered").

The "common methodology" for calculating damages proposed by Plaintiffs' expert,

Professor Feinstein, wholly ignores macroeconomic and other exogenous factors.  Empirical

studies show that macroeconomic factors, rather than loan underwriting, were the dominant

driver of residential foreclosures.  Torous Rep. ¶¶ 91-92 (Ex. A).  Professor Feinstein, however,

acknowledged that analyzing exogenous factors that might have resulted in defaults in the loan

pools, such as rising unemployment or a declining real estate market, "wasn't part of the scope of

[his] engagement."  Feinstein Tr. at 124:8 (Ex. N).  In order to calculate recoverable damages

under Section 11 or 12(a)(2), macroeconomic factors must be untangled from any potential loss

caused by alleged misstatements regarding IndyMac's underwriting guidelines.

Indeed, an empirical study by economists at the Federal Reserve Bank in 2009 concluded

that the dominant cause of recent residential foreclosures was macroeconomic effects – dramatic

declines in housing prices – rather than the weakening of underwriting standards.  Torous Rep.

¶ 92 (Ex. A).  Moreover, macroeconomic factors may have impacted different certificates

differently.  For example, some certificates were backed by loan groups with a higher percentage

of loans originated in California, which was hit hardest by the real estate crisis, than others.  *Id.*
¶ 95.  In addition, because of the different credit enhancement features applicable to different
certificates, some certificates may have suffered losses due to macroeconomic deterioration
alone, whereas other certificates may or may not have suffered a loss and may or may have
suffered a loss caused by some factor other than macroeconomic deterioration.  Moreover, the
proposed class includes investors who purchased or sold certificates at multiple different times
over an extended time period.  Thus, the impact of macroeconomic factors on each investor's
alleged loss must be separately assessed.  *Id.* ¶¶ 95-99.

There also may have been other factors separate from macroeconomic deterioration that
could have caused an investor's alleged loss.  For example, in its Amended Class Action
Complaint, Plaintiff claims that it suffered harm as a result of alleged misrepresentations
regarding credit ratings and the ratings process.  Though the Court has determined the alleged
misrepresentations concerning credit ratings and the ratings process to be non-actionable for
reasons unrelated to loss causation, Professor Feinstein's proposed "damages computation
methodology" also does not take into account how to disentangle losses allegedly suffered from
misrepresentations concerning IndyMac's underwriting practices with losses suffered from other
alleged misrepresentations, though Professor Feinstein "made the assumption that the allegations
in the complaint were true."[32]

There will also be individualized issues because the certificates did not trade on a
national exchange or in a liquid market.  *See* Torous Rep. ¶ 100 (Ex. A).[33]  Even if the "value"

---

[32]  Feinstein Tr. at 20:16-17 (Ex. N).

[33]  Moreover, at least two courts in this District have recognized that Securities Act claims based on
the alleged diminution in "value" of certificates in the secondary market is not a cognizable loss
where, as here, the offering documents expressly warn that certificates may not be resalable.  *See
NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, 2010 WL 4054149, at *3-4
(S.D.N.Y. Oct. 14, 2010); *RALI/Harborview*, 2011 WL 147735 at *6.

of a certificate in the secondary market were a cognizable metric, it could not be determined

simply by looking at some readily determinable market price. *Id.* ¶¶ 100-101. Because there is

no liquid or efficient market for the certificates, "pricing databases" may not provide the "value"

of a certificate on any given date as claimed by Plaintiffs' expert. *Compare* Feinstein Rep. ¶¶

75, *with* Torous Rep. ¶¶ 102-104, 111. Rather, the "value" of a certificate at any given point in

time must be determined based on an individualized analysis of available data points at each

point in time, including unique factors surrounding each transaction. Torous Rep. ¶ 101. Indeed,

the certificates were traded in individually "negotiated transactions" based on a number of

factors distinct to each transaction. *Id.* ¶ 100; Pro Supp. at S-132 (Ex. D). *See Abu Dhabi*, 269

F.R.D. at 258-66 (denying certification where investors "purchased their Rated Notes on

different dates between 2005 and 2007 in individually negotiated and priced transactions").

The uniqueness of each transaction in the certificates precludes adjudication of damages

and loss causation on a class-wide basis. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith,*

*Inc.*, 259 F. 3d 154, 187-90 (3d Cir. 2001) (denying certification because loss causation would

have to be assessed based on a number of factors that "vary from class member to class member

and, for each class member, from trade to trade"). Accordingly, class certification should be

denied. *See Abu Dhabi*, 269 F.R.D. at 265-66 (denying certification because "loss causation

cannot be resolved by way of generalized proof").

* * *

In sum, Plaintiff cannot establish predominance because generalized proof about each of

the uniquely situated investors in the putative class and each of the 26 certificates is impossible

with regard to virtually every element of the claims and defenses in this action, including

investor knowledge, investor notice, investor reliance, falsity, materiality, damages, and

causation. "Given . . . the overwhelming predominance of individualized inquiries in this case,

class certification is not warranted." *Abu Dhabi*, 269 F.R.D. at 266.

## II.    PLAINTIFF CANNOT SATISFY THE SUPERIORITY
##        REQUIREMENT OF RULE 23(b)(3)

Plaintiff also has failed to satisfy the superiority requirement of Rule 23(b)(3), which

requires proof that a "class action is superior to other methods."  *Kottler*, 2010 WL 1221809 at

*1 (denying certification).  Class treatment is not the superior method of handling this litigation

for multiple reasons.

*First*, in light of all the individualized issues discussed in Section I above, addressing all

of the claims and defenses relating to the 26 different securities would not be manageable.  In

*RALI/Harborview*, for example, Judge Baer found that the *Harborview* plaintiffs' request for

certification of a class covering 39 certificates to be unmanageable:

> [A]ddressing all claims as part of the same class would present obstacles to the
> management of the litigation.  Were I to certify the proposed classes the Court
> would have to hear significant individualized evidence on, among other things,
> each purchaser's knowledge and damages.  The necessity of hearing all this
> individualized evidence defeats the requisite superiority of class treatment.  *See*
> Fed. R. Civ. P. 23(b)(3)(D).

*RALI/Harborview*, 2011 WL 147735 at *11.[34]

*Second*, as discussed in Section I above and reflected in the chart attached as Exhibit B to

the Wu Declaration, the putative class here includes many sophisticated investors "with the

financial resources and incentive to pursue their own claims."  *RALI/Harborview*, 2011 WL

147735 at *11.  *See also Ansari*, 179 F.R.D. at 116 (class action not superior because potential

---

[34]  While a court may carve out an appropriate class, including by constructing subclasses (*see* Fed.
R. Civ. P. 23(c)(4)-(5)), Plaintiff bears the burden of showing how an action may be divided into
manageable subclasses, and "[t]he court has no *sua sponte* obligation so to act."  *U.S. v.
Geraghty*, 445 U.S. 388, 408 (1980).  Here, Plaintiff has failed to explain how any purported
subclass would be manageable, much less independently meet all the requirements of Rule 23(a)
and Rule 23(b)(3).  *See In re Fosamax Prod. Liab. Litig.*, 248 F.R.D. 389, 403-04 (S.D.N.Y.
2008) (finding inadequate plaintiffs' "general assurance that individual questions can be managed
or eliminated through sub-classing"); *Kaczmarek v. IBM Corp.*, 186 F.R.D. 307, 312 (S.D.N.Y.
1999) (class action inferior where "subclasses will not cure the problems of . . . diverse individual
factual issues").

recovery of $90,000 is sufficient incentive for individual members of proposed class to join the named plaintiff's suit or to file suits on their own behalf); *Zimmerman v. Thompson McKinnon Sec., Inc.*, 1989 WL 122742, at *1 (S.D.N.Y. Oct. 11, 1989) (putative class members who invested over $75,000 had "both the incentive and capability to pursue claims individually without the benefit of a class action"); *Stoudt v. E.F. Hutton & Co.*, 121 F.R.D. 36, 38 (S.D.N.Y. 1988) ("When the size of each claim is significant, and each proposed class member therefore possesses the ability to assert an individual claim, the goal of obtaining redress can be accomplished without the use of the class action device.").[35]

The purchasers identified by Plaintiff's counsel, for example, include ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████████ ██████████████████████████████████████████████████

*Third*, investors in the certificates include foreign entities such as the Lead Plaintiff Vaszurele, a British Virgin Islands personal holding company ███████████████ ██████████████████████████████████████████

---

[35] There have been a number of individual actions filed concerning IndyMac MBS.  *See*, *e.g.*, Amended Complaint, ¶¶ 11-13, 112-19, in *Federal Home Loan Bank of Pittsburgh v. J.P. Morgan Sec., Inc., et al.*, No. GD-09-016893 (Pa. Ct. C.P.) (Ex. V); Complaint, ¶¶ 108-13, in *Federal Home Loan Bank of San Francisco v. Deutsche Bank Sec., Inc., et al.*, No. CGC-10-497839 (Cal. Super. Ct.) (Ex. W); Complaint, ¶¶ 203-13, in *Federal Home Loan Bank of Chicago v. Banc of America Funding Corp., et al.*, No. 10-CH-45033 (Ill. Cir. Ct.) (Ex. X).

[36] ████████████████████████████████████████████████████████████████

[37] ██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████ Many home countries of the putative class members do not preclude their residents from suing in their home countries if they are dissatisfied with the results in class action litigation.  "[T]his fact, although not dispositive, counsels against a finding that the class action is superior to other forms of litigation."  *Ansari*, 179 F.R.D. at 116-17 (denying certification).  *See also Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 996-97 (2d Cir. 1975) (directing district court to "eliminate from the class action all purchasers other than persons who were residents or citizens of the United States" to solve the problem of unenforceability of class action judgments in Europe).

## III.    PLAINTIFF CANNOT SATISFY THE REQUIREMENTS OF RULE 23(a)

Plaintiff also cannot satisfy Rule 23(a), which requires proof of four elements: (1) numerosity; (2) commonality of legal and factual issues; (3) typicality of the claims and defenses of the class representative; and (4) adequacy of representation.  Fed. R. Civ. P. 23(a).

### A.    There Is No "Typical" Or "Common" Claim Shared By The Proposed Class, And Plaintiff Is Subject To Unique Defenses

The only common issues identified by Plaintiff are superficial.  *See* P's Br. at 12-15.  As discussed in Section I above, however, "the proof needed by Lead Plaintiff to prevail on its claim" is *not* "the same that is needed to prove the claims of the rest of the Class."  *Id.* at 15. Rather, individualized questions predominate as to virtually every element of the claims and defenses.  It is thus not surprising that the proposed class representative, Vaszurele, is itself subject to unique defenses.  *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59-60 (2d Cir. 2000) ("class certification is inappropriate where a putative class representative is subject to unique defenses") (citation omitted).

Vaszurele is subject to the unique defense that it suffered no cognizable economic loss. On May 19, 2006, prior to the filing of either the prospectus or prospectus supplement for the

RAST 2006-A8 offering, 

---

38  Tsereteli Tr. at 44:9 – 45:8; 47:7-10; 81:3-21, 114:5-14 (Ex. M).

39  Vaszurele Certification, Schedule A (Dkt. 24-2) (Ex. H).

40  Tsereteli Tr. at 67:18-24; 84:13 – 85:8 (Ex. M).

41  *Id.* at 65:4-8; 72:9-13; 72:21 – 73:4; 79:18-24: 90:16-19.

42  *Id.* at 67:18-24; 68:12-15.

43  *Id.* at 28:21-25; 52:5-13; 90:10-19.

44  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

While Vaszurele now complains that it was unable to sell its Class 1-A-1 certificate at "$1.00 per dollar of face value" more than two years later in November 2008, *after* the collapse of the residential real estate market (P's Br. at 6), Mr. Tsereteli acknowledged at deposition that

Moreover, although the offering documents expressly warned investors that there could be increased rates of delinquencies, foreclosures, and losses in the underlying mortgage pool if there was "an overall decline in the residential real estate market" (Pros. at 9 (Ex. E)),

Under these circumstances, as reflected in two recent decisions by courts in this District in MBS cases, Vaszurele's alleged inability to sell its Class 1-A-1 certificate "at $1.00 per dollar

---

45  Tsereteli Tr. at 85:18 – 87:7 (Ex. M).

46  *Id.* at 92:13-23.

of face value" is not a cognizable harm.  *See NECA-IBEW*, 2010 WL 4054149 at *3 ("Because NECA made an investment that it knew might not be liquid, it may not allege an injury based upon the hypothetical price of the Certificates on a secondary market at the time of suit."); *N.J. Carpenters*, 2011 WL 147735 at *6 ("In some situations, section 12(a)(2) damages can be sufficiently alleged based on market value decline.  That is not so where the injured party was warned in advance [that there might be no secondary market for the security].") (internal citations omitted).

At a minimum, Vaszurele is subject to unique defenses that threaten to become the focus of the litigation.  *See Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 475-76 (S.D.N.Y. 1989) (denying certification where proposed class representatives were subject to unique defenses).

**B.      Plaintiff Is An Inadequate Representative For The Proposed Class**

Plaintiff also has failed to satisfy the adequacy requirements of Rule 23(a)(4).

**1.      Plaintiff's Unfamiliarity With, And
Lack Of Control Over, This Case**

"An essential element of adequacy of representation is that the class representative be sufficiently familiar with the case as to exercise independent control over the attorney."  *Scott v. New York City Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 355 (S.D.N.Y. 2004). *See also Kamerman v. Steinberg*, 113 F.R.D. 511, 517 (S.D.N.Y. 1986) ('The standard for fair and adequate representation in this Circuit requires that the plaintiff seeking class certification demonstrate a thorough familiarity with the underlying basis for his cause of action . . .").

Here, Vaszurele's principal, Mr. Tsereteli, a Russian citizen, lacks sufficient knowledge of the allegations in this case to exercise independent control over the case. ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ █

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ Second, Vaszurele's Amended Complaint contained

allegations that this Court found were "exceptionally misleading" and would "fail miserably" if

they "were subjected to the standard of full and frank disclosure."[49] ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ ████████████████████████████████████████████

████████████████ In its Amended Complaint, Vaszurele asserts Securities Act claims for

alleged misrepresentations relating to IndyMac's underwriting practices, appraisals, loan-to-

value ratios, and credit ratings and the ratings process. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

47  *Id.* at 100:4-7; 104:11-24.

48  *Id.* at 109:22 – 110:2; 112:25 – 113:15.

49  *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 393-94
    (S.D.N.Y. 2010).

50  Tsereteli Tr. at 134:24 – 135:3 (Ex. M).

51  *Id.* at 160:18-23.

██████████████████████████████████████  ███

██████████████████████████████

Mr. Tsereteli's demonstrated unfamiliarity with the action and wholesale reliance on counsel render him an inadequate representative for the proposed class.  *See Beck v. Status Game Corp.*, 1995 WL 422067, at *7 (S.D.N.Y. July 14, 1995) (denying certification because of plaintiffs' "lack of familiarity with this suit and the lack of control that they have exercised"); *Scott*, 224 F.R.D. at 257 (denying certification where plaintiffs had "turned over the prosecution and monitoring of their case to counsel"); *Darvin v. Int'l Harverster Co.*, 610 F. Supp. 255, 256 (S.D.N.Y. 1985) (denying certification because "plaintiff has demonstrated a serious lack of familiarity with the suit").

### 2. Inherent Conflicts In The Proposed Class

Another purpose of the Rule 23(a)(4) adequacy requirement is to "ferret out potential conflicts between representatives and other class members."  *Spagnola*, 264 F.R.D. at 95-96 (citation omitted) (denying certification because of "apparent conflict" between proposed class representatives and other class members).  Here, Plaintiff is inadequate because of inherent conflicts between differently situated class members that purchased different securities at different points in time based on different information.

*First*, there will be conflicting damages theories between those investors, such as Plaintiff, that received all promised "pass-through" payments and those that have not.  Vaszurele has no interest in presenting a damages model based on disruptions in "pass-through" payments, whereas other investors that have suffered a disruption in "pass-through" payments would.

---

52  *Id.* at 152:12 – 153:15.

53  *Id.* at 160:2-6.

*Second*, there will be conflicting knowledge, materiality, damages and causation theories between those who purchased certificates in the initial offering and those who purchased at later points, and thus had different information available to them.

*Third*, there will be acute conflicts in the settlement context because investors in different tranches have significantly different claims as to both liability and damages.  Investors in any given tranche will have an incentive to argue that their claims are particularly strong, that the value of their certificates in particular has declined as a result of the alleged misrepresentations, and that they should get a correspondingly bigger slice of the settlement pie.  This creates intra-class conflicts and conflicts on the part of Plaintiff, who will be incentivized to allocate as much of the settlement proceeds as possible to its own tranche.  *See Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*, 162 F.R.D. 471, 481 (E.D. Pa. 1995) ("[S]ettlement potential is a facet of very case . . . Thus, Losch's potentially conflicting interests with some members of the proposed class regarding settlement raise serious concern regarding its ability to adequately represent the proposed class for litigation.")

*Fourth*, Plaintiff's interests conflict with the interests of putative class members that are defendants in other MBS cases.  Plaintiff has an interest in having pro-plaintiff positions on unsettled legal questions adopted in this and other MBS cases.  ████████████████████████
████████████████████████████████████████████  Thus, Plaintiff and these class members "would have competing interests in controlling the prosecution of the action."  *RALI/Harborview*, 2011 WL 147735 at *11.

## C.    <u>Plaintiff Has Not Established Numerosity</u>

Finally, Plaintiff has failed to establish that the number of putative class members is "so numerous that joinder of all members would be impracticable."  Fed. R. Civ. P. 23(a)(1).  "Whether joinder is practicable does not depend on hard numbers."  *Primavera Familienstiftung v. Askin*, 178 F.R.D 405, 410 (S.D.N.Y. 1998).  "In dealing with the issue of numerosity, we deal

with it not in absolute numbers, but in the relationship of the numbers of the putative class members involved to their economic interests and all of the other circumstances peculiar to each case." *Id.* (citation omitted).

Here, Plaintiff has not come close to satisfying its burden.  As an initial matter, a number of putative class members that Plaintiff has counted are properly excluded.  For example, Plaintiff has failed to exclude investors that purchased after the publication of the CRL Report on June 30, 2008 that this Court found was the latest possible date at which investors in IndyMac MBS were on notice of their claims.  *See In re IndyMac Mortgage-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 505-06 (S.D.N.Y. 2010).[54]

Moreover, though Plaintiff's proposed class encompasses investors in 26 different securities, Plaintiff provides no analysis of the number of investors by security.  Instead, Plaintiff lumps together the investors in 26 different securities in one tally and asserts that it has identified "at least 97 Class members" but "believes that numerous additional Class members exist."  P's Br. at 2.  Professor Torous has performed a security level analysis and the numbers are revealing. Unlike Plaintiff, and to avoid undercounting, Professor Torous did not exclude investors that were financial institutions, which Plaintiff acknowledges "may have traded in the Certificates for their own accounts."  Harrod Decl. ¶ 13 & n.4.  Nevertheless, when examining initial offering purchases, Professor Torous found that 25 out of 26 certificates were purchased by fewer than four potential class members, and 26 out 26 certificates were purchased by fewer than 17 potential class members.  Torous Rep. ¶ 120 (Ex. A).  When examining initial offering and aftermarket purchases, Professor Torous found only 2 of the 26 securities had more than 40 investors.  *Id.* ¶ 121.  The other 24 certificates were purchased by fewer than 10 potential class

---

[54]   In addition, Plaintiff has failed to exclude foreign purchasers who should not be included because of ambiguities regarding the enforcement of class judgments in foreign countries.  *See In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 95 (S.D.N.Y. 2007).

members.  *Id.  See Abu Dhabi*, 269 F.R.D. at 255 ("Generally, courts will find that the

numerosity requirement  . . . has not been satisfied when the class comprises 21 or fewer.").[55]

Plaintiffs "fail to show why class certification as opposed to joinder would better serve

the interests of judicial economy."  *Abu Dhabi*, 269 F.R.D. at 258.  Accordingly, "Plaintiffs have

failed to meet the numerosity requirement of Rule 23(a)(1)."  *Id.* at 259.

## CONCLUSION

For all these reasons, Defendant Credit Suisse Securities (USA) LLC respectfully

requests that the Court deny Lead Plaintiff's Motion for Class Certification (Dkt. 75).

Dated:  New York, New York       GIBSON, DUNN & CRUTCHER LLP
            February 28, 2011

                                                    By:  /s/ Robert F. Serio
                                                          Robert F. Serio (RS-2479)
                                                          Aric H. Wu (AW-0252)

                                                    200 Park Avenue
                                                    New York, New York 10166-0193

                                                    Attorneys for Defendant
                                                    Credit Suisse Securities (USA) LLC

---

[55]  Thus, any belated request by Plaintiff for certification of subclasses also would be misguided.
Subclasses must independently meet the requirements of class certification, including
numerosity.  *See Warren v. Xerox Corp.*, 2004 WL 1562884, at *18 (E.D.N.Y. Jan. 26, 2004)
("Courts within the Second Circuit have refused subclass certification where, without more, the
requirement of numerosity has not been met."); *U.S. Fid. & Guar. Co. v. Madison Fin. Corp.*,
2002 WL 31731020, at *5 (S.D.N.Y. Dec. 4, 2002) (refusing subclass certification absent
numerosity); *Ashe v. Bd. of Elections in the City of New York*, 124 F.R.D. 45, 52 (E.D.N.Y. 1989)
(refusing to certify a subclass of eleven plaintiffs.).