# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :

VASILI TSERETELI and VASZURELE LTD., on    :
behalf of themselves and all others similarly situated,  :

                                      :    No. 08-CV-10637 (LAK)

                Plaintiffs,    :

                                      :

          v.                              :

                                      :

RESIDENTIAL ASSET SECURITIZATION    :
TRUST 2006-A8, CREDIT SUISSE SECURITIES  :
(USA) LLC, MOODY'S INVESTORS SERVICE,  :
INC., and THE McGRAW-HILL COMPANIES, INC.,  :

                                      :

              Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

 

 

**REPORT OF WALTER N. TOROUS, PH.D.**

**FEBRUARY 28, 2011**

**Contains Confidential Material Subject To Protective Order (Docket No. 74)**

**TABLE OF CONTENTS**

I.      QUALIFICATIONS ...............................................................................................1

II.     CASE BACKGROUND ........................................................................................2

III.    ASSIGNMENT......................................................................................................3

IV.     SUMMARY OF OPINIONS .................................................................................4

V.      EVOLUTION OF THE HOUSING MARKET AND BACKGROUND ON
        SECURITIZATIONS .............................................................................................6

        A.    Increase And Subsequent Decline In U.S. Home Prices .........................6

        B.    Securitization And Mortgage-Backed Securities.....................................8

VI.     THE 26 DISTINCT SECURITIES FOR WHICH PLAINTIFF SEEKS CLASS
        TREATMENT .....................................................................................................12

VII.    THE CHANGING MACROECONOMIC ENVIRONMENT ENCOMPASSED BY THE
        PROPOSED CLASS............................................................................................21

        A.    The Housing Market ..............................................................................21

        B.    Underwriting Guidelines........................................................................22

        C.    Credit Risk .............................................................................................23

VIII.   PUBLIC INFORMATION AND INVESTOR KNOWLEDGE REGARDING
        UNDERWRITING PRACTICES ........................................................................25

        A.    Increasing Public Information Over Time ..............................................25

        B.    Sophistication Of Investors In Proposed Class.......................................31

        C.    Differences In Investor Knowledge Necessitate Individualized Inquiries ...........35

IX.     INDIVIDUALIZED ISSUES OF LIABILITY ..................................................35

        A.    Falsity.....................................................................................................36

        B.    Materiality..............................................................................................37

              1.   Professor Feinstein Ignores That The  Total Mix Of Information Changed Over
                   Time ………………………………………………………………38

              2.   Professor Feinstein Erroneously Assumes That The "Reasonable Investor" For
                   One Certificate Is The Same For All 26 Certificates ......................... 39

              3.   Professor Feinstein Ignores That Assessments Of Loan Files Will Be Required
                   ………….……………………………………………………………..40

X.      INDIVIDUAL ISSUES OF DAMAGES AND CAUSATION.........................................41

        A.    Professor Feinstein's "Damages Computation Methodology" Ignores
              Macroeconomic And Other Exogenous Factors That May Have  Caused Loan
              Defaults And Losses To Investors In IndyMac MBS............................41

        B.    Professor Feinstein's "Damages Computation Methodology" Ignores  That
              IndyMac MBS Were Traded In Negotiated Transactions .....................46

C.    Professor Feinstein's "Damages Computation Methodology" Relies  On IDC Data That Are Based On A Proprietary Model And Are Inconsistent With Data From Other Sources ....................................................................................................47

1. IDC Data Are Based On A Proprietary Model.................................................. 48

2. IDC Data Do Not Closely Track Actual Trade Prices ..................................... 48

3. IDC Data Are Inconsistent With Data From Other Sources ........................... 49

D.    Because IDC Data May Not Be A Reliable Proxy For Value, Damages Calculations Will Require Financial Models That Account For Factors Specific To Different Loan Groups, Certificates, And Transactions...................................50

XI.    NUMBER OF INVESTORS IN DIFFERENT CERTIFICATES ....................................51

A.    Mr. Harrod's Analysis .........................................................................................51

B.    Numerosity Analysis Adjustments ......................................................................52

XII.    CONCLUSIONS...........................................................................................................54

## I.  QUALIFICATIONS

1.       I am the Lee and Seymour Graff Endowed Professor at the UCLA Anderson School of Management.  I am the Founding Director of the Richard S. Ziman Real Estate Center at the Anderson School.  Prior to my current position, I was on the faculty at the University of Michigan and the London Business School.  I am currently a Visiting Professor at the Center for Real Estate of the Massachusetts Institute of Technology.  I received my Ph.D. in economics from the University of Pennsylvania in 1981.

2.       My areas of research include real estate markets, mortgage financing generally and mortgage-backed securities ("MBS") in particular, the behavior of interest rates, the pricing of risk, and financial distress.  I am currently the Associate Editor of a number of academic journals, including the *Journal of Housing Economics* and the *Journal of Real Estate Finance and Economics*, and serve as the Editor of *Real Estate Economics*, the official publication of the American Real Estate and Urban Economics Association.

3.       I have published articles on the effects of homeowner prepayment and default decisions on the valuation of residential mortgages and residential MBS.  I have also published articles investigating the valuation of commercial mortgages and the risk and return tradeoffs prevailing in the commercial real estate market.  My paper, "Commercial Office Space: Testing the Implications of Real Options Models and Competitive Interactions," which investigates the real options approach to valuing commercial real estate, was awarded the American Real Estate and Urban Economics Association's 2007 Edwin S. Mills Prize for Best Paper.  I have spoken at numerous academic and business conferences about my research.  I teach courses in securitization and managerial finance at the master's level and empirical methods in finance at the doctoral level.

4.      My curriculum vitae, which includes a list of my publications as well as testimony in the past four years, is attached as Appendix A to this report.

## II.     CASE BACKGROUND

5.      Plaintiff Vaszurele Ltd. has defined the proposed class as follows:

> [A]ll persons who purchased the Senior Mortgage Pass-Through Certificates ("Certificates")[1] issued on June 28, 2006 (the "Offering") by the Residential Asset Securitization Trust 2006-A8 ("RAST" or the "Trust") pursuant and/or traceable to the Offering Documents.[2]

6.      The initial offering for the MBS issued in the RAST 2006-A8 offering occurred on June 28, 2006.  There were 33 certificates registered with the Securities and Exchange Commission ("SEC"), including the 26 certificates for which Plaintiff seeks class treatment. Each class of certificate represents an ownership interest in a pool of residential mortgage loans originated by IndyMac Bank, F.S.B. ("IndyMac"), or acquired by IndyMac from other loan originators, primarily between 2005 and 2006.[3]  Each class of certificate is a separately traded security with a unique CUSIP identifier, interest rate, credit rating, and payment priority.

7.      Plaintiff contends that the offering documents for the certificates failed to provide adequate information about IndyMac's underwriting practices, alleging that "IndyMac abandoned its stated underwriting guidelines."[4]

---

[1]   The CUSIPs for the "Certificates" for which Plaintiff seeks class certification are: 761119AA4, 761119AB2, 761119AC0, 761119AD8, 761119AE6, 761119AF3, 761119AG1, 761119AH9, 761119AJ5, 761119AK2, 761119AL0, 761119AM8, 761119AN6, 761119AP1, 761119AQ9, 761119AR7, 761119AS5, 761119AT3, 761119AU0, 761119AV8, 761119AW6, 761119AX4, 761119AY2, 761119AZ9, 761119BA3, 761119BB1.

[2]   Lead Plaintiff's Memorandum of Law in Support of its Motion for Class Certification, December 10, 2010, p. 1.

[3]   IndyMac Residential Asset Securitization Trust 2006-A8 Prospectus Supplement, June 28, 2006 ("RAST 2006-A8 Prospectus Supplement"), p. S-58 (see "Range of Loan Age for the Mortgage Loans").

[4]   Lead Plaintiff's Memorandum of Law in Support of its Motion for Class Certification, December 10, 2010, p.5.

8.      In its Amended Class Action Complaint, Plaintiff claims that it suffered harm as a result of a number of different categories of alleged misrepresentations and omissions, including alleged misrepresentations and omissions relating to IndyMac's underwriting practices, appraisals, loan-to-value ratios, and credit ratings and the ratings process.  Plaintiff's expert, Steven P. Feinstein ("Professor Feinstein"), an Associate Professor of Finance at Babson College, "made the assumption that the allegations in the complaint were true."[5]  I note that claims relating to appraisals, loan-to-value ratios, and credit ratings and the ratings process were dismissed.[6]

9.      Plaintiff contends that the existence of material misstatements and omissions and the measurement of harm to any of the investors in the 26 certificates can be assessed on a classwide basis.

III.    **ASSIGNMENT**

10.     I have been engaged to:

- Describe conditions in the residential real estate, mortgage, and MBS markets in the period leading up to and following the RAST 2006-A8 offering.

- Examine and assess the characteristics of the RAST 2006-A8 offering.

- Review and respond to the analysis and conclusions of the Plaintiff's expert, Professor Feinstein, as well as of James A. Harrod ("Mr. Harrod").

- Opine on other issues potentially relevant to class certification.

11.     In working on this assignment, I have relied upon the documents and data listed in Appendix B.  Others working under my supervision and direction have assisted me in this

---

[5]    Transcript of Deposition of Steven Feinstein, January 28, 2011 ("Feinstein deposition"), p. 20.

[6]    *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 393-96 (S.D.N.Y. 2010).

matter.  I am being compensated in this matter at a rate of $675 per hour.  My compensation is

not contingent upon the outcome of this case.

## IV.   <u>SUMMARY OF OPINIONS</u>

12.    Based on my review of Professor Feinstein's report, and my assessment of data

available to me, I have formed the following opinions in this matter.

- **First, Plaintiff has proposed a single class of investors who purchased 26
  distinct securities under differing circumstances.**  The 26 securities are
  backed by different collateral in three different loan groups, and there are
  significant structural differences underlying each group and certificate, and
  different payment priority structures.  The 26 securities have distinct
  characteristics for different investors with different risk appetites.  Moreover,
  while the initial offering of the certificates occurred in June 2006, during the
  height of the residential real estate market, the proposed class includes investors
  who purchased in secondary market transactions years after the initial offering.
  During this period, the residential real estate and MBS markets declined
  significantly, and, as disclosed in the offering documents, macroeconomic
  conditions deteriorated.

- **Second, individualized inquiries of investor knowledge will be required
  because each investor's purchase circumstances are unique.**  There was
  increasing public information regarding the underwriting practices of IndyMac
  (and other originators and issuers) over time.  In addition, the proposed class
  includes many sophisticated investors, ███████████████████████████████████
  ██████████████████████████████████████████████████████████████████████
  each of which had varying levels of expertise in MBS markets and knowledge of
  and access to the mortgage industry.  In light of the increasing public
  information over time, the different research, analyses and due diligence
  undertaken by the different sophisticated investors in the proposed class, and
  lengthy period of time over which different investors made different purchases
  of different certificates, individualized inquiries will be needed to assess each
  investor's knowledge at each investor's particular time of purchase.

- **Third, liability to the proposed class cannot be established by common
  proof.**  Showing liability to the proposed class does not involve a unified set of
  loans, underwriting guidelines, and transactions at a single point in time.  Rather,
  the proposed class encompasses investors in 26 distinct securities, including
  investors who purchased years after the initial offering of the securities.  There
  are different collateral, mixes of information available at different times,
  underwriting guidelines, exceptions to underwriting guidelines, and levels of
  investor knowledge that must be assessed.

- **Fourth, recoverable damages, if any, cannot be computed through a "straightforward arithmetic function," because individualized inquiries of loss causation will be required.** Among other studies, an empirical study by economists at the Federal Reserve Bank in 2009 concluded that the dominant driver of recent residential foreclosures was macroeconomic effects – dramatic declines in housing prices – rather than the relaxation of underwriting standards. Professor Feinstein has admitted that, in proposing his "damages computation methodology," he did not consider macroeconomic factors, such as rising unemployment or a declining real estate market, that might have resulted in loan defaults and losses to certificate holders because it "wasn't part of the scope of [his] engagement."[7] The impact of adverse macroeconomic events on different certificates must be separately assessed based on the different characteristics of the different collateral backing the certificates and the credit enhancement features applicable to and payment prioritizations of each certificate. In addition, to the extent the certificates were traded in "negotiated transactions," a given transaction price does not necessarily provide evidence of the value of that certificate to all proposed class members. Thus, each transaction must be individually examined to disentangle factors unrelated to representations concerning underwriting practices from the purchase price. Furthermore, the IDC data on which Professor Feinstein relies for his "damages computation methodology" are based on a non-transparent, proprietary model and are inconsistent with data from other sources. Thus, computing reliable values for the certificates during the alleged damages period would require the construction of detailed, robust models that account for group- and certificate-specific factors, in conjunction with additional consideration of the unique factors surrounding each transaction.

- **Fifth, Mr. Harrod has provided a flawed analysis of numerosity.** Though Plaintiff's proposed class encompasses investors in 26 different securities, Mr. Harrod provides no analysis of the number of investors by security. Based on my analysis, only two of the securities had more than 40 investors. Most of the securities had fewer than ten purchasers.

13.     In the following sections, I expand upon the summary of opinions above and provide the bases for them. My work in this matter is ongoing, and I reserve the right to supplement my analysis and opinions should more information become available to me.

---

[7]   Feinstein deposition, p. 24.

V.    **EVOLUTION OF THE HOUSING MARKET**
      **AND BACKGROUND ON SECURITIZATIONS**

14.    In this section, I provide an overview of the housing and mortgage market evolution emphasizing the period from 2000 through 2007.  The unprecedented growth in the housing market and mortgage industry between 2000 and mid-2006 was followed by a similarly unprecedented decline.  The housing market collapse that began after the peak in mid-2006 was more severe than any decline since the Great Depression.[8]  This background describes the macroeconomic context in which the offering was made and supports my conclusion that different investors purchased in substantially different macroeconomic and risk environments.

A.  **Increase And Subsequent Decline In U.S. Home Prices**

15.    As shown in Exhibit 1, U.S. home prices, as measured by a recognized index of home prices in ten metropolitan cities, experienced modest increases from 1990 through 2000.[9] Starting around 2000, home prices began to increase at an accelerated rate, increasing at a compound annual growth rate of 16.7 percent from January 2000 to April 2006, when prices peaked at approximately double their value in 2000.  As home prices increased, so too did annualized housing starts in the U.S., increasing by 60 percent from July 2000 to January 2006, as shown in Exhibit 2.

16.    Home ownership rates in the U.S., which had been relatively flat at approximately 64 percent in the early 1990s, peaked at approximately 69 percent by late 2004/early 2005 and

---

[8]    Data available at <http://www.irrationalexuberance.com/index.htm>, accessed on February 9, 2011.

[9]    The Case-Shiller Home Price Index Composite (10) tracks the residential real estate market in 10 metropolitan areas (Boston, Chicago, Denver, Las Vegas, Los Angeles, Miami, New York, San Diego, San Francisco, and Washington, D.C.).  The Case-Shiller indices are based on price changes for the same home based on the two most recent sales transactions, which helps to control for several factors that affect price.  "What's in a Price? A Comparison of National Home Price Series," *National Association of Realtors*, 2008; Standard & Poor's S&P/Case-Shiller Home Price Indices: Index Methodology, November 2009, < http://www.standardandpoors.com/indices/sp-case-shiller-home-price-indices/en/us/?indexId=spusa-cashpidff--p-us---->.

remained above 68 percent through mid-2006.[10]  Home ownership became a national priority

starting in the mid-1990s, reinforced by a number of government initiatives, including programs

initiated under Fannie Mae and Freddie Mac.[11]

17.     The surge of activity in residential real estate markets between 2000 and mid-

2006 led to corresponding growth in the supply of mortgages and innovative new mortgage

products.[12]  The combination of new financial instruments, the expansion of credit, government

policies, and the interest rate environment was a primary driver of an expanding mortgage

market.[13]  The increase in loan originations was met by simultaneous increases in loan

securitizations, including residential MBS, as discussed in the following section.

---

[10]   U.S. Census Bureau, Housing Vacancies and Homeownership (CPS/HVS), Table 14.
     Homeownership Rates for the US and Regions: 1965 to Present,
     <http://www.census.gov/hhes/www/housing/hvs/hvs.html>.

[11]   Affordable housing and other goals were mandated by the Federal Housing Enterprises Financial
     Safety and Soundness Act ("FHEFSSA"), signed by President George H.W. Bush in 1992.  See
     Public Law No. 102-550, Title XIII.  As part of their dual charter, Fannie Mae and Freddie Mac were
     required to provide "stability" and "ongoing assistance" to the secondary market for residential
     mortgages.  See U.S. Code Title 12, Chapter 13, Subchapter III, Sec. 1716; and Public law No. 91-
     351, Sec. 301.  In addition, starting in 1993 and continuing through 2007, HUD set and increased
     specific goals for the financing of affordable housing by Fannie Mae and Freddie Mac.  HUD directed
     Fannie Mae and Freddie Mac to ensure that 30 percent of the mortgages it purchased each year
     between 1993 and 1995 were mortgages for low- and moderate-income families.  HUD raised the
     goal to 42 percent in 1997, 50 percent in 2001, and 55 percent in 2007.  See Peppercorn, Ira G.,
     Statement Before the House Subcommittee on Capital Markets, Securities and Government
     Sponsored Enterprises, Committee on Banking and Financial Services, July 30, 1998, p. 3, Table:
     "Overview of GSE Goal Performance Relative to Final Rule Definitions;" "Overview of the GSEs'
     Housing Goal Performance, 1993-2001," *U.S. Department of Housing and Urban Development,
     Office of Policy Development and Research*, July 2002; "Overview of the GSEs' Housing Goal
     Performance, 2000-2007," *U.S. Department of Housing and Urban Development, Office of Policy
     Development and Research*, November 2008.

[12]   "The State of the Nation's Housing 2006," *Joint Center for Housing Studies of Harvard University*,
     2006.

[13]   Bush, George, "A Home of Your Own: Expanding Opportunities for All Americans," The White
     House, June 2002, pp. 2-4.

B. **Securitization And Mortgage-Backed Securities**

18.    "Securitization" refers to a category of financing transactions in which companies (for example, mortgage loan originators) sell assets (in this case, mortgage loans) to a trust (or other special-purpose vehicle, or "SPV").[14]  The trust, in turn, sells to investors the rights to payments from the mortgage loans by packaging the loans and their cash flows into various types of securities.  The underlying pool of assets for a residential MBS may comprise any number of first- or second-lien mortgage products.[15]

19.    The earliest securitization transactions were structured as simple "pass-through" securitizations in which the payments from the financial assets, in this case payments on mortgages, are passed through the SPV to the investors in the securities *pro rata*, such that no investor has a superior claim relative to that of any other investor on any of the payments.  See Exhibit 3.  A limitation of this simple pass-through structure is that it does not provide securities that allow for the segregation of risks such as, for example, prepayment or credit, and/or allow investors to select between principal and interest income.  New securitization structures, such as a senior-subordinate structure, were subsequently introduced to meet investor demand for securities with these characteristics.  Risks in these structures are differently allocated to various certificates so that different investments are available to investors with different appetites for risk or investment objectives.  Further, in some cases, investors collaborate with issuers to create certificates that meet their investment objectives.

---

[14]    Other types of financial assets that are securitized include auto loans, student loans, and equipment leases.

[15]    First-lien mortgages provide the lender with the first call on the proceeds of liquidation and second-lien mortgages provide the lender with the proceeds of liquidation only after the first-lien balance is exhausted.  Fabozzi, Frank, *The Handbook of Mortgage-Backed Securities*, 6th Ed., McGraw-Hill, 2006, p. 4.

20.     In a senior-subordinate structure, an SPV issues a number of securities (*i.e.*, multiple tranches, or certificates), in which losses due to late payments or defaults are absorbed by the different certificates in sequence, as shown in Exhibit 4; in this example, the lowest rated certificate carries a credit rating of B and the highest carries a credit rating of AAA.[16]   Thus, the most senior certificate is the last to absorb any losses.  Investors who purchase the most senior certificates therefore have a lower risk of loss relative to investors who purchase less senior (mezzanine or subordinate) certificates.

21.     As a highly simplified example of a senior-subordinate structure, consider an SPV with $1,000 face amount of financial assets and $900 of liabilities consisting of $700 of senior certificates, $200 of subordinated certificates, and $100 of overcollateralization (a form of credit enhancement, as discussed below).  If $150 of the financial assets default and are written off completely, the remaining $850 of collections would repay the $700 senior certificates in full, leaving only $150 (*i.e.*, $850 minus $700) to pay the subordinated certificates.[17] Investors in the subordinated certificates would thus be paid only 75 cents on the dollar (*i.e.*, $150 on their $200 of claims), while holders of the senior certificates would be paid in full.  Holders of the subordinated certificates bargain to take this higher risk of loss by demanding a higher interest rate on their securities.  See Exhibit 5.  Accordingly, while an investor is aware that losses may occur on the underlying collateral, the investor is also aware that such losses: a) will not necessarily impact the performance of the certificates, and b) even where performance is impacted, will not impact the certificates equally.  Because of the senior-subordinate structure,

---

[16]   Credit ratings are opinions of a security's credit quality, or likelihood of making payments in full in a timely manner, issued by credit rating agencies.  In the case of Standard & Poor's ("S&P"), a credit rating agency, the securities with the highest credit quality at the time of offering carry a rating of AAA.

[17]   This example ignores monthly payments of principal and and interest.

the resulting differences in credit ratings and spreads associated with individual certificates, distinct collateral, and other factors described below, each certificate is a unique security.

22.     Credit enhancement mechanisms in residential MBS are generally divided into two categories: internal credit enhancements and external credit enhancements.  Internal credit enhancements operate within the SPV, typically determining the prioritization of cash flow and losses among the certificates.  As previously discussed, the senior-subordinate structure is an example of an internal credit enhancement.  Similarly, overcollateralization is another form of internal credit enhancement.  Overcollateralization exists within an SPV if the amount of the collateral underlying the SPV (*e.g.*, mortgage loans) exceeds the amount of the liability (*e.g.*, offering amount of the certificates);  other forms of internal credit enhancements may include cross-collateralization (in which cash flows from the loans underlying one group of certificates can be used to enhance the cash flows to another group of certificates) and excess spread (which refers to the allocation of excess cash into a separate reserve account after paying out interest to investors, and all other fees and expenses).[18]

23.     External credit enhancements exist outside of the SPV and are typically agreements with third-parties that provide for protection against losses.  For example, bond insurance, also referred to as note guaranty insurance, is a financial guarantee from a monoline insurance company (*e.g.*, Financial Guaranty Insurance Corporation) on a particular bond or class of certificates.  This guarantee ensures that timely payments of principal and interest are made to certificate holders if cash flows from the mortgage pool are insufficient to make such payments; other examples of external credit enhancements include letters of credit (in which an SPV obtains a guarantee from a bank to reimburse losses up to a predetermined amount) and

---

[18]   Fabozzi, Frank, *The Handbook of Mortgage-Backed Securities*, 6th Ed., McGraw-Hill, 2006, pp. 113, 116-121.

pool insurance (which provides coverage for losses beyond default and foreclosures, such as "special-hazard" losses, *e.g.*, earthquakes).[19]

24.     In 1992, the Securities and Exchange Commission observed: "The home mortgage market was truly revolutionized by securitization.  In a little more than twenty years, we have gone from no securitized home mortgages to over $1.2 trillion worth of home mortgage securities outstanding in 1992."[20]   Exhibit 6 sets out the growth of asset-backed debt in the United States since 1996 and indicates the growth in mortgage-related, other home equity, automobile, credit card, equipment, manufactured housing, and student loan financing was facilitated through securitization.  As is evident from Exhibit 7, mortgage-backed and other asset-backed securities were a substantial and growing portion of the U.S. bond market through the latter half of the 1990s and the first decade of the current century.

25.     Securitizations of mortgage loans increased dramatically between 2001 and 2007. Residential mortgage securitizations peaked at more than $2.6 trillion in 2003, when almost 70 percent of mortgage originations were securitized.[21]   From 2003 to 2006, securitization of non-agency mortgage products increased while agency securitizations decreased.[22]  The securitization of home equity loans, for example, increased from $15.5 billion in 2001 to a peak of $74.2

---

[19]   Fabozzi, Frank, *The Handbook of Mortgage-Backed Securities*, 6th Ed., McGraw-Hill, 2006, pp. 113-116.

[20]   Schapiro, Mary L., Commissioner of the United States Securities and Exchange Commission, "Promoting Small Business Capital Formation: The Role of the SEC," U.S. Securities and Exchange Commission, November 13, 1992, p. 14.

[21]   "The 2010 Mortgage Market Statistical Annual," Inside Mortgage Finance, Vol. IIA.

[22]   "The 2010 Mortgage Market Statistical Annual," Inside Mortgage Finance, Vol. IIA.; Agency securities are defined as "specific securities that are issued by either Ginnie Mae, Fannie Mae, Freddie Mac or the Federal Home Loan Banks;"  See "The 2010 Mortgage Market Statistical Annual," Inside Mortgage Finance, Glossary.

billion in 2006.[23]  As shown in Exhibit 8, non-agency MBS increased ten-fold between 1997 and

2005, when they peaked at $1.2 trillion.[24]  Non-agency securitizations decreased dramatically

beginning in 2007, as shown in Exhibit 9.

26.     Each certificate in a securitization is a distinct security with various distinct

elements appealing to varying investor risk appetites and investment strategies.  As distinct

securities, each certificate is assigned a CUSIP, which is a unique nine-character identification

number for each class of security approved for trading in the U.S. and Canada.[25]  From an

investor standpoint, there are many certificate-specific characteristics that may be considered

when comparing certificates to one another.  In the following section, I discuss a number of these

characteristics in the context of the at-issue IndyMac MBS.

## VI.     THE 26 DISTINCT SECURITIES FOR WHICH PLAINTIFF SEEKS CLASS TREATMENT

27.     The IndyMac MBS for which Plaintiff seeks class treatment collectively consist

of 26 distinct securities backed by three loan groups comprising 1,708 mortgage loans.  The

securities were initially offered on June 28, 2006, but the proposed class includes investors who

purchased in secondary market transactions years after the initial offering.  During that period,

---

[23]  "The 2010 Mortgage Market Statistical Annual," Inside Mortgage Finance, Vol. IIA.

[24]  Non-agency MBS are securities issued by private banks and institutions.  Agency MBS are "[s]pecific securities that are issued by either Ginnie Mae, Fannie Mae, Freddie Mac or the Federal Home Loan Banks. They are backed by mortgage loans and these companies enjoy credit protection based on an explicit guarantee from the U.S. Government in the case of Ginnie Mae securities, or an implicit guarantee from the U.S. Government in the case of Fannie Mae and Freddie Mac, giving them high ratings."  "The 2010 Mortgage Market Statistical Annual CD-ROM," Inside Mortgage Finance, Glossary.

[25]  "About CGS Identifiers," CUSIP Global Services, <https://www.cusip.com/cusip/about-cgs-identifiers.htm>, accessed on February 23, 2011.

the macroeconomic environment changed dramatically.  In this section, I discuss structural and collateral distinctions among the three loan groups and 26 certificates.[26]

28.     IndyMac has sponsored hundreds of residential mortgage loan securitizations, with an approximate value of $60 billion from 2002 through 2005.[27]  Each securitization and its mortgage pool is unique, as disclosed by IndyMac in the RAST 2006-A8 prospectus supplement: "Each of these securitizations is unique, and the characteristics of each securitized mortgage pool varies from each other as well as from the Mortgage Loans to be included in the issuing entity that will issue the certificates offered by this prospectus supplement."[28]

29.     Exhibit 10 sets forth the basic attributes of the RAST 2006-A8 offering.[29]  The mortgage pool for the RAST 2006-A8 trust is divided into three separate loan groups, with distinct sets of certificates drawing cash flows from those distinct loans groups.[30]  For example, the Class 1-A-1 certificate primarily receives cash flows from loans in Group 1, whereas the Class 2-A-1 certificate primarily receives cash flows from loans in Group 2.  Each distinct set of certificates differs in terms of payment priorities and other characteristics, and therefore the sets are not comparable.  For example, super senior and senior support certificates are present only in Group 2; and certificates that are classified as "Accretion Directed Class," "Companion Class" and "Targeted Principal Class" are present only in Group 3.

---

[26]   Unless otherwise noted, these distinctions are identified in the Prospectus Supplement and monthly Trustee Reports.

[27]   RAST 2006-A8 Prospectus Supplement, p. S-67, S-68.

[28]   RAST 2006-A8 Prospectus Supplement, p. S-68.

[29]   For additional information regarding the structure and payment priority of the certificates at issue, see Exhibits 22 – 24.

[30]   Of the 26 at-issue certificates, 24 are categorized as group-specific certificates (*e.g.*, Group 1 Senior Certificates are Class 1-A-1, Class 1-A-2, Class 1-A-3, Class 1-A-4, and Class 1-A-5.)  The remaining two at-issue certificates, Class PO and Class A-X, have components that pertain to specific groups (*e.g.*, Class PO-1 receives principal from Group 1 loans and Class PO-1 is defined as a Group 1 Senior Certificate). See RAST 2006-A8 Prospectus Supplement, p. S-12.

30. Each of the three loan groups is distinct across multiple dimensions. To help explain these distinctions, I discuss examples of economic differences among the three loan groups.

31. ***Different Loan Characteristics.*** The three distinct loan groups in the offering comprise different loans that have a variety of different collateral characteristics:[31]

- **Average Stated Principal Balance:** For each loan group, there is a different mix of principal balances. Groups 1 and 2 contain high balance mortgages with an average stated principal balance of $595,887 and $600,223, respectively; while Group 3 contains loans with a lower average balance of $230,515. In fact, Groups 1 and 2 have 19 percent and 23 percent, respectively, of loans with principal balances greater than $750,000, while there are no loans in Group 3 that exceed this amount. Therefore, Groups 1 and 2 will be affected more by poor performance (late payments and defaults) of high balance mortgage loans than Group 3.

- **Second Lien On Original Loan:** The three loan groups comprise first lien loans; however, the loan groups have differing percentages of original loans with second liens. Specifically, 41 percent of loans in Group 1 have second liens on the original loans compared to 67 percent of loans in Group 3.[32] Investors who purchased certificates in Group 3 would likely be exposed to greater probabilities of borrower default because borrowers with second lien debt are more likely to have higher combined-loan-to-value ratios[33] and to be in negative equity positions.

- **Geographic Concentration:** Groups also differ from one another with respect to the geographic concentration of their loans. For example, California and Florida loans comprise 55 percent of Group 1 compared to only 36 percent of Group 3. Groups with higher concentrations of mortgages in California and Florida (which have experienced unprecedented home price declines) will be impacted more negatively than other groups by defaults in those states.

- **Prepayment Charge:** The range of mortgage loans that carry prepayment charges varies across the loan groups. Specifically, approximately 30 percent of the loans in Groups 1 and 2 carry prepayment charges in comparison to Group 3, in which 62 percent of loans had prepayment charges. Thus, in a falling interest rate environment,

---

[31] All percentages under loan characteristics are based on aggregate principal balances as of the cut-off date in the prospectus supplement.

[32] "… [A]t the time of origination of the first lien mortgage loan, the originator of the mortgage loan also originated a second lien mortgage loan that will not be included in the issuing entity and is not reflected in the loan-to-value ratio tables included in this prospectus supplement." RAST 2006-A8 Prospectus Supplement, p. S-27.

[33] Loan-to-value ratios and combined-loan-to-value ratios are the outstanding balance of the loan(s) in relation to the property value.

14

investors in certificates backed by Groups 1 and 2 would be subject to greater prepayment risk than investors in certificates backed by Group 3.

- **Amortization Schedule:** The groups at issue comprise loans that have differing amortization schedules. For example, while 11 percent of the loans in Group 2 are 40/30 balloon loans, only one percent of the loans in Group 3 have this amortization schedule. Therefore, loans in Group 2 would be subject to greater default risk as the balloon payments on these 40/30 loans come due.

- **Weighted Average Mortgage Rate:** The weighted average mortgage rate on the underlying loans backing each loan group also vary. For example, loans in Groups 1 and 3 both have a weighted average mortgage rate of 6.40 percent, compared to an average mortgage rate of 7.14 percent for loans in Group 2. Because the mortgage rate typically indicates the perceived riskiness of the borrower, this difference demonstrates the variability in the risk characteristics of the loans. If, in fact, the loans across these three groups were homogenous, then the weighted average mortgage rates across all three groups would be more similar.

- **Required Coupon Rate:** While the mortgage rate payable by a borrower varies subject to borrower characteristics, there is a required mortgage rate known as the "required coupon rate" for loans in each loan group. The mortgage loans in Groups 1, 2, and 3 are required to pay an adjusted net mortgage rate of 6.25 percent, 6.50 percent, and 6.00 percent, respectively. This required coupon has important implications for the calculation of payments due to certificate holders in each loan group because payments to investors are calculated taking into account each mortgage loan in each group that has a mortgage rate less than the applicable required coupon rate. Thus, the rate used to compute payment distributions to investors will be different for each group.

32. *Different Documentation Programs.* For each loan group, there is a different mix of loan documentation programs. For example, only 16 percent of the loans in Group 2 were originated pursuant to the "Full/Alternate" Documentation Program, whereas 41 percent of loans in Group 3 were originated pursuant to that program. Given different documentation programs with unique underwriting guidelines for the loans in each mortgage pool, a certificate backed by Group 2 mortgage loans may be exposed to more uncertainty than a certificate backed by Group 3 mortgage loans given that borrower characteristics, such as income and employment, may be less fully documented.

33.     The implication of the above collateral differences is that the groups within an offering may be exposed to unique risks and require different sets of inquiries regarding any allegations about the loans in each group.

34.     Each of the 26 certificates also has distinct characteristics for different investors with different risk appetites.

35.     ***Different Types Of Securities.***  As discussed above, the 26 at-issue certificates consist of multiple types of securities with different characteristics, which include fixed rate, floating rate, inverse floating rate, super senior, senior support, interest-only, principal-only, accretion directed, companion, non-accelerated senior, and targeted principal, as well as combinations of characteristics thereof.  To fully understand how the macroeconomy and factors such as defaults, loss recoveries, prepayments, and late payments may affect cash flows to investors in different certificates, one must analyze the characteristics, structure, and payment prioritization of each separate certificate.

36.     ***Different Maturity Dates.***  The expected maturity dates of the certificates vary greatly.  See Exhibit 11.  For example, the modeled scheduled distribution date for Class 2-A-7 was July 2011.  In contrast, Class 1-A-4 certificate was not expected to mature until May 2036. Thus, an investor in the Class 2-A-7 certificate is unlikely to have the same investment preferences as an investor in the Class 1-A-4 certificate.

37.     ***Different Fixed Pass-Through Rates.***  Certificates that receive fixed pass-through rates within the offering differ by the interest rate they receive, both within a group and across groups.  For example, while investors in the Class 1-A-1 certificate receive a pass-through rate of 6.00 percent, investors in the same group in the Class 1-A-4 and Class 1-A-5 certificates receive a pass-through rate of 6.25 percent.  Similarly, certificates in Group 2 offer interest rates

that differ from those offered in Group 1.  For example, investors in the Class 2-A-1 and Class 2-A-2 receive pass-through rates of 6.50 percent and 6.75 percent, respectively.  This demonstrates the variability in each certificate's perceived riskiness and related investor risk appetite.

38.     ***Different Floating Rate Certificates.***  Floating and inverse floating rate certificates in each group carry pass-through rates that adjust monthly based on the level of the one-month LIBOR rate.  Floating rate certificates benefit from an increase in the one-month LIBOR rate, as the certificates receive the LIBOR rate plus a margin (a predetermined basis point spread).  Inverse floating rate certificates function the opposite way: they benefit when the one-month LIBOR rate decreases as the certificates receive a fixed rate less the one-month LIBOR rate.  Given the unprecedented decline in interest rates between 2006 and the present, the floating rate certificates at issue have been affected in opposite ways, as seen in Exhibit 12.  While floating rate certificates were receiving pass-through rates equal to between 5.4 and 6.0 percent at the time of the offering, these certificates now receive between 0.6 and 1.0 percent.  In contrast, the inverse floating rate certificates have benefited from the falling interest rate environment and now receive between 5.0 and 6.9 percent.  Therefore, investors purchasing certificates with floating and inverse floating rate certificates presumably had different expectations regarding interest rate paths and payments.

39.     ***Different Credit Enhancement Mechanisms.***  There are a variety of credit enhancement mechanisms that are specific to certain certificates.  In fact, the prospectus supplement states that, "[t]he credit enhancement for each class of offered certificates varies.  Not all credit enhancement is available for every class."[34]  For example, while the super senior certificate (Class 2-A-5) and its senior support certificate (Class 2-A-8) both benefit from subordination, the Class 2-A-5 certificate's status as a super senior certificate also benefits from

---

[34]     RAST 2006-A8 Prospectus Supplement, p. S-1.

the protection of the Class 2-A-8 certificate, which must absorb Class 2-A-5's portion of losses

until Class 2-A-8 is depleted.

40.    ***Other Contracts.***   Some certificates within the offering also carry certificate-

specific contracts: an interest-rate corridor contract and an interest rate cap contract.  Class 2-A-

5, Class 3-A-3, and Class 3-A-8 certificates receive floating rate pass-through rates which are

subject to fluctuations in the index according to which their interest rate payments are calculated.

Thus, these certificates benefit from these contracts because the contracts protect investors from

interest rate fluctuations, while other investors who purchased floating rate certificates without

this contract would not have been protected from interest rate movements.

41.    ***Different Payment Prioritization.***   Certificates may benefit in varying degrees

from unique payment prioritization structures that are distinct within each group.  For example,

the non-accelerated senior ("NAS") certificates in each group (Class 1-A-4, Class 2-A-4, Class

2-A-8, and Class 3-A-4) receive, in a given month, only that group's "priority amount," which is

calculated based on payments received from each loan group.  The priority amount differs from

principal that is distributed to other senior certificates (*e.g.,* Class 1-A-5 and Class 2-A-1) within

each group in that the NAS certificates are subject to a payment cap whereas other certificates

are paid the remaining amount from borrowers.  The NAS certificates are typically at the top of

the payment priority structure, but their principal payments are limited by the priority amount

restriction.  Only after the other senior certificates are paid down to zero or a specified amount of

time has passed, do NAS certificates become eligible for the rest of their principal payments.  In

addition, even within the other senior certificates, certain certificates classified as "targeted

balance" certificates are paid in accordance with an amortization schedule.  Therefore, rather

than a payment priority structure in which principal is paid sequentially to the certificates, there are a number of senior certificates that are subject to different calculations of principal.

42.     ***Different Certificates Have Multiple and Different Characteristics.***  While all certificates at issue are senior, they have different and multiple characteristics associated with them that make them distinct from one another.  For example, while both Class 1-A-1 and Class 1-A-4 are senior certificates with fixed pass-through rates, Class 1-A-4 is an NAS certificate.  In addition, while Class 3-A-6 and Class 3-A-8 are both paid in accordance with an amortization schedule and are classified as "targeted balance" classes, they have other classifications that make them dissimilar: Class 3-A-6 is a companion class that receives interest on an accrual basis with a fixed pass-through rate and Class 3-A-8 receives a floating pass-through rate.  These certificates demonstrate the multiple factors that affect payments to investors in different certificates, yielding a unique choice set that would appeal to certain investors depending upon payment expectations and risk appetite.

43.     ***Different Impacts Of Principal and Interest Payments.***  There are a number of interest-only and principal-only certificates.[35]  For example, Class 1-A-3 is an interest-only certificate in Group 1 with a notional balance equal to the outstanding principal balance of the Class 1-A-2 certificate.  Principal payments to investors in Class 1-A-2 effectively reduce the certificate's outstanding principal balance, and in turn, lower the notional balance upon which interest payments are calculated for Class 1-A-3.  Interest-only certificates in the other two groups, specifically Class 2-A-6 in Group 2 and Class 3-A-5 and Class 3-A-9 in Group 3, however, are not affected by principal distributions in Group 1, further demonstrating that distinct sets of loans affect certificates within the same offering differently.

---

[35]  The payments on an interest-only certificate are based upon the principal balance(s) of one or more other certificates in the same group.

44.    ***Different Payment Distributions.***   Distributions to investors in certificates may be made *pro rata*-concurrently, sequentially, or both.  This payment distribution varies across groups and within certificates.  For example, in Group 2, after Class 2-A-4 and Class 2-A-8 are paid, Class 2-A-1, Class 2-A-2, and Class 2-A-3 are paid 76.1 percent of the principal received from Group 2 *pro rata* concurrently.  In comparison, Class 2-A-7 receives principal distributions only after the principal balances of Class 2-A-1, Class 2-A-2, and Class 2-A-3 are paid down to zero, introducing a sequential pay structure in which Class 2-A-7 is paid only after certain certificates have been paid-in-full.  In addition, another layer of a sequential pay structure exists between the other senior certificates and the Class 2-A-4 and Class 2-A-8 certificates.  Class 2-A-4 and Class 2-A-8 stand to receive principal payments without regard to their respective amortization schedules once all other certificates have been paid-in-full.

45.    ***Different Amortization Schedules.***  Class 3-A-3, Class 3-A-6 and Class 3-A-8 certificates (also known as the "targeted balance" certificates) in Group 3 receive principal distributions in accordance with an amortization schedule while other senior certificates across the groups are eligible to receive principal amounts based on a percentage of the principal received by each loan group.  For example, the amortization schedule for Class 3-A-8[36] states that on the first distribution date (July 2006), the certificate will only be paid up to $29,558.65, decreasing the outstanding principal balance from $3 million to approximately $2.97 million.  While Class 3-A-8 receives up to a fixed principal distribution every month, other certificates such as Class 3-A-1 within the same group receive a varying proportion of the principal received by loans in Group 3.  Therefore, an investor who purchases the Class 3-A-8 certificate will likely have payment expectations that closely mirror the amortization schedule put forth in the

---

[36]    RAST 2006-A8 Prospectus Supplement, p. S-137.

Prospectus Supplement, whereas an investor in another certificate will likely depend upon forecasts of interest rates and other macroeconomic factors to determine the potential amortization schedule for his security.

## VII.   THE CHANGING MACROECONOMIC ENVIRONMENT ENCOMPASSED BY THE PROPOSED CLASS

46.    The initial offering of the 26 certificates was in June 2006, two months after what was, in hindsight, the height of the housing market.  The proposed class includes investors who purchased years after the initial offering in June 2006.  The macroeconomic environment changed substantially during the period in which proposed class members purchased certificates.

### A.   The Housing Market

47.    As discussed above, U.S. home prices, as measured by the Case-Shiller Home Price Index Composite (10), peaked in April 2006 (see Exhibit 1).  Along with national home prices, home prices in California, Florida, and New York – areas in which the at-issue offerings were heavily represented – also experienced peaks in the spring of 2006.  With the increase in home prices throughout the U.S., however, many potential buyers could no longer afford homes and increasing interest rates exacerbated the fall in demand for homes.

48.    The reduced demand for homes corresponded with a record supply of homes.  As shown in Exhibit 2, annualized housing starts increased steadily from 1991 through early 2006 and peaked in January 2006, tripling from approximately 600,000 starts per year in 1991 to approximately 1.8 million; in June 2006, there were approximately 1.45 million starts.  New homes were built ahead of demand, and existing home inventory on the market increased.[37]

---

[37]   Klyuev, Vladimir, "What Goes Up Must Come Down?  House Price Dynamics in the United States," IMF Working Paper, July 2008, p. 11.

However, by the beginning of 2009, annual housing starts had declined by 75 percent from June 2006 to a historic low at approximately 360,000 starts.

49.    Declining demand and an excess supply of homes in the mid-2000s caused house prices to flatten and then decline.[38]  As shown in Exhibit 1, the Case-Shiller Home Price Index Composite (10) had fallen from the RAST 2006-A8 offering date in June 2006 to its lowest point three years later in May 2009 by approximately 33 percent, with larger declines in some areas, such as Miami, where home prices fell by approximately 48 percent over the same time period.

## B.  Underwriting Guidelines

50.    Declining house prices increased the probability of default for all borrowers.[39] Recent empirical studies have shown that the dramatic decline in home prices was the dominant factor in the increase in foreclosures that accelerated in 2007.[40]  As a result, lenders began to revise their underwriting guidelines to take into account the changing perceptions of risk.  After generally easing from 2004 through 2006, underwriting guidelines for mortgage loans continued to ease in early 2006, when the at-issue offering occurred (see Exhibit 13).[41]  Because the loans

---

[38]    Klyuev, Vladimir, "What Goes Up Must Come Down?  House Price Dynamics in the United States," IMF Working Paper, July 2008, p. 11.

[39]    See, for example, Gerardi, Kristopher, Adam Hale Shapiro, and Paul S. Willen, "Subprime Outcomes: Risky Mortgages, Homeownership Experiences, and Foreclosures," *Federal Reserve Bank of Boston Working Paper*, May 4, 2008, p. 35; Foote, Christopher, et al., "Reducing Foreclosures," *Federal Reserve Bank of Boston Public Policy Discussion Paper*, April 8, 2009, p. 15; Joint Center for Housing Studies of Harvard University, "The State of the Nation's Housing: 2007," 2007, p. 3.

[40]    Studies have found that the decline in home prices was a primary driver of foreclosures, and that changes in underwriting standards, although they occurred, would not have increased the foreclosure rate without a decline in house prices.  See, for example, Gerardi, Kristopher, Adam Hale Shapiro, and Paul S. Willen, "Decomposing the Foreclosure Crisis: House Price Depreciation versus Bad Underwriting," Federal Reserve Bank of Atlanta, September 2009; Bajari, Patrick, Chenghuan Sean Chu, and Minjung Park, "An Empirical Model of Subprime Mortgage Default From 2000 to 2007," NBER Working Paper, December 2008; Gerardi, Kristopher, et al., "Making Sense of the Subprime Crisis," *Brookings Paper on Economic Activity*, Fall 2008.

[41]    See, for example, "Mortgage Letter 2010-21: HUD Multifamily Risk Mitigation," *U.S. Department of Housing and Urban Development*, July 6, 2010; "RMBS Trends: U.S. CES and HELOC Second-

underlying the at-issue offering had been originated primarily in late 2005 and early 2006 when underwriting guidelines were continuing to ease, the underlying loans in the at-issue offering were likely subject to different underwriting guidelines.

## C. Credit Risk

51.     An indication of the changing credit risk environment during this period is the spread between conforming and jumbo loan interest rates.  Jumbo loans are typically made to prime borrowers but are too large to be sold to Fannie Mae or Freddie Mac,[42] therefore this spread between conforming and jumbo interest rates is a measure of the perceived increased risk assumed by lenders in originating loans that cannot be sold to the government-sponsored entities ("GSEs").  As shown in Exhibit 14, this spread fluctuated throughout 2006 and 2007, and increased more than ten-fold from its lowest point in 2007 at approximately 16 basis points to a peak of 184 basis points in January 2009; that is, borrowers had to pay higher premiums for jumbo loans, reflecting the perceived increased risk.

---

Quarter Securitization Volume Drops Significantly," Standard & Poor's, October 8, 2007; Federal Reserve Board, Senior Loan Officer Opinion Survey on Bank Lending Practices, <http://www.federalreserve.gov/boarddocs/snloansurvey/201011/chartdata.htm>, accessed on February 23, 2011.

[42]   "Jumbo mortgages are loans too big to be purchased by Fannie Mae and Freddie Mac, the two largest secondary market lenders (together, they own or securitize more than 70 percent of the residential mortgage loans in the United States).  Fannie and Freddie are permitted to buy only those loans that conform to a limit set by the Office of Housing Enterprise Oversight – $417,000 for the continental United States since 2006 (higher for remaining states and territories)."  See Pescatori, Andrea and Shenk, Michael, "Jumbo Mortgages and Mortgage Market Conditions," Federal Reserve Bank of Cleveland, October 29, 2007, p. 1.  A conforming loan is one that meets the qualifications of Fannie Mae and Freddie Mac. See "The 2010 Mortgage Market Statistical Annual," Inside Mortgage Finance, Glossary.  A non-conforming loan is one that does not meet the purchase requirements of the GSEs, "because it is too large or for other reasons, such as poor credit or inadequate documentation."  See Guttentag, Jack, *The Mortgage Encyclopedia*, McGraw-Hill, 2004, p. 138.

52.     As shown in Exhibit 15, the seriously delinquent rate[43] in the U.S. increased from about two percent to almost ten percent from the at-issue offering in June 2006 to the end of 2009, reaching the highest level since at least 1990.  The increase was even greater in certain areas; for example, as shown in Exhibit 16, the seriously delinquent rate in California increased from less than one percent in Q2 2006 to an unprecedented 12.5 percent by Q4 2009.[44]

53.     The market's perception of increased credit risk due to defaults and foreclosures lessened the demand for securitized mortgages in mid-2007.[45]  In addition, a growing financial crisis impacted the credit markets.  As shown in Exhibit 9, non-agency residential MBS volume virtually disappeared as the volume decreased by an astounding 95 percent from over $300 billion in Q2 2006 to a mere $16 billion by Q4 2009.   Furthermore, a significant share of residential MBS experienced ratings downgrades after 2006, indicating an increase in riskiness perceived by the market, due largely to the overwhelming macroeconomic and credit risk changes.  The Standard & Poor's ("S&P") ratings downgrades of residential MBS increased dramatically from less than two percent in 2006 to almost 50 percent of ratings transitions in 2008[46] as shown in Exhibit 17.  Market observers understood that the unprecedented crisis in the housing market would adversely affect the financial health of mortgage market participants.[47]

---

[43]   The seriously delinquent rate is defined as "the non-seasonally adjusted (NSA) percentage of loans that are 90+ days delinquent or in the process of foreclosure."  See Mortgage Bankers Association National Delinquency Survey Facts, <http://mbaa.org/files/Research/NDSFactSheet.pdf>.

[44]   Mortgage Bankers Association National Delinquency Survey, 2009.

[45]   "Update 2-US agency debt, MBS pummeled as Treasuries soar," *Reuters*, July 26, 2007; "Holding of Debt Securities Falls Again at Goldman," *The New York Times*, October 11, 2007.

[46]   In 2007, of the remaining approximately 84 percent of ratings transitions, 1.66 percent were upgrades while the remaining were stable ratings.  See "Global Structured Finance Default and Transition Study – 1978-2008: Credit Quality of Global Structured Securities Fell Sharply in 2008 Amid Capital Market Turmoil," Table 5, Standard & Poor's, February 25, 2009, p. 17.

[47]   See, for example, Greenspan, Alan, "Mortgage Banking," Speech for the American Bankers Association Annual Convention, September 26, 2005; "Cracks in the Façade – America's Housing

54.     Overall, the macroeconomic environment for housing changed dramatically during the period in which proposed class members purchased certificates.  Moreover, as will be discussed in the following section, as time progressed, potential investors were able to rely upon increasing, broadly available information when making purchasing decisions.

## VIII.  PUBLIC INFORMATION AND INVESTOR KNOWLEDGE REGARDING UNDERWRITING PRACTICES

55.     I have been advised by counsel that investors who purchase while aware of an alleged false statement have no claim under Section 11 or 12(a)(2) of the Securities Act.  As I discuss more fully below, what an investor knew or did not know about IndyMac's loan underwriting practices at the time of his purchase is a function of the public information available at the time at which the investor purchased, the investor's sophistication in MBS markets, and the investor's knowledge of and access to the mortgage industry.

### A.  Increasing Public Information Over Time

56.     There was increasing public information regarding the underwriting practices of IndyMac (and other originators and issuers) over time.  The financial community, including banks, underwriters, credit rating agencies, and investors, had access to different information at the different times when proposed class members purchased certificates.

57.     Exhibit 18 and Exhibit 19 illustrate the types of information that emerged in public reports from January 2004 through December 2008 regarding underwriting practices in

---

Market," *The Economist*, March 24, 2007; Bajaj, Vikas, "Mortgages Grow Riskier, and Investors are Attracted," *The New York Times*, September 6, 2006; Spence, John and Morcroft, Greg, "After the Real-estate Bubble: If Housing Market Tumbles, the Impact could be Far-reaching," *MarketWatch*, June 3, 2005.

the Alt-A mortgage market,[48] in which IndyMac was the largest player, and in subprime and

non-prime mortgage markets.

58.     Relaxed underwriting standards and aggressive lending practices were widely

reported.  For example, an August 8, 2004 article in the *Financial Times* stated:

> As higher rates slow mortgage lenders' fixed rate businesses, some are
> lowering their underwriting standards. A recent survey from the Consumer
> Federation of America found that some lenders are selling variable rate
> mortgages to any potential buyer, regardless of the buyer's income or
> credit history.[49]

On July 26, 2005, a *Wall Street Journal* article stated:

> Mortgage lenders are continuing to loosen their standards, despite
> growing fears that relaxed lending practices could increase risks
> for borrowers and lenders in overheated housing markets.
>
> . . .
>
> But lenders are making it still easier for borrowers to qualify for a loan.
> They are lowering the credit scores needed to qualify for certain loans,
> increasing the debt loads borrowers can carry and easing the way for
> borrowers to get loans while providing little documentation.[50]

On May 18, 2006, a *Wall Street Journal* article referring to both Alt-A and subprime

mortgage loans stated:

> Soaring housing prices and aggressive mortgage lending have saddled
> home buyers with ever greater levels of debt, and early signs are now
> emerging that more people are unable to keep up with their monthly
> mortgage payments.[51]

---

[48]  "Alt-A loans are typically (but not exclusively) made to 'A' quality credit borrowers whose mortgage
characteristics encompass a wide range of loan balances, LTVs, documentation types, and so on." See
Hayre, Lakhbir, *Salomon Smith Barney Guide to Mortgage-Backed and Asset-Backed Securities*, p.
281.

[49]  Wiggins, Jenny, "Interest rate rises to hit households' debt loads," *Financial Times*, August 8, 2004.

[50]  Simon, Ruth, "Mortgage Lenders Loosen Standards – Despite Growing Concerns, Banks Keep
Relaxing Credit-Score, Income, and Debt-Load Rules," *The Wall Street Journal*, July 26, 2005.

[51]  Simon, Ruth, "Late Payments on Mortgages Rise – Studies Find Higher Loan Delinquencies
Stemming From 2005's Lending Boom," *The Wall Street Journal*, May 18, 2006.

59.     The expansion of "nontraditional" loan products was also widely reported.  For example, an October 13, 2005 article from the *American Banker* stated:

> [T]he proliferation of "nontraditional" mortgage products, such as option adjustable rate mortgages, have increased the likelihood that borrowers will experience negative amortization … "When affordability products are offered along with easing of traditional credit underwriting practices … these products may pose a potentially higher risk of default than traditional mortgages," [Federal Reserve Board Governor Susan] Bies said.[52]

60.     At the same time, there were reports of increased borrower fraud.  For example, a July 30, 2005 article published by *The Washington Post* stated that there was "widespread and growing fraud in home loan applications, where sticker-shocked buyers lie about their incomes and assets."[53]  A July 24, 2006 article in the *National Mortgage News* stated:

> One lender has discovered that a large percentage of borrowers' incomes on its stated income loans were exaggerated by more than 50%, according to the Mortgage Asset Research Institute.
>
> The unidentified lender sampled 100 of its stated-income loans and checked the borrowers' salaries with the Internal Revenue Service.
>
> "Ninety percent of the stated incomes were exaggerated by 5% or more. More disturbingly, almost 60% of the stated amounts were exaggerated by more than 50%," MARI said in a recent report to the Mortgage Bankers Association.[54]

61.     Given the reports of aggressive lending practices and increased borrower fraud, industry observers noted that it had become exceptionally difficult to quantify the default risk of potential borrowers.  For example, a February 17, 2007 article in *The Economist* stated:

---

[52]   Mullins, Luke, "In Brief:  Bies Warns of Real Estate Lending Risks," *American Banker*, October 13, 2005.

[53]   Harney, Kenneth R. "Lies are Growing in Loan Process," *The Washington Post*, July 30, 2005.  See also, Tedeschi, Bob, "Mortgages: The Growing Problem of Fraud," *The New York Times,* July 9, 2006 (describing the growing problem of "fraud for property" and "fraud for profit," which involves the falsification of mortgage application documents by applicants or predatory lenders).

[54]   Collins, Brian, "Borrowers Fib About Income," *National Mortgage News*, July 24, 2006.

> An over-reliance on unseasoned risk models is also partly to blame for bad underwriting.  Subprime and alternative mortgages belong to "uncharted territory", says Sheila Bair, head of the FDIC, making "modelling credit performance exceptionally difficult".  The chief executive of HSBC, Michael Geoghegan, admitted as much in a conference call last week: "You've got to have history for analytics . . . the fact of the matter is there [isn't history] for the adjustable-mortgage rate business when you've had 17 jumps in US interest rates."[55]

62.     The housing market collapse that began after the peak in mid-2006 caused trouble for a number of mortgage originators.  Exhibit 20 charts the demise of multiple Alt-A and subprime lenders, in the context of falling home prices.  In December 2006, OwnIt Mortgage filed for bankruptcy.  Less than four months later, New Century Financial filed for bankruptcy on April 2, 2007.  An article on New Century's bankruptcy in the *Orange County Register* reported that:

> While New Century's defenders say it was caught in a perfect storm, critics on Wall Street, aggrieved shareholders and ex-employees say New Century sank because of poor navigation – lax lending standards, inadequate reserves for losses and accounting "errors."[56]

63.     In August 2007, GreenPoint Mortgage, owned by Capital One, was shut down.  A *Bloomberg* article commenting on the closing of GreenPoint and the bankruptcies of other Alt-A lenders published on August 20, 2007 stated:

> GreenPoint focused on "Alt-A" lending, an alternative for people with good credit records who don't meet the standards for prime mortgages.  Investors who buy Alt-A loans stopped bidding this year as concern about rising defaults grew, pushing lenders including American Home Mortgage Investment Corp. and HomeBanc Corp. into bankruptcy this month.[57]

---

[55]   "Bleak houses - American mortgages," *The Economist*, February 17, 2007.

[56]   Gittelsohn, John and Padilla, Mathew, "How New Century ran out of money," *The Orange County Register, Calif.*, April 15, 2007.

[57]   DiStefano, Joseph N., "Capital One Closes GreenPoint Mortgage, Idling 1,900 (UPDATE4)," *Bloomberg*, August 20, 2007.

64.     Numerous questions were raised about IndyMac's underwriting practices.  For example, on March 19, 2007, a lawsuit was filed alleging that IndyMac's "underwriting guidelines [failed] to adequately manage the risk of loan delinquencies."[58]  That same day, *CNNMoney.com* reported statements of industry experts describing Alt-A loans as "liar loans" based on "little or no verification of income," and identified IndyMac as "the biggest Alt. A lender."[59]  On July 18, 2007, *BusinessWeek Online* reported that "[b]uyers who take out Alt-A loans . . . submit little documentation" and that "IndyMac, as one of the country's biggest Alt-A originators, is vulnerable as the defaults rise among the loans."[60]  On September 7, 2007, the amended complaint in the lawsuit filed against IndyMac in March 2007 alleged that IndyMac had "greatly loosened its underwriting guidelines to drive up volume and bring in more loan sales" and adopted a policy of "'pushing through' unqualified loans."[61]

65.     The monthly trustee reports for the offering were publicly available and included performance data on the underlying loans in the loans in the loan groups, such as the number and dollar value of loans in various stages of delinquency, bankruptcy, foreclosure, and real-estate owned (REO) status.   The monthly trustee reports showed increasing delinquency rates throughout 2007, 2008 and 2009.  For example, the delinquency rate for the mortgage pool jumped from 4.22 percent in December 2006 to 12.12 percent in December 2007, to 25.21 percent in December 2008, and to 32.21 percent by December 2009.[62,63]   Investors who

---

[58]   Complaint, paragraph 29, in *Reese v. IndyMac Financial, Inc.*, No. 07-CV-01635 (C.D. Cal.).

[59]   Isidore, Chris, "'Liar Loans': Mortgage Woes Beyond Subprime," *CNNMoney.com*, March 19, 2007.

[60]   Steverman, Ben, "Mortgage Crisis Roughs Up IndyMac; The Mortgage Lender, Which Provides 'Alt-A' Loans, Suffers as the Mortgage Crisis Spreads," *BusinessWeek Online*, July 18, 2007.

[61]   Amended Complaint, paragraphs 39, 55, in *Tripp v. IndyMac Bancorp, Inc.*, No. 07-CV-1635 (C.D. Cal.).

[62]   RAST 2006-A8 Trustee Reports, December 2006, December 2007, December 2008, and December 2009.

purchased in the months or years following the initial offering date thus would have various

additional levels of knowledge regarding the performance of the loans underlying the at-issue

IndyMac MBS.  Likewise, investors would have had various additional levels of knowledge

regarding the performance of loans underlying other IndyMac MBS.

66.     In November 2007, the credit ratings for five certificates issued by RAST 2006-

A8 were downgraded.[64]  More generally, as discussed above, S&P ratings downgrades of

residential MBS had increased dramatically from less than two percent in 2006 to nearly 50

percent of ratings transitions in 2008.  Investors in the IndyMac offering would also have had

access to this information.

67.     On June 30, 2008, the Center for Responsible Lending published a report (the

"CRL Report") stating that "[l]ike many other lenders during the housing and mortgage boom of

2003-2006, IndyMac moved away from documenting borrowers' incomes and assets – basic

information that's crucial to determining whether consumers can afford a loan."[65]  On July 11,

2008, the Office of Thrift Supervision seized IndyMac.[66]

68.     The proposed class includes investors who purchased throughout and after the

time periods described above, including after the filing of the complaints against IndyMac in

---

[63]  Delinquency rates are reported as the principal balance of loans currently 30+ days delinquent
(including those loans that are 30+ days currently delinquent and currently in the process of
foreclosure, bankruptcy, or REO) over the current principal balance of the offering or group.
Delinquency rates are given for the entire offering, however, the delinquency rates varied greatly by
group.  For example, in December 2008, the delinquency rate for Group 1 was 13.55 percent, Group 2
was 36.49 percent, and Group 3 was 19.86 percent.  See RAST 2006-A8 Trustee Reports, December
2008.

[64]  "Moody's takes negative rating actions on certain Alt-A deals issued by Residential Asset
Securitization Trust in 2006 and late 2005," *Moody's Investors Service Press Release*, November 27,
2007.

[65]  Hudson, Mike, "IndyMac:  What Went Wrong?" *Center for Responsible Lending*, June 30, 2008, p. 3.

[66]  "IndyMac seized by FDIC; Office of Thrift Supervision reproaches Sen. Schumer," *AFX Asia*, July
11, 2008.

March and September 2007, the rise in loan delinquency rates reported in the monthly trustee reports in 2007, the rating downgrades of IndyMac MBS in 2007, the CRL Report published in June 2008, and the Office of Thrift Supervision's seizure of IndyMac in July 2008.

**B.   Sophistication Of Investors In Proposed Class**

69.     The proposed class includes a variety of investors, 

70.     To illustrate the range of sophisticated institutional investors in the proposed class, I describe below the businesses and roles in the MBS markets of some of the investors[67] in the offering:

- 













71.     The research, analyses, and due diligence undertaken by sophisticated investors

likely included one or more of the following:

- Evaluating mortgage originators, their respective underwriting guidelines, and a securitization's underlying servicer(s) through due diligence conducted by their own internal credit departments.

- Conducting sensitivity analyses of expected certificate performance based on the underlying collateral performance, which would include taking into account collateral statistics, home price changes, and adjustments to default or loss expectations to account for less stringent underwriting



- Contacting rating agencies to ascertain corporate debt rating,  performance ratings on the originator/servicer, credit enhancement structure, certificate rating, and views on expected collateral performance.

- Speaking or meeting with originators, along with the issuer and servicer, on a regular basis to discuss underwriting guidelines and practices, including exceptions to guidelines that could carry a greater risk of delinquency and default, and to uncover any changes to underwriting guidelines, market conditions, and loan performance

- Attending conferences on the ABS/MBS market and reading research reports on the industry from broker/dealers and third parties

## C. Differences In Investor Knowledge Necessitate Individualized Inquiries

72.    Plaintiff seeks to certify a single class consisting of investors in 26 distinct securities who purchased at different points in time.  In light of the increasing public information over time, the different research, analyses and due diligence undertaken by the different sophisticated investors, and the lengthy period of time over which different investors made different purchases of different certificates, individualized inquiries likely will be needed to assess each investor's knowledge base at each investor's particular time of purchase.

## IX.    INDIVIDUALIZED ISSUES OF LIABILITY

73.    Plaintiff argues that "the proof needed by Lead Plaintiff to prevail on its claim is the same that is needed to prove the claims of the rest of the Class."[90]  However, the alleged liability does not involve a unified set of loans and transactions at a single point in time.  The proposed class encompasses investors in 26 different securities, who purchased at different times.  There are different groups, mixes of information available at different times, underwriting guidelines, and exceptions to underwriting guidelines that must be assessed.

---

[90]   Lead Plaintiff's Memorandum of Law in Support of its Motion for Class Certification, December 10, 2010, p. 15.

A. **Falsity**

74.     At a threshold level, in order to assess whether the allegations of misstatements are true, the loan files for the underlying loans must be assessed against the underwriting guidelines that applied at the time as well as the representations and disclosures in the offering documents.  Because deviations from underwriting guidelines may have occurred with respect to some loans, but not others, and because different certificates are backed by different loans from different loan groups and different loan pools, loans from different loan groups and loan pools will have to be separately assessed.

75.     Each loan file will present many individualized inquiries.  For example, different underwriting guidelines apply to different loans.  IndyMac's "underwriting procedures" varied by channel of origination; a portion of loans in Groups 2 and 3 were underwritten according to the "Consumer Direct" origination channel underwriting guidelines.[91]  However, there are no loans in Group 1 that were originated via this channel, and thus no loans were underwritten according to the guidelines pertaining to the Consumer Direct channel.[92]  Thus, different loans will have to be assessed in accordance with the underwriting guidelines applicable to their channel of origination.

---

[91]   This channel is defined as follows: "Mortgage loans initiated through direct contact with the borrower. This contact may arise from internet advertising and IndyMac Bank website traffic, affinity relationships, company referral programs, realtors and through its Southern California retail banking branches."  It is further stated that the guidelines for this channel differ from the other three channels: "Underwriting  procedures vary by channel of origination. Generally, mortgage loans originated through the mortgage professional channel will be submitted to e-MITS for assessment and subjected to a full credit review and analysis. Mortgage loans that do not meet IndyMac Bank's guidelines may be manually re-underwritten and approved under an exception to those underwriting guidelines. Mortgage loans originated through the consumer direct channel are subjected to essentially the same procedures, modified as necessary to reflect the fact that no third-party contributes to the preparation of the credit file."  See Prospectus Supplement, RAST 2006-A8, pp. S-45, S-52, S-61, S-63.

[92]   RAST 2006-A8 Prospectus Supplement, p. S-39.

76.     In addition, there will have to be a determination of when the loans were underwritten and which guidelines applied at the time.  The offering documents described IndyMac's underwriting guidelines in general terms only; the specific underwriting guidelines used to originate the loans do not appear in the offering documents.  As discussed above, the specific underwriting guidelines of lenders such as IndyMac changed over time.

77.     There also will have to be a determination of whether applicable exceptions to underwriting guidelines applied as the offering documents stated that mortgage loans were underwritten "according to IndyMac Bank's underwriting guidelines . . . or pursuant to an exception to those guidelines."[93]  Thus, even if a loan may not appear to have complied with the relevant guidelines, an additional inquiry will be required to determine whether the loan nevertheless complied based on an applicable exception at the time the loan was originated.

78.     Because the loan files present a host of individualized inquiries, the answers to which may not be applied to all loan files, and because different certificates are backed by different loans from different loan groups, the falsity of alleged statements regarding IndyMac's underwriting practices for the loans underlying the 26 certificates cannot be established by common proof.

**B.  <u>Materiality</u>**

79.     I understand that Plaintiffs must prove a misrepresentation or omission of material fact and that materiality requires showing a substantial likelihood that the omitted fact would have been significant to a "reasonable investor" in an at-issue security.  In assessing materiality, Professor Feinstein makes no attempt to address the different information available to different investors who purchased different certificates at different times, or to empirically test the

---

[93]    RAST 2006-A8 Prospectus Supplement, p. S-62.

materiality of any alleged misstatements or omissions for any of the 26 certificates at any point in time.[94]  Instead, Professor Feinstein reviews a selection of excerpts from the academic and finance literature and makes the simplistic conclusion that "information about underwriting guidelines is important to investors."[95]  As explained below, Professor Feinstein's conclusion ignores a number of factors specific to the MBS at issue in this case and the investors who purchased them.

### 1.      Professor Feinstein Ignores That The Total Mix Of Information Changed Over Time

80.     Because publicly available information about IndyMac's underwriting practices and the performance of the loans underlying the certificates changed over time, the materiality of alleged misstatements or omissions regarding IndyMac's underwriting practices must be separately assessed for each purchase to account for the total mix of information available at the time of purchase.  The total mix of information available to a reasonable investor for a certificate in June 2006 is not the same as that available to a reasonable investor for the same (or any other) certificate in 2007, 2008, or later.

81.     In concluding that "a reasonable investor" would consider "information about the underwriting process in the offering of the Certificates" to be "important" when making an investment decision,[96] Professor Feinstein does not appear to have accounted for the different times at which the proposed class members purchased certificates and has performed no analysis of what information beyond the offering documents was available to investors at any point in

---

[94]   Feinstein deposition, pp. 72-74.

[95]   Expert Report of Professor Steven P. Feinstein, Ph.D., CFA, *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, Master Docket No. 08-CV-10637 (LAK), United States District Court for the Southern District of New York, December 10, 2010 ("Feinstein Report") paragraph 60.

[96]   Feinstein Report paragraph 17.

time, or whether the information changed over time.[97]  I also note that Professor Feinstein conceded at deposition that such information would be relevant to a reasonable investor.[98]

### 2. Professor Feinstein Erroneously Assumes That The "Reasonable Investor" For One Certificate Is The Same For All 26 Certificates

82.     Professor Feinstein ignores that the facts that would have assumed actual significance in the deliberations of a reasonable investor in one certificate are not necessarily the same facts that would have assumed actual significance in the deliberations of reasonable investors in all 26 certificates.

83.     For example, the Class 2-A-5 certificate is considered a "super senior" certificate that "will not bear its proportionate share of realized losses (other than excess losses) as its share is directed to another class (the "Support Class") until the Class Security Balance of the Support Class is reduced to zero."[99]  As a super senior certificate, the Class 2-A-5 certificate has a unique relationship with the Class 2-A-8 certificate, the "Support Class" certificate: "Any Realized Losses, other than Excess Losses, that would otherwise be allocated to the Class 2-A-5 Certificates will instead be allocated to the Class 2-A-8 Certificates until its Class Certificate Balance is reduced to zero."[100]  As such, purchasers of the Class 2-A-5 certificate, have additional protection from losses and are therefore less susceptible to the performance of the underlying collateral (*e.g.*, defaults).  The materiality standards for the insured Class 2-A-5 certificate and for the Class 2-A-8 certificate, for example, thus cannot be simply assumed to be the same.

---

[97]  Feinstein deposition, pp. 155-57.

[98]  Feinstein deposition, pp. 58, 153, 156-157.

[99]  RAST 2006-A8 Prospectus, p. 44.

[100]  RAST 2006-A8 Prospectus Supplement, p. S-124.

84.     As illustrated in Exhibits 22, 23 and 24, there are different payment priority structures for different certificates in different groups.  As I previously discussed, payment priorities differ within groups by various mechanisms (*e.g.*, priority amounts and NAS provisions for certain certificates).  Moreover, as illustrated by these exhibits, the payment priority structures for Groups 1, 2 and 3 are very different from one another.  The complex payment priority structure both within and across groups demonstrates that each certificate has a unique payment priority, and thus a reasonable investor in each certificate will have different considerations and interpretations of information that lead to differences in what might be considered material.

### 3.     Professor Feinstein Ignores That Assessments Of Loan Files Will Be Required

85.     Professor Feinstein also ignores that the materiality of alleged deviations from underwriting guidelines will require assessments of loan files.  For example, if it is determined that a loan file does not strictly comply with the relevant guidelines, the nature of the non-compliance will have to be assessed.  Deviations from guidelines may vary from a missing signature on one page of a lengthy HUD-1 form to unverified financial information for a loan under a full-documentation program.  Minor technical deviations do not create an expectation of losses.

86.     Moreover, to the extent there are loan files that do not materially comply with the relevant guidelines, the number and aggregate amount of such non-complying loans will vary among the different loan groups backing the different certificates.  The determination of whether the number or aggregate amount of non-complying loans is material for one loan group is not determinative of whether there is a material number or aggregate amount of non-complying loans in another loan group.  Because of different certificate-specific credit enhancements and

payment prioritizations, materiality must be separately assessed for each of the 26 certificates. And because the total mix of information available to investors changed over time, materiality must be separately assessed for each purchase of a certificate to account for the total mix of information available at the time of purchase.

## X.    INDIVIDUAL ISSUES OF DAMAGES AND CAUSATION

87.    I have been advised by counsel that Plaintiff may only recover damages that are caused by an alleged misrepresentation or omission.  As explained below, Professor Feinstein offers a flawed "damages computation methodology" that, among other things, ignores macroeconomic and other exogenous factors that might have resulted in defaults in the loan pools.  He also ignores that certificates were traded in negotiated transactions and relies on data that are based on a non-transparent, proprietary model and are inconsistent with data from other sources.

### A.  Professor Feinstein's "Damages Computation Methodology" Ignores Macroeconomic And Other Exogenous Factors That May Have Caused Loan Defaults And Losses To Investors In IndyMac MBS

88.    Professor Feinstein has admitted that, in proposing his "damages computation methodology," he did not consider macroeconomic factors, such as rising unemployment or a declining real estate market, that might have resulted in loan defaults and losses to certificate holders because it "wasn't part of the scope of [his] engagement."[101]

89.    I also note that Professor Feinstein asserted in his deposition that "the purpose of the underwriting is to insulate the performance of the loan pool from adverse economic events."[102]  This is not correct.  The purpose of underwriting is to assess risk.  At the originator level, the purpose of underwriting is to approve or deny a borrower's loan application; at the

---

[101]   Feinstein deposition, p. 124.

[102]   Feinstein deposition, pp. 123-124.

securitization level, the purpose is to include or exclude a loan from a pool of mortgages. Loan underwriters assess the *ex ante* risk of default based on a profile of borrower and property attributes.[103] To the extent potential adverse economic events are taken into consideration, loan and securitization underwriters would likely estimate the *ex ante* risk of default based on historical experience with little weight given to the probability of a catastrophic macroeconomic decline like the one that began in 2006. Moreover, the "Risk Factors" section of the Prospectus and Prospectus Supplement identifies certain significant sources of risk (including potential adverse macroeconomic events) that would potentially impact the value of investments in the certificates *regardless* of the underwriting practices applied to the loan. Therefore, in order to determine the impact of the alleged abandonment of underwriting guidelines, one would have to separately assess the impact of adverse economic events.

90.     As I already have discussed, the macroeconomic environment changed dramatically during the period in which proposed class members purchased the at-issue certificates. This changing macroeconomic environment cannot be excluded, as Professor Feinstein has done, in assessing what caused loan defaults and alleged losses to investors in IndyMac MBS.

91.     Real estate economists have attributed the downturn in the mortgage market predominantly to the deterioration in the macroeconomic environment, and more particularly to the unprecedented fall in home prices. Research has shown that the decline in home prices is the primary driver of high levels of delinquency and foreclosures.

---

[103]   Bhardwaj, Geetesh and Rajdeep Sengupta, "Where's the Smoking Gun? A Study of Underwriting Standards for US Subprime Mortgages," Federal Reserve Bank of St. Louis Working Paper Series, Working Paper 2008-036C, October 2009.

92.    For example, an empirical study by economists at the Federal Reserve Bank in 2009 concluded that the dominant driver of recent residential foreclosures was macroeconomic effects – dramatic declines in housing prices – rather than the "underwriting standards" applied to loans.  In the Federal Reserve study, researchers took a sample of 2005-vintage loans and applied the housing price paths experienced by a sample of 2002-vintage loans.  They found that, given these housing price paths, "foreclosure rates would rise relative to 2002 levels, but would still remain almost an order of magnitude below those seen in 2005."  The researchers then took the sample of 2002-vintage loans, to which they applied the price paths experienced by the sample of 2005-vintage loans, and found that foreclosure rates decreased relative to 2005, but were still "gigantic" relative to historical averages.  Thus, the researchers found that "had house prices not fallen, the foreclosure crisis would not have occurred, regardless of whether lenders had lowered underwriting standards."[104]  Therefore, the study found that the decline in home prices was a primary driver of foreclosures, and that "lowered underwriting standards" would not have similarly increased the foreclosure rate without a decline in home prices.

93.    Moreover, while Plaintiff alleges that delinquencies in the underlying loan pools provide evidence of the alleged misstatements and abandonment of underwriting guidelines,[105] some delinquencies are expected in any pool of mortgage loans, regardless of the underwriting. Given the extensive variation in the loans underlying the certificates, described at length in this report, it is not surprising that delinquencies vary across loan groups for myriad reasons unrelated to the quality of underwriting.  For example, the offering has three groups of loans that

---

[104]  Gerardi, Kristopher, Adam Hale Shapiro, and Paul S. Willen, "Decomposing the Foreclosure Crisis: House Price Depreciation versus Bad Underwriting," Federal Reserve Bank of Atlanta Working Paper Series, September 2009, pp. 3, 25.

[105]  Amended Complaint, paragraph 77.

have performed differently to date.[106]  Even if, *arguendo*, one were to accept Plaintiff's

allegation that delinquencies are evidence of abandonment of underwriting guidelines, it does not

and cannot explain why one loan group has incurred higher losses than another loan group;

instead, the evidence suggests that other factors are contributing to the difference in losses across

loan groups, including factors that may require individualized inquiries to disentangle.

94.     Professor Feinstein makes no attempt to explain how his proposed "damages

computation methodology" would disentangle the effects of macroeconomic factors, much less

disentangle them on a classwide basis.[107]

95.     The deterioration of the macroeconomy discussed above impacted different

groups within RAST 2006-A8 differently.  For example, loans in California comprised

approximately 50 percent of the loans in Group 1, but only approximately 31 percent of the loans

in Group 3.  Certificates supported by loans in Group 1, therefore, were exposed to more risk

from the California real estate market (which has experienced unprecedented home price

declines) than those in Group 3.  This risk of geographic concentration of loans was disclosed to

investors:

**Geographic Concentration Increases Risk That Certificate Yields Could Be
Impaired**

- Economic conditions in states with significant concentrations (which may or
  may not affect real property values) may affect the ability of borrowers to
  repay their loans on time;

- Declines in the residential real estate market in states with significant
  concentrations may reduce the values of properties located in those states,

---

[106]  For example, Group 1 has lost 5.4 percent of its original principal balance of the loans as of the first
distribution date, while Group 2 has lost 10.8 percent.  Loss percentage is calculated as the
cumulative realized loss experienced by the underlying collateral as of December 2010 over the
original principal balance of the collateral as of the first distribution date.  See RAST 2006-A8
Trustee Reports, December 2010.

[107]  Feinstein deposition, pp. 123-124.

which would result in an increase in the loan-to-value ratio. Mortgage loans
with higher loan-to-value ratios may present a risk of default and, in
the case of defaults, an increase in the severity of losses. . . .[108]

96.     Thus, the impact of adverse macroeconomic events on different certificates must

be separately assessed based on the different characteristics of the different collateral backing the

certificates.

97.     The credit enhancement features applicable to and payment prioritizations of each

certificate also must be considered.  For example, a senior support certificate that has a lower

payment priority than other senior certificates may suffer losses due to macroeconomic

deterioration alone, whereas a super senior certificate may or may not have suffered a loss, and

may or may not have suffered a loss caused by some factor other than macroeconomic

deterioration.

98.     Moreover, there may have been other factors separate from macroeconomic

deterioration that could have caused Plaintiff's losses.  For example, in its Amended Class

Action Complaint, Plaintiff claims that it suffered harm as a result of alleged misrepresentations

regarding credit ratings and the ratings process.  While I understand that the Court has

determined the alleged misrepresentations relating to credit ratings and the ratings process to be

non-actionable for legal reasons unrelated to loss causation, Professor Feinstein's proposed

"damages computation methodology" also does not take into account how to disentangle losses

allegedly suffered from misrepresentations concerning IndyMac's underwriting practices with

losses suffered from other alleged misrepresentations.

99.     As discussed in Sections VI and VII, the differences in the underlying collateral

and the various effects that macroeconomic factors may have on the loans in a given pool are

---

[108]   RAST 2006-A8 Prospectus Supplement, p. S-29.

likely the primary drivers of the loan pool performance.   Because macroeconomic and other

exogenous factors were likely the primary drivers of loan default and any alleged loss to

certificate holders, and because the impact of adverse macroeconomic events on different

certificates must be separately assessed based on the different characteristics of the different

collateral backing the certificates, recoverable damages cannot be computed through a

"straightforward arithmetic function."[109]   Rather, individualized inquiries of loss causation will

be required.

**B.  Professor Feinstein's "Damages Computation Methodology" Ignores
That IndyMac MBS Were Traded In Negotiated Transactions**

100.    Professor Feinstein's "damages computation methodology" also ignores that

IndyMac MBS did not trade on a national exchange or other liquid, transparent market.   Rather,

in the initial offering, certificates were sold through "negotiated transactions" at "varying prices

to be determined at the time of sale."[110]   Similarly, secondary market transactions were, by

definition, negotiated transactions since the certificates did not trade on an organized exchange.

Moreover, the lack of liquidity in any secondary market and the potential adverse effect of this

lack of liquidity on prices that could be obtained in secondary market transactions were disclosed

to potential investors.   Thus, the price paid for a certificate in both initial and subsequent

purchases likely varied from transaction to transaction due to the identity and nature of the

parties, the size and nature of the transaction, and the timing of the transaction.   Since such

transaction prices were the result of individualized negotiations, they do not necessarily provide

evidence of the value of any certificates to all proposed class members.

---

[109]   Feinstein Report paragraph 74.

[110]   The "Method of Distribution" sections of the prospectus supplements state: "Distribution of the
Underwritten Certificates will be made by the applicable underwriter from time to time in negotiated
transactions or otherwise at varying prices to be determined at the time of sale."   RAST 2006-A8
Prospectus Supplement, p. S-132.

101.     Moreover, the price paid for a certificate could have varied from transaction to transaction due to the identity and nature of the parties, the size and nature of the transaction, and the timing of the transaction.  All of these factors would be distinct to each transaction and need to be examined transaction by transaction to disentangle from the purchase price factors unrelated to representations concerning IndyMac's underwriting practices.  Professor Feinstein's "damages computation methodology" excludes consideration of these factors.

**C. Professor Feinstein's "Damages Computation Methodology" Relies On IDC Data That Are Based On A Proprietary Model And Are Inconsistent With Data From Other Sources**

102.     In addition to excluding consideration of macroeconomic and other exogenous factors, Professor Feinstein's "damages computation methodology" relies entirely on pricing data from Interactive Data Corporation ("IDC") that are based on a proprietary model and are inconsistent with data from other sources.

103.     Professor Feinstein contends that IDC prices may be used in a damages calculation to value those certificates still held on the date the complaint was filed.  Professor Feinstein makes no attempt, however, to disaggregate other factors that influence price, such as macroeconomic factors, the liquidity of the secondary market, or any other factors that influence the price of particular certificates at particular points in time.

104.     Furthermore, IDC prices do not appear to match trade price data particularly well, especially during periods of market turmoil, and IDC prices do not match Bloomberg data well.  Because of these and other issues discussed further below, it is my opinion that, IDC prices may be an unreliable proxy for value in a damages model.  Rather, I find that financial models would need to be developed for different loan groups and certificates in order to provide reliable inputs to a damages calculation, should one be required.

### 1.    IDC Data Are Based On A Proprietary Model

105.    IDC states that it computes prices based on trade data (which are scant for the securities at issue), comparable trades (which, again, are scant for the securities at issue), and a proprietary model incorporating deal structure.[111]  While IDC represents that its prices are free from bias, IDC does not divulge, and I cannot ascertain, how its prices for specific certificates at specific points in time are computed.[112]

### 2.    IDC Data Do Not Closely Track Actual Trade Prices

106.    I reviewed the IDC prices for a subset of certificates to see whether they closely match trade prices.  Exhibit 25 shows the IDC prices for Certificate 1-A-1 along with trade prices, which was analyzed because it was purchased by the Plaintiff.  IDC prices do not closely track the trade prices, and contain numerous, large one-day jumps ("discontinuities").[113]  This behavior is similar to that of other IDC price series I have investigated, such as those shown in Exhibits 26, 27, and 28.[114]

---

[111]  "Evaluation Services," Products and Services, *Interactive Data*, <http://www.interactivedata-prd.com/07products/data_type/evaluated/index.shtml>, accessed on February 22, 2011; "Evaluation Services – Evaluation Methodologies," Products and Services, *Interactive Data*, <http://www.interactivedata.com/index.php/Contents/show/content/EvalMeth>, accessed on February 22, 2011.

[112]  "Evaluation Services," Products and Services, *Interactive Data*, <http://www.interactivedata-prd.com/07products/data_type/evaluated/index.shtml>, accessed on February 22, 2011.

[113]  Between November 5, 2008 and December 4, 2008, for 16 of the 26 certificates at-issue, the greatest daily change in IDC price is greater than 10 percent.  For six of the 26 certificates at-issue, the greatest daily change in IDC price is greater than 20 percent.  In an attempt to understand these discontinuities, in Exhibits 29, 30, 31, and 32, I present credit actions on the same graphs as IDC prices; credit actions do not explain the majority of the discontinuities.

[114]  Classes 1-A-5, 2-A-2, and 3-A-5 were selected because these certificates had the most unique trading days within their respective loan groups, based on the trade data produced in discovery.

107.    The trade data appear to deviate from IDC prices.[115]  For example, IDC prices and trade prices on average vary by 16.8 percent for Certificate 1-A-1; by 8.2 percent for Certificate 1-A-5; by 13.5 percent for Certificate 2-A-2, and by 25.3 percent for Certificate 3-A-5.[116]  In particular, as shown in the exhibits, I note that the trades generally tend to be farther from the IDC prices in the portion of the graphs representing approximately late-2007 onward, *i.e.*, from the peak of the financial crisis through the complaint filing date in 2008.  In contrast, near the offering date, trades and IDC prices are better aligned.  This may be consistent with IDC's model having been highly stressed, and perhaps inappropriate, for the period of high volatility and low liquidity during the financial crisis.

108.    Furthermore, these exhibits show the most heavily traded of the certificates in each loan group.[117]  Differences in trading volume among various certificates indicate potential liquidity differences, which would need to be accounted for in modeling value, certificate by certificate.  Because IDC's pricing model is not observable, it cannot be determined how differences in trading volume affect IDC prices.

### 3.    IDC Data Are Inconsistent With Data From Other Sources

109.    I also compared IDC prices to Bloomberg prices, as shown in Exhibits 33, 34, and 35.[118]  In many ways, Bloomberg's business approach in this area is similar to IDC's; it sells pricing data for a large set of securities based on proprietary models.  However, as shown in these exhibits, Bloomberg prices may differ markedly from IDC prices.  In fact, IDC prices and

---

[115]  The exhibits show volume weighted average prices, but the underlying trades show similar dispersion.

[116]  The percent reported is equal to the measured absolute value of deviation in percent of the day's IDC price.  Trade prices are weighted by volume daily, and days are equally weighted.   The average is calculated for the period from June 28, 2006 to December 31, 2010.

[117]  Certificate 1-A-1 is analyzed because it was purchased by Plaintiff.

[118]   Certificate 3-A-5 does not have Bloomberg price data available.

Bloomberg prices on average vary by 6.8 percent for Certificate 1-A-1; by 20.6 percent for Certificate 1-A-5, and by 8.7 percent for Certificate 2-A-2.[119]  These differences likely occur because Bloomberg and IDC have different models using different inputs.  Since their models are proprietary, I am unable to determine to what extent they incorporate up-to-date, economically-relevant information specific to each certificate in this case, or the appropriateness of assumptions contained in the models.  I have seen no evidence to suggest that Professor Feinstein has been provided access to IDC modeling and inputs to assess their accuracy.

110.    Differences between the Bloomberg and IDC prices during 2010 (a comparatively stable financial market environment) raise doubt as to the reliability of the IDC prices and prices from pricing services generally.  Bloomberg prices are unavailable around the complaint filing date for all of the certificates.  I also note that at deposition Professor Feinstein stated that the unavailability of Bloomberg prices would render them inappropriate for his proposed damages methodology.[120]  I agree with Professor Feinstein that missing Bloomberg prices would make them inappropriate for his proposed damages methodology.  Furthermore, to the extent that trade data may or may not represent value, I also note that trade data do not appear to be available for any of the 26 certificates on the complaint filing date.

**D.  Because IDC Data May Not Be A Reliable Proxy For Value, Damages Calculations Will Require Financial Models That Account For Factors Specific To Different Loan Groups, Certificates, And Transactions**

111.    Overall, I find that IDC prices are unreliable for Professor Feinstein's proposed purpose.  It is my opinion that computing reliable values for the certificates at issue during the alleged damages period would require the construction of detailed, robust models that account

---

[119]  The percent reported is equal to the absolute percentage difference between IDC and Bloomberg prices, relative to each day's IDC price.  Days are equally weighted.  The average is calculated for the period from January 1, 2010 to December 31, 2010.

[120]  Feinstein deposition, pp. 175-176.

for group-, and certificate-specific factors, in conjunction with additional consideration of the

unique factors surrounding each transaction.

## XI.     NUMBER OF INVESTORS IN DIFFERENT CERTIFICATES

112.    As discussed previously, Plaintiff has defined the proposed class as follows:

> [A]ll persons who purchased the Senior Mortgage Pass-Through
> Certificates ("Certificates") issued on June 28, 2006 (the "Offering") by
> the Residential Asset Securitization Trust 2006-A8 ("RAST" or the
> "Trust") pursuant and/or traceable to the Offering Documents.[121]

113.    As explained below, Plaintiff has identified as proposed class members investors

who purchased certificates years after the initial offering in June 2006.

### A.  Mr. Harrod's Analysis

114.    Though Plaintiff's proposed class encompasses investors in 26 different

securities, Mr. Harrod provides no analysis of the number of investors by security.  Instead, Mr.

Harrod provides an aggregate number, claiming that he identified 97 investors in the 26

securities,[122] but believes that the proposed class comprises "a significant multiple of 97."[123]

115.    Mr. Harrod purports to base his aggregate number on trading records produced by

Defendant Credit Suisse Securities (USA) LLC and 18 third parties.[124]  Mr. Harrod contends that

569 "market participants" transacted in at least one of the certificates,[125] but that he cannot

determine for a number of transactions whether the market participant was the beneficial owner

of the certificate.[126]  In addition, Mr. Harrod "only included those accounts that reflected . . .

---

[121]  Lead Plaintiff's Memorandum of Law in Support of its Motion for Class Certification, December 10, 2010, p. 1.

[122]  Harrod Declaration paragraph 12.

[123]  Harrod Declaration paragraph 14.

[124]  Harrod Declaration paragraphs 5 and 6.

[125]  Harrod Declaration paragraph 11.

[126]  Harrod Declaration paragraph 13.

non-financial institutions," though "[m]any of the Market Participants are financial institutions and may have traded in the Certificates for their own accounts."[127]

116.    Mr. Harrod includes investors whose earliest purchase transaction occurred after the release of a number of publicly available documents, including the publication of the CRL Report in June 2008,[128] that would have provided information to potential investors about the risks associated with IndyMac MBS.  Indeed, I understand that the Court has determined that investors in IndyMac MBS were on notice of their claims no later than the publication of the CRL Report in June 2008.[129]

## B.    Numerosity Analysis Adjustments

117.    I have made adjustments to address oversights in Mr. Harrod's numerosity analysis.  I incorporated all the trade data produced by the underwriter defendant Credit Suisse and the third-parties in this action.[130]  I included both "initial purchase" transactions (identified using the Credit Suisse data) as well as all "subsequent purchase" transactions identified in Credit Suisse data and the data produced by third parties.  To identify "initial purchase" transactions, I included the earliest purchase transactions for each certificate up to the point at which cumulative purchases reached the total value of certificates sold per the monthly trustee reports for the offering.[131]  I classified non-initial purchase transactions in the underwriter data

---

[127]   Harrod Declaration paragraph 14 and note 4.

[128]   Harrod Declaration paragraph 13.

[129]   *In re IndyMac Mortgage-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 505-06 (S.D.N.Y. 2010).

[130]   Brown Brothers Harriman, Charles Schwab, CIBC, Citigroup, Deutsche Bank, DTCC, First Clearing, Goldman Sachs, JP Morgan Chase, Morgan Stanley, National Financial, Northern Trust, Pershing LLC, PNC Bank, RBC, State Street, Stifel Nicolaus, and UBS.

[131]   Credit Suisse produced overlapping transactions data.  In a small number of cases, the same transaction is recorded more than once, but with small variations in the content of some of the data fields.  For such cases, I counted each transaction only once.

file as "subsequent purchase" transactions, which were also identified using the subsequent trading records files produced by the third-party brokers.[132]

118.    I identified the earliest purchase transaction for each investor in each certificate and used that transaction to identify a potential class member for the numerosity analysis.  I excluded purchase transactions in which:  (i) the investor's name was a duplicate of an earlier transaction within the same certificate; (ii) the transaction occurred after the publication of the CRL Report in June 2008, which the Court has determined was the latest date at which investors in IndyMac MBS were on notice of their claims; and (iii) no investor is identified by name.[133]  Unlike Mr. Harrod, I did not exclude identifiable financial institutions, which Mr. Harrod acknowledges "may have traded in the Certificates for their own accounts."[134,135]

119.    As shown in Exhibits 36A and 36B, the number of unique potential class members per certificate varies.  Exhibit 36A includes initial purchases only.  Exhibit 36B relates to my analysis of potential class members, including initial and subsequent purchases.   Exhibits 36A-1 and 36B-1 list all the potential initial and both initial and subsequent purchasers, respectively.

120.    Exhibits 36A and 37A show that, when examining initial purchases only, 25 out of 26 certificates were purchased by fewer than four potential class members, and 26 out of 26

---

[132]  One of the third-party data sources, DTCC, contains holdings data rather than buy and sell transactions.  To be conservative, I have treated such data as purchases in my analysis, with the exception that I have not counted as a purchase any DTCC records that list Credit Suisse.

[133]  Mr. Harrod similarly excluded transactions in which the investors "have not been identified by name."  Harrod Declaration paragraph 13 and note 2.

[134]  Harrod Declaration paragraph 14 and note 4.

[135]  I also note that Mr. Harrod states that he excluded investors who sold their certificates at a gain.  Harrod Declaration paragraph 13 and note 4.  I have not made that adjustment.  Thus, my class member counts may be overinclusive.

certificates were purchased by fewer than 17 potential class members.  No certificate was purchased by more than 40 class members.

121.    Exhibits 36B and 37B show that, when examining both initial and subsequent purchases, 24 out of 26 certificates were purchased by fewer than ten potential class members. Only two certificates were purchased by more than 40 class members.

## XII.   CONCLUSIONS

122.    Based on my experience, my analyses and the documents I have reviewed, I have concluded that the investors in Plaintiff's proposed class are distinguished individually based on their sophistication and expertise in MBS markets, knowledge of and access to the mortgage industry, the certificates that they purchased, and the timing of their purchases; and that each of the loan groups and certificates encompassed by Plaintiff's proposed class is distinct and presents individualized questions on liability and damages.  This overarching conclusion is based on the following findings.

- The IndyMac MBS with respect to which Plaintiff seeks class treatment consists of 26 distinct securities.  The securities were initially offered on June 28, 2006, but the proposed class includes investors who purchased in secondary market transactions years after the initial offering.  During that period, the macroeconomic environment changed dramatically.

- In light of increasing public information about underwriting practices over time, as well as the different research, analyses and due diligence undertaken by the different sophisticated investors in the proposed class, and the lengthy period of time over which different investors made different purchases of different certificates, individualized inquiries will be needed to assess each investor's knowledge base at each investor's particular time of purchase.

- Liability to the proposed class cannot be established by common proof.  The proposed class encompasses investors in 26 distinct securities, including investors who purchased years after the initial offering of the securities.  There are different collateral, mixes of information available at different times, underwriting guidelines, exceptions to underwriting guidelines, and levels of investor knowledge that must be assessed.

- Individualized inquiries of loss causation will be required because (i) the impact of adverse macroeconomic events on different certificates must be separately assessed based on the different credit enhancement features applicable to and payment prioritizations of

different certificates; and (ii) certificates were traded in "negotiated transactions;" and (iii) computing reliable values for the certificates during the alleged damages period would require the construction of detailed, robust models that account for group-, and certificate-specific factors, in conjunction with additional consideration of the unique factors surrounding each transaction.

- Professor Feinstein's "damages computation methodology" ignores macroeconomic or other exogenous factors, ignores that certificates traded in "negotiated transactions," and is based on IDC data that are derived from a proprietary model and are inconsistent with data from other sources.

- The available trading data shows that only two of the 26 securities encompassed by Plaintiff's proposed class had more than 40 investors.  Most of the securities had fewer than four initial purchasers and fewer than ten initial and subsequent purchasers.


_____

Walter N. Torous, Ph.D.

# Appendix A

## WALTER N. TOROUS

John E. Anderson Graduate School of Management
UCLA

**Office Address:**

Center for Real Estate
Massachusetts Institute of Technology
W31-310
77 Massachusetts Avenue
Cambridge, MA, 02139
Telephone:    (Office)          (617) 253-5901

E-Mail          walter.n.torous@anderson.ucla.edu

**Home Address**

50 Longwood Avenue, Apt. #311
Brookline, MA, 02446
Telephone:    (310) 234-1090

**Academic Degrees**

B. Math.        University of Waterloo, Statistics and Economics, 1976
Ph. D.          University of Pennsylvania, Economics, 1981

**Academic Appointments**

1980-81         Graduate School of Business Administration, University of
                Michigan, Lecturer

1981-85         Graduate School of Business Administration, University of
                Michigan, Assistant Professor

1986-87         Graduate School of Management, University of California, Los
                Angeles,  Visiting Assistant Professor

1987-90         Graduate School of Management, University of California,
                Los Angeles, Assistant Professor

A-1

| | |
|---|---|
| 1990-95 | John E. Anderson Graduate School of Management, University of California, Los Angeles, Associate Professor |
| 1995-97 | London Business School, Corporation of London Professor of Finance |
| 1995-2006 | John E. Anderson Graduate School of Management, University of California, Los Angeles, Professor |
| 1997-2003 | Director, Richard S. Ziman Real Estate Center, John E. Anderson Graduate School of Management, University of California, Los Angeles |
| 2006- | John E. Anderson Graduate School of Management, University of California, Los Angeles, Lee and Seymour Graff Endowed Professor |
| 2009- | Visiting Professor Center for Real Estate Massachusetts Institute of Technology, Cambridge, MA |

## Professional Activities

Journal of Housing Economics, Associate Editor, 1991 -
Journal of Real Estate Finance and Economics, Associate Editor, 1992 -
Real Estate Economics,
    Associate Editor, 1993 - 2005
    Editor, 2006 -
Pacific-Basin Finance Journal, Associate Editor, 1997- 2003
Economic Notes, Associate Editor, 1999 -

Ad hoc referee for Journal of Finance, Journal of Financial and    Quantitative Analysis, Journal of Banking and Finance, Journal of      Business, Review of Financial Studies, Journal of Financial Economics,   Journal of Money, Credit, and Banking, Management Science, Journal of    Empirical Finance, Journal of International Money and Finance

Member:
American Finance Association, 1980 -
American Real Estate and Urban Economics Association, 1990 -
Western Finance Association, 1980 -
    Associate Program Chair, 1990

Board of Directors, 1991-94

**Refereed Publications**

1. Ball, C. A., and Torous, W. N., "A Simplified Jump Process for Common Stock Returns," Journal of Financial and Quantitative Analysis, 18:1, pp. 53-65, March 1983.

2. Ball, C. A., and Torous, W. N., "Bond Price Dynamics and Options," Journal of Financial and Quantitative Analysis, 18:4, pp. 517-531, December 1983.

3. Ball, C. A., and Torous, W. N., "The Maximum Likelihood Estimation of Security Price Volatility: Theory, Evidence, and Application to Option Pricing," Journal of Business, 57:1, pp. 97-112, January 1984.

4. Milne, W. J., and Torous, W. N., "Long-Term Interest Rates and the Price Level: The Canadian Evidence on the Gibson Paradox," Canadian Journal of Economics, 17:2, pp. 327-339, May 1984.

5. Ball, C. A., Torous, W. N., and Tschoegl, A. E., "On Inferring Standard Deviations from Path Dependent Options," Economic Letters, 18, pp. 377-380, 1985.

6. Ball, C. A., Torous, W. N., and Tschoegl, A. E., "The Degree of Price Resolution: The Case of the Gold Market," Journal of Futures Markets, 5:1, pp.29-43, Spring 1985.

7. Ball, C. A., Torous, W. N., and Tschoegl, A. E., "An Empirical Investigation of the EOE Gold Options Market," Journal of Banking and Finance, 9:1, pp. 101-113, March 1985.

8. Ball, C. A., and Torous, W. N., "On Jumps in Common Stock Prices and Their Impact on Call Option Pricing," Journal of Finance, 40:1, pp. 155-173, March 1985.

9. Torous, W. N., "Differential Taxation and the Equilibrium Structure of Interest Rates," Journal of Banking and Finance, 9, pp. 363-385, August 1985.

   Reprinted in The Debt Market, S. Ross (Editor), Edward Elgar, 2000.

10. Ball, C. A., and Torous, W. N., "Futures Options and the Volatility of Futures Prices," Journal of Finance, 41:4, pp. 857-870, September 1986.

11. Ball, C. A., and Torous, W. N., "Investigating Security Price Performance in the Presence of Event Date Uncertainty," Journal of Financial Economics, 22, pp. 123-153, October 1988.

12. Schwartz, E. S., and Torous, W. N., "Prepayment and the Valuation of Mortgage-Backed Securities," Journal of Finance, 44:2, pp. 375-392, June 1989.

13. Titman, S., and Torous, W. N., "Valuing Commercial Mortgages: An Empirical Investigation of the Contingent-Claims Approach to Valuing Commercial Mortgages," Journal of Finance, 44:2, pp. 345-373, June 1989.

    Reprinted in The Debt Market, S. Ross (Editor), Edward Elgar, 2000.

14. Franks, J. R., and Torous, W. N., "An Empirical Investigation of U.S. Firms in Reorganization," Journal of Finance, 44:3, pp. 747-769, July 1989.

    Reprinted in Corporate Bankruptcy and Distressed Restructurings: Analytical Issues and Investment Opportunities, E. Altman (Editor), Irwin, 1992.

15. Schwartz, E. S., and Torous, W. N., "Valuing Stripped Mortgage-Backed Securities," Housing Finance Review, 8, pp. 241-251, Fall 1989.

    Reprinted in The Debt Market, S. Ross (Editor), Edward Elgar, 2000.

16. Haugen, R. A., Talmor, E., and Torous, W. N., "The Effect of Volatility Changes on the Level of Stock Prices and Subsequent Expected Returns," Journal of Finance, 46:8, pp. 985-1007, July 1991.

17. Geske, R. L., and Torous, W. N., "Skewness, Kurtosis, and Black-Scholes Option Mispricing," Statistical Papers, 32, pp. 299-309, December 1991.

18. Schwartz, E. S., and Torous, W. N., "Prepayment, Default, and the Valuation of Mortgage Pass-Through Securities," Journal of Business, 65:2, pp. 221-239, April 1992.

19. Franks, J. R., and Torous, W. N., "Lessons from a Comparison of U.S. and U.K. Insolvency Codes," Oxford Review of Economic Policy, 8:3, pp. 70-82, September 1992.

    Reprinted in Journal of Applied Corporate Finance, pp. 95-103, January 1993.

20. Schwartz, E. S., and Torous, W. N., "Mortgage Prepayment and Default Decisions: A Poisson Regression Approach", Journal of the American Real Estate and Urban Economics Association, 21:4, pp. 431-448, March 1993.

21. Franks, J. R., and Torous, W. N., "A Comparison of Financial Recontracting in Workouts and Chapter 11 Reorganizations," Journal of Financial Economics, 28:8, pp. 349-370, June 1994.

A-4

Reprinted in Studies in Empirical Corporate Finance, M. Brennan (Editor), Edward Elgar, 2001.

22. Ball, C. A., and Torous, W. N., "On Unit Roots and the Estimation of Interest Rate Dynamics", Journal of Empirical Finance, 3:2, pp. 215-238, June 1996.

23. Franks, J. R., Nyborg, K., and Torous, W. N., "A Comparison of U. K, U. S., and German Insolvency Codes," Financial Management, 25:3, pp. 274-301, Autumn 1996.

24. Roma, A., and Torous, W. N., "On the Cyclical Behavior of Interest Rates," Journal of Finance, 52:4, pp. 1519-1542, September 1997.

25. Brennan, M. J., and Torous, W. N., "Individual Decision Making and Investor Welfare," Economic Notes, 28:2, pp. 119-143, July 1999.

26. Ball, C. A., and Torous, W. N., "The Stochastic Volatility of Short-term Interest Rates: Some International Evidence," Journal of Finance, 54:6, pp. 2339-2359, December 1999.

    Reprinted in Model Risk: Concepts, Calibration, and Pricing, R. Gibson (Editor), Risk Books, 2000.

27. Ball, C. A., and Torous, W. N., "Stochastic Correlation Across International Stock Markets," Journal of Empirical Finance, 7:3-4, pp. 373-388, November 2000.

28. Torous, W. N., Yan, S. and Valkanov, R., "On Predicting Stock Returns with Nearly Integrated Explanatory Variables," Journal of Business, 77:4, pp. 937-966, October 2004.

29. Dierker, M., Quan, D., and Torous, W. N., "Pricing the Defeasance Option in Securitized Commercial Mortgages," Real Estate Economics, 33:4, pp. 663-680, Winter 2005.

30. Berardi, A., and Torous, W. N., "Term Structure Forecasts of Long Term Consumption Growth," Journal of Financial and Quantitative Analysis, 40:2, pp. 241-258, June 2005.

31. Brennan, M. J., Lee, F., and Torous, W. N., "Dollar Cost Averaging", Review of Finance, 9:4, pp. 509-535, 2005.

32. Hong, H, Torous, W. N., and Valkanov, R., "Do Industries Lead Stock Markets?", Journal of Financial Economics, 83:2, pp. 367-396, 2007.

33. Schwartz, E. S., and Torous, W. N., "Commercial Office Space: Tests of a Real Options Model with Competitive Interactions", <u>Real Estate Economics</u>, 35:1, pp. 1-20, 2007.

   Awarded Edwin S. Mills Prize for best paper in <u>Real Estate Economics</u> for 2007.

34. Plazzi, A., Torous, W. N., and Valkanov, R., "The Cross-Sectional Dispersion of Commercial Real Estate Returns and Rent Growth: Time Variation and Economic Fluctuations", <u>Real Estate Economics</u>, 36:3, pp. 403-429, 2008.

35. Plazzi, A., Torous, W. N., and Valkanov, R., "Expected Returns and the Expected Growth in Rents of Commercial Real Estate", *forthcoming*, <u>Review of Financial Studies</u>, 2010.


## <u>Chapters in Books</u>

36. Geske, R. L., and Torous, W. N., "Black-Scholes Option Pricing and Robust Variance Estimation," pp. 49-69, in <u>Options: Recent Advances in Theory and Practice</u>, S. Hodges (Editor), Manchester University Press, 1990.

37. Schwartz, E. S., and Torous, W. N., "Caps on Adjustable Rate Mortgages: Valuation, Insurance, and Hedging," pp. 283-303, in <u>Financial Markets and Financial Crises</u>, R. G. Hubbard (Editor), University of Chicago Press, 1991.

38. Betker, B. L., Franks, J. R., and Torous, W. N., "Are Stockholders Better Off When Debt is Restructured Privately?," pp. 391-400, in <u>Corporate Bankruptcy and Distressed Restructuring: Analytical Issues and Investment Opportunities</u>, E. Altman (Editor), Irwin, 1992.

39. Torous, W. N., "Mortgage Backed Securities," in <u>North-Holland Handbook of Operations Research and Management Science</u>, R. A. Jarrow, V. Maksimmovic, and W. T. Ziemba (Editors), North-Holland, 1995.

40. Franks, J. R., Nyborg, K, and Torous, W. N., "A Tale of Three Codes: A Comparison of U. K., U. S., and German Insolvency Codes," in <u>Mastering Finance</u>, H. Rose (Editor), Pittman Publishing, 1998.

41. Torous, W. N. "The Behaviour of Short Term Interest Rates," in <u>Mastering Finance</u>, H. Rose (Editor), Pittman Publishing, 1998.

42. Schwartz, E. S., and Torous, W. N., "Can We Disentangle Risk Aversion from Intertemporal Substitution in Consumption?," in <u>Essays on Uncertainty: Festschrift in Honor of Steinar Ekern</u>, Norges Handelshoyskole, Bergen, Norway, 2002.

**Submitted Manuscripts**

43. Torous, W. N., and Valkanov, R., "Boundaries of Predictability: Noisy Predictive Regressions", *revise and resubmit*, <u>Review of Financial Studies</u>, 2000.

44. Ball, C. A., and Torous, W. N., "Contagion in the Presence of Stochastic Interdependence", *revise and resubmit*, <u>Review of Financial Studies</u>, 2005.

45. Linnainmaa, J. T., and Torous, W. N., "Reading the Tea Leaves: Why Serial Correlation Patterns in Analysts' Forecast Errors are Not Evidence of Inefficient Information Processing", *submitted*, <u>Review of Financial Studies</u>, 2010.


**Working Papers**

46. Goyal, A., Kahl, M., and Torous, W. N., "The Long-Run Performance of Financially Distressed Firms: An Empirical Investigation", 2003.

47. Miltersen, K., and Torous, W. N., "Cash-Out Refinancing, Default Clustering and the Unraveling of Collateralized Debt Obligations", 2010.

## <u>Testimony in the Past Four Years</u>

2010-  New Jersey Carpenters Vacation Fund, et. al., v. The Royal Bank of Scotland Group, plc, et. al; In the United States District Court for the Southern District of New York; Civil Action No. 08-CV-5093
Provided expert report and deposition testimony.

2009 -  WFC Holdings Corporation v. United States of America; In the United States District Court for the District of Minnesota; Civil Action No. 07-CV-3320-JRT-FLN
Provided expert report and deposition testimony.

## Appendix B

## Materials Relied Upon

### <u>Academic Literature</u>

- Bajari, Patrick, Chenghuan Sean Chu, and Minjung Park, "An Empirical Model of Subprime Mortgage Default From 2000 to 2007," *NBER Working Paper*, December 2008.
- Fabozzi, Frank, *The Handbook of Mortgage-Backed Securities*, 6th Ed., McGraw-Hill, 2006.
- Gerardi, Kristopher, et al., "Making Sense of the Subprime Crisis," *Brookings Paper on Economic Activity*, Fall 2008.
- Guttentag, Jack, *The Mortgage Encyclopedia*, McGraw-Hill, 2004.
- Hayre, Lakhbir, *Salomon Smith Barney Guide to Mortgage-Backed and Asset-Backed Securities.*
- Klyuev, Vladimir, "What Goes Up Must Come Down?  House Price Dynamics in the United States," *IMF Working Paper*, July 2008.

### <u>Data Produced In Discovery</u>

- Brown Brothers 11 12 10.pdf
- Charles Schwab 12-2-2010_xls.xls
- CIBC - TRIAXX collateral pool.xls
- CITI_T 0000001.pdf
- CITI_T 0000053.pdf
- CS_T 00001389.pdf
- CS_T 00001389.xls
- CS_T_0000022.xls
- DBSI_T_0000001.tif
- DTC Production.pdf
- EBS Export File--761119AA4.xls
- EBS Export File--761119AE6.xls
- EBS Export File--761119AG1.xls
- EBS Export File--761119AJ5.xls
- EBS Export File--761119AN6.xls
- EBS Export File--761119AS5.xls
- EBS Export File--761119AT3.xls
- EBS Export File--761119AW6.xls
- GS_T 0000001-GS_T 0000046.pdf
- JPMSL_T 0000001.pdf
- MS_T 0000001.pdf
- National Financial Sheet 1.xls
- National Financial Sheet 2.xls

- National Financial Sheet 3.xls
- Northern Trust 11-16-2010.pdf
- PNC Data 11-11-2010.pdf.
- Securities Trading Activity Report #1.pdf
- State Street - Transaction Data with Fund Code.xls
- Stifel Nicolaus Production. 11-23-2010.pdf
- UBSFS_T 0000001.pdf
- Unterberg FCC Trades.xlsx

## Data Sources

- "The 2010 Mortgage Market Statistical Annual," Inside Mortgage Finance, Vol. IIA, IIB, and Glossary.
- Bloomberg
- Capital IQ
- Interactive Data Corporation (IDC)
- Moodys.com

## Government Publications

- "Mortgage Letter 2010-21: HUD Multifamily Risk Mitigation," *U.S. Department of Housing and Urban Development*, July 6, 2010.
- "Overview of the GSEs' Housing Goal Performance, 1993-2001," *U.S. Department of Housing and Urban Development, Office of Policy Development and Research*, July 2002.
- "Overview of the GSEs' Housing Goal Performance, 2000-2007," *U.S. Department of Housing and Urban Development, Office of Policy Development and Research*, November 2008.
- "The Financial Crisis Inquiry Report," *Financial Crisis Inquiry Commission*, January 2011.
- Bhardwaj, Geetesh and Rajdeep Sengupta, "Where's the Smoking Gun? A Study of Underwriting Standards for US Subprime Mortgages," *Federal Reserve Bank of St. Louis Working Paper Series*, Working Paper 2008-036C, October 2009.
- Federal Reserve Board, Senior Loan Officer Opinion Survey on Bank Lending Practices, <http://www.federalreserve.gov/boarddocs/snloansurvey/201011/chartdata.htm>, accessed on February 23, 2011.
- Foote, Christopher, et al., "Reducing Foreclosures," *Federal Reserve Bank of Boston Public Policy Discussion Paper*, April 8, 2009.
- Gerardi, Kristopher, Adam Hale Shapiro, and Paul S. Willen, "Decomposing the Foreclosure Crisis: House Price Depreciation versus Bad Underwriting," *Federal Reserve Bank of Atlanta*, September 2009.
- Gerardi, Kristopher, Adam Hale Shapiro, and Paul S. Willen, "Subprime Outcomes: Risky Mortgages, Homeownership Experiences, and Foreclosures," *Federal Reserve Bank of Boston Working Paper*, May 4, 2008.
- Pescatori, Andrea and Shenk, Michael, "Jumbo Mortgages and Mortgage Market Conditions," *Federal Reserve Bank of Cleveland*, October 29, 2007.

## Industry Publications

- "CDO/CDS Update 05/23/05," *Nomura Fixed Income Research*, May 23, 2005.
- "CDO/CDS Update 09/26/06," *Nomura Fixed Income Research*, September 26, 2006.
- "Global Structured Finance Default And Transition Study–1978-2008: Credit Quality Of Global Structured Securities Fell Sharply In 2008 Amid Capital Market Turmoil, Table 5," *Standard & Poor's*, February 25, 2009.
- "RMBS Trends: U.S. CES and HELOC Second-Quarter Securitization Volume Drops Significantly," *Standard & Poor's*, October 8, 2007.
- "The State of the Nation's Housing 2006," *Joint Center for Housing Studies of Harvard University*, 2006.
- "The State of the Nation's Housing: 2007," *Joint Center for Housing Studies of Harvard University*, 2007.
- "What's in a Price? A Comparison of National Home Price Series," *National Association of Realtors,* 2008.
- Adelson, Mark, "U.S. Fixed Income 2005 Outlook/2004 Review," *Nomura Fixed Income Research*, December 16, 2004.
- Ellington Financial LLC (NYSE: EFC), *Morgan Stanley Financials Conference 2011*, February 2, 2011.
- Hudson, Mike, "IndyMac: What Went Wrong?" Center for Responsible Lending, June 30, 2008.
- Mortgage Bankers Association National Delinquency Survey Facts, <http://mbaa.org/files/Research/NDSFactSheet.pdf>.
- Mortgage Bankers Association National Delinquency Survey, 2009.
- Zelman, Ivy L., et al., "Mortgage Liquidity du Jour: Underestimated No More," *Credit Suisse*, March 12, 2007.

## Legal Filings

- Amended Class Action Complaint for Violations of the Securities Act of 1933, *Vasili Tsereteli and Vaszurele Ltd.,v. Residential Asset Securitization Trust 2006-A8, et al.,* No. 08-CV-10637 (LAK), United States District Court for the Southern District of New York, April 16, 2009.
- Amended Complaint, *Tripp v. IndyMac Bancorp, Inc.*, No. 07-CV-1635 (C.D. Cal.).
- Complaint, *Reese v. IndyMac Financial, Inc.*, No. 07-CV-01635 (C.D. Cal.).
- Complaint, *Vasili Tsereteli v. Residential Asset Securitization Trust 2006-A8, et al.,* No. 08603380, Supreme Court of the State of New York County of New York, November 19, 2008.
- Declaration of James A. Harrod in Support of Lead Plaintiff's Motion for Class Certification, December 10, 2010.
- Expert Report of Professor Steven P. Feinstein, Ph.D., CFA, *Vasili Tsereteli and Vaszurele Ltd.,v. Residential Asset Securitization Trust 2006-A8, et al.,* No. 08-CV-10637 (LAK), United States District Court for the Southern District of New York, December 10, 2010.

- *In re IndyMac Mortgage-Backed Sec. Litig.,* 718 F. Supp. 2d 495, 505-06 (S.D.N.Y. 2010).
- Lead Plaintiff's Memorandum of Law in Support of its Motion for Class Certification, December 10, 2010.
- Transcript of Deposition of Steven Feinstein, January 28, 2011.
- *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 393-96 (S.D.N.Y. 2010).

## Legislation

- Public Law No. 102-550, Title XIII.
- Public Law No. 91-351, Sec. 301.
- U.S. Code Title 12, Chapter 13, Subchapter III, Sec. 1716.

## News Articles and Press Releases

- "'Lenders made wholesale exceptions to underwriting policies in 2006 to try and correct thinning margins in the subprime market'," *Securitization News*, December 22, 2006.
- "2006 subprime mortgage collateral heads south-DBRS," *Reuters News*, December 11, 2006.
- "Alt-A Backed Rating Methodology Refined," *Mortgage Servicing News*, September 1, 2007.
- "Bank of America buys Merrill Lynch," *The Washington Time*, September 15, 2008.
- ██████████████████████████████████████████████████
  ████████
- "Bank Regulators Issue Warnings," *National Mortgage News*, November 6, 2006.
- "Barclays Downplays Subprime Contagion Fears," *Securitization News*, March 2, 2007.
- "Bleak houses - American mortgages," *The Economist*, February 17, 2007.
- "Business Glance," *The Salt Lake Tribune*, July 10, 2007.
- "COMPTROLLER DUGAN URGES IMPROVED UNDERWRITING STANDARDS ON THIRD PARTY LOANS," *States News Service*, October 8, 2007.
- "Countrywide taps $11.5 billion credit line to help with mounting liquidity problems," *Associated Press*, August 16, 2007.
- "Cracks in the Façade – America's Housing Market," *The Economist*, March 24, 2007.
- "Defaults Go Up and Prices Go Down," *Mortgage Servicing News*, October 1, 2007.
- "Did Big Lenders Cross the Line?, Lawsuits assert some firms doctored loan documents," *Bloomberg BusinessWeek*, August 20, 2007.
- "Editorial: $1 Billion Here, $1 Billion There.," *National Mortgage News*, December 11, 2006.
- "Entering its Prime," *National Mortgage News*, June 7, 2004.

- "First Franklin Closed As Deal Fails for Merrill Lynch," *Home Equity Wire*, March 15, 2008.
- "Fitch: Is the U.S. Consumer Prepared for Rising Interest Rates?," *Business Wire*, June 16, 2004.
- "Fitch: U.S. Alt-A RMBS Faced With Potential Landmines," *Business Wire*, October 12, 2004.
- "GE Closes B&C Unit," *National Mortgage News*, November 12, 2007.
- "Global Fixed Income Advisors Lures Top Marketing Director; Former Partner of III Offshore…," *Business Wire*, February 8, 2000.
- "Holding of Debt Securities Falls Again at Goldman," *The New York Times*, October 11, 2007.
- "Impac Cuts 144 Jobs, Exits Alt-A Market," *Associated Press*, September 18, 2007.
- "IndyMac seized by FDIC; Office of Thrift Supervision reproaches Sen. Schumer," *AFX Asia*, July 11, 2008.
- "IO, Option ARM Guidance May Have Chilling Effect," *Home Equity Wire*, January 1, 2006.
- "Lenders asked to stem home defaults," *Monterey County Herald*, May 16, 2007.
- "Moody's downgrades 399 subprime RMBS issued in 2006; 32 additional securities placed on review for possible downgrade," *Moody's*, July 10, 2007.
- "Moody's takes negative rating actions on certain Alt-A deals issued by Residential Asset Securitization Trust in 2006 and late 2005," *Moody's Investors Service Press Release*, November 27, 2007.
- "Mortgage Froth Worries Fed.," *Home Equity Wire*, June 15, 2005.
- ██████████████████████████
- "O'Connor & Co. Securities Acquired by SWS Securities Group Inc," *Business Wire*, August 17, 2001.
- "Option ARMs, Low Doc, Piggyback Loan Worries," *Home Equity Wire*, October 15, 2005.
- "Press Releases & Announcements," *Credit Suisse*, August 15, 2008, <http://www.hedgeindex.com/hedgeindex/ja/PressRelease.aspx?DocID=794&cy=CHF>, accessed February 24, 2011.
- "Rising damp - Subprime lending," *The Economist*, March 10, 2007.
- "Roundup: S&P Eyeing 200+ Alternative-A Credit RMBS Classes," *National Mortgage News*, August 20, 2007.
- "S&P says downgrades $660 mln of Alt-A RMBS," *Reuters News*, August 17, 2007.
- "Subprime lending rising damp - will turbulence in America's subprime mortgage market spread?," *The Economist*, March 8, 2007.
- "Subprime subsidence - Mortgage lending," *The Economist*, December 16, 2006.

- "Subprime litigation," *Financial Times*, April 10, 2007.
- "Top Alt-A Lenders in Q4 '05," *National Mortgage News*, April 10, 2006.
- "Top Subprime Lenders in 2005," *National Mortgage News*, May 15, 2006.
- "Update 2-US agency debt, MBS pummeled as Treasuries soar," *Reuters*, July 26, 2007.
- "When it goes wrong... - Securitisation - Securitisation," *The Economist*, September 22, 2007.
- Abreu, Steven M., "The Alt-A Mortgage Problem? Too Many Rookies Making Loans," *American Banker*, May 27, 2004.
- Adelson, Mark and Jacob, David, "ABS/MBS Litigation Outlook," *Asset Securitization Report*, November 19, 2007.
- Anderson, Jenny, "Wall St. Firms Hurt by the Subprime Lending Fallout," *The New York Times*, June 15, 2007.
- Andrews, Edmund L., "Rising rates could be trouble for some homeowners; Buyers with most of income wrapped up in house may be squeezed," *The Milwaukee Journal Sentinel*, July 4, 2004.
- Bajaj, Vikas and Haughney, Christine, "Tremors at the Door," *The New York Times*, January 26, 2007.
- Bajaj, Vikas, "Bankers' Lesson From Mortgage Mess: Sell, Don't Hold," *The New York Times*, November 5, 2007.
- Bajaj, Vikas, "If Everyone's Finger-Pointing, Who's to Blame?," *The New York Times*, January 22, 2008.
- Bajaj, Vikas, "Mortgages Grow Riskier, and Investors are Attracted," *The New York Times*, September 6, 2006.
- Barr, Alistair, "Subprime Mortgage Woes May Be Spreading," *MarketWatch*, March 11, 2007.
- Beales, Richard and Spikes, Sarah, "Scrutiny grows on US subprime lenders," *Financial Times*, March 4, 2007.
- Beales, Richard and Wighton, David, "Fears grow over subprime loan market.," *Financial Times*, February 13, 2007.
- Beckner, Steven K., "Fed'l Regulators Working on Guidance to Curb Risky Mtg Loans," *Market News International*, November 10, 2005.
- Bergman, Hannah, "Fast-Growing Loan Lines Show Stress," *American Banker*, December 6, 2004.
- Berry, Kate and Shenn, Jody, "Countrywide's Suit Illustrates Exception Risk," *American Banker*, September 29, 2006.
- Berry, Kate, "Fast Defaults Spur Earlier Intervention," *American Banker*, November 27, 2006.
- ████████████████████████████████████████████████████

- Bielski, Lauren, "Helping handoff: more profitable than vanilla lending, but more 'high maintenance,' specialty- and consumer lending thrive with outsource partners.(outsourced lending)," *ABA Banking Journal*, October 1, 2006.
- Bisbey Colter, Allison, "2005 Vintage Of Subprime Mortgage ABS May Not Age Well," *Dow Jones Newswires*, January 27, 2006.
- Church, Steven and Keoun, Bradley, "American Home files for bankruptcy," *The Miami Herald*, August 6, 2007.
- Collins, Brian, "Borrowers Fib About Income.," *National Mortgage News*, July 24, 2006.
- Collins, Brian, "Fed Tallies 'Nontraditional' Mortgage Percentages," *Origination News*, September 1, 2005.
- Collins, Brian, "IOs/POAs Spark Concern," *National Mortgage News*, August 21, 2006.
- Comtois, James, "UBS: 2006 Vintage Shaping Up as a Bad One; 'We were a bit surprised at the magnitude and speed at which this vintage year deteriorated.'," *National Mortgage News*, November 27, 2006.
- Cornwell, Ted, "Defaults Set Record," *National Mortgage News*, March 10, 2008.
- Cornwell, Ted, "Lenders Refocus on Borrower's Capacity to Pay," *Mortgage Servicing News*, July 1, 2007.
- Cranford, John, "Political Economy: 'Home' to Roost?," *CQ Weekly*, January 12, 2007.
- Craver, Richard, "THE OTHER SIDE OF THE HOUSING BOOM; MORE TRIAD PEOPLE ARE BUYING HOMES, BUT RISKY MORTGAGES PUT THEM IN DANGER; A WIDER SWATH: ALL KINDS OF HOMEOWNERS AFFECTED," *Winston-Salem Journal*, October 1, 2006.
- Dattels, Peter, et. al., "Global Financial Stability Report: Market Developments and Issues," *International Monetary Fund*, April 10, 2007.
- Davies, Megan and Giannone, Joseph, "UPDATE 3- JPMorgan to buy Bear Stearns for $2 a share," *Reuters News*, March 16, 2008.
- Der Hovanesian, Mara, "Nightmare Mortgages," *Business Week*, September 11, 2006.
- DiStefano, Joseph N., "Capital One Closes GreenPoint Mortgage, Idling 1,900 (UPDATE4)," *Bloomberg*, August 20, 2007.
- Dreman, David, "Bad Times Ahead? The market will be volatile for a while. But the subprime mess won't prompt a recession. So good bargains are to be had.," *Forbes*, April 23, 2007.
- Edwards, Will and Hester, Elizabeth, "Mortgage defaults hurt lenders Countrywide Financial, IndyMac and Friedman, Billings all posted weaker first-quarter earnings.," *Orlando Sentinel*, April 27, 2007.
- Eisinger, Jesse, "Long & Short: Mortgage Market Begins to See Cracks As Subprime-Loan Problems Emerge," *The Wall Street Journal*, August 30, 2006.
- England, Robert Stowe, "Pushing the Edge on Alternative-A," *Mortgage Banking*, February 1, 2004.

- Feldheim, David, "Interest-Only Mtge Loans Role Grows In Home-Equity Deals," *Dow Jones Newswires*, May 7, 2004.
- Garrahan, Matthew, "'Zero US effort' on housing slammed," *Financial Times*, October 30, 2007.
- Gentile, Gary, "Major subprime mortgage lender files for bankruptcy, fires 3,200 workers," *The Canadian Press*, April 2, 2007.
- Gittelsohn, John and Padilla, Mathew, "How New Century Ran Out of Money," *The Orange County Register, Calif.*, April 15, 2007.
- Hadar, Leon, "Subprime loans crisis offers some lessons," *Business Times Singapore*, March 15, 2007.
- Harney, Kenneth R., "Lies are Growing in Loan Process," *The Washington Post*, July 30, 2005.
- Harney, Kenneth R., "Subprime mortgage market in trouble," *San Jose Mercury News*, February 16, 2007.
- Heavens, Alan J., "Rules aim to cut risks on 'exotic' mortgages," *The Philadelphia Inquirer*, October 15, 2006.
- Hernandez, Jaime O., "High-risk loans take toll on both lenders, borrowers; Capital Sources," *Broward Daily Business Review*, February 28, 2007.
- Hopkins, Cheyenne, "Mortgage Buyers, Legislators Argue On Laying Blame," *American Banker*, May 9, 2007.
- Hyde, Paul and Saumya, Shubh, "Viewpoint: Mortgage Crisis Exposed System Flaws," *American Banker*, September 7, 2007.
- Inman, Phillip, "US subprime turmoil claims another victim," *Guardian Unlimited*, June 28, 2007.
- Isidore, Chris, "'Liar Loans': Mortgage Woes Beyond Subprime," *CNNMoney.com*, March 19, 2007.
- Kaiser, Emily, "UPDATE 1-Sen. Clinton-Wall St must share blame for subprime," *Reuters News*, December 5, 2007.
- Kaper, Stacy, "GAO Study: Foreclosure Level to Top One Million; Report's views on causes may support assignee liability," *American Banker*, October 16, 2007.
- Kaper, Stacy, "OCC Study Links Disclosure, Foreclosure," *American Banker*, August 31, 2006.
- Kingsbury, Kevin, "UPDATE: Lehman Brothers Cuts Back Mortgage Lending Further," *Dow Jones Newswires*, January 17, 2008.
- Kopecki, Dawn, "Exotic New Mtge Loans Could Lead To Rise In Delinquencies," *Dow Jones Newswires*, May 3, 2005.
- Korry, Elaine, "Bank of America Acquires Countrywide for $4 Billion," *National Public Radio News*, January 11, 2008.

- Kostigen, Thomas M., "Hedge Funds Banking on Social and Moral Issues," *WashingtonPost.com*, December 25, 2004.
- Lagomarsino, Deborah, "Fed Bies: Worry US Borrowers 'Increasingly Speculative'," *Dow Jones Newswires*, June 14, 2005.
- Lagomarsino, Deborah, "Fed Survey: Alternative Mtges Less Than 25% Of All Mtges," *Dow Jones Newswires*, August 15, 2005.
- Laing, Jonathan R., "Review & Preview Follow-Up -- A Return Visit to Earlier Stories: A Subprime Lender's Woes Aren't Over," *Barron's*, February 12, 2007.
- Leckey, Andrew, "Lure of easy credit tends to end with a hard lesson," *Chicago Tribune*, August 26, 2007.
- Leinfuss, Nancy, "UPDATE 2-Benchmark ABX subprime indexes sink to record lows," *Reuters News*, August 16, 2007.
- LePage, Andrew, "Popular loan can be a stretch; With stated-income mortgages, some may blur truth to get into a home - and get in over their heads," *The Sacramento Bee*, December 5, 2004.
- Mavin, Duncan, "Housing market fallout: HSBC says profit will be hit by soaring sub-prime home-mortgage defaults," *National Post*, February 9, 2007.
- Maxey, Henry, "A subprime tale of silliness and irrational behaviour," *Financial Times*, July 12, 2007.
- McAllister, Sue, "Loans Without Proof of Income," *San Jose Mercury News*, November 26, 2004.
- Mitchell, Eve, "Tighter lending standards make home loans hard to get," *Oakland Tribune*, July 20, 2007.
- Morse, Neil J, "Servicing's Tough New Challenges," *Mortgage Banking*, February 1, 2007.
- Mullins, Luke, "In Brief: Bies Warns of Real Estate Lending Risks," *American Banker*, October 13, 2005.
- Padilla, Mathew, "WaMu closing subprime unit," *The Orange County Register*, September 14, 2007.
- Paletta, Damian and Blackstone, Brian, "No Big Subprime Spillover Seen Into Economy," *Dow Jones Newswires*, May 17, 2007.
- Paletta, Damian, "Fed's Bies: Banks Must Recognize Mortgage Lending Risks," *Dow Jones Newswires*, January 11, 2007.
- Paletta, Damian, "OCC Chief Warns Of Growing Dangers Of 'Stated Income' Loans," *Dow Jones Newswires*, May 23, 2007.
- Paletta, Damian, "Subprime Players Get Washington Summons --- Regulators Ask Wall Street If Investor Demand Led To Looser Loan Standards," *The Wall Street Journal*, March 28, 2007.

- Paletta, Damian, "U.S. tightens rules for subprime loans --- Bank regulators tell mortgage lenders to toughen criteria," *The Wall Street Journal*, July 2, 2007.
- Paletta, Damian, "US Senate Democrats Urge Fed To Curb Subprime Lending Abuses," *Dow Jones Newswires*, April 23, 2007.
- Petruno, Tom, "Cheap Loans Are Under Fire," *Los Angeles Times*, September 18, 2005.
- Pittman, Mark, "Pimco Says Subprime Woes May Spread to Alt-A, Jumbo (Update1)," *Bloomberg*, March 16, 2007.
- Powell, Joy, "Here come the foreclosures; Low rates and aggressive lending let some overreach for the American Dream. Now, they're a stumble away from losing it," *Star-Tribune*, June 11, 2006.
- Pyburn, Allison, "2006 HE ABS vintage: the worse ever?," *Asset Securitization Report*, November 27, 2006.
- Pyburn, Allison, "ABS CDS contracts under scrutiny," *Asset Securitization Report*, November 20, 2006.
- Pyburn, Allison, "Home price growth flounders in Q1," *Asset Securitization Report*, May 29, 2006.
- Pyburn, Allison, "Who's playing who in subprime?," *Asset Securitization Report*, September 19, 2005.
- Reckard, E. Scott, "Ownit seeks bankruptcy protection; The sub-prime lender, a casualty of the changing mortgage market, owes more than $165 million.," *Los Angeles Times*, December 30, 2006.
- Reed, Danielle, "Beyond Subprime: Problems Simmer For Alt-A Bonds, CDOs," *Dow Jones Newswires*, March 28, 2007.
- Richardson, Karen and Ng, Serena, "Bond Insurers Appear Shaky As Credit Climate Worsens," *The Wall Street Journal*, November 8, 2007.
- Richardson, Karen, "Double Trouble for Mortgage Shares: Dual-Loan Borrowers Pose Added Risk," *The Wall Street Journal*, December 12, 2006.
- Rucker, Patrick, "Wall Street often shelved damaging subprime reports," *Reuters News*, July 27, 2007.
- Sanders, Bob, "As housing market cools, foreclosure rate rises," *New Hampshire Business Review*, September 1, 2006.
- Scholtes, Saskia, "High-risk loans revealing shaky foundations," *Financial Times*, January 11, 2007.
- Scholtes, Saskia, "S&P could cut ratings on Alt-A loans," *Financial Times*, August 7, 2007.
- Scholtes, Saskia, "Subprime bonds in ratings downgrades," *Financial Times*, July 10, 2007.
- Scholtes, Saskia, "Subprime woes fuel concern for CDO holdings.," *Financial Times*, March 2, 2007.

- Scholtes, Saskia, "Warning on home-backed bonds - SUBPRIME MORTGAGES.," *Financial Times*, December 22, 2006.
- Sender, Henny, "Hedge Funds' Risky Bets Come to Roost --- Subprime Investments Are Starting to Hurt, Highlighting Volatility," *The Wall Street Journal*, March 8, 2007.
- Shenn, Jody, "'05 Home Loan Delinquency Rise a Riddle," *American Banker*, May 23, 2006.
- Shenn, Jody, "'Prime,' 'Subprime,' 'Nonprime' – Does it Matter?," *American Banker*, October 21, 2005.
- Shenn, Jody, "How Lenders Cut Risk on Low-Doc Loans," *American Banker*, October 26, 2004.
- Shenn, Jody, "Moody's Says Some 'Alt A' Mortgages Are Like Subprime (Update3)," *Bloomberg*, July 31, 2007.
- Shenn, Jody, "Mortgage Risk Debate Heating Up," *American Banker*, May 5, 2005.
- Shenn, Jody, "OFHEO's New Worry at Fannie; Report cites credit risk, liquidity soft spots," *American Banker*, June 16, 2005.
- Shenn, Jody, "WaMu tightens rules for mortgages, UBS AG stops accepting no-documentation loans," *Seattle Post-Intelligencer*, August 8, 2007.
- Shrivastava, Anusha, "ABS Subprime Loan Deals Churned Out At Higher Premiums," *Dow Jones Newswires*, December 8, 2006.
- Shrivastava, Anusha, "Asset-Backed Issuance To Slow Amid Housing Mkt Troubles," *Dow Jones Newswires*, December 20, 2006.
- Shrivastava, Anusha, "Mortgage Delinquency Levels Could Go Higher, Says S&P," *Dow Jones Newswires*, March 13, 2007.
- Shrivastava, Anusha, "Murky World Of Alt-A Loans Gives Bond Investors Pause," *Dow Jones Newswires*, May 10, 2007.
- Shrivastava, Anusha, "S&P Warns About Alt-A Mortgage Bond Deal For First Time," *Dow Jones Newswires*, February 15, 2007.
- Simon, Ruth and Hudson, Michael, "Whistling Past Housing's Graveyard? --- Bad Loans Draw Bad Blood," *The Wall Street Journal*, October 9, 2006.
- Simon, Ruth, "Late Payments on Mortgages Rise – Studies Find Higher Loan Delinquencies Stemming From 2005's Lending Boom," *The Wall Street Journal*, May 18, 2006.
- Simon, Ruth, "Mortgage Lenders Loosen Standards --- Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules," *The Wall Street Journal*, July 26, 2005.
- Simpson, Glenn R., "Loan Data Focus of Probe," *The Wall Street Journal*, March 11, 2008.
- Sloan, Steven, "Fed Official Says Some Systems Are Vulnerable," *American Banker*, October 18, 2006.

- Spence, John and Morcroft, Greg, "After the Real-estate Bubble: If Housing Market Tumbles, the Impact could be Far-reaching," *MarketWatch*, June 3, 2005.
- Stein, Gabrielle, "Subprime Contagion Spreads to Prime RMBS?," *Asset Securitization Report*, August 6, 2007.
- Stempel, Jonathan, "UPDATE 2-Ameriquest closes, Citigroup buys mortgage assets," *Reuters News*, August 31, 2007.
- Steverman, Ben, "Mortgage Crisis Roughs up IndyMac; The Mortgage Lender, Which Provides 'Alt-A' Loans, Suffers as the Mortgage Crisis Spreads," *BusinessWeek Online*, July 18, 2007.
- Tedeschi, Bob, "Mortgages: The Growing Problem of Fraud," *The New York Times*, July 9, 2006.
- Terris, Harry and Berry, Kate, "Warning Puts Alt-A Loans In Spotlight," *American Banker*, July 2, 2007.
- Thetgyi, Olivia, "Subprime Shorting Hedge Fund To Launch," *Securitization News*, September 15, 2006.
- Tong, Vinnee And Bel Bruno, Joe, "Lehman Brothers files for bankruptcy protection, appears headed for liquidation," *Associated Press*, September 15, 2008.
- Tyson, James, Torres, Craig and Vekshin, Alison, "Fed admits to subprime inaction; 'We could have done more sooner,' bank director tells Senate hearings amid fears crisis will spread," *The Toronto Star*, March 23, 2007.
- Veiga, Alex, "Industry tightens standards on 'no proof' loans amid subprime woes," *Associated Press*, April 2, 2007.
- Veiga, Alex, "Office of Thrift Supervision shuts down IndyMac," *Associated Press*, July 11, 2008.
- Veiga, Alex, "U.S. foreclosures jump sharply in July," *Associated Press*, August 21, 2007.
- Wei, Lingling and Enrich, David, "Ameriquest Empire, Once High Flying, May Find Citi A Buyer," *Dow Jones Newswires*, February 14, 2007.
- White, Brenda B., "Change Is the Only Constant," *Mortgage Banking*, October 1, 2007.
- White, Brenda B., "The Emergence of Alt-A," *Mortgage Banking*, April 1, 2006.
- Wiggins, Jenny, "Interest rate rises to hit households' debt loads," *Financial Times*, August 8, 2004.
- Yip, Pamela, "Borrowing trouble Looser lending leads to more homeownership - and more foreclosures," *The Dallas Morning News*, August 29, 2004.
- Yoon, Al, "Subprime home loan improvement sparse, lenders say," *Reuters News*, January 31, 2007.
- Yoon, Al, "U.S. bond group urges subprime loan modifications," *Reuters News*, June 6, 2007.

**Publicly Available Data**

- ███████████████████
- Data available at <http://www.irrationalexuberance.com/index.htm>, accessed on February 9, 2011.
- IndyMac Residential Asset Securitization Trust 2006-A8 Prospectus Supplement, June 28, 2006.
- LIBOR rates available at <http://www.moneycafe.com/library/1monthlibor.htm>, accessed on February 8, 2011.
- Merrill Lynch Government Securities Inc. and Subsidiary Consolidated Balance Sheet, June 29, 2007.
- RAST 2006-A8 Trustee Reports, July 2006 to December 2010.
- S&P/Case-Shiller Home Price Indices, available at <http://www.standardandpoors.com/indices/sp-case-shiller-home-price-indices /en/us/?indexId=spusa-cashpidff--p-us---->, accessed on January 14, 2011.
- Securities Industry and Financial Markets Association, U.S. ABS Outstanding (xls), <http://www.sifma.org/research/statistics.aspx>, accessed on February 16, 2011.
- Standard & Poor's S&P/Case-Shiller Home Price Indices: Index Methodology, November 2009, < http://www.standardandpoors.com/indices/sp-case-shiller-home-price-indices/en/us/?indexId=spusa-cashpidff--p-us---->.
- U.S. Bond Market Outstanding (xls), *Securities Industry and Financial Markets Association*, <http://www.sifma.org/research/statistics.aspx>, accessed on February 16, 2011.
- U.S. Census Bureau, Housing Vacancies and Homeownership (CPS/HVS), Table 14. Homeownership Rates for the US and Regions: 1965 to Present, <http://www.census.gov/hhes/www/housing/hvs/hvs.html>.
- U.S. Census Bureau, New Residential Construction Index, <http://www.census.gov/const/www/newresconstindex.html>, accessed on January 14, 2011.

**Speeches**

- Bush, George, "A Home of Your Own: Expanding Opportunities for All Americans," The White House, June 2002.
- Greenspan, Alan, "Mortgage Banking," Speech for the American Bankers Association Annual Convention, September 26, 2005.
- Peppercorn, Ira G., Statement Before the House Subcommittee on Capital Markets, Securities and Government Sponsored Enterprises, Committee on Banking and Financial Services, July 30, 1998.
- Schapiro, Mary L., Commissioner of the United States Securities and Exchange Commission, "Promoting Small Business Capital Formation: The Role of the SEC," U.S. Securities and Exchange Commission, November 13, 1992.

**<u>Websites</u>**

- ████████████████████████████████████
  ███████████████████████████████

- "About CGS Identifiers," CUSIP Global Services, <https://www.cusip.com/cusip/about-cgs-identifiers.htm>, accessed on February 23, 2011.

- ██████████████████████████████████████████
  ███████████████████████

- ██████████████████████████████████████████
  ██████████████████████

- ██████████████████████████████████████
  ████████████████████████

- █████████████████████████████████████████
  ████████████████████████████

- ████████████████████████████████████
  █████████████████████████████

- ████████████████████████████████████████
  ████████████████████

- "Evaluation Services – Evaluation Methodologies," Products and Services, Interactive Data, <http://www.interactivedata.com/index.php/Contents/show/content/EvalMeth>, accessed on February 22, 2011.

- "Evaluation Services," Products and Services, Interactive Data, <http://www.interactivedata-prd.com/07products/data_type/evaluated/index.shtml>, accessed on February 22, 2011.

- █████████████████████████████████████
  ████████████████████████

- ████████████████████████████████████
  ███████████████████████

- █████████████████████████████████████████
  ████████████████████████

- ███████████████████████████████████
- ████████████████████████████████████
  ████████████████████████

- ████████████████████████████████████████
  ████████████

- ████████████████████████████████████████
  ████████████████

- 



**Exhibit 1**
**Case-Shiller Home Price Indices**
**Composite (10) Index and Selected Cities**
**January 1990 - December 2009**

RAST 2006-A8
Offering Date -
June 28, 2006

Legend: — — New York · · · · · Miami —— Los Angeles —— San Francisco —— Composite (10)

**Note:**
[1] The Case-Shiller Home Price Index Composite (10) tracks monthly changes in the value of the residential real estate market in 10 metropolitan regions (Boston, Chicago, Denver, Las Vegas, Los Angeles, Miami, New York, San Diego, San Francisco, and Washington DC). The Case-Shiller indices use a value-weighted repeat sales pricing technique to measure changes in these housing markets.  Seasonally adjusted values are used for this analysis.
**Sources**:
[1] S&P/Case-Shiller Home Price Indices, <http://www.standardandpoors.com/indices/sp-case-shiller-home-price-indices/en/us/?indexId=spusa-cashpidff--p-us---->,
accessed on January 14, 2011.
[2] Standard & Poor's, S&P/Case-Shiller Home Price Indices Methodology, November 2009, <http://www.standardandpoors.com/indices/sp-case-shiller-home-price-indices
/en/us/?indexId=spusa-cashpidff--p-us---->, accessed on January 14, 2011.





**Notes:**
[1] Annualized housing starts are an estimate of the number of single family residential properties on which construction has begun.
[2] Annualized housing starts are seasonally adjusted.
**Source**:
[1] U.S. Census Bureau, New Residential Construction Index, <http://www.census.gov/const/www/newresconstindex html>, accessed on January 14, 2011.

**Exhibit 3**
**Basic Securitization Process**



**Exhibit 4**
**Basic Senior-Subordinate Structure of a Mortgage-Backed Security**



**Exhibit 5**
**Example of Effect of Subordination on Payouts in the Event of Losses**

**In the event of a $150 write-off in the value of the mortgage loan pool:**

|  | Loan Pool |  | Senior Certificates |  | Subordinated Certificates |  | Overcollateralization (OC) |
|---|---|---|---|---|---|---|---|
| Initial Standing | $1,000 | = | $700 | + | $200 | + | $100 |
| Write-off | ($150) | = |  |  | ($50) | + | ($100) |
| Final Payouts | $850 | = | $700 |  | $150 |  | $0 |

| **Before losses** | **After losses** |
|---|---|



**Senior certificates are paid in full, while the subordinated certificates absorb any losses not covered by overcollateralization.**



**Exhibit 6**
**Annual Outstanding U.S. Asset-Backed Debt by Type**
**1996 - 2009**

**Notes:**
[1] Includes Ginnie Mae, Fannie Mae, and Freddie Mac mortgage-backed securities (MBS), collateralized mortgage obligations (CMO), and commerical mortgage-backed securities, and private-label MBS/CMOs.
[2] Includes home equity loans, home improvement loans, home equity lines of credit, mortgage servicing rights, home equity net interest margin (NIM) securities, and other home equity resecuritizations.

**Sources:**
[1] Securities Industry and Financial Markets Association, U.S. ABS Outstanding (xls), <http://www.sifma.org/research/statistics.aspx>, accessed on February 16, 2011.
[2] Securities Industry and Financial Markets Association, U.S. Bond Market Outstanding (xls), <http://www.sifma.org/research/statistics.aspx>, accessed on February 16, 2011.



**Exhibit 7**
**Annual Outstanding U.S. Bond Market Debt by Type**
**1996 - 2009**

**Notes:**
[1] Interest bearing marketable public debt.
[2] Includes commercial paper, bankers' acceptances, and large time deposits.
[3] Includes Ginnie Mae, Fannie Mae, and Freddie Mac mortgage-backed securities (MBS), collateralized mortgage obligations (CMO), and commerical mortgage-backed securities, and private-label MBS/CMOs.
[4] Includes auto, credit card, home equity, manufacturing, student loans, other, and CDOs of ABS.
[5] Due to FAS 166/167 changes, the GSE debt category in the Federal Reserve is no longer its source for agency debt going forward from Q1 2010.
**Source:**
[1] Securities Industry and Financial Markets Association, U.S. Bond Market Outstanding (xls), <http://www.sifma.org/research/statistics.aspx>, accessed on February 16, 2011.



**Notes:**
[1] Categorization and definitions from Inside Mortgage Finance, The Mortgage Market Statistical Annual CD-ROM, 2009 Edition, Volume IIA, Mortgage Related Securities Market.
[2] Agency securities are defined as "specific securities that are issued by either Ginnie Mae, Fannie Mae, Freddie Mac or the Federal Home Loan Banks." (Inside Mortgage Finance Glossary)
**Sources:**
[1] Inside Mortgage Finance, The Mortgage Market Statistical Annual CD-ROM, 2010 Edition, Volume IIA, Mortgage Related Securities Market.
[2] Inside Mortgage Finance, The Mortgage Market Statistical Annual CD-ROM, 2010 Edition, Glossary.



**Exhibit 9**
**Volume of Non-Agency Residential Mortgage Securitizations**
**Q1 2004 - Q4 2009**

Source:
[1] Inside Mortgage Finance, The Mortgage Market Statistical Annual CD-ROM, 2010 Edition, Volume IIB1, The Private- Label Mortgage Security Market, Prvt-Lbl MBS by type.

**Exhibit 10**
**IndyMac Residential Asset Securitization Trust 2006-A8**
**Trust Attributes**

| | IndyMac Residential Asset Securitization Trust 2006-A8 | | |
|---|---|---|---|
| Closing date[1] | June 28, 2006 | | |
| Publicly-offered Amount | $632,676,943 | | |
| At-Issue Offered Amount[2] | $603,163,842 | | |
| Principal Balance of Mortgage Pool[3] | $641,665,755 | | |
| Number of Loans in Mortgage Pool[4] | 1,708 | | |
| **Group** | **Group 1** | **Group 2** | **Group 3** |
| Loan Group Description | "The mortgage pool will consist of three loan groups Each loan group will consist primarily of 30-year conventional, fixed rate mortgage loans secured by first liens on one-to-four family residential properties " (p  S-5) | | |
| Principal Balance of Loan Group[5] | $119,177,383 | $283,905,563 | $238,582,809 |
| Number of Loans in Loan Pool Group[6] | 200 | 473 | 1,035 |

**Certificates**

**At-Issue Certificates[2]**

| | Group 1 | Group 2 | Group 3 |
|---|---|---|---|
| Senior Certificates | 1-A-1 | 2-A-1 | 3-A-1 |
| | 1-A-2 | 2-A-2 | 3-A-2 |
| | 1-A-3 | 2-A-3 | 3-A-3 |
| | 1-A-4 | 2-A-4 | 3-A-4 |
| | 1-A-5 | 2-A-5 | 3-A-5 |
| | | 2-A-6 | 3-A-6 |
| | | 2-A-7 | 3-A-7 |
| | | 2-A-8 | 3-A-8 |
| | | | 3-A-9 |
| | | | 3-A-10 |
| | | | 3-A-11 |
| Principal-Only Certificate[7] | PO | | |
| Interest-Only Certificate[7][8] | A-X | | |

**Non-At-Issue Certificates**

| | | | |
|---|---|---|---|
| Residual[9] | A-R | | |
| Subordinate Certificates | B-1 | | |
| | B-2 | | |
| | B-3 | | |
| | B-4 | | |
| | B-5 | | |
| | B-6 | | |
| Non-Offered Certificates | B-7 | | |
| | B-8 | | |
| | B-9 | | |
| | B-10 | | |
| | P | | |

**Credit Enhancement:**

| | |
|---|---|
| | Subordination |
| | Allocation of Losses |
| | Cross-Collateralization |

**Notes:**
[1] "Closing Date: On or about June 28, 2006 " (p  S-5)
[2] Per the Notice of Lead Plaintiff's Motion for Class Certification, the class consists of the Senior Mortgage Pass-Through Certificates (p  1)  The CUSIPs associated with these certificates are identified in note 1 of the Notice of Lead Plaintiff's Motion for Class Certification
[3] "As of the cut-off date, the depositor expects that the mortgage loans in the securitization as of the cut-off date will have the following characteristics: Aggregate Current Principal Balance $641,665,755 " (p  S-6)
[4] See pages S-53 through S-59 of prospectus supplement for the number of loans in the securitization as of the cut-off date
[5] See page S-6 of prospectus supplement
[6] See pages S-35 through S-52 of prospectus supplement for the number of loans in the Groups 1, 2, and 3 as of the cut-off date
[7] "Solely for purposes of calculating distributions and allocating losses, each of the Class PO and Class A-X Certificates will be made up of three components having the designations and initial Component Balances or initial Component Notional Amounts " (p  S-75)
[8] In addition to Certificate A-X, Certificates 1-A-3, 2-A-6, 3-A-5 and 3-A-9 are also interest only  (pp  S-7 - S-8)
[9] The Class A-R Certificates will initially be equal to $100, and will first be paid from Group 1 (p  S-12)  These Certificates will also be entitled to cash flows "for any loan group remaining after distribution or accretion of interest and principal on the senior certificates and Class PO Deferred Amounts on the Class PO Certificates and interest and principal on the subordinated certificates, as described above " (p  S-100)
**Sources:**
[1] IndyMac Residential Asset Securitization Trust 2006-A8, June 28, 2006
[2] Lead Plaintiff's Memorandum of Law in Support of its Motion for Class Certification, December 10, 2010

**Exhibit 11**
**IndyMac Residential Asset Securitization Trust 2006-A8**
**Certificate Analysis**

| Trust | Certificate | Pass-Through Rate[1] | Maturity Date[5] | Modeled Scheduled Distribution Date[6] |
|---|---|---|---|---|
| **Offered Certificates:** | | | | |
| 2006-A8 | 1-A-1 | 6.000% | August 2036 | January 2013 |
| 2006-A8 | 1-A-2 | LIBOR + 0.300%[2] | August 2036 | January 2013 |
| 2006-A8 | 1-A-3 | 7.200% - LIBOR[2] | August 2036 | January 2013 |
| 2006-A8 | 1-A-4 | 6.250% | August 2036 | May 2036 |
| 2006-A8 | 1-A-5 | 6.250% | August 2036 | January 2014 |
| 2006-A8 | 2-A-1 | 6.500% | August 2036 | February 2011 |
| 2006-A8 | 2-A-2 | 6.750% | August 2036 | February 2011 |
| 2006-A8 | 2-A-3 | 6.000% | August 2036 | February 2011 |
| 2006-A8 | 2-A-4 | 6.500% | August 2036 | May 2036 |
| 2006-A8 | 2-A-5 | LIBOR + 0.600%[2] | August 2036 | July 2011 |
| 2006-A8 | 2-A-6 | 5.900% - LIBOR[2] | August 2036 | July 2011 |
| 2006-A8 | 2-A-7 | 6.500% | August 2036 | July 2011 |
| 2006-A8 | 2-A-8 | 6.500% | August 2036 | May 2036 |
| 2006-A8 | 3-A-1 | 6.000% | August 2036 | June 2012 |
| 2006-A8 | 3-A-2 | 6.000% | August 2036 | October 2012 |
| 2006-A8 | 3-A-3 | LIBOR + 0.500%[2] | August 2036 | March 2010 |
| 2006-A8 | 3-A-4 | 6.000% | August 2036 | April 2036 |
| 2006-A8 | 3-A-5 | 5.500% - LIBOR[2] | August 2036 | March 2010 |
| 2006-A8 | 3-A-6 | 6.000% | August 2036 | April 2007 |
| 2006-A8 | 3-A-7 | 6.000% | August 2036 | December 2006 |
| 2006-A8 | 3-A-8 | LIBOR + 0.750%[2] | August 2036 | March 2010 |
| 2006-A8 | 3-A-9 | 5.250% - LIBOR[2] | August 2036 | March 2010 |
| 2006-A8 | 3-A-10 | 6.000% | August 2036 | January 2007 |
| 2006-A8 | 3-A-11 | 6.000% | August 2036 | December 2012 |
| 2006-A8 | PO | Principal Only[3] | August 2036 | May 2036 |
| 2006-A8 | A-X | 6.500% | August 2036 | May 2036 |
| 2006-A8 | A-R | 6.250% | August 2036 | May 2036 |
| 2006-A8 | B-1 | Variable[4] | August 2036 | May 2036 |
| 2006-A8 | B-2 | Variable[4] | August 2036 | May 2036 |
| 2006-A8 | B-3 | Variable[4] | August 2036 | May 2036 |
| 2006-A8 | B-4 | Variable[4] | August 2036 | May 2036 |
| 2006-A8 | B-5 | Variable[4] | August 2036 | May 2036 |
| 2006-A8 | B-6 | Variable[4] | August 2036 | May 2036 |
| **Non-Offered Certificates:** | | | August 2036 | May 2036 |
| 2006-A8 | B-7 | Variable[4] | August 2036 | May 2036 |
| 2006-A8 | B-8 | Variable[4] | August 2036 | May 2036 |
| 2006-A8 | B-9 | Variable[4] | August 2036 | May 2036 |
| 2006-A8 | B-10 | Variable[4] | August 2036 | May 2036 |
| 2006-A8 | P | N/A | N/A | N/A |

**Exhibit 11**
**IndyMac Residential Asset Securitization Trust 2006-A8**
**Certificate Analysis**

**Notes:**

[1] "The Class 1-A-3, Class 2-A-6, Class 3-A-5, Class 3-A-9 and the Class A-X Certificates are interest only, notional amount certificates" (p. S-1)

[2] "The pass-through rates on the LIBOR Certificates may adjust monthly based on the level of one-month LIBOR, subject to an interest rate cap." (p. S-10)

[3] "The Class PO Certificates are not entitled to any distributions of interest." (p. S-10)

[4] "The pass-through rate for a class of subordinated certificates for the interest accrual period related to each distribution date will be a per annum rate equal to the sum of (i) 6.25% multiplied by the excess of the aggregate Stated Principal Balance of the group 1 mortgage loans as of the Due Date in the prior month over the aggregate Class Certificate Balance of the group 1 senior certificates immediately prior to that Distribution Date, (ii) 6.50% multiplied by the excess of the aggregate Stated Principal Balance of the group 2 mortgage loans as of the Due Date in the prior month over the aggregate Class Certificate Balance of the group 2 senior certificates immediately prior to that Distribution Date, and (iii) 6.00% multiplied by the excess of the aggregate Stated Principal Balance of the group 3 mortgage loans as of the Due Date in the prior month over the aggregate Class Certificate Balance of the group 3 senior certificates immediately prior to that Distribution Date; divided by the aggregate Class Certificate Balance of the subordinated certificates immediately prior to that Distribution Date. The pass-through rate for each class of subordinated certificates for the first interest accrual period is expected to be approximately 6.268% per annum." (pp. S-85 - S-86)

[5] The Maturity Date is the Final Scheduled Distribution Date, and "is the distribution date in the month after the month of the latest stated maturity date of any Mortgage Loan." (p. S-8)

[6] "The modeling final distribution date is based upon (a) an assumed rate of prepayments equal to 100% PPC with respect to the group 1 and group 3 certificates, and 120% PPC with respect to the group 2 certificates, (b) the modeling assumptions used in this prospectus supplement, and (c) assuming the optional termination is not exercised by the servicer." (p. S-8)

**Source:**

[1] IndyMac Residential Asset Securitization Trust 2006-A8 Prospectus Supplement, June 28, 2006.



**Exhibit 12**
**Observed Pass-Through Rates for RAST 2006-A8 Floating Rate Certificates**
**July 2006 - December 2010**

**Notes:**

[1] Certificates 1-A-2, 2-A-5, 3-A-3 and 3-A-8 are Floating Pass-Through Rate LIBOR certificates and earn 1 month LIBOR plus a margin. "The pass-through rates on the LIBOR Certificates may adjust monthly based on the level of one-month LIBOR, subject to an interest rate cap." (p. S-10)

[2] Certificates 1-A-3, 2-A-6, 3-A-5 and 3-A-9 are Inverse Floating Pass-Through Rate LIBOR certificates and earn LIBOR equal to LIBOR less a margin. "The pass-through rates on the LIBOR Certificates may adjust monthly based on the level of one-month LIBOR, subject to an interest rate cap." (p. S-10)

**Sources:**

[1] LIBOR rates, <http://www.moneycafe.com/library/1monthlibor.htm>, accessed on February 8, 2011.

[2] IndyMac Residential Asset Securitization Trust 2006-A8 Prospectus Supplement, June 28, 2006.

**Exhibit 13**
**Federal Reserve Board Senior Loan Officer Opinion Survey on Bank Lending Practices**
**Q1 2000 - Q4 2009**



**Notes:**
[1] Data are from Figure 3, Panel 1, titled "Net Percentage of Domestic Respondents Tightening Standards for Mortgage Loans" under "Measures of Supply and Demand for Residential Mortgage Loans."
[2] For data starting in 2007:Q2, change in standards for prime, nontraditional, and subprime mortgage loans are reported separately. Series are not reported when the number of respondents is 3 or fewer.  Q2 data is reflected as Q1 as each quarter's survey  results reflects responses for the previous quarter.
**Source:**
[1] Senior Loan Officer Opinion Survey on Bank Lending Practices Chart Data, <http://www.federalreserve.gov/boarddocs/snloansurvey/201011/chartdata htm>, accessed on February 23, 2011.



**Exhibit 14**
**Jumbo Mortgage Spread**
**United States**
**January 1, 2000 - December 31, 2009**

**Note:**
[1] The jumbo mortgage spread is defined as the spread between the 30-year jumbo mortgage national average rate and the 30-year fixed conforming national average rate.
**Source:**
[1] Bankrate.com data obtained from Bloomberg, accessed on January 14, 2011.



**Notes:**

[1] Seriously delinquent is defined as "the non-seasonally adjusted (NSA) percentage of loans that are 90+ days delinquent or in the process of foreclosure." Series include all residential loan types.  The "rates are calculated based on the number of loans serviced and not the dollar value." (Mortgage Bankers Association, National Delinquency Survey Facts (As of May 2008), <http://www.mbaa.org/files/Research/NDSFactSheet.pdf>).

[2] The National Delinquency Survey is "a voluntary survey of over 120 mortgage lenders, including mortgage banks, commercial banks, thrifts, savings and loan associations, subservicers, and life insurance companies."  The National Delinquency Survey covers between 80 and 85 percent of loans outstanding in the market. (Mortgage Bankers Association, National Delinquency Survey Facts (As of May 2008), <http://www.mbaa.org/files/Research/NDSFactSheet.pdf>).

**Source**:

[1] Mortgage Bankers Association National Delinquency Survey and Survey Facts, <http://www.mbaa.org/files/Research/NDSFactSheet.pdf>, accessed on January 14, 2011.

**Exhibit 16**
**Serious Delinquency Rate: California**
**Q1 1990 - Q4 2009**



**Notes:**
[1] Serious delinquency is defined as "the non-seasonally adjusted (NSA) percentage of loans that are 90+ days delinquent or in the process of foreclosure." Series include all residential loan types. The rates "are calculated based on the number of loans serviced and not the dollar value." (Mortgage Bankers Association, National Delinquency Survey Facts (As of May 2008), <http://www.mbaa.org/files/Research/NDSFactSheet.pdf>).
[2] The National Delinquency Survey is "a voluntary survey of over 120 mortgage lenders, including mortgage banks, commercial banks, thrifts, savings and loan associations, subservicers, and life insurance companies." The National Delinquency Survey covers between 80 and 85 percent of loans outstanding in the market (Mortgage Bankers Association, National Delinquency Survey Facts (As of May 2008), <http://www.mbaa.org/files/Research/NDSFactSheet.pdf>).
**Source**:
[1] Mortgage Bankers Association National Delinquency Survey and Survey Facts, <http://www.mbaa.org/files/Research/NDSFactSheet.pdf>, accessed on January 14, 2011.



**Exhibit 17
S&P Downgrade Transitions of Residential MBS
United States
2000 - 2008**

**Note:**
[1] "Downgrades (%)" represents the percent of S&P ratings transitions for RMBS each year that are downgrades.  Statistics are comprised of all downgrades, including rating modifiers (+ and -), near-defaults ('CC' or 'C'), and defaults.  RMBS includes subprime mortgage transactions.
**Source:**
[1] Standard & Poor's, "Global Structured Finance Default And Transition Study–1978-2008: Credit Quality Of Global Structured Securities Fell Sharply In 2008 Amid Capital Market Turmoil, Table 5," February 25, 2009, p. 17.

**Exhibit 18**
**Selected Public Knowledge about Underwriting Standards in the Alt-A Mortgage Market**
**January 2004 - December 2008**



**Note:**
[1] The Case-Shiller Home Price Index Composite (10) tracks monthly changes in the value of the residential real estate market in 10 metropolitan regions (Boston, Chicago, Denver, Las Vegas, Los Angeles, Miami, New York, San Diego, San Francisco, and Washington DC)  The Case-Shiller indices use a value-weighted repeat sales pricing technique to measure  changes in these housing markets   Seasonally adjusted values are used for this analysis

**Sources:**
[1] S&P/Case-Shiller Home Price Indices, <http://www standardandpoors com/indices/sp-case-shiller-home-price-indices/en/us/?indexId=spusa-cashpidff--p-us---->, accessed on January 14, 2011
[2] Press articles and other public references; Factiva

**Exhibit 19**
**Selected Public Knowledge about Underwriting Standards in the Subprime and Non-Prime Mortgage Market**
**January 2004 - December 2008**



**Note:**
[1] The Case-Shiller Home Price Index Composite (10) tracks monthly changes in the value of the residential real estate market in 10 metropolitan regions (Boston, Chicago, Denver, Las Vegas, Los Angeles, Miami, New York, San Diego, San Francisco, and Washington DC)  The Case-Shiller indices use a value-weighted repeat sales pricing technique to measure  changes in these housing markets   Seasonally adjusted values are used for this analysis

**Sources:**
[1] S&P/Case-Shiller Home Price Indices, <http://www standardandpoors com/indices/sp-case-shiller-home-price-indices/en/us/?indexId=spusa-cashpidff--p-us---->, accessed on January 14, 2011
[2] Press articles and other public references; Factiva

**Exhibit 20**
**Selected Lender Events in the Alt-A and Subprime Mortgage Markets**
**November 2006 - December 2008**



**Note:**
[1] The Case-Shiller Home Price Index Composite (10) tracks monthly changes in the value of the residential real estate market in 10 metropolitan regions (Boston, Chicago, Denver, Las Vegas, Los Angeles, Miami, New York, San Diego, San Francisco, and Washington DC)  The Case-Shiller indices use a value-weighted repeat sales pricing technique to measure  changes in these housing markets   Seasonally adjusted values are used for this analysis

**Sources:**
[1] S&P/Case-Shiller Home Price Indices, <http://www standardandpoors com/indices/sp-case-shiller-home-price-indices/en/us/?indexId=spusa-cashpidff--p-us---->, accessed on January 14, 2011
[2] Press articles and other public references; Factiva

**Exhibit 21**
**Selected Initial & Subsequent Purchasers**
**IndyMac Residential Asset Securitization Trust 2006-A8**

| | Class | Original Balance/Notional Amount ($) | Pass-Through Rate | Selected Initial & Subsequent Purchasers[7],[8] |
|---|---|---|---|---|
| **SENIOR** 94% [1] | 1-A-1 | $72,080,834 | 6.00% | 10 Individual Investors; 8 Banks; 6 Diversified Financial Firms; 6 Asset Management Firms; 1 Broker-Dealer; 1 Insurer; 1 Institutional Investor; 1 Endowment Fund; 1 Investment Fund |
| | 1-A-2 | 14,416,166 | LIBOR + 0.30%[3] | 1 Bank in Hong Kong |
| | 1-A-3 | 14,416,166[2] | 7.20% - LIBOR[3] | 1 Diversified Financial Firm |
| | 1-A-4 | 20,495,900 | 6.25% | 1 Diversified Financial Firm; 1 CDO |
| | 1-A-5 | 2,903,000 | 6.25% | 10 Individual Investors; 4 Diversified Financial Firms; 3 Asset Management Firms; 3 Endowment Funds |
| | 2-A-1 | 43,516,500 | 6.50% | 1 Diversified Financial Firm; 1 CDO |
| | 2-A-2 | 72,000,000 | 6.75% | 2 Banks; 2 Asset Management Firms; 1 Diversified Financial Firm |
| | 2-A-3 | 36,000,000 | 6.00% | 1 Asset Management Firm; 1 Broker-Dealer; 1 Mortgage REIT |
| | 2-A-4 | 54,819,500 | 6.50% | 1 Asset Management Firm |
| | 2-A-5 | 50,000,000 | LIBOR + 0.60%[3] | 1 Diversified Financial Firm |
| | 2-A-6 | 50,000,000[2] | 5.90% - LIBOR[3] | 1 Diversified Financial Firm; 1 Asset Management Firm; 1 Investment Fund |
| | 2-A-7 | 7,468,000 | 6.50% | 1 Bank; 1 Investment Advisor |
| | 2-A-8 | 3,000,000 | 6.50% | 1 Asset Management Firm |
| | 3-A-1 | 129,783,000 | 6.00% | 2 Banks in China; 2 Asset Management Firms |
| | 3-A-2 | 20,295,000 | 6.00% | 1 Diversified Financial Firm; 1 Bank; 1 Hedge Fund |
| | 3-A-3 | 13,000,000 | LIBOR + 0.50%[3] | 1 Diversified Financial Firm; 1 Hedge Fund; 1 CDO |
| | 3-A-4 | 48,500,000 | 6.00% | 1 Diversified Financial Firm; 1 Hedge Fund; 1 CDO |
| | 3-A-5 | 13,000,000[2] | 5.50% - LIBOR[3] | 2 Diversified Financial Firms; 1 Broker-Dealer |
| | 3-A-6 | 3,193,000 | 6.00% | None met criteria |
| | 3-A-7 | 942,000 | 6.00% | None met criteria |
| | 3-A-8 | 3,000,000 | LIBOR + 0.75%[3] | 1 Bank in Taiwan |
| | 3-A-9 | 3,000,000[2] | 5.25% - LIBOR[3] | 1 Diversified Financial Firm; 1 Bank in Netherlands |
| | 3-A-10 | 160,000 | 6.00% | None met criteria |
| | 3-A-11 | 3,853,000 | 6.00% | 1 Diversified Financial Firm; 1 Investment Advisor |
| | A-R | 100 | 6.25% | N/A[9] |
| | A-X | 19,774,322[2] | 6.50% | 1 Diversified Financial Firm |
| | PO | 3,737,943 | N/A[4] | 1 Diversified Financial Firm |
| **SUBORDINATED** 6% [1] | B-1 | 13,795,000 | Variable[5] | N/A[9] |
| | B-2 | 3,208,000 | Variable[5] | N/A[9] |
| | B-3 | 5,454,000 | Variable[5] | N/A[9] |
| | B-4 | 1,924,000 | Variable[5] | N/A[9] |
| | B-5 | 3,849,000 | Variable[5] | N/A[9] |
| | B-6 | 1,283,000 | Variable[5] | N/A[9] |
| | B-7 | 1,924,000 | Variable[5] | N/A[9] |
| | B-8 | 1,283,000 | Variable[5] | N/A[9] |
| | B-9 | 3,529,000 | Variable[5] | N/A[9] |
| | B-10 | 2,252,812 | Variable[5] | N/A[9] |
| | P | $100 | N/A[6] | N/A[9] |

**Exhibit 21**
**Selected Initial & Subsequent Purchasers**
**IndyMac Residential Asset Securitization Trust 2006-A8**

**Notes:**

[1] The senior certificates will have an aggregate initial beneficial ownership interest in the issuing entity of approximately 94% and the subordinated certificates will have an approximately 6% beneficial ownership interest  (Prospectus Supplement, p  S-74)

[2] "The Class 1-A-3, Class 2-A-6, Class 3-A-5, Class 3-A-9 and the Class A-X Certificates are interest only, notional amount certificates " (Prospectus Supplement, p  S-1)

[3] "The pass-through rates on the LIBOR Certificates may adjust monthly based on the level of one-month LIBOR, subject to an interest rate cap      " (Prospectus Supplement, p  S-10)

[4] "The Class PO Certificates are not entitled to any distributions of interest " (Prospectus Supplement, p  S-10)

[5] "The pass-through rate for a class of subordinated certificates for the interest accrual period related to each distribution date will be a per annum rate equal to the sum of:

6 25% *multiplied by* the excess of the aggregate stated principal balance of the group 1 mortgage loans as of the due date in the prior month (after giving effect to principal prepayments in the prepayment period related to that prior date) over the aggregate class certificate balance of the group 1 senior certificates immediately prior to that distribution date;

6 50% *multiplied by* the excess of the aggregate stated principal balance of the group 2 mortgage loans as of the due date in the prior month (after giving effect to principal prepayments in the prepayment period related to that prior date) over the aggregate class certificate balance of the group 2 senior certificates immediately prior to that distribution date; and

6 00% *multiplied by* the excess of the aggregate stated principal balance of the group 3 mortgage loans as of the due date in the prior month (after giving effect to principal prepayments in the prepayment period related to that prior date) over the aggregate class certificate balance of the group 3 senior certificates immediately prior to that distribution date;

*divided by* the aggregate class certificate balance of the subordinated certificates immediately prior to that distribution date "
(Prospectus Supplement, p  S-11)

[6] The Class P Certificates will not receive interest distributions, but "will be entitled to receive all prepayment charges collected on the mortgage loans " (Prospectus Supplement, pp  S-9 - S-10)

[7] Selected initial and subsequent purchasers must meet these criteria: (1) must have purchased during or before June 2008, and (2) the purchaser's name (not simply its account number) must be identified

[8] Purchaser type was determined using Business Description and Primary Industry Classification from Capital IQ  If Capital IQ data was unavailable, purchaser type was determined using public references

[9] The subordinated certificates, Class A-R Certificates, and Class P Certificates are not at-issue  (Lead Plaintiff's Memorandum of Law in Support of its Motion for Class Certification, December 10, 2010, p  1 )

**Sources:**

[1] Brown Brothers 11 12 10 pdf
[2] Charles Schwab 12-2-2010_xls xls
[3] CIBC - TRIAXX collateral pool xls
[4] CITI_T 0000001 pdf
[5] CITI_T 0000053 pdf
[6] CS_T_0000022 xls
[7] CS_T 00001389 xls
[8] DBSI_T_0000001 tif
[9] DTC Production pdf
[10] EBS Export File--761119AA4 xls
[11] EBS Export File--761119AE6 xls
[12] EBS Export File--761119AG1 xls
[13] EBS Export File--761119AJ5 xls
[14] EBS Export File--761119AN6 xls
[15] EBS Export File--761119AS5 xls
[16] EBS Export File--761119AT3 xls
[17] EBS Export File--761119AW6 xls
[18] GS_T 0000001 - GS_T 0000046 pdf
[19] JPMSL_T 0000001 pdf
[20] MS_T 0000001 pdf
[21] National Financial Sheet 1 xls
[22] National Financial Sheet 2 xls
[23] National Financial Sheet 3 xls
[24] Northern Trust 11-16-2010 pdf
[25] PNC Data 11-11-2010 pdf
[26] Securities Trading Activity Report #1 pdf
[27] State Street - Transaction Data with Fund Code xls
[28] Stifel Nicolaus Production  11-23-2010 pdf
[29] UBSFS_T 0000001 pdf
[30] Unterberg FCC Trades xlsx
[31] IndyMac Residential Asset Securitization Trust 2006-A8 Trustee Report, July 25, 2006
[32] IndyMac Residential Asset Securitization Trust 2006-A8 Prospectus Supplement, June 28, 2006
[33] Lead Plaintiff's Memorandum of Law in Support of its Motion for Class Certification, December 10, 2010
[34] Capital IQ, Bloomberg, and publicly available references for purchaser types

**Exhibit 22**
**RAST 2006-A8: Non-PO Principal Distribution – Group 1 Senior Certificates**



**Notes:**
[1] Non-PO principal is distributed to all certificates other than the PO and interest-only certificates.
[2] This principal payment distribution reflects the Non-PO Formula Principal Amount distributed to Senior Certificates before the Senior Credit Support Depletion Date.
[3] 1-A-4 is paid the Group 1 Priority Amount which is equal to zero for the first five years, and then gradually increases according to the Shift Percentage.
[4] Once A-R is reduced to zero, 1-A-1 and 1-A-2 receive principal payments concurrently, *pro rata*, until their respective balances are reduced to zero.
**Source:**
[1] IndyMac Residential Asset Securitization Trust 2006-A8 Prospectus Supplement, June 28, 2006, pp. S-92 – S-93.

**Exhibit 23**
**RAST 2006-A8: Non-PO Principal Distribution – Group 2 Senior Certificates**



**Notes:**
[1] Non-PO principal is distributed to all certificates other than the PO and interest-only certificates.
[2] This principal payment distribution reflects the Non-PO Formula Principal Amount distributed to Senior Certificates before the Senior Credit Support Depletion Date.
[3] 2-A-4 and 2-A-8 are paid the Group 2 Priority Amount concurrently, *pro rata*, which is equal to zero for the first five years, and then gradually increases according to the Shift Percentage.
[4] 2-A-1, 2-A-2 and 2-A-3 receive 76.1% of the available principal payments concurrently, *pro rata,* while 2-A-5 receives 23.9% of the available principal payments until their balances are reduced to zero.
**Source:**
[1] IndyMac Residential Asset Securitization Trust 2006-A8 Prospectus Supplement, June 28, 2006, pp. S-92 – S-93.

**Exhibit 24**
**RAST 2006-A8: Non-PO Principal Distribution – Group 3 Senior Certificates**



**Notes:**
[1] Non-PO principal is distributed to all certificates other than the PO and interest-only certificates.
[2] This principal payment distribution reflects the Non-PO Formula Principal Amount distributed to Senior Certificates before the Senior Credit Support Depletion Date.
[3] 3-A-4 is paid the Group 3 Priority Amount which is equal to zero for the first five years, and then gradually increases according to the Shift Percentage.
[4] 3-A-2 is first paid up to $237,985 for each distribution date before other relevant certificates are paid.
[5] 3-A-3 and 3-A-6 are paid an amount up to the amount necessary to reduce the aggregate balance to the Aggregate Targeted Balance for that Distribution Date, according to the Aggregate Payment Rule, before 3-A-7 is paid.
**Source:**
[1] IndyMac Residential Asset Securitization Trust 2006-A8 Prospectus Supplement, June 28, 2006, pp. S-92 – S-93.

**Exhibit 25**
**IndyMac Residential Asset Securitization Trust 2006-A8 - Certificate 1-A-1**
**IDC and Trade Prices**
**June 28, 2006 through December 31, 2010**



**Notes:**
[1] Offering date for RAST 2006-A8 was June 28, 2006.
[2] Trade prices are weighted by volume.
**Sources:**
[1] IDC, accessed on January 17, 2011.
[2] Capital IQ, accessed on January 10, 2011.
[3] Trade data from counsel, received January 4, 2011, January 15, 2011, January 19, 2011 and February 24, 2011.
[4] IndyMac Residential Asset Securitization Trust 2006-A8 Prospectus Supplement, June 28, 2006.
[5] Complaint, Tsereteli v. Residential Asset Securitization Trust, No. 08603380, Supreme Court of the State of New York, County of New York, November 19, 2008.

**Exhibit 26**
**IndyMac Residential Asset Securitization Trust 2006-A8 - Certificate 1-A-5**
**IDC and Trade Prices**
**June 28, 2006 through December 31, 2010**



**Notes:**
[1] Offering date for RAST 2006-A8 was June 28, 2006.
[2] Trade prices are weighted by volume.
**Sources:**
[1] IDC, accessed on February 16, 2011.
[2] Capital IQ, accessed on January 10, 2011.
[3] Trade data from counsel, received January 4, 2011, January 15, 2011, January 19, 2011 and February 24, 2011.
[4] IndyMac Residential Asset Securitization Trust 2006-A8 Prospectus Supplement, June 28, 2006.
[5] Complaint, Tsereteli v. Residential Asset Securitization Trust, No. 08603380, Supreme Court of the State of New York, County of New York, November 19, 2008.

**Exhibit 27**
**IndyMac Residential Asset Securitization Trust 2006-A8 - Certificate 2-A-2**
**IDC and Trade Prices**
**June 28, 2006 through December 31, 2010**



**Notes:**
[1] Offering date for RAST 2006-A8 was June 28, 2006.
[2] Trade prices are weighted by volume.
**Sources:**
[1] IDC, accessed on February 16, 2011.
[2] Capital IQ, accessed on January 10, 2011.
[3] Trade data from counsel, received January 4, 2011, January 15, 2011, January 19, 2011 and February 24, 2011.
[4] IndyMac Residential Asset Securitization Trust 2006-A8 Prospectus Supplement, June 28, 2006.
[5] Complaint, Tsereteli v. Residential Asset Securitization Trust, No. 08603380, Supreme Court of the State of New York, County of New York, November 19, 2008.

**Exhibit 28**
**IndyMac Residential Asset Securitization Trust 2006-A8 - Certificate 3-A-5**
**IDC and Trade Prices**
**June 28, 2006 through December 31, 2010**



**Notes:**
[1] Offering date for RAST 2006-A8 was June 28, 2006.
[2] Trade prices are weighted by volume.
[3] Two trade prices are excluded because they appear to be mistakenly recorded for this certificate. The prices are $99.07 on July 2, 2007 and $99.12 on July 3, 2007.
**Sources:**
[1] IDC, accessed on February 16, 2011.
[2] Capital IQ, accessed on January 10, 2011.
[3] Trade data from counsel, received January 4, 2011, January 15, 2011, January 19, 2011 and February 24, 2011.
[4] IndyMac Residential Asset Securitization Trust 2006-A8 Prospectus Supplement, June 28, 2006.
[5] Complaint, Tsereteli v. Residential Asset Securitization Trust, No. 08603380, Supreme Court of the State of New York, County of New York, November 19, 2008.

**Exhibit 29**
**IndyMac Residential Asset Securitization Trust 2006-A8 - Certificate 1-A-1**
**IDC Prices, Credit Ratings and Credit Watches**
**June 28, 2006 through December 31, 2010**



**Note:**
[1] Offering date for RAST 2006-A8 was June 28, 2006.
**Sources:**
[1] IDC, accessed on January 17, 2011.
[2] Capital IQ, accessed on January 10, 2011 and February 24, 2011.
[3] Moodys.com, accessed on February 18, 2011.
[4] IndyMac Residential Asset Securitization Trust 2006-A8 Prospectus Supplement, June 28, 2006.
[5] Complaint, Tsereteli v. Residential Asset Securitization Trust, No. 08603380, Supreme Court of the State of New York, County of New York, November 19, 2008.

**Exhibit 30**
**IndyMac Residential Asset Securitization Trust 2006-A8 - Certificate 1-A-5**
**IDC Prices, Credit Ratings and Credit Watches**
**June 28, 2006 through December 31, 2010**



**Note:**
[1] Offering date for RAST 2006-A8 was June 28, 2006.
**Sources:**
[1] IDC, accessed on February 16, 2011.
[2] Capital IQ, accessed on January 10, 2011 and February 17, 2011.
[3] Moodys.com, accessed on February 18, 2011.
[4] IndyMac Residential Asset Securitization Trust 2006-A8 Prospectus Supplement, June 28, 2006.
[5] Complaint, Tsereteli v. Residential Asset Securitization Trust, No. 08603380, Supreme Court of the State of New York, County of New York, November 19, 2008.

**Exhibit 31**
**IndyMac Residential Asset Securitization Trust 2006-A8 - Certificate 2-A-2**
**IDC Prices, Credit Ratings and Credit Watches**
**June 28, 2006 through December 31, 2010**



**Note:**
[1] Offering date for RAST 2006-A8 was June 28, 2006.
**Sources:**
[1] IDC, accessed on February 16, 2011.
[2] Capital IQ, accessed on January 10, 2011 and February 17, 2011.
[3] Moodys.com, accessed on February 18, 2011.
[4] IndyMac Residential Asset Securitization Trust 2006-A8 Prospectus Supplement, June 28, 2006.
[5] Complaint, Tsereteli v. Residential Asset Securitization Trust, No. 08603380, Supreme Court of the State of New York, County of New York, November 19, 2008.

**Exhibit 32**
**IndyMac Residential Asset Securitization Trust 2006-A8 - Certificate 3-A-5**
**IDC Prices, Credit Ratings and Credit Watches**
**June 28, 2006 through December 31, 2010**



**Note:**
[1] Offering date for RAST 2006-A8 was June 28, 2006.
**Sources:**
[1] IDC, accessed on February 16, 2011.
[2] Capital IQ, accessed on January 10, 2011 and February 17, 2011.
[3] Moodys.com, accessed on February 18, 2011.
[4] IndyMac Residential Asset Securitization Trust 2006-A8 Prospectus Supplement, June 28, 2006.
[5] Complaint, Tsereteli v. Residential Asset Securitization Trust, No. 08603380, Supreme Court of the State of New York, County of New York, November 19, 2008.

**Exhibit 33**
**IndyMac Residential Asset Securitization Trust 2006-A8 - Certificate 1-A-1**
**IDC and Bloomberg Prices**
**January 1, 2010 through December 31, 2010**



**Note:**
[1] Bloomberg prices start on January 28, 2010.
**Sources:**
[1] Capital IQ, accessed on January 10, 2011.
[2] Bloomberg, accessed on January 21, 2011.

**Exhibit 34**
**IndyMac Residential Asset Securitization Trust 2006-A8 - Certificate 1-A-5**
**IDC and Bloomberg Prices**
**January 1, 2010 through December 31, 2010**



**Note:**
[1] Bloomberg prices start on January 28, 2010.
**Sources:**
[1] Capital IQ, accessed on January 10, 2011.
[2] Bloomberg, accessed on February 17, 2011.

**Exhibit 35**
**IndyMac Residential Asset Securitization Trust 2006-A8 - Certificate 2-A-2**
**IDC and Bloomberg Prices**
**January 1, 2010 through December 31, 2010**



**Note:**
[1] Bloomberg prices start on January 28, 2010.
**Sources:**
[1] Capital IQ, accessed on January 10, 2011.
[2] Bloomberg, accessed on February 17, 2011.

**Exhibit 36A**

**Identification of Potential Class Members (Initial Purchasers) for**

**IndyMac Residential Asset Securitization Trust 2006-A8 (Offering Date: June 28, 2006)**

**by Certificate**

| Certificate | Certificate Value per Initial Purchase Data ($) | Potential Class Member | Duplicate Customer Name | Purchased After June 2008 | Purchaser's Name Is Not Identified | Number of Purchasers |
|---|---|---|---|---|---|---|
| 1A1 | 72,080,834 | 16 | 1 | 0 | 36 | 53 |
| 1A2 | 14,416,166 | 1 | 0 | 0 | 0 | 1 |
| 1A3 | 14,386,779 | 1 | 0 | 0 | 0 | 1 |
| 1A4 | 20,495,900 | 2 | 0 | 0 | 0 | 2 |
| 1A5 | 2,903,000 | 1 | 0 | 0 | 0 | 1 |
| 2A1 | 43,516,500 | 2 | 0 | 0 | 0 | 2 |
| 2A2 | 72,000,000 | 1 | 0 | 0 | 0 | 1 |
| 2A3 | 36,000,000 | 1 | 0 | 0 | 0 | 1 |
| 2A4 | 54,819,500 | 2 | 0 | 0 | 0 | 2 |
| 2A5 | 50,000,000 | 1 | 0 | 0 | 0 | 1 |
| 2A6 | 42,607,520 | 1 | 0 | 0 | 0 | 1 |
| 2A7 | 7,468,000 | 1 | 0 | 0 | 0 | 1 |
| 2A8 | 3,000,000 | 1 | 0 | 0 | 0 | 1 |
| 3A1 | 129,702,050 | 3 | 0 | 0 | 0 | 3 |
| 3A2 | 19,807,507 | 1 | 0 | 0 | 0 | 1 |
| 3A3 | 13,000,000 | 1 | 0 | 0 | 0 | 1 |
| 3A4 | 48,500,000 | 2 | 0 | 0 | 0 | 2 |
| 3A5 | 12,916,670 | 1 | 0 | 0 | 0 | 1 |
| 3A6 | 3,193,000 | 0 | 0 | 0 | 0 | 0 |
| 3A7 | 1,083,164 | 0 | 0 | 1 | 0 | 1 |
| 3A8 | 3,000,000 | 1 | 0 | 0 | 0 | 1 |
| 3A9 | 2,999,199 | 1 | 0 | 0 | 0 | 1 |
| 3A10 | 183,976 | 0 | 0 | 1 | 0 | 1 |
| 3A11 | 3,853,000 | 1 | 0 | 0 | 0 | 1 |
| A-X | 19,774,322 | 1 | 0 | 0 | 0 | 1 |
| PO | 3,737,942 | 1 | 0 | 0 | 0 | 1 |
| Total | 695,445,029 | 44 | 1 | 2 | 36 | 83 |
| Purchasers Purchasing Multiple Certificates | | 5 | | | | |
| Potential Class Members Across All Certificates | | 39 | | | | |

**Notes:**

[1] This exhibit only considers purchases in the initial offering from the underwriter

[2] A potential class member must have purchased in the initial offering from the underwriter  All duplicate purchaser names are excluded so that each unique purchaser is only counted as a potential class member once  A potential class member must also meet these criteria:  (1) must have purchased during or before June 2008,  and (2) the purchaser's name (not simply account number) must be identified

[3] "Duplicate Customer Name" lists the number of observations per certificate that were excluded because the purchaser's name is a duplicate of a purchaser already counted as a potential  class member for the same certificate

[4] "Purchased After June 2008" lists the number of observations per certificate that were excluded because the purchaser purchased after June 2008

[5] "Purchaser's Name Is Not Identified" lists the number of observations per certificate that were excluded because the name of the purchaser is not identified

[6] The exclusions criteria were implemented on a priority basis, with the first listed exclusion (i e , "Duplicate Customer Name") being implemented first and the last listed exclusion (i e , "Purchaser's Name Is Not Identified") being implemented last  Although a given purchaser could be excluded for multiple reasons, its exclusion is counted only once, under its first exclusion category

**Sources:**

[1] CS_T_0000022 xls

[2] CS_T 00001389 xls

[3] IndyMac Residential Asset Securitization Trust 2006-A8 Trustee Report, July 2006

[4] IndyMac Residential Asset Securitization Trust 2006-A8 Prospectus Supplement, June 28, 2006, p  1



**Exhibit 36B**

**Identification of Potential Class Members (Initial and Subsequent Purchasers) for**

**IndyMac Residential Asset Securitization Trust 2006-A8 (Offering Date: June 28, 2006)**

**by Certificate**

| Certificate | Certificate Value per Initial Purchase Data ($) | Potential Class Member | Duplicate Customer Name | Purchased After June 2008 | Purchaser's Name Is Not Identified | Number of Purchasers |
|---|---|---|---|---|---|---|
| | | | | Exclusions | | |
| 1A1 | 72,080,834 | 62 | 4 | 91 | 52 | 209 |
| 1A2 | 14,416,166 | 2 | 0 | 16 | 0 | 18 |
| 1A3 | 14,386,779 | 1 | 0 | 0 | 0 | 1 |
| 1A4 | 20,495,900 | 2 | 1 | 0 | 0 | 3 |
| 1A5 | 2,903,000 | 78 | 3 | 20 | 47 | 148 |
| 2A1 | 43,516,500 | 4 | 0 | 1 | 1 | 6 |
| 2A2 | 72,000,000 | 7 | 3 | 7 | 2 | 19 |
| 2A3 | 36,000,000 | 4 | 1 | 7 | 2 | 14 |
| 2A4 | 54,819,500 | 6 | 2 | 37 | 0 | 45 |
| 2A5 | 50,000,000 | 1 | 1 | 4 | 1 | 7 |
| 2A6 | 42,607,520 | 4 | 1 | 1 | 0 | 6 |
| 2A7 | 7,468,000 | 2 | 0 | 0 | 0 | 2 |
| 2A8 | 3,000,000 | 4 | 5 | 4 | 0 | 13 |
| 3A1 | 129,702,050 | 9 | 1 | 3 | 0 | 13 |
| 3A2 | 19,807,507 | 3 | 0 | 0 | 0 | 3 |
| 3A3 | 13,000,000 | 3 | 0 | 0 | 0 | 3 |
| 3A4 | 48,500,000 | 3 | 3 | 0 | 0 | 6 |
| 3A5 | 12,916,670 | 6 | 1 | 11 | 5 | 23 |
| 3A6 | 3,193,000 | 0 | 0 | 0 | 0 | 0 |
| 3A7 | 1,083,164 | 0 | 0 | 3 | 0 | 3 |
| 3A8 | 3,000,000 | 3 | 0 | 3 | 0 | 6 |
| 3A9 | 2,999,199 | 2 | 0 | 0 | 0 | 2 |
| 3A10 | 183,976 | 0 | 0 | 2 | 0 | 2 |
| 3A11 | 3,853,000 | 5 | 4 | 0 | 0 | 9 |
| A-X | 19,774,322 | 4 | 1 | 2 | 0 | 7 |
| PO | 3,737,942 | 2 | 1 | 0 | 0 | 3 |
| Total | 695,445,029 | 217 | 32 | 212 | 110 | 571 |
| Purchasers Purchasing Multiple Certificates | | 24 | | | | |
| Potential Class Members Across All Certificates | | 193 | | | | |

**Notes:**

[1] This exhibit considers purchases both in the initial offering from the underwriter and in subsequent trades.

[2] A potential class member must have purchased in the initial offering from the underwriter or in subsequent trades.  All duplicate purchaser names are excluded so that each unique purchaser is only counted as a potential class member once.  A potential class member must also meet these criteria  (1) must have purchased during or before June 2008, and (2) the purchaser's name (not simply account number) must be identified.

[3]  "Duplicate Customer Name" lists the number of observations per certificate that were excluded because the purchaser's name is a duplicate of a purchaser already counted as a potential  class member for the same certificate.

[4]  "Purchased After June 2008" lists the number of observations per certificate that were excluded because the purchaser purchased after June 2008.

[5] "Purchaser's Name Is Not Identified" lists the number of observations per certificate that were excluded because the name of the purchaser is not identified.

[6] The exclusions criteria were implemented on a priority basis, with the first listed exclusion (i.e., "Duplicate Customer Name") being implemented firsand the last listed exclusion (i.e., "Purchaser s Name Is Not Identified") being implemented last.  Although a given purchaser could be excluded for multiple reasons, its exclusion is counted only once, under its first exclusion category.

**Sources:**

[1] Brown Brothers 11 12 10.pdf.
[2] Charles Schwab 12-2-2010_xls.xls.
[3] CIBC - TRIAXX collateral pool.xls.
[4] CITI_T 0000001.pdf.
[5] CITI_T 0000053.pdf.
[6] CS_T_0000022.xls.
[7] CS_T 00001389.xls
[8] DBSI_T_00001389.tif.
[9] DTC Production.pdf.
[10] EBS Export File--761119AA4.xls
[11] EBS Export File--761119AE6.xls.
[12] EBS Export File--761119AG1.xls.
[13] EBS Export File--761119AJ5.xls.
[14] EBS Export File--761119AN6.xls.
[15] EBS Export File--761119AS5.xls.
[16] EBS Export File--761119AT3.xls.
[17] EBS Export File--761119AW6.xls.
[18] GS_T 0000001 - GS_T 0000046.pdf.
[19] JPMSL_T 0000001.pdf.
[20] MS_T 0000001.pdf.
[21] National Financial Sheet 1.xls
[22] National Financial Sheet 2.xls.
[23] National Financial Sheet 3.xls.
[24] Northern Trust 11-16-2010.pdf
[25] PNC Data 11-11-2010.pdf.
[26] Securities Trading Activity Report #1.pdf.
[27] State Street - Transaction Data with Fund Code.xls.
[28] Stifel Nicolaus Production. 11-23-2010.pdf.
[29] UBSFS_T 0000001.pdf .
[30] Unterberg FCC Trades.xlsx.
[31] IndyMac Residential Asset Securitization Trust 2006-A8 Trustee Report, July 2006.
[32] IndyMac Residential Asset Securitization Trust 2006-A8 Prospectus Supplement, June 28, 2006, p. 1.









**Exhibit 37A**
**Distribution of the Number of Potential Class Members (Initial Purchasers)**
**per Certificate for IndyMac Residential Asset Securitization Trust 2006-A8 (Offering Date: June 28, 2006)**
**(26 Certificates)**



**Notes:**
[1] This table considers purchases in the initial offering from the underwriter.
[2] A potential class member must have purchased in the initial offering from the underwriter.  All duplicate purchaser names are excluded so that each unique purchaser is only counted as a potential class member once. A potential class member must also meet these criteria: (1) must have purchased during or before June 2008, and (2) the purchaser's name (not simply account number) must be identified.

**Exhibit 37B**
**Distribution of the Number of Potential Class Members (Initial and Subsequent Purchasers)**
**per Certificate for IndyMac Residential Asset Securitization Trust 2006-A8 (Offering Date: June 28, 2006)**
**(26 Certificates)**



**Notes:**
[1] This table considers purchases both in the initial offering from the underwriter and in subsequent trades.
[2] A potential class member must have purchased either in the initial offering from the underwriter or in subsequent trades.  All duplicate purchaser names are excluded so that each unique purchaser is only counted as a potential class member once. A potential class member must also meet these criteria: (1) must have purchased during or before June 2008, and (2) the purchaser's name (not simply account number) must be identified.