UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

VASILI TSERETELI, and VASZURELE LTD.  :
on behalf of themselves and all others similarly  :   Docket No.
situated,  :   08 Civ.10637 (LAK)

                 Plaintiffs,  :

                        :

    -against-  :

                        :

RESIDENTIAL ASSET SECURITIZATION  :
TRUST 2006-A8, CREDIT SUISSE  :
SECURITIES (USA) LLC, MOODY'S  :
INVESTORS SERVICE, INC., and THE  :
MCGRAW-HILL COMPANIES, INC.  :

                        :

             Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
## LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

ARGUMENT .................................................................................................................2

I.      PLAINTIFF'S CLAIMS INVOLVE COMMON QUESTIONS THAT
        PREDOMINATE OVER ANY INDIVIDUAL ISSUES ....................................................2

        A.      Common Issues Predominate Concerning Investors ...............................3

                1.      "Knowledge".................................................................... 3

                2.      Investor Notice/Statute of Limitations...................................... 6

                3.      Reliance on Trustee Reports .................................................. 6

        B.      Common Issues Predominate Concerning All Certificates .....................7

                1.      Common Questions of Falsity Predominate ............................... 8

                2.      Materiality Is a Common Issue ............................................... 9

                3.      Damages and Loss Causation ............................................... 10

II.     LEAD PLAINTIFF HAS SATISFIED THE SUPERIORITY REQUIREMENT ............12

III.    LEAD PLAINTIFF HAS SATISFIED THE REQUIREMENTS OF RULE 23(a) ..........14

        A.      Adequacy ........................................................................................14

        B.      Numerosity .......................................................................................15

CONCLUSION..............................................................................................................15

# TABLE OF AUTHORITIES

## CASES

*Ackerman v. Oryx Commc'ns, Inc.*,
810 F. 2d 336, 341 (2d Cir. 1987)........................................................................12

*Ansari v. New York Univ.*,
179 F.R.D. 112 (S.D.N.Y. 1998) ........................................................................13

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..............................................................................................2

*Bersch v. Drexel Firestone, Inc.*,
519 F.2d 974 (2d Cir. 1975)................................................................................13

*Board of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
269 F.R.D. 340 (S.D.N.Y. 2010) ........................................................................13

*In re Countrywide Fin. Corp. Sec. Litig.*,
2009 WL 7322254 (C.D. Cal. Dec. 9, 2009) ...................................................6, 7

*Dorchester Investors v. Peak Trends Trust*,
2002 WL 272404 (S.D.N.Y. Feb. 26, 2002)........................................................6

*Dura-Bilt Corp. v. Chase Manhattan Corp.*,
89 F.R.D. 87 (S.D.N.Y. 1981) .........................................................................2, 3

*In re Dynex Capital, Inc. Sec. Litig.*,
2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ........................................................12

*In re Enron Corp. Sec. Litig.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) ................................................................11

*In re First holdings Corp. Fin. Prods. Sec. Litig*,
1993 WL 144861 (C.D. Cal Feb 26, 1993)........................................................10

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009)..................................................................................15

*In re Heritage Bond Litig.*,
2004 WL 163201 (C.D. Cal. July 12, 2004)......................................................10

*In re Initial Public Offering Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006).........................................................................3, 4, 5

*In re Initial Pub. Offering Sec. Litig.*,
    243 F.R.D. 79 (S.D.N.Y. 2007) ...............................................................2

*In re Initial Pub. Offering Sec. Litig.*,
    483 F.3d 70 (2d Cir. 2007)......................................................................4

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) ............................................................5

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997).....................................................................2

*Marsden v. Select Medical Corp.*,
    246 F.R.D. 480 (E.D. Pa. 2007)......................................................13, 14

*McMahan & Co. v. Wherehouse Entm't*,
    65 F.3d 1044 (2d Cir. 1995)........................................................10, 11, 12

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008).............................................................9, 10

*Mersay v. First Republic Corp. of America*,
    43 F.R.D. 465 (S.D.N.Y. 1968) ............................................................14

*In re Metropolitan Sec. Litig.*,
    2008 WL 5102303 (E.D. Wash. Nov. 25, 2008) .............................11, 12

*In re Monster Worldwide, Inc. Sec. Litig.*,
    251 F.R.D. 132 (S.D.N.Y. 2008) ............................................................6

*New Jersey Carpenters Health Fund v. Residential Capital, LLC*,
    2011 WL 147735 (S.D.N.Y. Jan. 18, 2011) .............................. *passim*

*New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*,
    2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ......................................11

*In re Pilgrim Sec. Litig.*,
    1996 WL 742448 (C.D. Cal. Jan. 23, 1996) .........................................10

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    632 F.3d 762 (1st Cir. 2011).....................................................................4

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).....................................................................6

*In re Superior Offshore Int'l, Inc. Sec. Litig.*,
  2010 WL 2305742 (S.D. Tex. June 8, 2010) ....................................................................5

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
  692 F. Supp. 2d 387 (S.D.N.Y. 2010) ..............................................................................4

*Tsirekidze v. Syntax-Brillian Corp.*,
  2009 WL 2151838 (D. Ariz. Jul. 17, 2009) ......................................................................6

*In re Vivendi Universal, S.A. Sec. Litig.*,
  242 F.R.D. 76 (S.D.N.Y. 2007) ........................................................................................2

*In re Warner Chilcott Ltd. Sec. Litig.*,
  2008 WL 344715 (S.D.N.Y. Feb. 4, 2008) .......................................................................2

*In re WorldCom, Inc.*,
  219 F.R.D. 267 (S.D.N.Y. 2003) ....................................................................................10

## STATUTES AND RULES

15 U.S.C. § 77k(a) ..........................................................................................................6, 7

15 U.S.C. § 77k(e) ...............................................................................................10, 11, 14

17 C.F.R. § 230.258(a) ........................................................................................................7

SEC Rule 158 .....................................................................................................................7

**INTRODUCTION**

The Certificates[1] were created by pooling together risky loans made to borrowers who could not afford to repay, and then slicing and dicing the pool into opaque financial instruments of mass destruction.   The Offering Documents accompanying the Certificates contained materially untrue statements and omissions about the single set of underwriting guidelines that were purportedly used to originate all of the Mortgage Loans; failing to disclose to investors that such underwriting guidelines were abandoned.  This abandonment of underwriting guidelines has negatively impacted the performance of all Certificates, regardless of their seniority or the individual statistical characteristics of the Mortgage Loans.

Despite the predominance of common issues, and the clear superiority of resolving Plaintiff's claims on a class-wide basis, Credit Suisse – responsible for underwriting and selling the Certificates to the Class – hopes to escape liability by convincing this Court to deny class certification.  Defendant raises a laundry list of arguments that focus on questions of investor knowledge, differences in timing of purchases and damages, and distinctions among the Certificates based on the senior/subordinate capital structure.  These arguments cannot defeat class certification as they are grounded in minutiae and speculation.  For example, Defendant baldly asserts that investor knowledge precludes class certification, while failing to acknowledge the threshold basis for a "knowledge" defense: that Class members actually knew of the untrue statements or material omissions concerning underwriting abandonment at the time of their purchase.  Instead, Defendant speculates about what a mere six (6) purportedly "sophisticated" investors would have known; Defendant has not sought any discovery from these investors and

---

[1] Unless otherwise stated, all capitalized terms herein shall have the same meaning as defined in Lead Plaintiff's Memorandum of Law in Support of its Motion for Class Certification [Dkt. No. 76] ("Opening Memorandum" or "P's Mem."), all internal quotations marks and citations are omitted, and all emphasis is added.  Defendant Credit Suisse Securities (USA) LLC's Memorandum of Law in Opposition to Lead Plaintiff's Motion for Class Certification [Dkt. No. 85] will be referred to herein as "Opposition Memorandum" or "D's Mem."

has no idea what they actually knew.  Further, Defendant's argument is contrary to common sense; no investor would knowingly buy a security backed by mortgage loans that were originated without any adherence to underwriting standards.  As the Supreme Court famously stated, "Who would knowingly roll the dice in a crooked crap game?"  *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988).  Like its "knowledge" argument, Defendant's other predominance arguments, and those about superiority, typicality, adequacy and numerosity are also flawed.

## ARGUMENT

## I.  PLAINTIFF'S CLAIMS INVOLVE COMMON QUESTIONS THAT PREDOMINATE OVER ANY INDIVIDUAL ISSUES

The Class members' injuries "derive from a unitary course of conduct" related to material misrepresentations and omissions about the underwriting of the Mortgage Loans.  *See, e.g., Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997); *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 85 (S.D.N.Y. 2007) ("[W]here putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied.").[2]

The Class consists entirely of investors who purchased Certificates that were issued in one Offering on June 28, 2006, by the same trust, pursuant to the same Offering Documents.  All of the Certificates were backed by a single pool of "primarily 30-year conventional, fixed rate mortgage loans secured by first liens on one-to-four-family residential properties,"[3] and originated between January and June 2006 (*i.e.*, of the same "vintage").  The Mortgage Loans

---

[2] *See also In re Warner Chilcott Ltd. Sec. Litig.*, 2008 WL 344715, at *2 (S.D.N.Y. Feb. 4, 2008); *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 90 (S.D.N.Y. 2007) (predominance satisfied because "[a]ll plaintiffs will rely on the same or substantially similar documents, statements, and legal theories to prove the defendants' liability."); *Dura-Bilt Corp. v. Chase Manhattan Bank*, 89 F.R.D. 87, 99 (S.D.N.Y. 1981) ("Factual differences will not defeat class certification where the various claims arise from the same legal theory. . . . . Thus, a difference in the amount of damages, date, size, or manner of purchase, the type of purchaser, and even the specific documents influencing the purchase will not render the claim atypical in most securities actions.").  This bedrock principal applies to cases involving MBS.  *See New Jersey Carpenters Health Fund v. Residential Capital, LLC ("N.J. Carpenters")*, 2011 WL 147735 (S.D.N.Y. Jan. 18, 2011) (Baer, J.), discussed *infra*.

[3] *See* Prospectus and Prospectus Supplement annexed as Exhibit E to the December 10, 2010 Declaration of James A. Harrod [Dkt. No. 77] ("Harrod Decl."), at S-1, S-58,

were all originated or acquired by IndyMac and purportedly subject to the <u>same</u> set of underwriting guidelines, which were disclosed in the Prospectus Supplement. S-61-64. In addition, as Defendant's expert testified, all Certificates were interconnected in the capital structure through subordination and cross-collateralization.[4] Thus, as Plaintiff's expert, Dr. Feinstein, has opined, the abandonment of those guidelines affected all Class members, regardless of the specific Certificate they purchased.[5]

### A.    Common Issues Predominate Concerning Investors

Defendant spends the majority of its Opposition Memorandum arguing, despite the above, that individualized issues predominate.  As explained below, the "issues" Defendant identifies are hypothetical and do not exist, and, even if they did exist, would not be "individualized" because they affect all Class members equally.  In any event, "Rule 23(b)(3) does not require that all questions of law or fact be common; it only requires that the common questions predominate over individual questions."  *Dura-Bilt Corp.*, 89 F.R.D. at 93.

### 1.    "Knowledge"

Defendant argues that class certification should be denied due to individual issues of "investor knowledge."  D's Mem. at 10-14.  The obvious question is: investor knowledge *of what*?  The type of knowledge required to defeat class certification must be "knowledge *of the alleged wrongful conduct*."  *N.J. Carpenters*, 2011 WL 147735, at *8 (citing *In re Initial Pub.*

---

[4] *See* Rebuttal Report of Prof. Steven P. Feinstein, Ph.D. CFA ("Feinstein Rebuttal"), annexed as Exhibit E to the Harrod Reply Decl., ¶ 40; Deposition Transcript of Walter N. Torous, Ph.D., (Mar. 15, 2011) ("Torous Tr."), annexed as Exhibit F to the April 8, 2011 Declaration of James A. Harrod In Further Support of Lead Plaintiff's Motion for Class Certification ("Harrod Reply Decl."), at 115—118; Confidential Deposition Transcript of Walter N. Torous, Ph.D., (Mar. 15, 2011) ("Torous Confid. Tr."), annexed as Exhibit G to the Harrod Reply Decl., at 16.

[5] *See, e.g.,* Feinstein Rpt. ¶¶ 18 ("The allegedly untrue statements about the underwriting process would impact the value of the Certificates and influence investors' investment decisions, irrespective of the specifics of the mortgage collateral pool loan data."); 21 ("The value of all credit tranches, and similarly all Certificates, would be impacted by the allegedly untrue statements about the underwriting process").  Feinstein Rebuttal ¶ 39(g) ("Increased risk in the mortgage pools impacts the risk of all of the certificates. When loans default and cash flow from a pool is reduced at higher than expected rates, the cash flows to junior tranches may be immediately impacted while the risk of reduced cash flows to the senior tranches rises.").

*Offering Sec. Litig.*, 471 F.3d 24, 44 (2d Cir. 2006) ("*IPO*")).  However, Defendant has failed to

demonstrate that *any* Class member, whether ordinary or "sophisticated," knew at the time of

purchase that underwriting standards were abandoned.  As this Court previously recognized:

> [P]laintiffs have not alleged that the Offering Documents failed to warn investors
> about the risks of loss associated with these [low-documentation] categories of
> loans.  They have alleged instead that IndyMac Bank failed to disclose that it had
> *abandoned the underwriting standards* that it professed to follow and ignored
> whether borrowers ever would be able to repay their loans.  The warnings Credit
> Suisse highlights did not disclose *these alleged facts*.

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 392 (S.D.N.Y. 2010).[6]

Moreover, Defendant "denies that the offering documents contained any [material]

misstatements or omissions," while also stating that it "has yet to take the position that the

Offering Documents contained false statements," and admits that it has no evidence of investor

knowledge of the alleged untrue statements or omissions.[7]

None of the public documents Defendant cites revealed information about the "alleged

wrongful conduct" (*i.e.,* the abandonment of underwriting standards), which would be required

for Defendant to establish its "knowledge" defense.[8]  Nor has Defendant provided evidence that

any "sophisticated" investor in the Class had such knowledge.  While the trustee reports showed

that the Mortgage Loans were experiencing rising delinquencies and defaults, and the ratings

downgrades similarly demonstrated that the Certificates had become riskier, neither of these

---

[6] *See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 773 & n.11 (1st Cir. 2011) ("Neither being 'less stringent' . . . nor saying that exceptions occur . . . reveals what plaintiffs allege, namely, a wholesale abandonment of underwriting standards.").

[7] *See*, respectively, Defendant's April 26, 2010 Answer [Dkt. No. 67], ¶¶ 59-62, and Defendant's March 4, 2011 Objections and Responses to Lead Plaintiff's Second Requests for Production of Documents, at 11-14, annexed as Exhibit D to the Harrod Reply Decl.

[8] Defendant asserts that, under *IPO*, "[p]laintiffs must show lack of knowledge to recover on their section 11 claims."  *See* D's Mem. at 11.  However, the Second Circuit felt compelled to "clarify" that it is the *defendant's* burden to demonstrate its knowledge "defense," not plaintiff's to show the absence of such defense.  *See In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 73 n.1 (2d Cir. 2007) ("To avoid any misunderstanding with respect to Petitioners' claims under section 11 . . ., we clarify our reference to these claims . . . to reflect the general rule that an issuer's liability under section 11 is absolute, but that it can assert a defense . . . [of knowledge]").

revelations provided any explanation for *why* the Certificate's collateral was performing poorly, let alone reveal any connection between the poor performance and the abandonment of underwriting practices outlined in the Complaint.  *See* Torous Confid. Tr. at 10—17; 23—25.

In the cases Defendant cites where the courts denied class certification after finding that individual issues of knowledge predominated, those defendants had *proof* of class members' *actual* knowledge of the alleged fraud or misrepresentation.  *See IPO*, 471 F.3d at 43 ("The [p]laintiffs' [own] allegations" revealed an "industry-wide understanding" of the scheme, as well as "evidence . . . and discovery responses" that "demonstrated" "widespread" knowledge among class members, "thousands" of which had actively *participated* in the scheme and thus "were fully aware" of it); *In re Superior Offshore Int'l, Inc. Sec. Litig.*, 2010 WL 2305742, at *1, *5 (S.D. Tex. June 8, 2010) (The alleged misrepresentations, which included the facts that the company's CEO and COO had previously worked for a bankrupt company and that Superior's transformation to serve deepwater markets, were held to be, respectively, a matter of public record and revealed to potential investors by the Company's CEO).[9]  Defendant's argument here fails because it has presented *no* evidence that *any* Class members had the required knowledge.  *See Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 182-84 (S.D.N.Y. 2008) ("[P]ublic statements by institutional investors, academic papers, and a complaint filed against [defendant] during the class period" provided only "generalized notice of the potential for fraud" by defendant and did not establish sufficiently that "any potential class plaintiff – including

---

[9] In *N.J. Carpenters*, which Defendant relies on extensively in its knowledge arguments, the court examined the evidence presented by the defendants and concluded that it established that "broad knowledge *of the alleged wrongful conduct* existed 'throughout the community of [MBS] market participants,'" many of whom were members of the proposed class.  2011 WL147735 at *8.  While Judge Baer used the correct legal standard, Plaintiff respectfully submits that none of the evidence the court considered reflected knowledge concerning the *alleged abandonment of underwriting standards*.  What evidence was submitted merely supported a general conclusion that "loan originators were '*loosening and lowering*' underwriting guidelines."  *Id.*  Based on *IPO* and other authorities cited, *infra*, that evidence does not reflect knowledge of the alleged misrepresentations or omissions concerning the abandonment of underwriting standards.

investment banks – had *actual* knowledge of, or participated in, any alleged fraud."  If such arguments succeeded defendants could "defeat class certification merely by citing comments by certain industry participants that note the potential for a type of fraud in the industry.").[10]

### 2.      Investor Notice/Statute of Limitations

Defendant's argument that its statute of limitations defense creates individual issues is inapposite.  If a fact finder determines, after merits discovery, that investors in the Certificates were on inquiry notice as of a certain date that would be a common issue.[11]  Defendant has presented no evidence that any class member had actual knowledge of the alleged misrepresentations or omissions (*i.e.*, knew underwriting standards were abandoned).[12]

### 3.      Reliance on Trustee Reports

Reliance is not an element of a Section 11 or 12(a)(2) claim, *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004), except where a purchaser "acquired the security after the issuer has made generally available to its security holders an *earning statement* covering a period of at least *twelve* months beginning after the effective date of the registration statement."  15 U.S.C. § 77k(a).  Defendant argues, essentially in a footnote, that the trustee reports prepared by DBNTC should be construed as "earning statements" and therefore, individual issues of reliance

---

[10] *See, e.g., In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 137 (S.D.N.Y. 2008) ("Monster provides no direct evidence that any putative class member actually knew about option backdating at Monster before the scandal became public on June 12, 2006.  This failure of Monster to produce evidence of a single class member who had actually figured out what Monster claims so many class members would have figured out is telling."); *Dorchester Investors v. Peak Trends Trust*, 2002 WL 272404, at *8 (S.D.N.Y.  Feb. 26, 2002) (rejecting knowledge defense as "merely speculative" where "[n]othing in [the relevant] deposition testimony indicates that he had any inside information or knowledge about the alleged false and misleading statements at the time of [his] purchases.").

[11] *See Tsirekidze v. Syntax-Brillian Corp.*, 2009 WL 2151838, at *8 n10 (D. Ariz. Jul. 17, 2009) (rejecting defendant's argument that "common questions do not predominate because of individual questions regarding the one year statute of limitations for Section 11 and Section 12(a)(2) claims."  "It is unlikely that defendants will have many, or any, defenses regarding when a specific individual actually discovered the facts of their claim, and a determination of when plaintiffs should have discovered a claim can easily be done on a class-wide basis.").

[12] Nor is it appropriate to limit claims at this stage of the case based on a hypothetical statute of limitations defense.  *See In re Countrywide Fin. Corp. Sec. Litig.*, 2009 WL 7322254, at*34 (C.D. Cal. Dec. 9, 2009) (declining to "cut short proposed class period" at class certification stage because, "[t]o the extent the . . . [defendants raised] concerns relate[d] to loss or loss causation, they raise merits issues that must be reserved for a later time.").

predominate.  *See* D's Mem. at 16-17; n.29.  Defendant cites no cases in support of this novel attempt to shoehorn trustee distribution reports into the Section 11(a) exception.

SEC Rule 158 defines the term "earning statement" as used in Section 11(a) to include certain traditional corporate income statements "made generally available to securityholders *of the registrant*."  17 C.F.R. § 230.258(a) (listing SEC Form 10-K's, 10-Q's and 8-K's as types of "earning statements").  The trustee reports are *not* statements of the "issuer" or "registrant" of the Certificates (*i.e.,* RAST or IndyMac); they are compiled and issued by Deutsche Bank (the trustee) and stored on Deutsche Bank's website.  The reports do not resemble the types of traditional corporate financial reports listed in the Rule.  Furthermore, the reports are not filed with the SEC.[13]  Finally, to the extent that the trustee reports do provide information about the Mortgage Loans' poor performance, they do not contain any narrative, are not audited, and do not explain the reasons for said poor performance.  Nor do the reports correct the Offering Documents' misstatements and omissions concerning underwriting.[14]

### B.    Common Issues Predominate Concerning All Certificates

Defendant argues that despite the fact that Class members' claims arise from the same legal theory involving misrepresentations and omissions in the Prospectus Supplement, issues of liability are not common.  *See* D's Mem. at 17-24.  Nearly identical arguments were recently rejected in *N.J. Carpenters*, 2011 WL 147735, at *4-5, where plaintiffs sought to certify a single class of holders of MBS issued, not merely in one offering, but in *multiple* MBS offerings (with different issuing trusts, offering documents, loan originators and loan pools) based on allegations

---

[13]  The reports had been filed as exhibits to Form 10-D's until December 26, 2006 (only *six* months after the Offering date), but never as exhibits to Forms 10-K, 10-Q or 8-K, or any other SEC filings listed in the Rule.

[14]  *See* Torous Confid. Tr. at 10:9—13:2; *In re Countrywide Fin.*, 2009 WL 7322254, at *34 ("Section 11(a) and the SEC rulemaking do not allow defendants to shift the reliance burden to plaintiffs [in a § 11 case] where . . . subsequent [periodic reports] are alleged to contain material accounting-related misstatements or omissions."  Under such circumstances, "those reports will not qualify as earning statements within the meaning of § 11(a)'s reliance provision  . . . [and] individualized reliance issues [will] not predominate.").

that "the [MBS] offering documents were materially misleading as to whether the underlying loans were originated in compliance with the underwriting guidelines." *Id.*, at *4-5.[15]

### 1.    Common Questions of Falsity Predominate

Defendant proposes that proof of falsity creates individual issues because it requires a loan-by-loan review to establish that underwriting standards were abandoned.  This is not true.  Proof of abandonment of underwriting standards will be common.  Such proof can be established through testimony from IndyMac whistleblowers, IndyMac's (or Defendant's or a third-party's) documents, or statistical sampling that reflects the *wholesale* abandonment of underwriting standards.  Defendant's insistence that there is only one method to prove this case is entirely speculative; at this stage of the case, the ultimate proof of falsity could take many forms.[16]

In any event, even if Plaintiff seeks to prove its case through a statistical sampling of evidence indicating that a material number of Mortgage Loans were not underwritten pursuant to the disclosed guidelines, that proof would not create individual issues.  Such an argument, incorrectly conflates the use of *particularized evidence* to establish a common course of conduct with "individualized" proof relating to particular Class members.  Due to cross-collateralization (as described *infra* at 10) proof that a statistically material number of the Mortgage Loans were underwritten improperly would relate not to a single Class member, or a single tranche, but to all Certificates and the entire Class.[17]

---

[15] The rejected arguments in *N.J. Carpenters* were made under Rule 23(a).  *N.J. Carpenters*, 2011 WL 147735, at *1-8.  In this case, Defendant makes the same arguments under the guise of Rule 23(b)(3).

[16] *See* Torous Tr. at 111:5—113:18; 120:4—121:25.  *See also* February 11, 2011 Complaint in *SEC v. Abernathy*, 11cv1308 (C.D. Cal.), ¶¶ 16-19, annexed as Exhibit H to the Harrod Reply Decl. (discussing Post Production Quality Control Reports ("PPQCs") that reflected monthly audits of IndyMac's loan production and which the SEC asserts reflected an admission that more than 10% (and up to 22%) of all sampled loans contained "misrepresentations" in the loan application/file or were originated with an "underwriting error.").  While the loans at issue in that case were originated in 2007, the PPQCs found similar errors dating back to September 2005.  Plaintiff has served a subpoena seeking the PPQCs, but the documents have not yet been produced.

[17] Defendant's and its expert's bald assertions that "different underwriting guidelines applied to different loans," "[t]he offering documents for the certificates described the underwriting guidelines [only] in general terms," and *Continued on next page*

### 2.    Materiality Is a Common Issue

The *N.J. Carpenters* defendants argued, similarly to Defendant here, that MBS investors who purchased from different tranches, even within the same offering, were too dissimilar to constitute a single class.  Judge Baer rejected such arguments, recognizing that "[t]he heart of [all] [p]laintiffs' claims" of undisclosed abandonment of underwriting guidelines was the same. *Id*. at *5.  Consequently, "[t]he alleged disregard for those guidelines thus impacted all proposed class members in the same manner, irrespective of which tranche [or MBS security] they purchased."  *Id*.  "The question whether the offering documents were materially misleading will be answered the same way regardless of the varying knowledge levels, risk levels, and loss levels of the purchasers of different tranches."  *Id*.  Thus, "[p]laintiffs easily demonstrate that their claims share common questions of both law and fact with absent class members."  *Id*. at *3.[18]

Judge Baer also rejected arguments that materiality was not subject to common proof since "deviations from underwriting standards would have a far greater and more immediate impact on the subordinated classes." *Id*. at *7.  According to the court, "[t]his [argument] merely rehashes the rejected arguments as to differences in damages," and thus "conflates the questions of whether the misstatements mislead and whether they had an impact on damages."  *Id*.  "It [also] fails to account for the very basic rule that the materiality of a misstatement or omission under the Securities Act provisions alleged here is judged against an objective standard, and [plaintiffs] allege the same exact misstatements and omissions are misleading as they pertain to

---

"[t]he specific underwriting requirements . . . changed over time," *see* D's Mem. at 19, are unsupported by any facts and belied by statements in the Offering Documents that all of the Mortgage Loans were originated pursuant to the same detailed set of underwriting guidelines set forth therein, *see* S-61-64, at nearly the identical time, *see* S-58. Defendant's expert was unable to provide any support for such assertions.  Torous Tr. at 57:21—60:9; 63:7-14.

[18] Judge Baer rejected defendants' arguments that "purchasers of the more senior certificates will be in conflict with purchasers of subordinate certificates; purchasers who sold their certificates after receiving all the principal an interest due them would conflict with purchasers who continue to hold their certificates; those who purchased earlier will conflict with those who purchased later and thus arguably had more knowledge; and pension funds will conflict with institutional investors, who may not wish to advance certain arguments or theories."  *Id*. at *4.

each tranche of each offering."  *Id.  See also McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 233 n.10 (2d Cir. 2008) ("[W]hat a 'reasonable person' would have known, and when, can be proven on a class-wide basis.").  These arguments should be rejected here as well.

Furthermore, all the Certificates were interconnected in the capital structure through subordination and cross-collateralization, regardless of seniority, payment priority or principal balance, and even if they were backed by different loan groups.  *See* Feinstein Rebuttal ¶ 40; Torous Tr. at 115—118; Torous Confid. Tr. at 16:5-22.  Therefore, when losses occurred due to abandoned underwriting they did not only affect those Certificates associated with that particular group of Mortgage Loans, but negatively impacted all of the Certificates.[19]

### 3.    Damages and Loss Causation

Damages will be calculated using the statutory method provided by the Securities Act. *See* P's Mem. at 12.[20]  Under Section 11(e), "damages represent the difference between the *amount paid* for the security . . . and (1) the *value* thereof as of the time such suit was brought, or (2) the *price* at which such security shall have been disposed of in the market."  15 U.S.C. § 77k(e).  The prices at which the Certificates were purchased or sold will be objectively determined in a post-trial claims process.  "Value," which need only be calculated as of a single date for all Class members – the date the complaint was filed – can be determined through the

---

[19] Additionally, Courts frequently certify classes involving multiple types of securities.  *See, e.g., In re WorldCom, Inc.,* 219 F.R.D. 267 (S.D.N.Y. 2003) (certifying class consisting of purchasers of defendant company's common stock and debt securities); *In re Heritage Bond Litig,* 2004 WL 163201, at *10 (C.D. Cal. July 12, 2004) (predominance satisfied for investors in 11 different bond offerings); *In re Pilgrim Sec. Litig.,* 1996 WL 742448, at *4 (C.D. Cal. Jan. 23, 1996) (certifying a Section 11 class comprised of investors in ten different mortgage-backed securities); *In re First Holdings Corp. Fin. Prods. Sec. Litig.,* 1993 WL 144861, at *6 (C.D. Cal. Feb. 26, 1993) (certifying class of common stock holders, preferred stock holders and debenture holders).

[20] *See, e.g., McMahan & Co. v. Wherehouse Entm't,* 65 F.3d 1044, 1048 (2d Cir. 1995) ("The plain language of section 11(e) prescribes the method of calculating damages . . . [T]he court must apply that method in every case.").

use of pricing databases,[21] from actual trading records[22] or based on valuation models. *See* Feinstein Rebuttal ¶¶ 7-9; 41; 58-62; Torous Tr. 84:15—87:19.

Defendant's argument, that "individually negotiated" transactions and the purported absence of an efficient market defeat predominance, is incorrect.[23] Defendant's argument appears to be that these transactions do not reflect the value of the securities because they are based on specific considerations unique to each transaction. Notwithstanding that this position is not economically sound,[24] it is irrelevant because the statute speaks to "price" in determining damages, so the question of "value" is only relevant as of the date this suit was brought, and as described above, is readily ascertainable through multiple means. Nor do differences in the *amount* of each Class members' damages, resulting from differences in the timing of their purchases and the seniority of their Certificates, present individualized issues that defeat class certification. *See* P's Mem. at 12 n.14; *N.J. Carpenters*, 2011 WL 147735, at *7 ("While the amount [of damages across tranches] may differ, the harm alleged resulted from the same course of conduct that violated the same sections of the securities laws for all tranches and all offerings. Even senior tranches were affected by market decline."); *see also In re Metro. Sec. Litig*, 2008 WL 5102303, at *2 (E.D. Wash. Nov. 25, 2008) ("Generally speaking, disputes concerning the damages suffered by individual class members do not preclude a finding of predominance.").

Moreover, as Defendant has not met its "heavy burden" of proving its negative causation

---

[21] *See* Feinstein Report ¶ 82; Feinstein Rebuttal ¶¶ 75-6. *See In re Enron Corp. Sec. Litig.*, 529 F. Supp. 2d 644, 760-61 (S.D. Tex. 2006) (accepting use of matrix prices, including those published by Interactive Data Corporation ("IDC")). Defendant's challenge to the use of IDC prices to determine "value," raises only common questions.

[22] *See McMahan,* 65 F.3d at 1048-49 (noting that, "even where market price is not completely reliable, it serves as a good starting point in determining value" under Section 11(e).); Feinstein Rebuttal ¶¶ 64-6.

[23] Relatedly, it is not true that losses owing to transactions in the secondary market are not cognizable damages. *See* D's Mem. at 23, n.33; Feinstein Rebuttal ¶ 65. Such arguments were previously raised by Defendant in its motion to dismiss (Dkt No. 32, at 22-25; Dkt No. 45, at 7-8). However, this Court refused to adopt the economic loss holdings cited by Defendant. *See N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, 2010 WL 1473288, at *4-6 (S.D.N.Y. Mar. 29, 2010) (rejecting similar arguments as "too cramped a reading of damages").

[24] *See* Feinstein Rebuttal ¶ 65, explaining that "it is a generally accepted principle of finance that a trade price is not only an indicator of value, it conforms to the definition of value."

defense at this stage, *Ackerman v. Oryx Commc'ns, Inc.*, 810 F. 2d 336, 341 (2d Cir. 1987), its arguments that certain "macroeconomic or exogenous factors" caused the Certificates to decline in value are merely speculative.[25]   As such, "any decline in value [of the Certificates] is presumed to be caused by the [alleged] misrepresentations."   *See McMahan*, 65 F.3d at 1048. Any arguments to the contrary relate solely to the merits and are improper.   *See Metro.*, 2008 WL 5102303, at *2 ("defendants have not cited, and independent research has failed to uncover, a Section 11 case in which a court has ruled that the existence of a[n] [unproven] loss causation defense precludes certification under Rule 23(b)(3).").[26]

## II.   LEAD PLAINTIFF HAS SATISFIED THE SUPERIORITY REQUIREMENT

Defendant's arguments against superiority are redundant of their arguments against predominance.  As before, they all fail.   *First*, the fact that there are 26 different Certificates at issue in this case is irrelevant, where all the Certificates are substantially similar, interconnected in the capital structure, backed by the same pool of Mortgage Loans, and where the misrepresentations and omissions are common to all Certificate holders.[27]

*Second*, the fact that the Class includes some investors who are more "sophisticated" than others and have more "financial resources" does not defeat superiority, where Defendant has

---

[25] *See* D's Mem. at 22-23.  Defendant's expert did not conduct any studies to isolate the effect of housing bubble on the Certificates, or to isolate other cause for their decline.  Torous Tr. at 70:3-23; Feinstein Rebuttal ¶¶ 29; 87.

[26] In support of its argument, Defendant cites distinguishable cases where addressing loss causation was only proper because: (1) merits discovery was complete (*Ackerman v. Oryx Commc'ns, Inc.*); (2) the defense was apparent on the face of the complaint (*In re Merrill Lynch & Co., Inc., Research Reports Sec. Litig.*); or (3) the burden of establishing loss causation fell on the plaintiff (*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* and *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*).  *See also Metro.*, 2008 WL 5102303, at *3 (finding that the § 10(b) cases cited by defendants "provide[d] little or no guidance" because, unlike plaintiffs in a § 10(b) case, "plaintiffs [in a Section 11 case] do not have to qualify for the *Basic* presumption in order to demonstrate predominance under Rule 23(b)(3).").

[27] *See In re Dynex Capital, Inc. Sec. Litig.*, 2011 WL 781215, *8 (S.D.N.Y. Mar. 7, 2011) (certifying class consisting of investors who purchased two series of bonds that were issued at different times pursuant to different offering statements.  In addressing superiority, the court stated: "The foregoing discussion of [p]laintiff's typicality and commonality is premised on submitted evidence that shows that the proposed class is cohesive in terms of the types of claims and evidence that will be presented.  Individual control of separate actions would not serve the class members' interests and class treatment in this case is the fairest and most efficient way to proceed.").

only identified six (6) purportedly "sophisticated" investors out of the 193 its expert believes are in the Class.  *See Bd. of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 269 F.R.D. 340, 354-55 (S.D.N.Y. 2010) ("*AFTRA*") (rejecting arguments against superiority where class members "are sophisticated institutional investors" with "millions of dollars" in claims and who have "ample resources and incentive[s] to pursue individual claims" because "the advantages of unitary adjudication exist to determine the defendant's liability.").[28]  Moreover, while Defendant claims that there have been a number of individual actions filed concerning IndyMac MBS *generally*, there have been *no* such individual actions filed concerning the RAST 2006-A8 Certificates at issue in this action.  *See* P's Mem. at 21.

*Third,* the existence of six (6) purportedly foreign investors does not render individual issues superior.[29]  Defendant identifies at least 193 unique investors who purchased the Certificates (Touros Rept., Ex. 36B), of which just six (or ~3% of 193) are purportedly "foreign entities."  D's Mem. at 27.  Any theoretical issues involving foreign investors are so *de minimis* to this case that they cannot be superior to the common issues that affect, by Defendant's own assessment, 97% of the class.[30]  Courts frequently certify classes that include some foreign class members.  *See, e.g., Marsden v. Select Medical Corp.*, 246 F.R.D. 480, 489 n.7 (E.D. Pa. 2007)

---

[28] The "advantages" the court identified in *AFTRA*, which are equally present in the instant action, included that: (1) "although larger institutional investor may be capable of filing individual suits, smaller institutional investors may not be willing and able to hire counsel to 'battle against the collective resources of the nation's largest financial industry firms'"; (2) "including the institutional investors – *who executed nearly seventy percent of all trades* – would significantly improve the prospects for an overall resolution"; and (3) the larger institutional investors "have a strong disincentive to 'initiate individual lawsuits because they may not be willing to sue their securities custodian with whom they have active ongoing relationships." *Id.* at 355.

[29] Defendant's argument does not apply to Vaszurele, who as a party to this litigation, would be bound by any judgment irrespective of the preclusive effect of Rule 23 outside the U.S.

[30] By contrast, the authorities Defendant cites address claims brought on behalf of classes consisting either entirely or primarily of foreign claimants, or against a foreign issuer and without reference to superiority.  *See* D's Mem. 27, citing *Ansari v. New York Univ.,* 179 F.R.D. 112, 113 (S.D.N.Y. 1998) (Indian dentist brought claims on behalf of a proposed class of "35 other dentists from 11 foreign countries"); *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 977-78 (2d Cir. 1975) (Proposed class consisted "preponderantly [of foreign] citizens and residents" in claims against a company "organized under the laws of Canada, having had its main business office in Geneva.").

(the "existence of foreign investors does not affect the superiority of the class action with respect to them.  The alleged wrongdoing by American defendants took place in the United States . . . it is unclear that any foreign class members would even have recourse in their home countries, and so their participation in the class is appropriate.").

## III.   LEAD PLAINTIFF HAS SATISFIED THE REQUIREMENTS OF RULE 23(a)

Defendants' arguments pursuant to Rule 23(a) suffer from numerous defects.[31]

### A.   Adequacy

Defendant's arguments about the adequacy of Lead Plaintiff, Vaszurele, are inapposite. Vasili Tsereteli's testimony on behalf of Vaszurele, as described in the Harrod Reply Decl. ¶¶ 7-11 and attached as Exhibit C thereto, makes clear that Vaszurele is a capable and adequate representative plaintiff.  *See* P's Mem at 16-18.  The testimony of Ms. Claire Lea-Howarth on behalf of Vaszurele's investment advisor, J.P. Morgan Chase Bank, N.A., is also consistent with a finding of adequacy.  *See* Harrod Reply Decl. ¶¶ 3-6, Exhibit A thereto.

Defendant's arguments that there are "inherent" conflicts among the Class (*see* D's Mem. at 32-33) are similarly unsupported, for many of the reasons discussed above:

- *First,* that Vaszurele (among many other Class members who purchased the certificates protected by subordination) received expected payments, while other Class members may not have, does not create a conflict stemming from different theories of damages. Findings of damages are subject to the statutory framework discussed above.[32]

- *Second*, differences in time of purchase may affect the magnitude of a Class member's damage, but the continued operation of the alleged untrue statements or omissions give the entire Class a common interest in the claims, particularly in proving that the Offering

---

[31] Defendant argues that "Vaszurele is subject to the unique defense that it suffered no cognizable economic loss." *See* D's Mem. at 27-30.  This is incorrect.  Vaszurele suffered an economic loss, as calculated under Section 11(e), by purchasing its Certificates at $1.00 and selling them at $0.45, a difference of $0.55 (per dollar of principal).  *See* 15 U.S.C. § 77k(e) (defining damages as "the difference between the amount paid for the security [and] . . . the price at which such security shall have been disposed of"). *Mersay v. First Rep. Corp. of Am.*, 43 F.R.D. 465,  468-469 (S.D.N.Y. 1968) (even if "Mersay individually suffered no loss, it is impossible to see how [this makes] Mersay's . . . interests antagonistic or inimical to those of the other members of the class.").

[32] To the extent Defendant establishes a negative causation defense, Plaintiff will seek to establish that any cash-flow shortages, which necessarily reflect losses to the common collateral pool underlying ***all*** of the Certificates (Feinstein Rebuttal ¶¶ 39(e)-(g)), affected the value of all Certificates in the Class.

Documents were untrue and incomplete. *See* Feinstein Rebuttal ¶ 46 ("[A]s public information changes, the market prices of the MBS change accordingly. Consequently, if it were the case that partially informative data about or reflecting noncompliance with underwriting standards made its way into the marketplace, investors who bought at that later date would pay a lower price reflecting that information.")

- *Third,* in the event of a settlement, absent Class members and this Court will have a full opportunity to review a plan of allocation and determine whether the methodology employed to distribute the recovery is fair to all Class members.[33]

Conflicts between the Class and its representative must be fundamental, and none of Defendants' purported conflict remotely approaches that level. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 35 (2d Cir. 2009).

### B.     Numerosity

Plaintiff has identified 97 Class members and 569 market participants, many of which are likely Class members. *See* P's Mem. at 6, 9-10; Harrod Decl. ¶¶ 11-12. This is sufficient to establish numerosity. *Id.* Compared with Plaintiff, Defendant's expert identified at least 193 potential class members by applying a methodology that was admittedly *less* conservative than Plaintiff's. *See* Torous Rpt. Exhibit 36B, ¶ 118 & n.135. Dr. Torous also included nominal holders in its count, which raises the chance that these holders purchased on behalf of numerous other beneficial holders. Defendant's sole argument against numerosity is that it must be established on a tranche-by-tranche basis, rather on a single offering basis. *See* D's Mem. at 34 (still finding two tranches with over 40 investors). This is the same argument that was explicitly rejected in *N.J. Carpenters*, 2011 WL 147735, at *2.

### CONCLUSION

Defendant's arguments do not defeat class certification.[34]

---

[33] Defendant also argues, somewhat inscrutably, that there are conflicts between Vaszurele and Class members who are defendants in other MBS cases. The basis for such conflict is not articulated. The only Class members Defendant identifies have not been an impediment to prosecuting these claims. Nor would any judgment in this matter have preclusive effect against these Class member/defendants or their affiliates in other litigation.

[34] Plaintiff can provide additional briefing or oral argument addressing any matter that the Court believes requires further explanation if not fully addressed in this memorandum due to space limitations.

Dated:  April 8, 2011
New York, New York

**WOLF POPPER LLP**


s/ James A. Harrod
Lester L. Levy
James A. Harrod
Robert S. Plosky
845 Third Avenue, 12th Floor
New York, New York 10022
T: 212.759.4600
F: 212.486.2093

*Lead Counsel for Lead Plaintiff and the
Proposed Class*

170630-16                                    16