UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
VASILI TSERETELI, et al.,

                     Plaintiffs,

                -against-                        08 Civ. 10637 (LAK)

RESIDENTIAL ASSET SECURITIZATION
TRUST 2006-A8, et al.,

                     Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

         Appearances:

                        James A. Harrod, III
                        Lester L. Levy
                        Robert S. Plosky
                        WOLF POPPER LLP
                        *Attorneys for Plaintiffs Vaszurele Ltd.*
                        *and Vasili Tsereteli*

                        Robert F. Serio
                        Aric H. Wu
                        GIBSON, DUNN & CRUTCHER LLP
                        *Attorneys for Defendant Credit Suisse*
                        *Securities (USA) LLC*

LEWIS A. KAPLAN, *District Judge.*

         This putative class action concerns the issuance, distribution, and sale of mortgage

backed securities known as Senior Mortgage Pass-Through Certificates, Series 2006-H (the

"Certificates"), issued on June 28, 2006.  Plaintiffs claim that the Certificates were issued pursuant

to materially misleading offering documents in violation of Sections 11 and 12(a)(2) of the Securities

2

Act of 1933 ("Securities Act").[1]  The matter is before the Court on the motion of lead plaintiff Vaszurele Ltd. ("Vaszurele") seeking class certification, appointment as class representative, and appointment of lead counsel.[2]

*Background*

Familiarity with the procedural and factual background of this case is presumed.[3]  The Court provides below a summary only to the extent necessary to explain its ruling on this motion.

I.      *The Parties*

Vaszurele is a holding company established and controlled by Vasili Tsereteli, who also is a plaintiff.[4]  Vaszurele allegedly purchased $200,000 face-value Class 1-A-1 Certificates "pursuant to the Offering Documents" in a transaction that closed on or about June 28, 2006.[5]  The Certificates were collateralized by a pool of 1,708 individual home mortgage loans that were originated by IndyMac Bank ("IndyMac").[6]

---

[1]      15 U.S.C. §§ 77k(a)(5), 77l(a)(2).

[2]      DI 75.

[3]      *See, e.g.*, *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387 (S.D.N.Y. 2010) ("*Tsereteli I*"); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 697 F. Supp. 2d 546 (S.D.N.Y. 2010) ("*Tsereteli II*").

[4]      Am. Cpt. [DI 25] ¶¶ 10-11.

[5]      *Id.*

[6]      Harrod Decl. [DI 77], Ex. E, at 1, 5, 53.

3

Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is an investment banking firm that was the sole firm-commitment underwriter in the offering.[7]  In a firm-commitment underwriting, all of the securities are sold to the underwriters which in turn sells them to the public.[8] Credit Suisse sold the Certificates to investors, providing them also with copies of the Offering Documents.[9]

## II.    *The Certificates*

The Certificates are a form of mortgage backed security ("MBS") that entitle their owners to portions of the revenue streams generated by the underlying pool of mortgage loans.  They were issued and sold by Residential Asset Securitization Trust 2006-A8 ("RAST")[10]   pursuant to a February 24, 2006 registration statement, which was amended on March 29 and April 13, 2006, a June 14, 2006 base prospectus, and a June 28, 2006 prospectus supplement.[11]

The Certificates' ratings have declined substantially since their initial offering.  As of March 2009, the last date as of which the Court has been informed, the percentage of the

---

[7]
> Am. Cpt.  ¶¶ 13, 22.  Lehman Brothers, Inc., which is not a party to this action, was an underwriter for the Subordinated Mortgage Pass-Through Certificates.  *Id.* ¶ 22.

[8]
> *Id.* ¶ 22.

[9]
> *Id.* ¶¶ 22-24.

[10]
> *Id.* ¶ 12.

[11]
> These documents are referred to collectively as the "Offering Documents."  A copy of the Offering Documents can be found in the Harrod Decl., Ex. E.

4

defaulting loans in the underlying pool had increased to more than twenty-five percent.[12]

### III.    The Amended Complaint

The operative complaint in this case alleges that the Offering Documents represented that IndyMac had originated the loans underlying the Certificates in accordance with its underwriting standards.[13]  They stated further that the underwriters evaluated information about borrowers' income, assets, and employment.[14]  Relying heavily on reports by the Treasury Department Office of Inspector General ("OIG")[15] and another entity referred to as "CRL," plaintiffs allege that these statements were false or misleading because IndyMac had abandoned its underwriting standards, instead "embark[ing] on a path of aggressive growth" where it "sought to produce as many loans as possible and sell them on the secondary market."[16]  The amended complaint alleges that IndyMac attempted to further this goal by "'routinely . . . [approving] loans without regard to borrowers' ability to repay' and with 'little, if any, review of borrower qualifications, including income, assets,

---

[12]

Am. Cpt.  ¶¶ 90, 104.

[13]

*Id.* ¶ 49; *see also id.* ¶¶ 50-51.  In essence, plaintiffs allege that the underwriting guidelines required "an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral."  Harrod Decl., Ex. E, at S-62.

[14]

Harrod Decl., Ex. E, at S61-S64.

[15]

OIG, Audit Report (OIG-09-032), *Safety and Soundness: Material Loss Review of IndyMac Bank, FSB*, February 26, 2009, at 2, 7, *available at* http://treasury.gov/inspector-general/audit-reports/2009/oig09032.pdf (the "OIG Report").

[16]

Am. Cpt. ¶¶ 52, 54, 57; DI 76, at 5.

5

and employment.'"[17]  This, in turn, is alleged to have led to the approval of loans to borrowers who were unable to meet their repayment obligations.  Borrowers subsequently defaulted on the mortgage loans underlying the Certificates, and the value of the Certificates decreased.[18]  Credit rating agencies "significantly downgraded" the Certificates' ratings to "junk."[19]

The amended complaint asserts claims for violations of Sections 11 and 12(a)(2) of the Securities Act against Credit Suisse, which Vaszurele claims was "responsible for ensuring the accuracy of the statements contained in the Offering Documents prior to distributing them to investors."[20]

## IV.    Procedural History

The Court appointed Vaszurele lead plaintiff on May 5, 2009.[21]  Credit Suisse then moved to dismiss the amended complaint on May 22, 2009.[22]

The Court's opinion resolving Credit Suisse's motion to dismiss significantly

---

[17]

Am. Cpt. ¶ 63.

[18]

*Id.* ¶¶ 60, 76, 104.

[19]

*Id.* ¶ 90.  IndyMac itself collapsed in 2008.  It filed for bankruptcy shortly after it held on its books a large portion of these mortgage loans that it had underwritten .  *Id.* ¶ 76.

[20]

DI 76, at 5; Am Cpt. ¶ 22.

[21]

Tsereteli, who owns and is the sole shareholder of Vaszurele, was appointed lead plaintiff on March 16, 2009.  DI 16.  The Court later granted a motion substituting Vaszurele as lead plaintiff because it, not Tsereteli, was the purchaser and holder of the Certificates.  *See* DI 26.

[22]

DI 31.

6

narrowed the scope of this litigation. The only claims that still are before it are those based on Credit Suisse's alleged failure to "make a reasonable and diligent inspection" of the Offering Documents insofar as they did not correctly report IndyMac's alleged abandonment of its underwriting standards.[23]

V.      *The Present Motion*

On December 10, 2010, Vaszurele moved pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure for an order certifying this as a class action on behalf of the following proposed class:

> "All persons who purchased the Senior Mortgage Pass-Through Certificates . . .
> issued on June 28, 2006 by the Residential Asset Securitization Trust 2006-A8,
> pursuant and/or traceable to the pursuant to a Registration Statement dated February
> 24, 2006 (File No. 333-132042), Prospectus dated June 14, 2006, and Prospectus
> Supplement dated June 28, 2006 . . . excluding: Defendant Credit Suisse Securities
> (USA) LLC . . . , its respective officers, affiliates and directors at all relevant times,
> members of its employees' immediate families, and its legal representatives, heirs,
> successors or assigns and any entity in which Defendant has or had a controlling
> interest."[24]

Vaszurele moved also to be appointed class representative and, pursuant to Rule 23(g) for its counsel,

---

[23]
    *See Tsereteli I*, 692 F. Supp. 2d 387; *see also* Am. Cpt. ¶¶ 22, 134 ("Defendant Credit Suisse owed the Plaintiffs and the Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents . . . ."). The motion to dismiss was granted insofar as plaintiffs' claims based on appraisal practices, loan-to-value-ratios, and ratings methodology were dismissed. Claims against Moody's Investors Service, Inc and The McGraw-Hill Companies earlier were dismissed. DI 52.  Vaszurele voluntarily dismissed its claims against RAST.  DI 53.

[24]
    DI 75, at 1.

Wolf Popper LLP, to be appointed class counsel.[25]   Credit Suisse opposes the motion, contending

that Vaszurele has failed to establish any of the requirements for class certification set forth in Rule

23, particularly Rule 23(b)(3)'s requirements of predominance and superiority.[26]

*Discussion*

I.      *Legal Standards*

        In order to qualify for class certification, plaintiffs must meet all of the requirements

of Rules 23(a) and 23(b)(3).[27]

        Before certifying a class, a district court is obliged to conduct a "rigorous analysis"

to determine whether the plaintiff has satisfied all of the requirements.[28]   It "may certify a class only

after [it] . . . resolves factual disputes relevant to each Rule 23 requirement and finds that whatever

underlying facts are relevant to a particular Rule 23 requirement have been established and is

---

[25]
        *Id.* The Court previously appointed Vaszurele as lead plaintiff, and Wolf Popper as lead
        counsel.  DI 16; DI 26.

[26]
        The lengthy pending of the motion is a result of the Court having awaited the outcome of
        an appeal raising similar issues in another case.

[27]
        A plaintiff seeking class certification must satisfy at least one of the three requirements of
        FED. R. CIV. P. 23(b).  Where, as here, the principal relief sought is money damages, Rule
        23(b)(3) requires that the plaintiff establish that "the questions of law or fact common to
        class members predominate over any questions affecting only individual members, and that
        a class action is superior to other available methods for fairly and efficiently adjudicating
        the controversy."  These two Rule 23(b)(3) requirements generally are referred to as
        "predominance" and "superiority."

[28]
        *In re Initial Pub. Offerings Sec. Litig.* ("*In re IPO*"), 471 F.3d 24, 41 (2d Cir. 2006); *In re
        Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2008 WL 3895539, at *2 (S.D.N.Y. Aug.
        21, 2008).

persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met."[29]   The Court "must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met."[30]   The burden of demonstrating by a preponderance of the evidence that these requirements have been met, moreover, rests with the moving party.[31]   Nevertheless, courts in this and other districts often have held that suits alleging violations of securities law, especially those brought under Sections 11, 12(a)(2) and 15 of the Securities Act, are "especially amenable" to class action certification and resolution.[32]

II.      *Rule 23(a)*

The prerequisites to any class certification are that:

"(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."[33]

---

[29]

*In re IPO*, 471 F.3d at 41.

[30]

*Id.* at 42.

[31]

*See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 201-03 (2d Cir. 2008).

[32]

*E.g.*, *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.* ("*Pub. Emps. v. Merrill*"), 277 F.R.D. 97, 101 (S.D.N.Y. 2011) (citing *Achem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267 (S.D.N.Y. 2003)).

[33]

FED. R. CIV. P. 23(a).

A.      *Numerosity*

Numerosity generally is presumed "at a level of 40 members,"[34] and may be found where "the number of class members is sufficiently large so that joinder of all members would make litigation needlessly complicated and inefficient."[35] "[M]ere numbers," however, are not sufficient for numerosity.  Rather, such a determination "depends on all the circumstances surrounding the case."[36]

In this case, Vaszurele has identified at least 97 prospective class members.[37] Additionally, it has provided an estimate from an expert that there are 569 "market participants, many of which are likely Class members."[38]

Credit Suisse's own estimate is that there are 193 potential class members.[39]  Its primary argument that numerosity has not been met is that it must be met on a tranche-by-tranche, rather than an offering-by-offering basis.  The argument, however, is not persuasive.[40]  The

---

[34]      *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

[35]      *Banyai v. Mazur*, 205 F.R.D. 160, 163 (S.D.N.Y. 2002).

[36]      *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993).

[37]      DI 76, at 10; Harrod Decl., ¶ 14 & Ex. B.

[38]      DI 92, at 15; Harrod Decl., ¶¶ 11-12 & Ex. A.

[39]      *See* Wu Decl. [DI 86], Ex. A, Report of Walter N. Torous, Ph.D. ("Torous Rep.") ¶¶ 112-21 & Ex. 36B.

[40]      *See Pub. Emps.' Ret. Sys. Of Miss. v. Goldman Sachs Grp., Inc.*, ("*Pub. Emps. v. Goldman*") No. 09 Civ. 1110 (HB), 2012 WL 336146, at *2  (S.D.N.Y. Feb 3, 2012) ("The invocation of tranches as a means to defeat class certification has failed in similar cases and fails here." (citing *Pub. Emps. v. Merrill*, 277 F.R.D. at 109; *In re Dynex Capital, Inc. Sec.*

10

numerosity requirement is satisfied.

B.      *Commonality*

Commonality is "plainly satisfied [where] the alleged misrepresentations in the prospectus relate to all the investors, [because the] existence and materiality of such misrepresentations obviously present important common issues."[41] It does not "mandate that all class members make identical claims and arguments."[42] A single common issue of law or fact may suffice to satisfy this requirement.[43]

Vaszurele asserts that commonality should be found here because the prospective class's Section 11 and 12 claims will require all of them to show that "(1) the Offering Documents contain untrue statements or omit statements of fact; (2) that the untrue statements or omissions are 'material'; and (3) that Class members have sustained damages."[44] Accordingly, the central issue

---

*Litig.*, No. 05 Civ. 1897 (HB), 2011 WL 781215, at *2 (S.D.N.Y. Mar. 7, 2011))); *N.J. Carpenters Health Fund v. Residential Capital, LLC* ("*NJ Carpenters*"), 272 F.R.D. 160, 163, 165-66 (S.D.N.Y. 2011), *aff'd* 2012 WL 1481519 (2d Cir. Apr. 30, 2012) (noting that defendants could not "provide[ ] authority" for a tranche-by-tranche numerosity requirement so plaintiffs were entitled to presumption of numerosity, and rejecting similar arguments for typicality as well); *see also Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, No. 09 Civ. 3701 (JPO), 2012 WL 1788142, at *7 (S.D.N.Y. May 15, 2012) (outlining recent history of findings in the Southern District of New York that there is no tranche-by-tranche requirement either for class certification).

41

*Korn v. Franchard Corp.*, 456 F.2d 1206, 1210 (2d Cir. 1972); *In re Prestige Brands Holdings, Inc. Sec. Litig.*, No. 05 Civ. 6924 (CLB), 2007 WL 2585088, at *2 (S.D.N.Y. Sept. 5, 2007).

42

*Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 198 (S.D.N.Y. 1992).

43

*See In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 70 (S.D.N.Y. 2009).

44

DI 76, at 11; *see also* 15 U.S.C. § 77k(a), 77l(a)(2); Am. Cpt. ¶ 110a-c.

11

is whether the Offering Documents contain material misstatements or omissions, an issue that is common to all class members.  The issue of the materiality of the allegedly untrue statements and omissions likewise is similar for all members of the class.[45]   Finally, damages for violations of Sections 11 and 12(a)(2) of the Securities Act would be calculated by a statutory method set forth in Section 11(e).[46]   The means of determining them therefore would be common to all class members.[47]  Credit Suisse nevertheless argues that these commonalities are "superficial."[48]  It argues that Vaszurele is subject to "unique defenses," particularly in demonstrating that it suffered any economic loss and is entitled to damages.[49]

---

[45]

See Harrod Decl., Ex. D, Report of Steven P. Feinstein ("Feinstein Rep.") ¶ 79 ("Information about the mortgage pool underwriting process matters greatly to investors as they value mortgage-backed securities and make investment decisions."). Furthermore, materiality is gauged by the *objective* standard of whether "any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering " and thus will be determined by the same criterion for all class members. *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004) (citing *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 257 (2d Cir. 2002)).

[46]

15 U.S.C. § 77k(e) ("The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public ) and the value thereof as of the time such suit was brought.").

[47]

*In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124, 139 ("Common issues may predominate when liability can be determined on a class-wide basis, even where there are some individualized damage issues.").

[48]

DI 85, at 27.

[49]

*Id.* at 27-29.

The unique defenses argument has not met with much success, at least when addressed to the commonality question.  Nor should it have done so.  Even if there are unique defenses with respect to Vaszurele, the fact remains that the central issues in this case are common to the claims of all.  The commonality requirement has been satisfied.

C.    *Typicality*

Typicality, a concern related both to adequacy of representation and commonality,[50] is satisfied where "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."[51]  The commonality requirement "establishes the existence of a certifiable class," and typicality "focuses on whether the claims of the putative class representatives are typical of the class sharing common questions."[52] Courts finding typicality generally look not at the "plaintiffs' behavior, but rather [at] the defendant's

---

[50]

Courts have noted that all three requirements "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 158 n.13; s*ee also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2553 (2011) ("The commonality and typicality requirements of Rule 23(a) tend to merge." (internal citations omitted)); *Dura-Bilt v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y. 1981) ("The typicality prerequisite overlaps with the common question requirement of Rule 23(a)(2) and the adequate representation requirement of Rule 23(a)(4).").

[51]

*In re Flag Telecom Holdings Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009); s*ee also In re NASDAQ Market-Makers Antitrust Litig.*, 172 F.R.D. 119, 126 (S.D.N.Y. 1997) (Plaintiffs "have the incentive to prove all of the elements of the causes of action which would be presented by the individual members of the class were they initiating individual actions") (citations omitted).

[52]

*In re Frontier Ins. Grp., Inc. Sec. Litig.*, 172 F.R.D. 31, 40 (S.D.N.Y. 1997).

actions."[53]  Both the named plaintiffs and the class that those plaintiffs seek to represent must allege "that the same unlawful conduct was directed at or affected" them all.[54]

The requirement of typicality is "not demanding."[55]  It "does not require that the factual background of each named plaintiff's claim be identical to that of all class members; rather, it requires that the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of the other members."[56]  It may be found in a securities class action based on something as simple as a common "disregard of underwriting guidelines."[57]  So long as "plaintiffs assert . . . that defendants committed the same wrongful acts in the same manner, against all members of the class, they establish the necessary typicality."[58]

Credit Suisse makes the same arguments regarding Vaszurele's failure to demonstrate typicality that it made about commonality.[59]  It argues that Vaszurele is subject to unique defenses, particularly that it did not suffer any "cognizable economic loss" because it has received all payments

---

[53]
       *Kottler v. Deutsche Bank AG*, No. 05 Civ. 7773 (PAC), 2010 WL 1221809, at *2 (S.D.N.Y. Mar. 29, 2010).

[54]
       *Robidoux v. Celani*, 987 F.2d at 936-37.

[55]
       *In re Prestige Brands Holdings, Inc.*, No. 05 Civ. 6924 (CLB), 2007 WL 2585088, at *3 (S.D.N.Y. Sept. 5, 2007) (internal citations omitted).

[56]
       *In re J.P. Morgan Chase Cash Balance Litig.*, 242 F.R.D. 265, 272-73 (S.D.N.Y. 2007) (citing *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999)).

[57]
       *NJ Carpenters*, 272 F.R.D. at 167.

[58]
       *NYSE Specialists*, 260 F.R.D. at 72-73.

[59]
       DI 85, at 27-29.

14

it was due under the Certificates' terms and because the Offering Documents "expressly warned" investors that the Certificates' performance would be contingent upon the real estate market as a whole.[60]

Vaszurele need not show that it has failed to receive principal or interest payments.[61] Indeed, a finding of typicality would not be precluded even if certain plaintiffs are unable to demonstrate that they would recover *any* damages with respect to certain certificates.[62]  Rather, Vaszurele need show only that its claims arise from the "same course of events" as those alleged by the class members, and that it makes "similar legal arguments to prove the defendant's liability."[63]

As with commonality, Vaszurele's claims that Credit Suisse is liable under the Securities Act center on the allegedly misleading Offering Materials.  Vaszurele points both to a common series of events – the offering at issue, the issuance of the Offering Documents that accompanied it, and Credit Suisse's alleged breach of its duty to make a reasonable and diligent inspection of those documents – and to common legal claims of violations of Sections 11 and 12 of the Securities Act. The typicality requirement therefore has been met.

---

[60]

DI 85, at 27, 29.

[61]

*See, e.g., N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, ("*NJ v. DLJ*") No. 08 Civ. 5653 (PAC), 2010 WL 1473288, at *5 (S.D.N.Y. Mar. 29, 2010) (finding it "too cramped a reading of damages" to require plaintiffs in mortgage backed securities class action to plead that they "failed to receive any principal or interest payments due under its Certificates"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1169-70 (C.D. Cal. 2008).

[62]

*Seijas v. Republic of Arg.*, 606 F.3d 53, 58 (2d Cir. 2010); *Pub. Emps. v. Merrill*, 277 F.R.D. at 108; *NJ Carpenters*, 272 F.R.D. at 165.

[63]

*In re Flag*, 574 F.3d at 35.

D.      *Adequacy of Representation*

Rule 23(a)'s final requirement is that the class representatives be able "fairly and adequately [to] protect the interests of the class."[64]  This includes consideration of whether "(1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."[65]  It generally requires "strong evidence" that the class representative's "interests are not antagonistic to those of the class."[66]

Here, as with typicality, Vaszurele and the other class members share common interests.  Vaszurele purchased Certificates in the same offering and pursuant to the same Offering Document as the prospective class.[67]  Any damages that each class member is entitled to would be established by the same statutory formula.[68]

Credit Suisse, however, asserts that Vaszurele and its principal, Mr. Tsereteli, "[l]ack[] sufficient knowledge of the allegations in this case to exercise independent control over the case."[69]  Vaszurele is stated also to have had a "20-year relationship with proposed class counsel, Wolf Popper LLP," during which neither Vaszurele nor Mr. Tsereteli "ever disagreed with Wolf

---

[64]      FED. R. CIV. P. 23(a)(4).

[65]      *In re Flag*, 574 F.3d at 35 (internal citations omitted).

[66]      *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 158 (S.D.N.Y. 2008).

[67]      Harrod Decl., Ex. F ¶ 2.

[68]      *See* 15 U.S.C. § 77k(e).

[69]      DI 85, at 30-31.

Popper on any legal matter."[70]  To further underscore these assertions of inadequacy, Credit Suisse relies on several errors made by lead counsel in commencing this action.[71]

The fact that Mr. Tsereteli, who testified on behalf of Vaszurele, is unaware or uninformed of certain facts about this suit does not inherently make Vaszurele an inadequate class representative.  The Supreme Court has "expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance."[72]  Even where parties are uninformed, adequacy rightly is found where "[a] great deal of reliance on expert counsel is to be expected."[73] To that point, lead counsel Wolf Popper is qualified and capable of prosecuting this action.[74]  It has conducted discovery, engaged in motion practice, and protected the interests of Vaszurele and the prospective class throughout the more than three years this case has been before the Court.[75]  It has done so diligently and professionally, and the Court has no reason to believe it will not continue to do so in the future.

Credit Suisse argues also that there are "inherent conflicts" in this case because there

---

[70]

*Id.*

[71]

These include listing Mr. Tsereteli rather than Vaszurele as lead plaintiff initially, *see* DI 22, and filing an amended complaint with certain allegations that this Court held were "exceptionally misleading."  *See Tsereteli II*, 697 F. Supp. 2d at 548.

[72]

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000).

[73]

*In re TCW/DWN Am. Gov't Income Trust Sec. Litig.*, 941 F. Supp. 326, 341 (S.D.N.Y. 1996).

[74]

Harrod Decl., Ex. G.

[75]

Vaszurele, as Lead Plaintiff, asserts also that it has reviewed the amended complaint and is willing to serve as class representative.  *See* Harrod Decl., Ex. F.

will be different theories asserted regarding (1) damages,[76] (2) materiality of the allegedly false and misleading statements, and (3) knowledge available to certain parties.  Further, it asserts that Vaszurele may come into conflict with certain potential class members who are institutional investors and defendants in other MBS cases over the legal theories the parties' respectively wish to assert.

None of these arguments demonstrates inadequacy of representation.  Any potential conflict that may arise in settlement negotiations is, at this point, "largely conjectural," and certainly does not rise to the requisite level of a "fundamental" conflict.[77]  The hypothetical variations in legal theories that Credit Suisse relies upon have yet to emerge.[78]  Credit Suisse's assertions based on knowledge defenses available for certain class members are similarly hypothetical and do not establish conflict.[79]

---

[76]

Credit Suisse asserts again as to adequacy that Vaszurele did not suffer "cognizable economic loss."  Plaintiffs' records, however, indicate that this is not true given the method for determining damages  set forth in Section 11(e) of the Securities Act.  *See* DI 92, at 14 n.31.  At any rate, these concerns are, as before, "merely speculative at this stage" of the proceedings, and thus do not defeat adequacy.  *See Pub. Emps. v. Goldman Sachs*, 2012 WL 336146, at *4.

[77]

*See Dynex*, 2011 WL 781215, at *2 (certifying a class and finding adequacy where lead plaintiffs invested only in senior tranches, although class members had invested in more junior tranches).

[78]

*In re Flag*, 574 F.3d at 35; *NJ Carpenters*, 272 F.R.D. at 164 (finding that even though "institutional investors" may "wish to advance certain arguments or theories" that are different from those asserted by "pension funds," adequacy was still met).  Furthermore, any class member may opt out and pursue its own claim.

[79]

Knowledge provides an affirmative defense to Section 11 claims.  *See In re Initial Pub. Offering Sec. Litig.* ("*In re IPO II*"), 483 F.3d 70, 73 n.1 (2d Cir. 2006).  Asserted differences in knowledge between class members and lead plaintiffs, however, do not defeat adequacy.  Credit Suisse cites to no legal support indicating otherwise, and provides no evidence in support of their argument indicating what knowledge it is that Vaszurele has that will provide a "fundamental" conflict with other class members.  For further discussion regarding knowledge defenses, *see infra*, Discussion Part III.A.2.i.

The Court is convinced that Vaszurele and its counsel will fairly and adequately pursue and protect the interests of the entire class.

### III.    Rule 23(b)(3) Requirements

#### A.    Predominance

Class-wide issues predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."[80]

While predominance requires a more rigorous showing than does commonality, it "does not require a plaintiff to show that there are *no* individual issues."[81]  Rather, "[i]n determining whether common questions of fact predominate, a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class."[82]  Where issues of liability are "common to the class, common questions are held to predominate over individual questions."[83]  In determining whether the predominance requirement has been met, courts must consider both

---

[80]

    *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010); *see also Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

[81]

    *NYSE Specialists*, 260 F.R.D. at 75 (emphasis added); *see also Dura-Bilt*, 89 F.R.D. at 99 ("[I]ndividual issues will likely arise in this case as in all class action cases," so to permit "various secondary issues of plaintiffs' claim[s] to preclude certification of a class would render the rule an impotent too for private enforcement of the securities laws").

[82]

    *In Re Bleck Sec. Litig.*, 187 F.R.D. 97, 107 (S.D.N.Y. 1999).

[83]

    *Dura-Bilt Corp.*, 89 F.R.D. at 93.

affirmative claims and potential defenses.[84]

### 1.      Relevant Legal Standards

Before analyzing Credit Suisse's arguments that predominance has not been met here, it is important to set forth the relevant legal standards that govern the claims in the amended complaint.

To bring a successful claim under Section 11 of the Securities Act, a plaintiff must allege that:

> "(1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'"[85]

Section 12 requires the following:

> "(1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'include[s] an untrue statement of a material fact or omit[s] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.'"[86]

Section 12 offers parties a means of recovery against any "statutory seller" whereas Section 11 is

---

[84]

    *See, e.g.*, *Myers v. Hertz Corp.*, 624 F.3d 537, 549 (2d Cir. 2010) ("It is . . . well established that courts must consider potential defenses in assessing the predominance requirement.").

[85]

    *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)).

[86]

    *Id.* at 358-59 (quoting 15 U.S.C. § 77l(a)(2)).

available against "offering participants."[87]  Liability under both provisions is limited in scope, but strict where applicable.[88]  That is, where a plaintiff can show that these elements have been met, it generally has established a *prima facie* case, and need not allege *scienter*, reliance, or loss causation.[89]

Defendants accused of violating either of these provisions may rely on a variety of defenses to avoid liability.[90]  A Section 11 or 12(a)(2) claim will not succeed where a defendant can show that "the plaintiff knew of the untruth or omission at the time or his or her acquisition of the security."[91]  Defendants similarly may avoid liability where they can show that a plaintiff had actual or inquiry notice of the materially misleading statements or omissions more than a year before its claims were filed.[92]

Defendants may show also that a plaintiff bringing a Section 11 claim against an underwriter (such as Credit Suisse) "acquired the security after the issuer ha[d] made generally available to its security holders an earning statement covering a period of at least 12 months

---

[87]

  *Id.* at 359.

[88]

  *See Herman & MacLean v. Huddlesont*, 459 U.S. 375, 381-82 (1983).

[89]

  *See In re Morgan Stanley*, 592 F.3d at 359-60 ("[P]laintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation." (citing *Rombach* v. *Chang*, 355 F.3d at 169 n.4)).

[90]

  Credit Suisse does not raise a due diligence defense in its briefing, which defendants facing section 11 claims may assert in certain circumstances.  *See* 15 U.S.C § 77k(b)(3).  In any event, such a defense would not defeat a finding of predominance here.

[91]

  *In re IPO II*, 483 F.3d at 73 n.1(internal citations omitted).

[92]

  *See Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 349-50 (2d Cir. 1993).

beginning after the effective date of the registration statement."[93]  Such a showing then requires plaintiff to demonstrate reliance on the material misstatement or omission, a requirement it would not otherwise have to meet.[94]

Finally, a Securities Act defendant may avoid liability by showing that there are loss-causation issues by demonstrating that the loss of a security's value is due to something other than the alleged misrepresentation or omission.[95]

### 2.    The Present Case

Vaszurele asserts that the predominance requirement has been met here because "the alleged untrue statements and omissions" that are central to its claims "were contained in (or missing

---

[93]

15 U.S.C. § 77k(a)(5).

[94]

See In re WorldCom, 219 F.R.D. at 288-89 (noting that where such an earning statement exists, "then the right of recovery under this subsection shall be conditioned on proof that such person acquired the securities relying on such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person" (quoting 15 U.S.C. § 77k(a)(5))).

[95]

See 15 U.S.C. § 77k(e) ("[I]f the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.").  The burden of demonstrating this is entirely on the defendant, as the "risk of uncertainty" in such instances is placed on the defendant, not on the plaintiff.  *See Akerman v. Oryx Comm'cns Inc.*, 810 F.2d 336, 341 (2d Cir. 1987).  Under Section 12(a)(2), a defendant may assert a similar affirmative defense when "the person who offered or sold such security proves that any portion or all of the amount recoverable under subsection (a)(2) represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communications, with respect to which liability of that person is asserted."  15 U.S.C. § 77l(b).

from) the same set of Offering Documents provided to all Certificate holders (*i.e.*, putative Class members)."[96]   It notes also that "the alleged untrue statements and omissions concerned the underwriting practices used to originate the entire group of Mortgage Loans" and so "would have similarly affected all Certificates, regardless of their place in the capital structure."[97]   Further, it points out that its claims concern "one Offering . . . by the same trust, pursuant to the same Offering Documents . . . . backed by a single pool" of loans.[98]

Credit Suisse's primary arguments that predominance has not been met here are that: (1) certain plaintiff-investors, particularly sophisticated investment funds that had experience with MBS, knew about the alleged misstatements or omissions at the time they purchased their securities,[99] (2) certain investors had actual or inquiry notice of the alleged misstatements or omissions such that the one-year statute of limitations now precludes their claims under the Securities Act,[100] (3) trustee reports made available to plaintiffs were "earning statements" sufficient to require plaintiffs to show reliance, which they have not done,[101] and (4) individual issues predominate regarding loss causation and available damages for various plaintiffs who purchased the Certificates

---

[96]     DI 76, at 19-20.

[97]     *Id.* at 20; Feinstein Rep., ¶ 81 ("Untrue statements about underwriting impact the value of all certificates.  Even senior and performing tranches are impacted.").

[98]     DI 92, at 2.

[99]     DI 85, at 10-15.

[100]     *Id.* at 15-16.

[101]     *Id*. at 16-17.

at different time periods.[102]

Credit Suisse focuses its arguments on the reasoning of *New Jersey Carpenters Health Fund v. Residential Capital, LLC*,[103] which denied certification of two classes in related MBS Securities Act cases, based in large part on the plaintiffs' inability to demonstrate that the predominance requirement had been met.  The court there held that there were sufficient disparities in knowledge within the two classes before it, each of which consisted mainly of sophisticated investors, to defeat predominance.[104]  But the case ultimately is not persuasive here.

### i.    *Knowledge and Notice*

Credit Suisse's first arguments center on (1) plaintiffs' alleged knowledge of the alleged misstatements and omissions in the Offering Documents at the time they purchased their Certificates and, (2) individualized statute of limitations issues arising from actual or inquiry notice available at some time after class members purchased their respective Certificates.[105]

In trying to establish that individual knowledge or notice issues predominate here,[106]

---

[102]

Id. at 17-24. This argument is broken up into several components, including issues with demonstrating the requisite falsity, materiality, causation, and damages.

[103]

272 F.R.D. 160 (S.D.N.Y. 2011), *aff'd*, 2012 WL 1481519 (2d Cir. Apr. 30, 2012).

[104]

Id. at 168-71.

[105]

Both Sections 11 and 12(a)(2) of the Securities Act are subject to a one-year statute of limitations, beginning when the plaintiff discovers "the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m.

[106]

Credit Suisse would bear the burden at trial of showing that the defenses of knowledge and notice apply here.  *See In re IPO II*, 483 F.3d 70, 73 n.1 (establishing that knowledge

Credit Suisse first argues that certain prospective class members are sophisticated and therefore are likely to have "had the benefit of different levels of information about the lending practices relevant to investment in mortgage backed securities."[107]   One of the plaintiffs, Pacific Investment Management Company ("PIMCO"), invested time and money in researching the "degradation of underwriting standards" generally.[108] Other plaintiff investors, including Vaszurele, had investment advisors,[109] a factor considered in *NJ Carpenters*.[110]   One investor held as much as $3 billion in investments in the MBS market.[111]

The Court assumes that some of the class members are sophisticated investors.[112] But that does not establish knowledge, inquiry, or actual notice sufficient to defeat the predominance requirement.  General investment sophistication of certain class members does not show that any of the class members knew anything at all about IndyMac's alleged deviation from its underwriting guidelines.  Nor does it significantly tend to show that sophisticated investors had any reason to

---

defenses, like other defenses, place the burden on defendants).

[107]

*NJ Carpenters*, 272 F.R.D. at 169.

[108]

Wu Decl., Ex. P, at 249-50 (Testimony of Paul A. McCulley, Managing director of PIMCO stating as such); Wu Decl., Ex. B15 (PIMCO's general research on MBS).

[109]

Wu Decl., Ex. B (setting forth investment advisors who managed certain prospective class members' investments); Wu Decl., Ex. Y (explaining Vaszurele's investment advisor – J.P. Morgan Asset Management's – experience with MBS); *see also Radiation Dynamics, Inc. v. Goldmuntz*, 323 F. Supp. 1097, 1099 (S.D.N.Y. 1971) ("The knowledge and notice of these [investment] advisors is imputed to their clients.").

[110]

*See* 272 F.R.D. at 171.

[111]

Torous Rep., Exs. 36A-1, 36B-1.

[112]

*See* Wu Decl., Ex. B (identifying fifteen of 193 potential class members as "sophisticated").

doubt IndyMac's statements regarding its underwriting practices for this particular offering, either before they purchased the Certificates or more than a year before the case was commenced.[113]

    This stands in contrast to *New Jersey Carpenters*, where the district court found what it felt were specific statements by certain class members, many of whom were sophisticated investors,[114] demonstrating specific individual knowledge of the underlying loans and underwriting guidelines set forth in the relevant offering documents.[115]  Such findings are not easily made, and this Court makes no such finding here.  Moreover, while the Second Circuit affirmed the denial of class certification in *New Jersey Carpenters*, it noted that even on the record in that case – including the presence of two classes where many or all of the members were sophisticated investors and evidence of knowledge on the part of some of those members of the structuring and formation of the offerings at issue – it was possible that "another inference could have been drawn" and that it was not "allowed to second-guess the trial court's choice between permissible competing inferences."[116]  The Court

---

[113]

    Credit Suisse's attempt to rely on *NJ Carpenters*' holding that because certain putative class members in one of the two cases the Court was considering there were defendants in the other case it was considering as well , predominance could not be found are unavailing also.  *See* DI 85, at 12-13.  Here, plaintiffs are alleged to be defendants in separate matters not before this Court.  *Id.*  This does not raise the same possible issues of conflict and legal strategy that were present in *NJ Carpenters*.

[114]

    *NJ Carpenters*, 272 F.R.D. at 169, 170 (noting that in one of two prospective classes before the court, "many putative class members" were sophisticated, and that the other was "entirely" comprised "of a narrow and identifiable group of sophisticated investors").

[115]

    *Id.* at 169-70 (finding that certain class members "were extensively involved in the structuring of the [offerings at issue], including in the review and selection of the loans that backed the certificates").

[116]

    *N.J. Carpenters Health Fund v. RALI Series 2006-Q01 Trust*, Nos. 11 Civ. 1683 & 11 Civ. 1684, 2012 WL 1481519, at *3 (2d Cir. Apr. 30, 2012) (quoting *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009)).

finds in this case that the presence of sophisticated investors alone, with no further evidence that any of those investors knew of the alleged misstatements or omissions, does not create individualized issues sufficient to defeat predominance.

Credit Suisse points also to publically available news stories, both about MBS generally and about IndyMac specifically, that, it contends, show that certain prospective class members must have had knowledge or notice of the allegedly misleading statements and omissions in the Offering Documents. But that material is insufficient also.[117] The only articles that Credit Suisse cites that even name IndyMac do not discuss the Certificates, the Offering Documents, or any particular facts that are included in Vaszurele's amended complaint.[118] They are insufficient to demonstrate that plaintiffs knew or are chargeable with knowledge of the claims that are central to this case – that the Offering Documents were materially misleading.

Credit Suisse's final argument is based on the availability of information from trustee reports, increasing delinquency rates in paying off underlying mortgage loans, and a ratings downgrade for five of the twenty-six tranches of RAST 2006-A8 in November 2007.[119] As Vaszurele notes, however, none of these occurrences provided "any explanation for *why* the Certificate's collateral was performing poorly, let alone reveal any connection between poor

---

[117]

See *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 285 (S.D.N.Y. 2009) ("To trigger the duty of inquiry, the . . . warnings must 'relate directly' to the misrepresentations and omissions on which the plaintiffs base their claims . . . .").

[118]

See Wu Decl., Exs. BB, CC.

[119]

See DI 85, at 14.

performance and the abandonment of underwriting practices outlined in the complaint."[120]  Again, Credit Suisse has not provided sufficient evidence that any class member had actual knowledge of the allegedly false or misleading statements in the Offering Documents themselves or that they later were on notice of such statements sufficient to raise individualized statute of limitations issues.

Furthermore, inquiry notice begins when the totality of the "circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded."[121]  Thus, it appears that any defense of inquiry notice that Credit Suisse might wish to assert "can be achieved through generalized proof."[122]  Credit Suisse cannot have it both ways.  Either the news reports, ratings downgrades, trustee reports, and other indicators they rely on would have to be sufficient to put *any* reasonable investor on notice, or they would not.  Thus, this defense almost inevitably will be susceptible to generalized proof and cannot defeat predominance.

Nor has actual notice – the crux of the decision not to certify the class at issue in *New Jersey Carpenters* – been shown here.  While knowledge regarding MBS may have varied among class members, this Court is not persuaded that these variations will necessitate individualized inquiries sufficient to defeat a finding of predominance here.  Where "the liability issues" arising from Securities Act claims are "common to the class, common questions are held to predominate over individual questions."[123]  This understanding is particularly applicable where, as here, there is

---

[120]    DI 92, at 5.

[121]    *Staehr v. The Hartford Fin. Servs. Grp., Inc.*, 546 F.3d 406, 411, 427 (2d Cir. 2008) (internal citations omitted).

[122]    *UFCW Local*, 620 F.3d at 131.

[123]    *Dura-Bilt Corp.*, 89 F.R.D. at 93.

28

"no allegation . . . that any class member actually participated in the conduct described in the" amended complaint.[124] The presence of sophisticated investors alone cannot defeat the predominance requirement.[125]

Credit Suisse has not shown that any party knew about the alleged misstatements and omissions in the Offering Documents prior to purchasing the Certificates or that any party subsequently was on inquiry or actual notice of the alleged falsity or misleading nature of these same alleged misstatements and omissions.   None of these arguments, then, suffices to show that plaintiffs' common claims regarding the misleading nature of certain statements or omissions in the Offering Documents do not predominate here.

### ii.    Reliance

While Section 11 plaintiffs generally are entitled to a presumption of reliance on allegedly false and misleading statements in offering documents, this presumption does not exist where the plaintiff "acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least 12 months beginning after the effective date of the registration statement."[126] Credit Suisse here points out that the class "includes investors who purchased more than a year after the certificates were issued in June 2006."[127] It argues that the

---

[124]

      *Pub. Emps. v. Merrill*, 277 F.R.D. at 118.

[125]

      *See Rocco v. Nam Tai Elecs, Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007).

[126]

      15 U.S.C. § 77k(a).

[127]

      DI 85, at 17; *see also* Harrod Decl., Ex. B (indicating prospective class members purchased the certificates as early as May 19, 2006, and as late as September 26, 2008).

presence of monthly trustee reports issued as soon as July 2006 therefore will require these "investors who purchased more than a year after the initial offerings" to show individually  that they relied on the allegedly material misstatements and omissions in the Offering Documents.[128]

As several courts already have held, the "factual premise of Defendant's argument is flawed."[129]  Only reports on Forms 10-K, 10-Q, 8-K, 20-F, 40-F, and 6-K, and annual reports made pursuant to Rule 14a-3 of the Exchange Act, are earning statements under the statute.[130] Accordingly, Credit Suisse has not shown that any class members are unentitled to the presumption of reliance.

### iii.    Damages and Liability

Credit Suisse asserts also a variety of arguments surrounding the possible variations in damages available to certain class members as well as their ability to demonstrate that Credit Suisse bears any liability stemming from the claims set forth in the amended complaint.  These arguments hinge generally on Credit Suisse's assertion that the 26 different tranches in the Offering raise sufficiently individual issues to outweigh any general issues that might otherwise exist.[131]  But

---

[128]
    Deutsche Bank National Trust Co. ("DBNTC") was the trustee for the certificates, and it issued monthly trustee reports that contained financial statements regarding the Certificates. *See, e.g.*, Wu Decl., Exs. I-K (trustee reports for July 2006, December 2006, and December 2007).  The first trustee report was available less than a month after the June 2006 offering. *See id.*, Ex. I.

[129]
    *Pub. Emps. v. Merrill*, 277 F.R.D. at 114-15; *see also In Re WorldCom*, 219 F.R.D. at 293.

[130]
    *See* 17 C.F.R. § 230.258(a).

[131]
    *See* DI 85, at 17-18.

these contentions are not persuasive in the context of this case.[132]

### a.    Falsity

Credit Suisse's first argument is that the Certificate at issue, RAST 2006-A8, was divided into three loan groups, each with its own set of certificates.  These loans, Credit Suisse argues, were originated under "different loan documentation programs," have performed differently, and were subject to different underwriting guidelines.[133]  Accordingly, Credit Suisse believes that "[d]eviations from underwriting standards may have occurred with respect to loans in some loan groups, but not others,"[134] thereby necessitating individual examination of each loan and the underwriting guidelines that govern it to determine which guidelines, if any, were false as to each and every loan or loan group.

This argument is unavailing.  Where, as here, securities in a given offering are "interrelated," then "untrue statements and material omissions in the Offering Documents similarly affect the securities of each offering."[135]  To the extent plaintiffs are able to show that falsity existed

---

[132]

      *See supra* note 40(setting out cases in this district that have determined that tranche-by-tranche rather than offering-by-offering considerations are not material to deciding issues of class certification).

[133]

      DI 85, at 18; Torous Rep. ¶¶ 31-45, 50, 65 n.63.

[134]

      DI 85, at 19.

[135]

      *Pub. Emps. v. Merrill*, 277 F.R.D. at 108; *see also* Feinstein Rep. ¶¶ 63-71 (stating that falsity of statements impacted all tranches in the offering to a similar extent).

at all, each individual member of the class is unlikely to need to show so on an individual level.[136] The underwriting guidelines governing the various certificates in the offering were the same,[137] further minimizing any purportedly "individualized" consideration that the Court will need to undertake to determine whether or not those guidelines were sufficiently false to establish a Section 11 or 12(a)(2) claim. Such concerns do not defeat predominance here.

### b.    Materiality

Credit Suisse next argues that "individualized proof on the issue of materiality will predominate."[138] It bases this on assertions that (1) the information available over time to prospective class members was not static, (2) the number of non-complying loans may have varied across the three loan groups, (3) every loan deemed non-compliant will have to be assessed individually, and (4) there were differences among certain certificates issued as a part of the offering.[139]

These arguments overlook the well-settled precedent establishing that materiality is an objective, not a subjective, requirement.  It is found where "the defendants' representations, taken together and in context, would have misled a reasonable investor."[140]    Accordingly, "what a

---

[136]

See DI 92, at 8 & n.16 (setting forth the various general means by which plaintiffs could show falsity).

[137]

See Harrod Decl., Ex. E (setting out the Offering Documents that applied to all of the Certificates).

[138]

DI 85, at 20.

[139]

Id. at 20-21.

[140]

Rombach v. Chang, 355 F.3d at 172 n.7.

'reasonable person' would have known, and when, can be proven on a class-wide basis."[141] Whether a misstatement or omission was material therefore presents common rather than individual issues.[142]

Vaszurele here alleges that "[t]he abandonment of IndyMac's loan underwriting procedures and guidelines . . . was not disclosed in the Offering Documents" and, accordingly, that the "[f]ailure to disclose this information, which was negligent, constitutes a material omission and rendered the disclosures . . . concerning those loan underwriting procedures and guidelines . . . untrue."[143] This and other similar allegations suffice to demonstrate that the same misstatements and omissions, taken from the same documents, are at issue in all class members' claims.  Thus, materiality considerations in this case have not been shown to raise predominantly individual issues.[144]

### c.    Loss Causation and Damages

Finally, Credit Suisse asserts that both individual loss causation[145] and individual damages calculations may be required for many or all of the class members, thus establishing that

---

[141]

     *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 233 n.10 (2d Cir. 2008).

[142]

     *See Dura-Bilt Corp.*, 89 F.R.D.at  94.

[143]

     Am. Cpt. ¶ 62.

[144]

     *NJ Carpenters*, 272 F.R.D. at 168.

[145]

     Loss causation provides an affirmative defense to Section 11 and 12(a)(2) claims.  It requires a defendant to show that there is no causal link between the alleged misstatements and plaintiffs' loss.  *See, e.g.*, *In re Merrill Lynch*, 289 F. Supp. 2d at 437; *Ackerman v. Oryx Commc'ns, Inc.*, 609 F. Supp. 363, 368 (S.D.N.Y. 1984).

individual issues will outweigh common issues in this litigation.[146]

Issues regarding individualized damage calculations generally are "not sufficient to defeat class certification."[147]  Furthermore, courts repeatedly have rejected the argument that loss causation can defeat predominance for class certification purposes.[148]  Credit Suisse's reliance on these arguments therefore is unsuccessful to demonstrate that there are likely to be enough individual inquiries in this case to warrant denying class certification.

The Court is convinced that they raise sufficiently general issues to predominate over any individual inquiries that may arise.

B.    *Superiority*

Vaszurele must show that resolving this dispute as a class action would be "superior" to other means.

This consideration focuses on "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely

---

[146]  DI 85, at 22-24.

[147]  *Seijas*, 606 F.3d at 58.

[148]  *In re Metropolitan Secs. Litig.*, No. CV-04-25-FVS, 2008 WL 5102303, at *2 (E.D. Wa. Nov. 25, 2008) ("[D]efendants have not cited, and independent research has failed to uncover, a Section 11 case in which a court has ruled that the existence of a loss causation defense precludes certification under Rule 23(b)(3)."); *see also Ackerman*, 810 F.2d at 341 (finding that loss causation presents a "heavy burden" for defendants).

difficulties in managing a class action."[149]  "In general, securities suits . . . easily satisfy the superiority requirement of Rule 23.  Most violations of the federal securities laws . . . inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible . . . . Moreover, although a large number of individuals may have been injured, no one person may have been damaged to a degree which would induce him to institute litigation solely on his own behalf."[150]

Vaszurele asserts that "[i]ndividual class members have demonstrated little or no interest in controlling the prosecution of separate actions, given the great number of investors who suffered damages as a result of Credit Suisse's conduct and the likelihood that many investors who lost relatively small amounts of money would not file individual Actions."[151]  This is supported by the fact that no individual actions regarding the Certificates had been filed at the time the motion for class certification was filed.[152]  Moreover, many smaller investors would not bring individual claims, because seeking recovery for the alleged damages caused by Credit Suisse would not be financially feasible.[153]  Requiring these claims to proceed as separate cases on behalf of multiple plaintiffs

---

[149]

      Fed. R. Civ. P. 23(b)(3).

[150]

      *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 187 (S.D.N.Y. 2008); *see also In re Blech Sec. Litig.*, 187 F.R.D. 97, 107-08 (S.D.N.Y. 1999).

[151]

      DI 76, at 21.

[152]

      *Id.*; DI 92, at 13.

[153]

      DI 76, at 22 n.18; s*ee also DuPont Glore Forgan, Inc. v. Am. Tel. & Tel. Co.*, 69 F.R.D. 481, 487 (finding superiority where "[t]he hard fact [was] that economic reality indicates the likelihood that unless this action is permitted to proceed as a class suit, it is the end of this litigation").

therefore would be inefficient, would fragment the recovery effort, and would diminish the incentives

for pursuing the claims.[154]  Smaller investors who were not included in a class action such as this one

would be unlikely to have the resources or the incentive to bring individual suits at all.

Credit Suisse argues that the same issues regarding knowledge that it raised in

questioning the predominance requirement apply here to defeat a finding of superiority.[155]  As with

predominance, this is not so.[156]  Credit Suisse has not provided the Court any evidence that class

members had knowledge of the alleged misstatements or omissions in the Offering Documents, and

thus does show that they have a valid knowledge defense.

Credit Suisse points also to the fact that certain prospective class members are

sophisticated investors who have the resources to bring suit on their own.  But Credit Suisse has

identified only fifteen of the 193 members it believes are part of the class as "sophisticated."[157]  This

does not suffice to undermine a finding of superiority.[158]

Finally, Credit Suisse argues that the fact that six prospective class members are

---

[154]

See *Bd. of Tr.of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 269 F.R.D. 340, 355
(S.D.N.Y. 2010) (finding that the existence of certain large claims "sufficient for individual
suits is no bar to a class when the advantages of unitary adjudication exist to determine the
defendant's liability").

[155]

DI 85, at 25.

[156]

See *supra* Discussion Part III.A.3 (discussing why defendant's defenses available here
regarding plaintiffs' knowledge do not defeat predominance).

[157]

See Wu Decl., Ex. B.

[158]

See 2 NEWBERG ON CLASS ACTIONS, § 4.29 at 260 (4th ed. 2010) (the "existence of large
individual claims that are sufficient for individual suits is no bar to a class when the
advantages of unitary adjudication exist to determine the defendant's liability").

foreign entities, including Vaszurele itself, should defeat superiority.[159]   The foreign identity of

prospective class members is a factor which can "counsel[] against a finding that the class action is

superior to other forms of litigation," but it is "not dispositive."[160]  Where, as here, unique issues of

foreign law involving foreign investors are minor or non-existent, superiority is not defeated.[161]

       Concentrating this litigation in a single forum, particularly this one, has clear benefits.

It avoids the "risk of inconsistent adjudication," and encourages "the fair and efficient use of the

judicial system."[162]   Furthermore, "the Southern District of New York is well known to have

expertise in securities law."[163]

       Here, where this action has been before it since 2009 and the Court has issued

previous opinions, including the opinion resolving Credit Suisse's motion to dismiss, efficiency

further counsels in favor of class certification.[164]  There are no difficulties "likely to be encountered

---

[159]

    *See* Torous Rep., Ex. 36B-1 (listing nationalities of prospective class members).

[160]

    *Ansari v. N.Y. Univ.*, 179 F.R.D. 112, 116-17 (S.D.N.Y. 1998).

[161]

    *See Marsden v. Select Med. Corp.*, 246 F.R.D. 480, 489 n.7 (E.D. Pa. 2007) (finding that the fac that certain investors were foreign did "not affect the superiority of the class action" because the "alleged wrongdoing by American defendants took place in the United States," and because it was "unclear that any foreign class members would even have recourse in their home countries").

[162]

    *In re Marsh & McLennan Cos. Inc. Secs. Litig.*, No. 04 Civ 8144 (CM), 2009 WL 5178546, at *12 (S.D.N.Y. Dec. 23, 2009) (internal citations omitted).

[163]

    *Albert Fadem Trust v. Duke Energy Corp.*, 214 F. Supp. 2d 341, 344 (S.D.N.Y. 2002).

[164]

    *See Pub. Emps. v. Goldman*, 2012 WL 336146, at *11 ("Concentrating litigation in this forum is desirable because the Court is familiar with the history of this case, having ruled on earlier motions and discovery disputes."); *Pub. Emps. v. Merrill*, 277 F.R.D. at 121 ("[e]fficiency interests are particularly weighty here given that this action has been ongoing since December 2008 and the Court has already issued three Opinions in this matter.").

in the management of this action as a class action apart from those inherent in any hard fought battle where substantial sums are at issue and all active parties are represented by able counsel."[165]  This Court, as is true of many other courts in this district, has overseen and managed many securities class actions.  There is no reason to believe that doing so again would not be the superior method of resolving these disputes.  Indeed, doing so will conserve the resources of both the parties and the Court.[166]  The Court concludes that the superiority requirement is satisfied here.

*   *   *

The Court has considered Credit Suisse's additional arguments and finds them to be without merit.

*Conclusion*

Vaszurele's motion to certify the class, and for appointment of class representative and class counsel [DI 75] is hereby granted.

SO ORDERED

Date:          June 29, 2012

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[165]   *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 134 (S.D.N.Y. 2001).

[166]   *See* Fed. R. Civ. P. 23(c)(1)(C), 23(c)(5), 23(d) (setting forth case management tools that allow the court to alter or amend the class certification, to certify subclasses, and to issue orders to help manage the case); *In re Flag*, 574 F.3d at 37 (noting same management tools).