**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VASILI TSERETELI and VASZURELE LTD., on behalf of themselves and all others similarly situated,<br><br>                          Lead Plaintiff,<br><br>          v.<br><br>RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A8, CREDIT SUISSE SECURITIES (USA) LLC,<br><br>                          Defendants. | No. 08-Civ.-10637 (LAK) |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR AN AWARD OF**
**ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ............................................................................................................................. 2

I.     Lead Counsel Is Entitled to an Award of Attorneys' Fees and Reimbursement of Litigation Expenses from the Common Fund ....................................................................... 2

II.    The Requested Fee Is Reasonable under the Lodestar Method ......................................... 3

      A.     Lead Counsel Spent a Reasonable Number of Hours Litigating this Case ............. 3

      B.     Lead Counsel's Hourly Rates Are Reasonable ....................................................... 5

      C.     Lead Counsel's Requested Negative Lodestar Multiplier is Reasonable ............... 6

III.   The Requested Fee Is Also Reasonable under the Percentage Method .............................. 7

IV.   The *Goldberger* Factors Confirm That the Requested Fee Is Reasonable ......................... 8

      A.     The Time and Labor Expended by Counsel ........................................................... 8

      B.     The Magnitude and Complexities of the Litigation .............................................. 10

      C.     The Risks of the Litigation .................................................................................... 11

      D.     The Quality of Lead Counsel's Representation ..................................................... 13

      E.     The Requested Fee in Relation to the Settlement .................................................. 15

      F.     Public Policy Considerations ................................................................................. 15

      G.     The Reaction of the Settlement Class to the Fee Request ..................................... 15

V.    Lead Counsel's Request for Reimbursement of Expenses Should Be Granted ................ 16

CONCLUSION ........................................................................................................................ 17

## <u>TABLE OF AUTHORITIES</u>

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*,
    No. 03 MDL 1529 (LMM), 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) ...................... 14

*In re Am. Bank Note Holographics*,
    127 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2001) ........................................................... 12-13

*In re Am. Int'l Grp. Sec. Litig.*,
    No. 04 Civ. 8141 (DAB), 2012 WL 345509, at *6 (S.D.N.Y. Feb. 2, 2012) ................... 16

*Anwar v. Fairfield Greenwich Ltd.*,
    No. 09-CV-118 VM, 11-CV-813 VM, 2012 WL 1981505 (S.D.N.Y. Jun 01, 2012) ......... 7

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*,
    522 F.3d 182 (2d Cir. 2008) ......................................................................................... 5

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
    472 U.S. 299, 105 S. Ct. 2622 (1985) .......................................................................... 3

*In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*,
    909 F. Supp. 2d 259, 271 (S.D.N.Y. 2012) ................................................................ 6-7

*In re Bisys Sec. Litig.*,
    No. 04 Civ. 3840 (JSR), 2007 WL 2049726 (S.D.N.Y. July 16, 2007) ........................... 7

*In re Blech Sec. Litig.*,
    No. 94 Civ. 7696(RWS), 2002 WL 31720381 (S.D.N.Y. Dec. 4, 2002) .......................... 7

*Blum v. Stenson*,
    465 U.S. 886,104 S. Ct. 1541 (1984) ............................................................................ 5

*Boeing Co. v. Van Gemert*,
    444 U.S. 472, 100 S. Ct. 745 (1980) ............................................................................. 2

*In re Canadian Superior Sec. Litig.*,
    No. 09 Civ. 10087 (SAS), 2011 WL 5830110 (S.D.N.Y. Nov. 16, 2011) ...................... 17

*Cent. States Se. and Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
    504 F.3d 229 (2d Cir. 2007) ......................................................................................... 3

*In re Comverse Tech., Inc. Sec. Litig.*,
    No. 06-CV-1825 (NGG)(RER), 2010 WL 2653354 (E.D.N.Y. June 24, 2010) .............. 15

*Cruz v. Local Union No. 3 of the IBEW*,
    34 F.3d 1148 (2d Cir. 1994) ......................................................................................... 5

*Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974).................................................................................8

*In re Elan Sec. Litig.*,
  385 F. Supp. 2d 363 (S.D.N.Y. 2005)...........................................................11

*In re Flag Telecom Holdings, Ltd.*,
  No. 02-CV-3400 (CM) (PED), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010).......... *passim*

*Gierlinger v. Gleason*,
  160 F.3d 858 (2d Cir. 1998).........................................................................6

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) .............................................................6, 13

*Goldberger v. Integrated Res., Inc.*,
  209 F.3d 43 (2d Cir. 2000).................................................................... *passim*

*Hayes v. Harmony Gold Min. Co., Ltd.*,
  509 F. App'x 21 (2d Cir. 2013) ...................................................................7

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983)....................................................................................4

*Hicks v. Morgan Stanley & Co.*,
  No. 01-cv-10071 (RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005).................2, 12, 15

*In re IMAX Sec. Litig.*,
  No. 06 Civ. 6128 (NRB), 2012 WL 3133476 (S.D.N.Y Aug. 1, 2012) ...........................7

*In re Lehman Bros. Mortgage-Backed Sec. Litig.*,
  No. 08-CV-6762 (LAK) (S.D.N.Y. June 21, 2012) (Exhibit B to Harrod Decl.)...............6

*Luciano v. Olsten Corp.*,
  109 F.3d 111 (2d Cir. 1997)........................................................................5

*Maley v. Del Global Techs. Corp.*,
  186 F. Supp. 2d 358 S.D.N.Y. 2002).......................................................2, 15

*In re Marsh ERISA Litig.*,
  265 F.R.D. 128 (S.D.N.Y. 2010) ...............................................................13

*McDaniel v. Cnty. of Schenectady*,
  595 F.3d 411 (2d Cir. 2010)........................................................................3

*In re Merrill Lynch & Co. Inc., Research Reports Sec. Litig.*,
No. 02 MDL 1484(JFK), 2007 WL 313474 (S.D.N.Y. Jan. 31, 2007) .............................6

*In re Merrill Lynch Tyco Research Sec. Litig.*,
249 F.R.D. 124 (S.D.N.Y. 2008) ...................................................................................11

*Missouri v. Jenkins*,
491 U.S. 274, 109 S. Ct. 2463 (1989).................................................................................6

*Parker v. Time Warner Entm't Co.*,
631 F. Supp. 2d 242 (E.D.N.Y. 2009) ...........................................................................11

*Polk v. New York State Dep't of Correctional Services*,
722 F.2d 23 (2d Cir. 1983).................................................................................................5

*In re Sumitomo Copper Litig.*,
189 F.R.D. 274 (S.D.N.Y. 1999) ...................................................................................10

*In re Sumitomo Copper Litig.*,
74 F. Supp. 2d 393 (S.D.N.Y. 1999).................................................................................13

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
No. 01 CV 11814 (MP), 2004 WL 1087261 (S.D.N.Y. May 14, 2004).............................5

*In re Telik, Inc. Sec. Litig.*,
576 F. Supp. 2d 570 (S.D.N.Y. 2008)................................................................. 2, 5-6, 15

*In re Veeco Instruments Inc. Sec. Litig.*,
No. 05 MDL 01695(CM), 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ............... 7, 13-14

*Victor v. Argent Classic Convertible Arbitrage Fund L.P.*,
623 F.3d 82 (2d Cir. 2010).................................................................................................2

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005).............................................................................................3, 6

*In re Winstar Commc'ns Sec. Litig.*,
No. 01 Civ. 3014 (GBD) (S.D.N.Y. Nov. 13, 2013) (Exhibit D to Harrod Decl.).............7

Lead Plaintiff respectfully submits this memorandum of law in support of its motion for an award of attorneys' fees in the amount of $3,190,000 and reimbursement of litigation expenses in the amount of $390,931.26, plus interest.

## PRELIMINARY STATEMENT[1]

Lead Counsel expended significant effort over five years and accrued and paid significant litigation expenses in the prosecution of this Action. Lead Counsel obtained an excellent result on behalf of the Class: a total benefit of $11 million, consisting of a Settlement Fund of $10.9 million and a Notice and Administration Fund (the "Notice Fund") of $100,000 (collectively, the "Settlement Benefit"). The Settlement Benefit represents one of the highest recoveries as a percentage of damages in a Securities Act class action on behalf of mortgage-backed securities ("MBS") investors.[2]

As described herein, Lead Counsel's requested attorneys' fees are reasonable, whether measured using the lodestar method – where they represent an 18% *reduction* to Lead Counsel's lodestar – or the percentage method. Lead Counsel's fee request is also reasonable in light of the *Goldberger* factors that consider, among other things, the substantial risk involved in prosecuting this complex class action. Moreover, despite over 2,800 Notices being mailed to potential Class Members since October 14, 2013, to date, no Class Member has objected to the request for attorneys' fees or reimbursement of expenses.

---

[1]    Unless otherwise stated or defined, all capitalized terms used herein shall have the meanings provided in the September 17, 2013 Stipulation of Settlement (the "Stipulation"). ECF No. 112. All internal quotations and citations are omitted unless otherwise indicated.

[2]    *See* the accompanying Declaration of James A. Harrod in Support of (I) Lead Plaintiff's Motion for Final Certification of the Settlement Class, Approval of the Proposed Settlement, and Approval of the Plan of Allocation, and (II) Lead Plaintiff's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses (the "Harrod Declaration" or "Harrod Decl."), ¶ 122 n. 6.

**ARGUMENT**

**I.      Lead Counsel Is Entitled to an Award of Attorneys' Fees and Reimbursement of Litigation Expenses from the Common Fund**

The Supreme Court has long recognized that "a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S. Ct. 745, 749 (1980); *see also Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 47 (2d Cir. 2000); *Victor v. Argent Classic Convertible Arbitrage Fund L.P.,* 623 F.3d 82, 86 (2d Cir. 2010) ("It is well established that the common fund doctrine permits attorneys whose work created a common fund for the benefit of a group of plaintiffs to receive reasonable attorneys' fees from the fund.  Class action lawsuits are the prototypical example of instances where the common fund doctrine can apply.").  The purpose of the common fund doctrine is to fairly and adequately compensate class counsel for services rendered and to ensure that all class members contribute equally towards the costs associated with litigation pursued on their behalf.  *See Goldberger*, 209 F.3d at 47; *In re Flag Telecom Holdings, Ltd.*, No. 02-CV-3400 (CM) (PED), 2010 WL 4537550, at *23 (S.D.N.Y. Nov. 8, 2010); *see also Hicks v. Morgan Stanley & Co.*, No. 01-cv-10071 (RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) ("To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding.").

Courts have recognized that, in addition to providing just compensation, awards of fair attorneys' fees from a common fund "serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future misconduct of a similar nature." *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 585 (S.D.N.Y. 2008); *see, e.g., Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) ("[C]ourts recognize that such awards serve the dual purposes of encouraging representatives to

2

seek redress for injuries caused to public investors and discouraging future misconduct of a similar nature").  The Supreme Court has emphasized that private securities cases provide "a most effective weapon in the enforcement' of the securities laws and are a necessary supplement to [SEC] action."  *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310, 105 S. Ct. 2622, 2628 (1985).[3]

## II.   The Requested Fee Is Reasonable under the Lodestar Method

The determination of a reasonable attorneys' fee is within the "sound discretion" of the district court.  *Cent. States Se. and Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 248 (2d Cir. 2007).  There are two methods that courts have found appropriate for calculating a reasonable fee in a class action:  the "lodestar" method and the "percentage of the benefit" method.  *See McDaniel v. Cnty. of Schenectady,* 595 F.3d 411, 417-19 (2d Cir. 2010) (refusing to adopt the percentage method as the presumptive approach to calculating fee awards in the Second Circuit).  Counsel's lodestar is calculated by "multiplying the hours reasonably expended against a reasonable hourly rate."  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 123 n.27 (2d Cir. 2005).

### A.   Lead Counsel Spent a Reasonable Number of Hours Litigating this Case

Lead Counsel has devoted approximately five years to prosecuting this Action on an entirely contingent basis without any compensation or guarantee of success.  As set forth more fully in the accompanying Harrod Declaration, during this time, Lead Counsel has, *inter alia*: (1) filed two comprehensive complaints after conducting extensive legal and factual investigations into, among other things, IndyMac's loan origination and underwriting practices,

---

[3]      Here it is appropriate to consider that the common fund is equivalent to the $11 million Settlement Benefit. The Notice Fund will be used to pay for the Notice and Administration Costs.  Such costs are typically paid out of a settlement fund (reducing the amounts available to the Class).  Here, any money left in the Notice Fund after the Notice and Administration Costs are paid in full, will be distributed to the Class.  Harrod Decl. ¶ 6.

3

Credit Suisse's due diligence practices, and the Offering Documents' disclosures concerning those issues and the Certificates generally; (2) fully briefed and largely defeated Credit Suisse's motion to dismiss; (3) litigated an appeal of the Court's decision to dismiss claims against the Rating Agencies; (4) fully briefed and successfully obtained an order certifying a class, on a record that included document discovery, competing expert reports and depositions; (5) briefed Defendant's Fed. R. Civ. P. 23(f) petition for an interlocutory appeal of this Court's ruling on class certification, and after that petition was accepted, briefed the merits of that appeal to the Second Circuit Court of Appeals; (6) sought, obtained, and reviewed significant document productions from Defendant and from numerous third parties, including overcoming the objections of the FDIC and OneWest Bank to our subpoenas seeking to obtain loan files in their possession; (7) retained, provided information to, and reviewed reports of experts, particularly as to issues of liability; and (8) drafted and negotiated the terms of all relevant settlement documents.  Lead Counsel spent more than eight months negotiating the Settlement with the assistance of David Geronemous of JAMS, an experienced and highly respected mediator.  This process included preparing and exchanging mediation briefs with Defendant and the mediator and participating in a formal, in-person mediation and numerous follow-up phone calls and discussions.

In determining the total number of hours it devoted to litigating this Action, Lead Counsel has carefully reviewed its time records, exercising "billing judgment" and making a "good faith effort to exclude . . . hours that are excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S. Ct. 1933, 1939-40 (1983).  *See* Harrod Decl. ¶¶ 109-115.

Also relevant to the reasonableness of the fee request is the fact that Lead Counsel is "highly experienced in prosecuting securities law claims and shareholder class actions." *In re Telik*, 576 F. Supp. 2d at 588.  This experience allowed Lead Counsel "to perform the various tasks necessary to advance Plaintiffs' and the Class's interests in a more efficient manner than would have counsel with a lesser degree of specialization in this field." *Id.* at 588-89; *see also Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01 CV 11814 (MP), 2004 WL 1087261, at *6 (S.D.N.Y. May 14, 2004) ("The skill and prior experience of Plaintiffs' Counsel are also relevant in determining fair compensation.").  Exhibit C to the Harrod Declaration attaches a firm resume that describes the firm's experience in litigating securities and shareholder class actions.

### B.      Lead Counsel's Hourly Rates Are Reasonable

Counsel's rates are the rates "prevailing in the community for similar services of lawyers of reasonably comparable skill, experience and reputation." *Cruz v. Local Union No. 3 of the IBEW*, 34 F.3d 1148, 1159 (2d Cir. 1994) (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11, 104 S. Ct. 1541, 1547 n.11 (1984)).  The relevant "community" here is the Southern District of New York.  *See Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997) ("It is well established that the 'prevailing community' the district court should consider to determine the 'lodestar' figure is 'the district in which the court sits.'") (quoting *Polk v. New York State Dep't of Correctional Services*, 722 F.2d 23, 25 (2d Cir. 1983)).  Counsel's rates are "the rate a paying client would be willing to pay." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 190 (2d Cir. 2008); *see also Goldberger*, 209 F.3d at 52 (instructing courts to consider "whether a fully informed group of plaintiffs able to negotiate collectively" would pay the rates).

The hourly billing rates of Wolf Popper range from $580 to $810 for partners, and from $475 to $495 for associates and counsel.[4]   *See* Harrod Decl. ¶ 113.   Similar or higher billing rates have been approved by other courts in this Circuit.   *See In re Lehman Bros. Mortgage-Backed Sec. Litig.*, No. 08-CV-6762 (S.D.N.Y. June 21, 2012) (Kaplan, J.), Order on Plaintiffs' Counsel's Application for an Award of Attorneys' Fees and Reimbursement of Expenses [ECF No. 197] (approving fee award based on Wolf Popper's customary hourly rates) (annexed as Exhibit B to the Harrod Decl.); *see also In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*, 909 F. Supp. 2d 259, 271-72 (S.D.N.Y. 2012) (approving fee award based on hourly rates ranging from $275 to $700 for associates and $725 to $975 for partners, as set forth in ECF No. 302-5 in Case No. 1:08-md-01963-RWS); *In re Merrill Lynch & Co. Inc., Research Reports Sec. Litig.*, No. 02 MDL 1484(JFK), 2007 WL 313474, at *22 (S.D.N.Y. Feb. 1, 2007) (approving billing rates up to $850 per hour).

### C.    Lead Counsel's Requested Negative Lodestar Multiplier is Reasonable

Once counsel's lodestar is calculated, "a multiplier is [then] typically applied."   *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 468 (S.D.N.Y. 2004) (citing *Goldberger*, 209 F.3d at 50).   The multiplier represents the "litigation risk, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors."   *Id*. at 466 (citing *Goldberger*, 209 F.3d at 47).   In complex contingent litigation, lodestar multipliers between 2 and 5 are commonly awarded.   *See Wal-Mart Stores*, 396 F.3d at 123 (upholding multiplier of 3.5 as reasonable on appeal); *Telik*, 576 F. Supp. 2d at 590 ("In contingent

---

[4]      Courts have repeatedly endorsed the use of current hourly rates to account for the delay in receiving payment, inflationary losses, and the loss of access to legal and monetary capital that could otherwise have been employed had class counsel been paid on a current basis during the pendency of the litigation.   *See Missouri v. Jenkins*, 491 U.S. 274, 284, 109 S. Ct. 2463, 2469 (1989) (using current rates constitutes "an appropriate adjustment for delay in payment"); *Gierlinger v. Gleason*, 160 F.3d 858, 882 (2d Cir. 1998) (rates "should be current rather than historic").   Former employees' hours are billed at the rate they charged when they left the firm.

litigation, lodestar multiples of over 4 are routinely awarded by courts, including this Court."); *In re Bisys Sec. Litig.*, No. 04 Civ. 3840(JSR), 2007 WL 2049726, at *3 (S.D.N.Y. July 16, 2007) (awarding 30% fee representing a 2.99 multiplier and finding that the multiplier "falls well within the parameters set in this district and elsewhere").

Here, Lead Counsel is not only seeking *no* multiplier to its lodestar, its requested fee represents a reduction of 18% of its lodestar. As set forth in the Harrod Declaration, Lead Counsel expended 6,857.80 hours for a total lodestar of $3,883,850 in the litigation of this case. The lodestar "multiplier" – the requested fee amount of $3,190,000 divided by the lodestar is **negative**. *In re Bear Stearns Co. Inc. Sec., Deriv. & ERISA Litig.*, 909 F. Supp. 2d 259, 271 (S.D.N.Y. 2012) (*citing In re Blech Sec. Litig.*, No. 94 Civ. 7696(RWS), 2002 WL 31720381, at *1 (S.D.N.Y. Dec. 4, 2002)) (a lodestar that results in a negative multiplier is "a strong indication of the reasonableness of the proposed fee.").

## III.   The Requested Fee Is Also Reasonable under the Percentage Method

Lead Counsel's requested fee is 29% of the settlement fund, which is well within the range of percentages typically awarded in this district for settlements of similar size. *See, e.g., In re Winstar Commc'ns Sec. Litig.,* No. 01 Civ. 3014 (GBD) (S.D.N.Y. Nov. 13, 2013) (ECF No. 363) (awarding 33% of a $10 million settlement fund) (Harrod Decl. Ex. D); *Hayes v. Harmony Gold Min. Co., Ltd.*, 509 F. App'x 21, 23-24 (2d Cir. 2013) (affirming approval of a 33% fee award in a $9 million settlement fund); *In re IMAX Sec. Litig.*, No. 06 Civ. 6128 (NRB), 2012 WL 3133476, at *11 (S.D.N.Y Aug. 1, 2012) (awarding 33% of a $12 million settlement fund); *Anwar v. Fairfield Greenwich Ltd.,* No. 09-CV-118 VM, 11-CV-813 VM, 2012 WL 1981505, at *3 (S.D.N.Y. Jun. 1, 2012) (awarding 33% of a $7.8 million settlement fund); *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695(CM), 2007 WL 4115808, at *1 (S.D.N.Y. Nov. 7, 2007)) (awarding 30% of a $5.5 million settlement fund and noting that "[t]he 30% fee

requested is well within the range of fees customarily sought by (and awarded to) experienced counsel in similar securities class actions").

## IV.    The *Goldberger* Factors Confirm That the Requested Fee Is Reasonable

In determining a reasonable attorneys' fee, district courts are guided by the factors first articulated by the Second Circuit in *Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).  As summarized more recently in *Goldberger*, and applied by this Court, these factors include:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50.  As set forth below, application of these criteria to the facts now before this Court shows that Lead Counsel's fee request is clearly reasonable and warranted.

### A.    The Time and Labor Expended by Counsel

As detailed in the Harrod Declaration, submitted herewith, and as discussed in Section II.A., *supra*, Lead Counsel has devoted substantial time and effort to the prosecution of the claims and to the settlement of the claims on terms favorable to the Class.

Lead Counsel's efforts began with a substantial investigation of the facts underlying the Class's claims, including a comprehensive review of publicly available information about the Certificates at issue and the underlying mortgage pools, and the preparation of two detailed complaints.  Harrod Decl. ¶¶ 26-33.  Lead Counsel also opposed the then-defendants' motion to dismiss, which required substantial briefing on a number of complex issues.  *Id*. ¶¶ 34-37. Thereafter, Lead Counsel litigated the class certification motion, which required retaining and working with experts for the Class, reviewing documents, deposing Defendant's expert and preparing for and defending the depositions of Lead Plaintiff's expert witness and Lead Plaintiff, and drafting memorandums and declarations in support of class certification.  *Id*. ¶¶ 48-60. Although Lead Plaintiff successfully defeated Defendant's arguments on class certification

before this Court, Lead Counsel was forced to continue litigating class certification pursuant to Defendant's Rule 23(f) petition for appellate review of the class certification order, including fully briefing the arguments on appeal before the Second Circuit. *Id*. ¶¶ 61-64.

Lead Counsel also conducted extensive fact discovery, which efforts were crucial to developing a strong record and, ultimately, to the Settlement achieved. As detailed in the Harrod Declaration, the parties heavily negotiated almost every aspect of discovery in this Action. Harrod Decl. ¶¶ 65-72. Ultimately, Lead Counsel obtained evidence from multiple sources and through different discovery procedures during both the class certification and merits phases of discovery. Overall, Lead Counsel prepared and propounded 37 document requests on Credit Suisse, and subpoenaed 36 non-parties for documents and testimony. Harrod Decl. ¶¶ 67-70. Lead Counsel also spent approximately eight months in difficult negotiations with the FDIC, as conservator for IndyMac, and OneWest Bank, as successor-in-interest to IndyMac, to obtain IndyMac's internal loan quality control reports ("PPQC Reports") and a statistically significant sample of loan files for its experts to re-underwrite. *Id*. ¶¶ 70-72. As a result of these efforts, Lead Counsel estimates that it obtained approximately 80,000 pages of documents (including pages of loan files and "native" electronic files) from Defendant and non-parties for analysis and to support the Class's claims. *Id*. ¶¶ 69, 71.

Lead Counsel also consulted extensively with experts in specialized areas, including in the areas of RMBS, statistics and economics. *Id*. ¶¶ 74-79. Finally, Lead Counsel engaged in settlement negotiations – including drafting mediation statements and holding in-person and phone meetings with Defendant – overseen by David Geronemus of JAMS in order to bring the Action to a successful resolution. *Id*. ¶¶ 80-82. As detailed in the Harrod Declaration, the discovery and pretrial process was far advanced at the time Lead Plaintiff reached an agreement

to resolve the litigation.  The significant amount of time and effort devoted to this case by Lead Counsel, and the efficient and effective management of the litigation, confirm that the fee request here is reasonable.

**B.     The Magnitude and Complexities of the Litigation**

The magnitude and complexity of this litigation also support the requested fee.  Courts have long recognized that securities class action litigation is "notably difficult and notoriously uncertain."  *In re Flag Telecom*, 2010 WL 4537550, at *15 (quoting *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999)).   This case raised novel and complex issues surrounding structured securities and the nationwide economic downturn.  *See, e.g.,* Harrod Decl. ¶¶ 37, 49, 56 and 88.

As discussed in the Harrod Declaration, the Action raised a number of complex questions that required extensive efforts by Lead Counsel and consultation with experts.  Thus, during the class certification phase of the case, Lead Counsel retained an economist who issued an expert report in support of class certification that detailed a financial analysis of the Offering, the interrelatedness of the tranches in the Offering and set out a methodology for calculating damages on a class-wide basis.  In the merits phase, Lead Counsel retained an expert in mortgage underwriting, who was re-underwriting a sample of loan files supporting the Offering, and a statistician who determined the composition of the sample and was preparing to analyze the data of the underlying mortgages and re-underwriting, in order to quantify the misstatements in the Offering Documents and prepare a damages report.  Lead Counsel also consulted with a due diligence expert to evaluate Credit Suisse's due diligence processes and its expected due diligence defense.  These experts all assisted Lead Counsel with the analysis of the various issues in the case.  Harrod Decl. ¶¶ 74-79.

10

Many of the arguments made in Defendant's motion to dismiss, opposition to class certification, and its Answer raised complex and novel legal issues, including issues of Article III standing, cognizable damages, rating agency liability under the Securities Act, the statute of limitations, knowledge, and due diligence defenses, among others.   Harrod Decl. ¶¶ 37-8, 49, 56, 59, 85-91 and 122.   The scope of these arguments was also indicative of the many complex issues that this litigation continued to present as it proceeded and of the zealous defense that Defendant's Counsel had mounted and would continue to pursue throughout the course of this litigation.

If the Action had not been settled, there would have been further fact discovery; expert discovery that would have been critical to the case, including on the issues of due diligence and damages; contested motions for summary judgment; *in limine* and *Daubert* motions; a trial that would require substantial factual and expert testimony; and inevitable appeals, including the appeal that was already pending at the time the Settlement was reached.   Accordingly, the magnitude and complexity of this litigation support the conclusion that the requested fee is reasonable and fair.

## C.    The Risks of the Litigation

"Courts of the Second Circuit have recognized the risk of litigation to be 'perhaps the foremost factor to be considered in determining' the award of appropriate attorneys' fees."   *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 139 (S.D.N.Y. 2008) (quoting *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 374 (S.D.N.Y. 2005)).   "It is well-established that [such] litigation risk must be measured as of when the case is filed."   *Goldberger*, 209 F.3d at 55.   In addition, "[c]ourts in the Second Circuit have recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award."   *In re Flag Telecom*, 2010 WL 4537550, at *27.   *See also Parker v. Time Warner Entm't*

11

Co., 631 F. Supp. 2d 242, 276 (E.D.N.Y. 2009) (courts should consider "the contingent nature of the expected compensation" and the "risk of non-payment viewed as of the time of the filing of the suit.").

While Lead Counsel believes that the claims of Lead Plaintiff and the Class have merit, it recognized that there were significant uncertainties and risks from the outset as to whether Lead Plaintiff would ultimately be able to prove liability and establish damages, as well as with respect to the amount of damages that Lead Plaintiff could establish.  As discussed in the Harrod Declaration and in Lead Plaintiff's Memorandum of Law in Support of Its Motion for Final Certification of the Settlement Class, Approval of the Proposed Settlement, and Approval of the Plan of Allocation, there were substantial risks here with respect to Lead Plaintiff's ability to sustain the action, continue to maintain it as a class action, and prove that Defendant had made material misstatements or omissions and to establish that the alleged misstatements, rather than other factors (such as the overall economic downturn, housing price declines or reduced liquidity in the market for mortgaged-backed securities), were the cause of the Class's losses.  Harrod Decl. ¶¶ 83-91 and 122.[5]

Moreover, resolution of many of the issues here at trial – including those related to liability based on re-underwriting of loan files and damages – necessarily would involve a "battle of the experts," with the concomitant risk that the jury could credit Defendant's experts over those of Lead Plaintiff.  *See Hicks*, 2005 WL 2757792, at *6 (reasoning that "a 'battle of the experts' . . . creates a significant obstacle to plaintiffs in establishing liability"); *In re Am. Bank*

---

[5]     These risks were enhanced in this Action because many of the legal and factual issues were issues of first impression, or for which there was little or no favorable authority, in the context of RMBS litigation.  *Id*. ¶¶ 37, 49 and 114.  While certain of these legal issues, such as Article III standing and rating agency liability, have been addressed by subsequent decisions in this and in other MBS cases, at the time the parties briefed the issues in this case, they had not been so-clarified.  These were thus risks inherent in the litigation.  *See Goldberger*, 209 F.3d at 55.

*Note Holographics*, 127 F. Supp. 2d 418 at 426-27 (S.D.N.Y. 2001) ("In such a battle, Plaintiffs' Counsel recognize the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount of Plaintiffs' losses.").  There is no guarantee that a jury would find the evidence compelling enough to warrant a verdict in favor of the Class and, in that case, the Class – and therefore counsel – would receive nothing.

In the face of these uncertainties, Lead Counsel undertook this case on a wholly contingent basis, knowing that the litigation could last for years and would require the devotion of a substantial amount of attorney time and a significant expenditure of litigation expenses with no guarantee of compensation.  Harrod Decl. ¶¶ 117-20.  *See In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999) (class counsel not only undertook risks of litigation, but advanced its own funds and financed the litigation).  Lead Counsel's assumption of this contingency fee risk strongly supports the reasonableness of the requested fee.  *See In re Flag Telecom*, 2010 WL 4537550, at *27 ("the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award"); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("There was significant risk of non-payment in this case, and Plaintiffs' Counsel should be rewarded for having borne and successfully overcome that risk.").

### D.    The Quality of Lead Counsel's Representation

The quality of the representation is another important factor that supports the reasonableness of the requested fee.  The quality of the representation here is best evidenced by the quality of the result achieved.  *See Goldberger*, 209 F.3d at 55; *Veeco*, 2007 WL 4115808, at *7; *In re Global Crossing*, 225 F.R.D. at 467.  The Settlement represents a favorable result for the Class in the face of difficult legal and factual circumstances and can be attributed to the diligence, determination, and hard work of Lead Counsel.  *See Veeco*, 2007 WL 4115808, at *7

("Plaintiffs' Counsel's 'skill and expertise' contribute to the favorable settlement for the class'"). Specifically, the Settlement provides an immediate cash benefit to the Class that is at the very top of the range of recoveries, in terms of percentage of damages recoveries, in comparable Securities Act class action on behalf of MBS investors.  *See* Harrod Decl. ¶ 122 n. 6.[6]

Lead Counsel also respectfully submits that the quality of its representation supports the reasonableness of the requested fee.  Lead Counsel has many years of experience in complex federal civil litigation, particularly the litigation of securities and other class actions.  *See* Harrod Decl. ¶ 111 and Exhibit C (firm resume).  The quality of opposing counsel is also important in evaluating the quality of Lead Counsel's work.  *See In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, 03 MDL 1529 (LMM), 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006)  ("The fact that the settlements were obtained from defendants represented by formidable opposing counsel from some of the best defense firms in the country also evidences the high quality of lead counsels' work.").  The skill, tenacity, experience and resources of Gibson, Dunn & Crutcher LLP, counsel for Credit Suisse, is well known.  These highly skilled attorneys zealously fought Lead Plaintiff's claims at every turn, but notwithstanding this formidable opposition, Lead Counsel was able to develop Lead Plaintiff's case so as to resolve the litigation on terms favorable to the Class.

---

[6]       As detailed further in the Harrod Declaration, Lead Plaintiff assumed, for purposes of settlement, that recoverable damages could range from approximately $138 million, assuming no negative causation, to near zero, assuming Defendant's position on negative causation.  Harrod Decl. ¶ 122.  The damage assumptions used by Lead Plaintiff in the Settlement negotiations also gave consideration to the fact that payments of principal to investors in the certificates sold in the Offering totaled over $290 million as of the time the Settlement was reached and that it was possible that such returns of principal would reduce the Class's damages.  *Id.* ¶ 85.  Thus, the Settlement represents a recovery of approximately 7.9% of the likely maximum damages estimated by Lead Plaintiff on the basis described.  Settlements in comparable MBS class actions are estimated to range from 8.1% to under 1% of damages using the same set of assumptions.  Harrod Decl. ¶ 122 n. 6.

**E.     The Requested Fee in Relation to the Settlement**

The fifth *Goldberger* factor, the relation of the fee to the settlement, also supports the requested attorneys' fee.  "When determining whether a fee request is reasonable in relation to a settlement amount, the court compares the fee application to fees awarded in similar securities class-action settlements of comparable value."  *In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825 (NGG)(RER), 2010 WL 2653354, at *3 (E.D.N.Y. June. 24, 2010).  As discussed in Sections II and III, *supra*, the requested fee here represents a negative multiplier to Lead Counsel's lodestar and is well within the percentage of settlement funds typically awarded in complex securities class action settlements.  Accordingly, the requested fee is reasonable in relation to the size of the Settlement.

**F.     Public Policy Considerations**

A strong public policy concern exists for rewarding firms for bringing successful securities litigation.  *See In re. Flag Telecom*, 2010 WL 4537550, at *29 (if the "important public policy [of enforcing the securities laws] is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook"); *Maley*, 186 F. Supp. 2d at 373 ("In considering an award of attorneys' fees, the public policy of vigorously enforcing the federal securities laws must be considered."); *Hicks*, 2005 WL 2757792, at *9 ("To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding.").  Accordingly, public policy favors granting Lead Counsel's fee and expense application here.

**G.     The Reaction of the Settlement Class to the Fee Request**

"The reaction of the Class," while not one of the formal *Goldberger* factors, "is entitled to great weight by the Court."  *Maley*, 186 F. Supp. 2d at 374; *see also Telik*, 576 F. Supp. 2d at

15

594 ("That only one objection to the fee request was received is powerful evidence that the requested fee is fair and reasonable."). While the deadline set by the Court for Class members to exclude themselves or object to the Settlement has not yet passed, to date, Lead Counsel has received no objections to the Settlement or Plan of Allocation and no requests for exclusion. After the objection deadline has passed, Lead Counsel will address the substance of objections, if any, in its reply papers.[7]

## V.      Lead Counsel's Request for Reimbursement of Expenses Should Be Granted

Lead Counsel respectfully seeks reimbursement in the amount of $3,190,000 for litigation expenses reasonably incurred in connection with prosecuting the claims against Defendant. Lead Counsel has submitted a chart showing an itemized breakdown of its expenses. Harrod Decl. ¶ 113.[8] It is well-established that such expenses are properly recovered by counsel. *See, e.g., In re Am. Int'l Grp. Sec. Litig.*, No. 04 Civ. 8141 (DAB), 2012 WL 345509, at *6 (S.D.N.Y. Feb. 2, 2012) ("Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were incidental and necessary to the representation of those clients.").

The expenses for which Lead Counsel seeks reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. Included in the amount of expenses is $317,096.25 paid or payable to Lead Plaintiff's experts and consultants. This encompasses over 81% of Lead Counsel's total expenses. As detailed in the Harrod Declaration, Lead Counsel worked extensively with experts and consultants at different

---

[7]      The deadline for requesting exclusion from the Class is January 6, 2014 and the deadline for submitting written objections is January 13, 2014. As provided in the Notice Order, Lead Plaintiff will file reply papers no later than January 20, 2014 addressing any objections and requests for exclusion that may be received.

[8]      Lead Counsel will bring to the Settlement Hearing the back-up documents evidencing its expenses should the Court want to review them.

stages of this litigation.  Experts were utilized to analyze documents, draft the mediation brief, prepare for mediation, assess the potential value and risks of the case and prepare for trial. Experts were retained in the complex and specialized areas of residential mortgage loan underwriting, due diligence, the mortgage-backed securities industry, statistical sampling, and securities law damages.  Harrod Decl. ¶¶ 74-79.

Without the tremendous work conducted by Lead Plaintiff's experts and consultants, there is a good chance that Lead Plaintiff would not have succeeded in achieving a settlement of this magnitude.  *See In re Canadian Superior Sec. Litig.*, No. 09 Civ. 10087 (SAS), 2011 WL 5830110 at *3 (S.D.N.Y. Nov. 16, 2011) (approving expenses and noting that the expenses, "particularly those attributable to professional services, were a contributing factor to achieving the settlement").

Moreover, the Notice advised Class members that Lead Counsel would seek reimbursement of expenses of up to $500,000.  Harrod Decl. ¶ 108.  To date, there has been no objection to reimbursing that amount and, in fact, Lead Counsel is requesting a lesser amount.

## CONCLUSION

For the foregoing reasons, Lead Counsel respectfully requests that the Court award attorneys' fees of $3,190,000 from the Settlement Fund and reimburse Lead Counsel's reasonable litigation expenses incurred in connection with the prosecution of this Action in the amount of $390,931.26, plus interest.

Dated: New York, New York
       December 20, 2013

                    **WOLF POPPER LLP**

                    ____/s/  James A. Harrod_____
                    Lester L. Levy
                    James A. Harrod
                    Robert S. Plosky
                    845 Third Avenue, NY 10022
                    Tel:    (212) 759-4600
                    Fax:    (212) 486-2093
                    llevy@wolfpopper.com
                    jharrod@wolfpopper.com
                    rplosky@wolfpopper.com

                    ***Lead Counsel for Lead Plaintiff***
                    ***Vaszurele Ltd.***